## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR : | Case No. _____ |
| THE SUBSTANTIVELY CONSOLIDATED : | |
| ESTATE OF MICHAEL S. GOLDBERG, LLC : | |
| AND MICHAEL S. GOLDBERG : | |
| : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| SCOTT A. LABONTE; SALLY A. LABONTE; : | |
| SCOTT A. LABONTE, TRUSTEE OF THE : | |
| SCOTT A. LABONTE REVOCABLE TRUST; : | |
| SALLY A. LABONTE, TRUSTEE OF THE : | |
| SCOTT A. LABONTE REVOCABLE TRUST; : | |
| SALLY A. LABONTE, TRUSTEE OF THE : | |
| SCOTT A. LABONTE DYNASTY TRUST; : | |
| ROLAND G. LABONTE; ROLAND G. : | |
| LABONTE, TRUSTEE OF THE SCOTT A. : | |
| LABONTE DYNASTY TRUST; ROLAND G. : | |
| LABONTE, TRUSTEE OF THE ROLAND G. : | |
| LABONTE REVOCABLE TRUST; MARILYN P. : | |
| LABONTE; MARILYN P. LABONTE, TRUSTEE : | Jury Trial Demanded |
| OF THE MARILYN P. LABONTE 2015 : | |
| REVOCABLE TRUST; MARILYN P. LABONTE : | |
| TRUSTEE OF THE MARILYN P. LABONTE : | |
| REVOCABLE TRUST; JOSEPH W. SPARVERI, : | |
| JR.; JOSEPH W. SPARVERI, JR., TRUSTEE OF : | |
| THE SCOTT A. LABONTE DYNASTY : | |
| TRUST; LAWRENCE J. MARKS; : | |
| JULIANO & MARKS, LLC; : | |
| PAUL L. BOURDEAU; : | |
| and ROBERT A. LANDINO : | |
| : | |
| Defendants. : | |
| | |

## <u>COMPLAINT</u>

The Plaintiff, James Berman, Chapter 7 Trustee (the "Goldberg Trustee") for the

substantively consolidated bankruptcy estates of the debtors, Michael S. Goldberg, LLC, d/b/a

1

Acquisitions Unlimited Group (the "Debtor LLC"), and Michael S. Goldberg ("Goldberg") (collectively, referred to hereinafter as the "Goldberg Debtors"), as and for his complaint against Scott A. LaBonte, individually and in his capacity as trustee of the Scott A. LaBonte Revocable Trust (the "SAL Rev. Trust"), Sally A. LaBonte, individually and in her capacity as trustee of the SAL Rev. Trust and the Scott A. LaBonte Dynasty Trust (the "SALDT"), Roland G. LaBonte, individually and in his capacity as trustee of the SALDT and the Roland G. LaBonte Revocable Trust (the "RGL Rev. Trust"), Marilyn P. LaBonte, individually and in her capacity as trustee of the Marilyn P. LaBonte 2015 Revocable Trust (the "MPL 2015 Rev. Trust") and the Marilyn P. LaBonte Revocable Trust (the "MPL Rev. Trust"), Joseph W. Sparveri, Jr., CPA individually and in his capacity as trustee of the SALDT, Lawrence J. Marks, Esq., the law firm Juliano & Marks, LLC, Paul L. Bourdeau, Esq., and Robert A. Landino, respectfully alleges as follows:

## I.   INTRODUCTION

1.      The Goldberg Trustee brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") to remedy the substantial harm Defendants, as defined herein, have caused to the hundreds of victims of the Goldberg Debtors' Ponzi scheme ("Goldberg Victims").

2.      Scott A. LaBonte was an investor in and feeder to the pure Ponzi Scheme run by the Goldberg Debtors (the "Goldberg Scheme"). SAL knew that the Goldberg Scheme was a fraud, but he saw it as an opportunity to make a quick and substantial profit. That is exactly what he did.

3.      The Goldberg Scheme collapsed in late 2009. Soon thereafter, the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") appointed the Goldberg Trustee, who commenced an action against SAL's cousin, Edward Malley ("E. Malley"), to avoid and recover more than $14 million in transfers that he had received from the Goldberg Scheme.

SAL invested in the Goldberg Scheme through E. Malley and he knew that the Goldberg Trustee would also sue him to recover the millions in Goldberg Scheme related transfers that he had received.

4.      Within weeks from when the Goldberg Trustee commenced litigation against E. Malley, SAL, certain members of SAL's family and certain professionals who had been performing services for SAL and his family for decades commenced what has become nearly a decade long joint effort that remains ongoing to (i) impede and obstruct the Goldberg Trustee from recovering the Goldberg Scheme transfers from SAL and (ii) preserve SAL's assets.

5.      After nearly a decade of serial fraudulent obstruction and the commission of numerous predicate acts, including obstruction of justice, money laundering, fraudulent transfers and concealments, bankruptcy fraud, mail fraud, and wire fraud the association-in-fact enterprise that began on June 2, 2010, (hereinafter the "Enterprise to Obstruct the Goldberg Trustee") has prevented the Goldberg Trustee from collecting the judgment entered in his favor against SAL (the "SAL Judgment"), dated September 27, 2017, which now exceeds $8,707,575.86.  Left with no alternative, the Goldberg Trustee now seeks to hold the Defendants accountable for their wrongful acts and the injuries that they caused to the Goldberg Trustee, as the court-appointed fiduciary charged with the duty of maximizing the Goldberg Victims' recovery.

6.      As a result of the conduct detailed herein, the Goldberg Trustee is entitled to recover tens of millions of dollars under the RICO Act from the Defendants, each of whom knowingly and intentionally helped SAL to impede and obstruct the Goldberg Trustee by fraudulently transferring SAL's assets beyond his reach and enabling SAL to personally retain the benefit of the assets that he fraudulently transferred, all to the detriment of the Goldberg Victims.

7.      The Defendants' pattern of racketeering activity has deprived the Goldberg Victims of any meaningful recovery on the multi-million-dollar SAL Judgment and proximately caused the Goldberg Debtors' estate to incur millions of dollars in professional fees and expenses attempting to enforce what became the SAL Judgment.

8.      The Defendants' misconduct perseverates to this very day.  After pursuing for nearly a decade the serial fraudulent transfers made and enabled by the Defendants, which stripped all value from otherwise viable business interests, rendering them hollow shells, this RICO action is the Goldberg Trustee's only remaining viable avenue to satisfy the SAL Judgment and compensate the Goldberg Victims for the damages that the Defendants have caused.

## II.      JURISDICTION & VENUE

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because many of the events and much of the conduct giving rise to the Goldberg Trustee's claims occurred in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a), because the Defendants transact affairs in this District, and pursuant to 18 U.S.C. § 1409(a), because the Goldberg Trustee's claims are related to a case under title 11.

## III.      THE PARTIES

### A.  The Goldberg Trustee

9.      On November 18, 2009, (the "Petition Date"), certain petitioning creditors filed involuntary petitions for relief under Chapter 7 of the Bankruptcy Code against the Goldberg Debtors.

10.      On November 24, 2009, the Bankruptcy Court, the Hon. Albert J. Dabrowski (Ret.) (hereinafter "Judge Dabrowski") entered the Order for Relief in the Goldberg Debtors' cases.

11.     By Orders dated January 11, 2010, Judge Dabrowski confirmed the election of James Berman as the Chapter 7 Trustee in both cases.

12.     On May 19, 2011, the United States District Court for the District of Connecticut, the Hon. Robert N. Chatigny (hereinafter "Judge Chatigny"), entered an order titled: Order Appointing Receiver (the "Receivership Order"), which appointed James Berman as Receiver for restitution in *United States of America v. Michael S. Goldberg*, Crim. Pro. No. 3:10-cr-192 (RNC) (the "Criminal Case"), the criminal matter arising out of the Goldberg Scheme (as defined below).

13.     In accordance with the Receivership Order, on June 16, 2011, Judge Dabrowski entered an order approving James Berman as Receiver due to, *inter alia*, the "substantial if not virtual identity between the creditors [of the Goldberg Debtors' bankruptcy estate] and the victims of the Goldberg Ponzi Scheme."

14.     On October 5, 2012, Judge Dabrowski entered an order substantively consolidating the Goldberg Debtors' bankruptcy estates.

15.     The Goldberg Trustee has the statutory authority to bring this action pursuant to, *inter alia*, 11 U.S.C. § 323(a) and (b).

**B.  The Defendants**

14.     SAL is an individual who, upon information and belief, resides at 106 Carnegie Harbor Drive, Portsmouth, Rhode Island.  SAL is a trustee of the SAL Rev. Trust.  SAL is sued herein personally and in his capacity as a trustee of the SAL Rev. Trust.

15.     Sally A. LaBonte ("Sally LaBonte") is an individual who, upon information and belief, resides at 106 Carnegie Harbor Drive, Portsmouth, Rhode Island.  Sally LaBonte is SAL's wife and is a trustee of the SAL Rev. Trust and a trustee of the SALDT.  Sally LaBonte is sued

herein personally as well as in her capacity as a trustee of the i) SAL Rev. Trust (hereinafter "Sally LaBonte Rev. Trustee") and ii) SALDT (hereinafter "Sally LaBonte Dynasty Trustee").

16.     Roland G. LaBonte ("Roland LaBonte") is an individual who resides at 195 Regatta Dr., Jupiter, Florida.  Roland LaBonte is Marilyn LaBonte's husband, SAL's father, a trustee of the SALDT, and the settlor and a trustee of the RGL Rev. Trust.  Roland LaBonte is sued herein personally as well as in his capacity as trustee of the i) SLDT (hereinafter "Roland LaBonte Dynasty Trustee") and ii) RGL Rev. Trust (hereinafter "Roland RGL Rev. Trustee").

17.     Marilyn P. LaBonte ("Marilyn LaBonte") is an individual who resides at 195 Regatta Dr., Jupiter, Florida. Marilyn LaBonte is SAL's mother, Roland LaBonte's wife, and the settlor and a trustee of the MPL 2015 Rev. Trust and the MPL Rev. Trust.  Marilyn LaBonte is sued herein personally, in her capacity as trustee of the MPL 2015 Rev. Trust (hereinafter "Marilyn MPL 2015 Rev. Trustee") and in her capacity as trustee of the MPL Rev. Trust ("Marilyn MPL Rev. Trustee" and jointly with SAL, SAL Rev. Trustee, Sally LaBonte, Sally LaBonte Rev. Trustee, Sally LaBonte Dynasty Trustee, Roland LaBonte, Roland LaBonte Dynasty Trustee, Roland-RGL Rev. Trustee, Marilyn LaBonte and Marilyn MPL 2015 Rev. Trustee, the "LaBonte Family").

18.     Joseph W. Sparveri, Jr. ("J. Sparveri, CPA") is an individual who resides at 507 Main Street, Old Saybrook, Connecticut.  J. Sparveri, CPA is the decades-long accountant to the LaBonte Family and to certain entities that they dominate and control.  J. Sparveri, CPA is currently and has been since 2012, a partner of CohnReznick, LLP.  Previously, J. Sparveri, CPA was employed by JH Cohn LLP, a CohnReznick, LLP predecessor, and Kostin, Ruffkess & Company LLC, a JH Cohn LLP predecessor.  Until October 2013, J. Sparveri, CPA served as the

non-insider trustee of the SALDT ("J. Sparveri Dynasty Trustee").  J. Sparveri, CPA is sued herein personally and in his capacity as a trustee of the SALDT.

19.     Lawrence W. Marks, Esq. ("L. Marks, Esq.") is an individual domiciled in the state of Connecticut and an attorney with the law firm Juliano & Marks, LLC ("J&M").  L. Marks, Esq. maintains a license to practice law in the state of Connecticut.  L. Marks, Esq. has, for a number of years, provided legal services to the LaBonte Family and entities they dominate and control.

20.     J&M is a limited liability company organized under the laws of the state of Connecticut with its principle place of business in West Hartford, Connecticut.  J&M is a law firm of which L. Marks, Esq. is a member.

21.     Paul L. Bourdeau, Esq. ("P. Bourdeau, Esq." and along with J. Sparveri, CPA, L. Marks, Esq., and J&M, collectively referred to herein as the "Professionals") is an individual domiciled in the state of Connecticut. P. Bourdeau, Esq. is a principal with the law firm of Cummings & Lockwood, LLC ("C&L") and has been practicing law for 38 years.  He currently practices out of C&L's West Hartford, Connecticut office.  P. Bourdeau, Esq. has, for many years, provided legal services to the LaBonte Family. P. Bourdeau, Esq. regularly advises three generations of the LaBonte Family on matters related to various LaBonte Family trusts that he helped establish with his high school classmate and personal and professional friend and associate, J. Sparveri, CPA.  P. Bourdeau, Esq. and J. Sparveri, CPA, who have known each other for decades, helped create and oversee, among others, the LaBonte Family Dynasty Trust (the "LFDT," which was settled by Roland LaBonte), the SALDT, and the MPL 2015 Rev. Trust, in addition to many other trusts established for other investors SAL introduced to the Goldberg Scheme.

22.     SAL was a referral source for high-net worth individuals to both J. Sparveri, CPA and P. Bourdeau, Esq.  SAL introduced both of them to former professional baseball player Carl Pavano ("Mr. Pavano") in December 2006, two years after Mr. Pavano had signed a four-year, $40 million contract with the New York Yankees.  Mr. Pavano retained both J. Sparveri, CPA and P. Bourdeau, Esq. to provide professional services.  Upon information and belief, SAL also introduced both J. Sparveri, CPA and P. Bourdeau, Esq. to Richard Polidori ("Mr. Polidori"), a successful Connecticut businessman. Mr. Polidori retained both J. Sparveri, CPA and P. Bourdeau, Esq. to provide professional services.  Both Mr. Pavano and Mr. Polidori were investors in multiple LaBonte family owned and controlled real estate entities.

23.     SAL was a supporter of UConn athletics and brought former UConn athletes who went on to play professional sports into certain of his investments, including the Goldberg Scheme (Alfred Fincher) and a LaBonte Family owned and controlled real estate entity (Dan Orlovsky). Upon information and belief, both J. Sparveri, CPA and P. Bourdeau, Esq. were aware of SAL's relationships and motivated to develop their own professional relationships with those same individuals, as well as to introduce SAL to potential investors for his and his family's real estate business.

24.     Robert A. Landino ("R. Landino, and with all other defendants collectively "Defendants") is an individual domiciled in the state of Connecticut.  R. Landino owns and operates a real estate development company. During the period 2006-2013, R. Landino partnered with SAL on a number of real estate development joint ventures, as further described below.

## IV.    Facts Common to All Counts

### A.    The Goldberg Scheme and SAL's Investments

25.    Beginning in 1997 and continuing until 2009, the Goldberg Debtors ran a pure Ponzi scheme (the "Goldberg Scheme"), which remains one of the largest known Ponzi schemes ever perpetrated in Connecticut.

26.    The Goldberg Scheme did not involve any legitimate business or investment activity by the Goldberg Debtors.  Instead, "the only revenues derived in connection with [the Goldberg Debtors'] ventures were the moneys the Debtors collected from a succession of new investors, whose money was then used to repay the earlier investors their original investment and guaranteed profits." May 11, 2015, Amended Proposed Findings of Fact and Conclusions of Law (*Dabrowski, J.*), *Berman, Chapter 7 Trustee v. Edward Malley, et al.,* Adv. Pro. No. 10-2082 (hereinafter "Judge Dabrowski Findings") at pp. 4-5, adopted in all material respects by the District Court's September 27, 2017, Order RE Proposed Findings (*Thompson, J.*) *Berman, Chapter 7 Trustee v. Edward Malley, et al.,* Civ. No. 3:15-cv-1682 (AWT) (hereinafter "Judge Thompson Findings").

27.    Between the early 2000s and 2007, investment activity in the Goldberg Scheme increased significantly as a result of "feeders" who enjoyed significant financial rewards for luring additional investors to the scheme. "In some instances, Goldberg compensated these 'feeders' through payment of a 'finder's fee.'  In other instances, Goldberg paid nothing and a loan fee was charged by the 'feeder' which was taken out of the third party's funds before the balance was paid over to Goldberg for his use." *Judge Dabrowski Findings*, pp. 16-17.

28.    Ultimately, feeders caused the scope of the Goldberg Scheme to increase dramatically from 2007 to 2009. It involved transactions exceeding $100 million and caused losses

to the Goldberg Victims amounting to $30 million.  There are hundreds of Goldberg Victims who are entitled to receive distributions from the Goldberg Debtors' bankruptcy estate.

29.     One such feeder was E. Malley, SAL's cousin, who began investing his own money in the Goldberg Scheme in April 2005. Over time, E. Malley stopped risking his own money and began feeding money entrusted to him by third-parties into the Goldberg Scheme in order to profit from others' investments.  In total, E. Malley, individually and as a feeder to third-party investors, received approximately $14 million from the Goldberg Debtors.

30.     Of the approximately forty-seven individuals who paid money to E. Malley for investment in the Goldberg Scheme, the largest investments came from SAL, E. Malley's "close" friend and cousin.  *Judge Dabrowski Findings*, p. 28.

31.     Beginning on or about January 16, 2006, and continuing until October 11, 2007, SAL invested money in the Goldberg Scheme through a series of six promissory notes issued by E. Malley (the "Malley/SAL Notes").  *Judge Dabrowski Findings* at p. 29.  Five of the six Malley/SAL Notes contained explicit instructions that the funds "could only be utilized for an investment in [Debtor LLC] for business or investment activities." *Judge Dabrowski Findings at p. 29.*  The only Malley/SAL Note that did not include that express requirement was the first note, which was also by far the lowest in terms of dollar amount.

32.     "Because [SAL] knew the Goldberg Scheme was a fraud, he structured his own investments in the Goldberg Scheme… as loans memorialized by" the Malley/SAL Notes. September 30, 2018, <u>Ruling on Motion to Compel and Motions to Quash Subpoenas</u> (*Thompson, J.*) issued in *Berman, Chapter 7 Trustee v. Sally A. LaBonte, et al.,* Civ. No. 3:15-cv-01687 (AWT) (hereinafter "*Crime-Fraud Order*") at p. 2.  SAL utilized the Malley/SAL Notes in an effort to insulate himself "from any liability and loss if the questionable investment with Goldberg went

sour." *Judge Dabrowski Findings at* p. 69.  At the same time, SAL touted his relationship with Goldberg, and boasted in a professional biography from 2008 that he was a "partner in [Goldberg's] investment firm."

33.     The Malley/SAL Notes carried usurious annual interest rates of between 25% and 40%.  In many instances the Malley/SAL Notes included a mandatory 20% "loan fee" payable to SAL upon execution of the note.

34.     Counsel for SAL drafted the Malley/SAL Notes.  *Judge Dabrowski Findings* at p. 29.  "[A]lthough all of the notes continued to be executed in Connecticut, [SAL] chose upon the advice of his attorney to have the notes governed and construed under Nevada law so as to avoid violating Connecticut usury laws." *Judge Dabrowski Findings* at p. 30; see also *Crime-Fraud Order* at pp. 2-3.  In the *Crime-Fraud Order*, Judge Thompson "conclude[d] that there is probable cause to believe that fraud has been committed by [SAL]… [and] [t]here is probable cause to believe that [SAL] made the [Dynasty Trust Transfers, as defined herein] with actual intent to hinder, delay, or defraud the Trustee." *Crime-Fraud Order* at p. 11.  Judge Thompson also determined that there is "probable cause to believe that the documents and communications at issue here [between certain of the Defendants] were in furtherance of a transfer of assets made by [SAL] with actual fraudulent intent." *Crime-Fraud Order* at 15.

35.      J. Sparveri, CPA has been providing accounting, auditing, investment and other advice and services to SAL, Roland LaBonte other members of the LaBonte family and entities that they own and control for more than thirty-five years.

36.      J. Sparveri, CPA holds, or at the very least held, a securities industry Series 7 General Securities Representative license and from 2001 through 2013 was registered with LPL Financial as a securities broker.

37.     In connection with SAL's investments in the Goldberg Scheme, J. Sparveri, CPA reviewed the Malley/SAL Notes and was concerned that their interest rates would violate Connecticut usury law.  Among others, J. Sparveri, CPA advised SAL on the use of Nevada law in the Malley/SAL Notes, concluding that SAL had nothing to lose by utilizing Nevada law.

38.     J. Sparveri, CPA calculated the interest due on the Malley/SAL Notes.  He did so on a compound basis, charging E. Malley interest on interest, which exacerbated the already usurious interest rates SAL received.

39.     SAL only made three Goldberg Scheme investments with his own money, as he too became a feeder by packaging investments into the Goldberg Scheme from others by way of the Malley/SAL Notes. *Judge Dabrowski Findings* at p. 31.

40.     SAL sourced a significant portion of the funds invested in the Goldberg Scheme through the Malley/SAL Notes from third-party "sub-investors," including Roland LaBonte, Chad LaBonte (SAL's brother), Mr. Pavano, Mr. Polidori, Alfred Fincher (Fincher), and Scott Custer (collectively, the "SAL Sub-Investors").  SAL utilized the SAL Sub-Investors' funds because "borrowing money from third parties made it a lower risk investment for him." *Judge Dabrowski Findings at* p. 31.

41.     In exchange for the SAL Sub-Investors' funds, SAL issued promissory notes that mirrored the Malley/SAL Notes, including provisions that required all funds collected from the SAL Sub-Investors to be invested with the Debtor LLC and providing that Nevada law applied. *Judge Dabrowski Findings* at pp. 33-34.

42.     Sally LaBonte knew, as of 2006, that SAL was investing money with Goldberg via E. Malley.

43.     SAL's efforts as a feeder "magnified and spread the harm to the creditor-victims of the Estate by furthering and enlarging the Goldberg Scheme." *Crime-Fraud Order*, p. 2. "By adding to the pot in placing other peoples' money with the Debtors, [SAL] and [E.] Malley were both extending the ability of the Debtors to keep the Ponzi scheme going and at the same time increasing the likelihood that their own investments would be repaid." *Judge Dabrowski Findings at* p. 71. Indeed, "[SAL] knowingly participated in an enterprise he knew was a fraud." *Judge Thompson Findings* at p. 5.

44.     SAL was a "net winner" in the Goldberg Scheme because he "received a full return" of his original investment in addition to significant, unearned profits.  In total, between January 15, 2008, and May 20, 2009, SAL received $7,241,797.52 in transfers from the Goldberg Debtors through E. Malley, who SAL continued to use as an intermediary in order to create the false appearance of separation between himself and the Goldberg Scheme. Of course, SAL's windfall came at the expense of the Goldberg Victims, "whose own investments were either not repaid at all or only repaid in part." *Judge Dabrowski Findings*, p. 5.

45.     Ultimately, a large group of investors who the Goldberg Debtors never paid sued Goldberg and froze his assets.  Shortly thereafter, in November 2009, Goldberg voluntarily turned himself in to the FBI and began cooperating with authorities to unwind the Goldberg Scheme. Goldberg entered a plea of guilty to federal wire fraud charges in September of 2010.

46.     On May 16, 2011, Judge Chatigny sentenced Goldberg to a term of imprisonment of 120 months and ordered restitution in the amount of $31,023,035.40 (the "Restitution Order").

47.     Creditors also filed involuntary bankruptcy petitions against Goldberg and the Debtor LLC in November 2009, after which the Goldberg Debtors consented to the entry of Orders for Relief.

48.     Following the initial Meeting of Creditors and an election, by orders dated January 11, 2010, the Court confirmed James Berman as Chapter 7 Trustee in both involuntary bankruptcy cases, which the Court later substantively consolidated.

49.     Since that time, the Goldberg Trustee has undertaken significant efforts to identify and collect assets that could compensate the Goldberg Victims, including commencing approximately 200 clawback actions ("adversary proceedings") designed to recover Goldberg Scheme payments made to "net winners," such as SAL.  The Goldberg Trustee equitably distributed the net-proceeds from these adversary proceedings to the Goldberg Victims.

50.     The first adversary proceeding that the Goldberg Trustee commenced, which was by far the largest in terms of both the monetary relief sought and the number of defendants, was *James Berman, Chapter 7 Trustee v. Edward Malley, et al.,* Adv. Pro. No. 10-2082 (the "Malley-LaBonte Action").  The overwhelming number of defendants in other adversary proceedings settled with the Goldberg Trustee in the face of overwhelming evidence.

51.     The Malley-LaBonte Action claims against E. Malley, SAL, and several others were tried to Judge Dabrowski over five days in June 2011.

52.     On September 27, 2017, following Judge Thompson's review and rejection of SAL's objections to *Judge Dabrowski's Findings*, the Goldberg Trustee obtained a judgment (the "September 2017 Judgment"), which included, *inter alia*, the SAL Judgment in the amount of $7,241,797.52 plus 3.25% interest accruing from November 12, 2010 (plus post-judgment interest accruing at 1.31% pursuant to 28 U.S.C. § 1961).  SAL owes the Goldberg Trustee no less than $ $8,707,575.86 on the SAL Judgment, and interest continues to accrue at $318.20 per diem.

53.     The September 2017 Judgment also included a judgment against E. Malley in the amount of $14,237,720.77 plus prejudgment interest accruing at 3.25% from November 12, 2010

and post-judgment interest accruing at 1.31%.  E. Malley presently owes the Goldberg Trustee $15,799,908.26 on the September 2017 Judgment.

54.     As part of the June 2011 trial of the Malley-LaBonte Action, Judge Dabrowski also entered an Order, which Judge Thompson affirmed over SAL's objection, providing the harshest sanction short of default for spoliation of evidence: adverse inferences against SAL because he intentionally destroyed all of his Goldberg Scheme related emails and he continued to do so after he received a litigation hold demand from the Goldberg Trustee and, most egregiously, even after the Goldberg Trustee sued him.

55.     Judge Dabrowski characterized SAL's conduct as "cavalier … in deleting the e-mails, even up to the date of the Trial [in the Malley-LaBonte Action] [that] is both egregious and reflective of his gross negligence, likely rising to the level of bad faith."  March 31, 2015, Memorandum and Order Granting Motion for Adverse Inference on Account of Spoliation (*Dabrowski, J.*), at pp. 7-8 (hereinafter "Judge Dabrowski Adverse Inference Order").

56.     Judge Dabrowski sanctioned SAL for willfully destroying evidence, drawing the following Adverse Inferences against him: (i) "that [SAL] knew or suspected that he had been participating in an illegitimate enterprise" and (ii) "that [SAL] knew or suspected that the transfers he received from the Debtors … were derived from an illegal or illegitimate business enterprise" (the "Adverse Inferences").  (Judge Dabrowski Adverse Inference Order, at 9).

**B.      The Illegal Conduct of the Enterprise to Obstruct the Goldberg Trustee's Primary Actors and Co-Conspirators**

57.     "[SAL] became aware of [the Malley-LaBonte Action], shortly after it was filed in May 2010, from a conversation he had with [E.] Malley." *Judge Dabrowski Findings at* p. 35. "When Malley told [SAL] that he had been sued by the [Goldberg] Trustee, [SAL] understood that the purpose of the [Goldberg] Trustee's lawsuit was to 'claw-back' for the benefit of creditor-

victims the money [E.] Malley had received from the Goldberg Scheme." *Crime-Fraud Order* at p .5.

58.     Upon learning that the Goldberg Trustee had sued E. Malley, SAL knew that the Goldberg Trustee would soon discover his involvement in the Goldberg Scheme, including the Malley/SAL Notes and his role as a feeder.

59.     In fact, after the Goldberg Scheme was publicly disclosed, J. Sparveri, CPA discussed with SAL the fact that Goldberg had been running a Ponzi scheme and J. Sparveri, CPA characterized SAL as "concerned."

60.     When SAL heard from his cousin E. Malley that the Goldberg Trustee had commenced a claw-back action against him, SAL reached out to his father, Roland LaBonte, J. Sparveri, CPA and P. Bourdeau, Esq. for assistance devising and executing a plan to insulate his assets from the Goldberg Trustee.

61.     The entire LaBonte Family had an extensive history with Ponzi schemes. Chad LaBonte invested in the Madoff Ponzi scheme.  Likewise, Shawn LaBonte, SAL's other brother, along with Roland LaBonte and Marilyn LaBonte through their revocable trusts and the LFDT (with Marilyn LaBonte and J. Sparveri, CPA as trustees), invested in the Rothstein Ponzi scheme. J. Sparveri, CPA also invested personally in the Rothstein Ponzi Scheme and introduced some of the SAL Sub-Investors to that scheme.

62.     SAL arranged for a June 2, 2010, meeting (the "RICO Meeting") in the offices of Devcon Enterprises, Inc. ("Devcon"), the LaBonte Family closely held real estate management company that provided property management, bookkeeping, and other services to LaBonte Family owned and controlled real estate, consisting of commercial shopping centers and residential apartment complexes.

63.     SAL, Roland LaBonte, J. Sparveri, CPA and P. Bourdeau, Esq. (the "RICO Meeting Participants") attended the RICO Meeting.

64.     In response to Judge Thompson's Crime-Fraud Order determining that there was "probable cause to believe that a fraud was committed [by SAL] and that the communications at issue were in furtherance of that fraud;" *Crime-Fraud Order* at p. 8; C&L produced P. Bourdeau, Esq.'s notes from the RICO Meeting (the "RICO Notes").  The RICO Notes reference a potential "claw back" by a "Hartford Trustee" (the Debtors' bankruptcy cases were originally pending in the Hartford division of the Bankruptcy Court), evidencing that the true purpose of the RICO Meeting was to denude SAL of any property that could satisfy a future judgment in favor of the Goldberg Trustee while allowing SAL unfettered control over and access to those assets.

65.     P. Bourdeau, Esq. admitted during an October 2018 deposition that the purpose of the RICO Meeting was to discuss and determine actions that SAL could take to put his assets beyond the reach of the Goldberg Trustee:

> Q.     So what was discussed as to options [SAL] should
>        consider?
>
> A.     Well, we discussed -- Item 4 is option does he
>        pay down line of credit note.  Item 5 is the possible
>        refi on Rhode Island.  Item 7 is extension of the dynasty
>        trust note, and Item 8 is someone floated the idea of
>        additional sales to the dynasty trust.
>
> Q.     And all of those options were intended to move
>        Scott LaBonte's assets in case the Trustee sought either
>        prejudgment remedy or sued him and obtained a judgment;
>        right?
>
> A.     Those were the options he could consider given
>        the situation he was in, yes.
>
> Q.     What was the situation that he was in?
>
> A.     Where he was concerned about a potential
>        claw-back from the Goldberg deal.

(October 12, 2018, deposition of P. Bourdeau, Esq, at 173(21)-174(11), conducted in *James Berman, Trustee v. Sally LaBonte, et al.*, Adv. Pro. 14-02026, now pending before the Hon. Alvin Thompson at Case No. 3:15-cv-01687 (AWT) (the "SALDT Action")).

66.    J. Sparveri, CPA was more direct about the purpose of the RICO Meeting during a November 2018 deposition:

> Q.    So there may be other reasons for putting assets in a dynasty trust, but specific to the [RICO] [M]eeting that we're talking about, the purpose of that meeting was to discuss putting Scott LaBonte's assets in the dynasty trust so that they would not be recoverable by the trustee; right?
>
> [Objection to Form]
>
> A.    Yes.

67.    (November 14, 2018, deposition of J. Sparveri, CPA, at 137(25)-138(9), conducted in the SALDT Action).

68.    Others were not so forthcoming.  When asked why the Dynasty Trust Transfers, as defined herein, occurred, Sally LaBonte testified in 2014 that she and SAL, along with individuals who were guardians of her children, were going to be taking a trip to Italy by plane, which could conceivably crash.  Sally LaBonte "testified that everything had to be done before they left on that trip, and that she wanted everything finalized because she was nervous about them all traveling together." *Crime-Fraud Order* at p. 14.

69.    Judge Thompson rejected Sally LaBonte's proffered explanation, noting that there was "probable cause to believe" that it was "pretextual" because the "trip [to Italy] took place between June 15, 2010 and June 28, 2010 and the documentation was not completed until after that trip and it was then backdated to June 2, 2010." *Crime-Fraud Order* at p. 14.

70.    Certain of the Defendants formed the Enterprise to Obstruct the Goldberg Trustee on June 2, 2010.  Incredibly, on the very same day, Roland LaBonte and Marilyn LaBonte, along

with, *inter alia*, J. Sparveri, CPA, commenced an action alleging violations of RICO and other claims for relief seeking to recover losses that they incurred investing in the Rothstein Ponzi Scheme.

*i.  SAL Transfers Virtually all of His Assets to the SALDT*

71.    Following the RICO Meeting, SAL, and, among others, J. Sparveri, CPA, and P. Bourdeau, Esq. began obstructing the Goldberg Trustee as they had planned by transferring all of SAL's assets, including those he held through the SAL Rev. Trust, to the SALDT (hereinafter the "Dynasty Trust Transfers").

72.    By way of instruments backdated to June 2, 2010, the date of the RICO Meeting, but not fully executed until months later, SAL transferred the vast majority of his assets to the SALDT.  The Dynasty Trust Transfers included:

| **Entity** | **Interest Transferred** |
| --- | --- |
| Devwest, LLC, a Massachusetts limited liability company | 50% interest |
| SAL NH Investments LLC, a Connecticut limited liability company | 34.69999% interest |
| SAL NH Investments LLC, a Connecticut limited liability company | .00001% interest |
| SAL Cranston LLC, a Rhode Island limited liability company | 27.2727% interest |
| SAL East Haven LLC, a Connecticut limited liability company | 15% interest |
| SAL North Haven LLC, a Connecticut limited liability company | 30% interest |
| Devcon Shops, LLC, a Massachusetts limited liability company | 25.0450% interest |
| Devcon Fairhaven LLC, a Connecticut limited liability company | 35% interest |
| Devcon Berdon, LLC, a Connecticut limited liability company | 50% interest |
| Devcon Manchester, LLC, a Connecticut limited liability company | 19.5% interest |
| Devman LLC, a Connecticut limited liability company | 50% interest |

Case 3:19-cv-01533-VLB   Document 1   Filed 09/27/19   Page 20 of 101

| | |
|---|---|
| Devcon Commons, LLC, a Connecticut limited liability company | 29.5% interest |
| Devfresh LLC, a Connecticut limited liability company | 50% interest |
| RSC Gilford, a New Hampshire limited liability company | 39.5% interest |
| Marketplace Port St. Lucie, LP | 29.7% interest |
| Marketplace Development Corp., a Florida corporation | 100 shares common capital stock |
| Devford, LLC, a New Hampshire limited liability company | 50% interest |
| Devcon Enterprises, Inc. | 10 shares of Class A Voting Common Capital Stock and 100 shares of Class B Non-Voting Common Capital Stock |

73.     By way of the Dynasty Trust Transfers, SAL transferred his interests (hereinafter the "Fraudulently Transferred Interests") in a number of income-producing and valuable LaBonte Family controlled entities, as described in greater detail at paragraph 101 (the "LaBonte Real Estate Entities").

74.     To effectuate some of the Dynasty Trust Transfers, SAL required consent from the other members of certain LaBonte Real Estate Entities.  Likewise, the trustees of the SALDT had to accept and assume the transferred assets and the trustees of the SAL Rev. Trust had to approve the transfers of the assets it owned to the SALDT.

75.     J. Sparveri, CPA, who knew the motive for and purpose of the Dynasty Trust Transfers, worked with Jomarie T. Andrews, Esq. ("Attorney Andrews") to obtain the third-party and insider signatures for the Assignment and Assumption Agreements required to effectuate the Dynasty Trust Transfers.

20

76.     J. Sparveri, Dynasty Trustee, Sally LaBonte Dynasty Trustee and Roland LaBonte Dynasty Trustee were all required to accept the assignment of the Fraudulently Transferred Interests and, where applicable, assume SAL's obligations under the respective entity's operating agreement.  Each of J. Sparveri, Dynasty Trustee, Sally LaBonte Dynasty Trustee and Roland LaBonte Dynasty Trustee executed the following Assignment and Assumption Agreements to effectuate the Dynasty Trust Transfers:

    a.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 25.0450% interest in Devcon Shops, LLC;

    b.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 19.50% interest in Devcon Manchester, LLC;

    c.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 35% interest in Devcon Fairhaven LLC;

    d.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 50% interest in Devwest, LLC;

    e.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 29.5% interest in Devcon Commons, LLC;

    f.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 50% interest in Devcon Berdon LLC;

    g.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 50% interest in Devman, LLC;

    h.   An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 50% interest in DevFresh, LLC;

      i.    An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 50% interest in Devford, LLC;

      j.    An Assumption Agreement whereby the SALDT accepted the assignment of the SAL Rev. Trust's 30% interest in SAL North Haven LLC;

      k.    An Assumption Agreement whereby the SALDT accepted the assignment of the SAL Rev. Trust's 34.69999% interest in SAL NH Investments LLC;

      l.    An Assumption Agreement whereby the SALDT accepted the assignment of the SAL Rev. Trust's 15% interest in SAL East Haven LLC;

      m.    An Assumption Agreement whereby the SALDT accepted the assignment of the SAL Rev. Trust's 27.2727% interest in SAL Cranston LLC;

      n.    An Assumption Agreement whereby the SALDT accepted the assignment of SAL's .00001% interest in SAL NH Investments LLC;

      o.    An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 39.50% interest in RSC Gilford, LLC; and

      p.    An Assumption Agreement whereby the SALDT accepted the assignment of SAL's 29.70% interest in Marketplace Port St. Lucie, Limited Partnership;

77.    J. Sparveri, CPA also executed Consents to the Dynasty Trust Transfers on behalf of certain trusts that were co-investors with SAL in the above-referenced entities, and for which J. Sparveri, CPA also served as a trustee.  J. Sparveri, CPA executed such Consents on behalf of: (i) the LFDT; (ii) the Polidori Family Dynasty Trust; and (iii) the Shawn G. LaBonte Irrevocable Trust.

78.    Marilyn LaBonte executed Consents on behalf of the LaBonte Family Dynasty Trust.

79.     In each instance where the SAL Rev. Trust owned the transferred interest, Sally LaBonte, along with SAL, executed an assignment agreement to effectuate the transfer.

80.     J. Sparveri, CPA pre-arranged a benign-appearing artifice to encourage and assuage any concerns that the other named trustee of the Polidori Family Dynasty Trust may have had about executing the Consents.  Attorney Andrews sent the proposed Consent to the interested trustee by email and J. Sparveri, CPA replied by email stating that he had reviewed the Consent and that he felt everything was in order.

81.     On September 9, 2010, Attorney Andrews sent an email to J. Sparveri, CPA and P. Bourdeau, Esq., attaching fully executed copies of the Dynasty Trust Transfer assignment, assumption and consent agreements for their respective records.  Thus, by no later than September 9, 2010, both J. Sparveri, CPA and P. Bourdeau, Esq. were aware that the transfer of SAL's assets intended to obstruct the Goldberg Trustee, initially discussed at the RICO Meeting, had been accomplished.

### ii.  The False Valuations of the Fraudulently Transferred Interests

82.     SAL and J. Sparveri, CPA valued the Fraudulently Transferred Interests using an income capitalization approach that was not credited or accepted by a certified appraiser, ostensibly to determine the proper consideration to be paid by the SALDT to SAL, or the SAL Rev. Trust, in exchange for the Fraudulently Transferred Interests.

83.     J. Sparveri, CPA relied upon SAL, a lay and interested person who settled the SALDT (who was not a named or even permissible trustee or beneficiary of the SALDT) to provide a critical component of the valuations: the capitalization rate or "cap rate."

84.     J. Sparveri, CPA valued the Fraudulently Transferred Interests in the aggregate at $1,168,214, utilizing the SAL-provided cap rates.

85.     After providing the SALDT with a "gift" of 10% of the "value" of each transferred interest, SAL and J. Sparveri, CPA calculated the amount of purported "consideration" to be paid by the SALDT for the transferred assets at $1,051,391.

86.     Significantly, in or about May 20, 2009, SAL provided a personal Statement of Financial Condition (the "2009 PFS"), compiled by J. Sparveri, CPA, to New Alliance Bank in connection with a line of credit in favor of Devcon.

87.     The 2009 PFS valued SAL's total assets at $13,138,000, including $2,500,000 in cash and $7,568,000 in real estate and business interests, nearly all of which were controlled by SAL and, to a lesser extent, Roland LaBonte.  After deducting a $3 million mortgage debt, the 2009 PFS represented SAL's net worth at $10,138,000, exclusive of the assets he had transferred to the SALDT when he settled it in 2006.

88.     The assets transferred to the SALDT that SAL and J. Sparveri, CPA, ostensibly valued as of June 2, 2010, are identical to the assets that were valued approximately one year earlier as reflected in the 2009 PFS that SAL delivered to New Alliance Bank, but the values reflected in the 2010 PFS are substantially and inexplicably lower by more than $6,000,000.

*iii. The Sham Promissory Notes*

89.     In an effort to legitimize the transaction, J. Sparveri, CPA and P. Bourdeau, Esq. determined that the SALDT would issue a promissory note to the SAL Rev. Trust. Thus, in exchange for the Fraudulently Transferred Interests, the SAL Rev. Trust received a promissory note in the principal amount of $1,051,391.00 (the "2010 Note").  The principal amount of the 2010 Note is based upon the valuations created by SAL and J. Sparveri, CPA, with P. Bourdeau, Esq. opining on, providing material information for, and approving the 2010 Note.

90.     To ensure that the 2010 Note had little to no value to SAL's creditors, the 2010 Note was payable interest only for thirty (30) years.  The 2010 Note matures on June 2, 2040, at which time any remaining unpaid principal and interest becomes due and payable.

91.     Although the 2010 Note is dated June 2, 2010, it was not drafted until mid-July 2010, and like the consents transferring the Fraudulently Transferred Interests to the SALDT, was backdated.

92.     Previously, the SALDT had issued a promissory note to the SAL Rev. Trust in connection with transfers of assets to the SALDT upon its creation in 2006 (the "2006 Note").  The 2006 Note had a nine (9) year maturity with a maturity date of July 27, 2015.

93.     The RICO Notes evidence that the RICO Meeting Participants recognized the threat of the 2006 Note reaching maturity so soon with one of the notes reading: "extend Dynasty Trust Note[,] 9 years[,] 30 years."

94.     Consistent with the plan developed at the RICO Meeting, J. Sparveri, CPA and P. Bourdeau, Esq. determined that the 2006 Note, with an outstanding principal balance of $1,881,836.44, would be replaced with a new note that had an effective date of June 2, 2010, and a maturity date of June 2, 2040 (the "Restated 2006 Note" and, with the 2010 Note, the "Notes"). J. Sparveri, CPA and P. Bourdeau, Esq. designed the Restated 2006 Note to be payable interest only for thirty (30) years, like the 2010 Note.

95.     On the evening of June 2, 2010, within hours of the conclusion of the RICO Meeting, P. Bourdeau, Esq. sent an email to J. Sparveri, CPA with interest rates to be used in the Restated 2006 Note.  Thereafter, J. Sparveri, CPA drafted the Restated 2006 Note and sent it to P. Bourdeau, Esq. for his review via email on June 9, 2010.  On June 10, 2010, P. Bourdeau, Esq. sent an email to J. Sparveri, CPA stating: "I have reviewed the note and it is in excellent shape."

96.     The only reason for issuing the Restated 2006 Note was to obstruct and impede the Goldberg Trustee.

97.     Sally LaBonte Dynasty Trustee, Roland LaBonte Dynasty Trustee, and J. Sparveri, CPA, Dynasty Trustee accepted the transfer of all of SAL's assets to the SALDT with an effective date of June 2, 2010, signed the 2010 Note and also signed the Restated 2006 Note.

98.     J. Sparveri, CPA prepared a personal financial statement for SAL dated as of June 2, 2010, (the "June 2 PFS"), the date of the RICO Meeting and the effective date of the Dynasty Trust Transfers.  The June 2 PFS, which did not account for the Goldberg Trustee's claim against SAL of more than $7.2 million, stated SAL's net worth as negative $1,381,000 (in stark contrast to his stated net worth of $10,138,000 in the 2009 PFS approximately one year earlier).

99.     SAL provided the June 2 PFS to New Alliance in connection with Devcon's line of credit that SAL guaranteed.  When he was asked by representatives of New Alliance why the June 2 PFS was materially different than the 2009 PFS, notes from New Alliance's internal records indicate that SAL lied, telling the bank that he moved his assets to a trust in connection with estate planning.

100.    P. Bourdeau, Esq. has testified that the SALDT Transfers were unrelated to SAL's and Sally LaBonte's estate planning.

*iv. SAL Retains Control of his Transferred Assets and Benefits Therefrom*

101.    Following the SALDT Transfers, the SALDT held *at least* the following assets, some of which had been transferred to the SALDT prior to the RICO Meeting:

    a.  An ownership interest in SAL NB Investments, LLC, a single purpose entity that owned an interest in Cakemaker, LLC.  Cakemaker, LLC owned a frozen foods manufacturing facility in New Britain, Connecticut.

b.  An ownership interest in SAL Middletown, LLC.  SAL Middletown, LLC owned a 60% interest in RA Middletown, LLC, which in turn owned a Rite Aid-anchored shopping center in Middletown, Connecticut.

c.  An ownership interest in SAL Smithfield, LLC.  SAL Smithfield, LLC owned a 60% interest in RA Smithfield, LLC, which in turn owned a Rite Aid in Smithfield, Rhode Island.

d.  A 25.54% interest in Devcon Shops, LLC.  Devcon Shops, LLC owned a Big Y-anchored shopping center.

e.  A 50% ownership interest in Devwest, LLC.  Devwest, LLC owned a 1% interest in Devcon Shops, LLC, which in turn owned a Big Y-anchored shopping center.

f.  A 69.4% ownership interest in SAL NH Investments, LLC.  SAL NH Investments, LLC owned a 50% interest in Centerplan College Square, LLC, which in turn owned real property in New Haven, Connecticut.

g.  A 63.6363% interest in SAL Cranston, LLC.  SAL Cranston, LLC held a 50% interest in RA Cranston, LLC, which in turn owned real property leased by Rite Aid in Cranston, Rhode Island.

h.  A 50% interest in SAL East Haven, LLC.  SAL East Haven, LLC owned an interest in RA East Haven, LLC, which in turn owned real property leased by Rite Aid in East Haven, Connecticut.

i.  A 60% interest in SAL North Haven, LLC.  SAL North Haven, LLC owned a 50% interest in RA North Haven, LLC, which in turn owned real property leased by Rite Aid in North Haven, Connecticut.

j.  A 35.5% interest in Devcon Fairhaven, LLC.  Devcon Fairhaven, LLC owned a Shaws-anchored shopping center in Fairhaven, Massachusetts.

k.  A 50% interest in Devcon Berdon, LLC.  Devcon Berdon, LLC owned a 1% interest in Devcon Fairhaven, LLC.

l.  A 20% interest in Devcon Manchester, LLC.  Devcon Manchester, LLC owned a Big Y-anchored shopping center in Manchester, Connecticut.

m.  A 50% interest in Devman, LLC.  Devman, LLC owned a 1% interest in Devcon Manchester, LLC,

n.  A 30% interest in Devcon Commons, LLC. Devcon Commons, LLC owned a Big Y-anchored shopping center in Enfield, Connecticut.

o.  A 50% interest in Devfresh, LLC.  Devfresh, LLC owned a 1% interest in Devcon Commons, LLC.

p.  A 40% interest in RSC Gilford, LLC. RSC Gilford, LLC owned a Shaws-anchored shopping center in Gilford, New Hampshire.

q.  A 50% interest in Devford, LLC.  Devford, LLC owned a 1% interest in RSC Gilford, LLC.

r.  A 30% interest in Marketplace Port St. Lucie, LP.  Marketplace Port St. Lucie, LP owned a shopping center in Port St. Lucie, Florida.

s.  A 50% interest in Marketplace Development Corp.  Marketplace Development Corp. was the general partner of Marketplace Port St. Lucie, LP, owning a .6% interest therein.

t.  10 shares of Devcon's class A stock.

u.  100 shares of Devcon's class B stock.

28

v.   An ownership interest in SAL EL Investments, LLC.

w.   An ownership interest in SAL EH Investments, LLC.

x.   An ownership interest in SAL GH Investments, LLC.

102.   SAL controlled these assets with the consent and permission of the SALDT trustees, despite the fact that he could not lawfully exercise control over assets in the SALDT, an irrevocable trust he had settled.

103.   J. Sparveri, CPA testified in another matter in which a former client sued him for investing his funds in the Rothstein Ponzi scheme while serving as trustee of his dynasty trust, that the very purpose for naming friends and family as trustees of a dynasty trust is to maintain control:

> The purpose of the dynasty trust is three-fold.  Assets in a dynasty trust are free from estate tax, they're creditor proof, and they're divorce proof.  There's one very big tradeoff for assets -- to get assets in a dynasty trust. You have to give up control. It's an irrevocable trust. So the settlor has to give up control. So my experience with dynasty trusts is that the settlor chooses a trustee, a quote unquote friendly trustee, whose ear he can whisper into so that he doesn't really lose control.  That's the reason for having family members in there as trustees, as well as a professional person that you have a close relationship with that you know that you can be sure is going to carry out what you want to carry out and not make decisions on their own.

104.   J. Sparveri, CPA has admitted under oath that the testimony quoted above in Paragraph 103 applied equally to the SALDT.

105.   The Fraudulently Transferred Interests generated income that the entities distributed to their respective members on a periodic, usually monthly, basis.

106.   In the years leading up to and including 2010, the Fraudulently Transferred Interests produced substantial cash flow for SAL's personal benefit.  For example, SAL realized approximately $4 million in cash flow from his assets in 2009, and approximately $2 million in cash flow from his assets in 2010.  SAL earned this income from assets that, according to the

valuation concocted by J. Sparveri, CPA and SAL, had an aggregate value of $1,168,214 as of June, 2010.

107.   From June through December of 2010, each of the monthly distributions due to the SALDT as a result of the Fraudulently Transferred Interests were deposited into SAL's personal bank account with Bank of America even though the SALDT purportedly owned those interests and should have received the income, not SAL individually.

108.   J. Sparveri, CPA coordinated the payment of the income directly to SAL by instructing an employee of Devcon in July 2010 that SAL could directly receive the income generated as long as J. Sparveri, CPA was informed of such payments so that he could account for them. The Devcon employee then made the payments directly to SAL, rather than to the SALDT.

109.   Roland LaBonte Dynasty Trustee and Sally LaBonte Dynasty Trustee permitted the payment of income generated by the Fraudulently Transferred Interests to SAL, rather than the SALDT.

v.   *The Stipulated PJR*

110.   When the Goldberg Trustee filed his amended complaint in the Malley-LaBonte Action on November 12, 2010, he also filed Applications for Prejudgment Remedies against, *inter alia,* SAL, seeking to attach his assets in the amount of $7,241,797.52 (the "PJR Application").

111.   On February 7, 2011, SAL stipulated to the entry of a prejudgment remedy in favor of the Goldberg Trustee in the amount of $5,000,000, which Judge Dabrowski issued on February 10, 2011, (the "PJR Attachment"), along with an order requiring SAL to provide a disclosure of assets to the Goldberg Trustee.   SAL's disclosure of assets did not include the Fraudulently Transferred Interests, which SAL still controlled when he submitted the disclosure of assets to the Goldberg Trustee.

112.    In January 2011, after the Goldberg Trustee filed the PJR Application and, at a minimum knowing that the Court would soon conduct a hearing on the PJR Application, and further likely knowing that he would soon be stipulating to the PJR Attachment, SAL, along with the SALDT trustees, began depositing the income generated by the Fraudulently Transferred Interests into the SALDT's bank account (the "Dynasty Account"), rather than SAL's personal account, because they knew that funds deposited into SAL's personal bank account would be attachable by the Goldberg Trustee.

113.    SAL also directed that his $10,000.00 monthly draw from Devcon be deposited to the Dynasty Account, rather than to his personal checking account where it would be subject to attachment by the Trustee.

114.    As detailed in the following chart, from January 2011, until December 2013, millions of dollars in income generated by the Fraudulently Transferred Interests were deposited into the Dynasty Account and then withdrawn for SAL's benefit and at his direction with the approval of the SALDT trustees, a practice that continued at least through 2018:

| Transaction Year | Inflows | Outflows |
| --- | --- | --- |
| 2010 | $1,637 | $26,356 |
| 2011 | $1,119,076 | $1,139,453 |
| 2012 | $2,058,264 | $2,065,542 |
| 2013 | $2,376,488 | $2,115,121 |
| 2014 | $81,248 | $329,744 |
| 2015 | $133,432 | $141,283 |
| 2016 | $54,053 | $54,150 |
| 2017 | $82,768 | $81,913 |
| 2018 | $33,555 | $35,663 |
| Total Cash (4/2010-3/2018) | $5,940,522 | $5,989,225 |

115.    The inflows and outflows decreased markedly in 2014, which, not surprisingly, is the same year the Goldberg Trustee commenced the SALDT Action in which the Trustee sought

to avoid and recover the Fraudulently Transferred Interests and to hold the SALDT liable for the full amount of the Goldberg Trustee's claim against SAL as his alter ego.

116.    The Goldberg Trustee commenced the SALDT Action on or about May 31, 2014, after spending nearly eight (8) months seeking to obtain discovery from SAL, Sally LaBonte Dynasty Trustee and J. Sparveri, CPA Dynasty Trustee pursuant to Bankruptcy Rule 2004 (the "SALDT 2004 Exams").  The Goldberg Trustee obtained the discovery only after filing multiple motions for contempt against SAL, Sally LaBonte Dynasty Trustee and J. Sparveri, CPA Dynasty Trustee for their continued refusal to comply with subpoenas and court orders.

117.    The vast majority of the millions of dollars that passed through the SALDT were diverted by SAL, with consent of the SALDT trustees, to satisfy his own obligations.  For example, on May 18, 2012, the SALDT was to receive nearly $400,000 from the sale of assets in which it owned an interest.  SAL diverted $386,000 of that payment to satisfy an obligation he owed to RCZS, LLC, an entity that owned a private jet for use by SAL and its other members, including Roland LaBonte, R. Landino, and E. Malley.  The SALDT did not own any interest in RCZS.

118.    The Dynasty Account paid SAL's personal and business expenses, as well as those of his family, becoming the family checking account after the entry of the PJR Attachment.

119.    J. Sparveri, CPA testified that the SALDT was "extremely active," and that he "[did not] have any others like it." The SALDT was so active because the Defendants used it to shield SAL and his assets from the Trustee.

120.    SAL was not authorized to endorse checks drawn from the Dynasty Account, but Sally LaBonte Dynasty Trustee was.  Thus, SAL routinely drafted checks drawn on the Dynasty Account and then Sally LaBonte Dynasty Trustee endorsed them.

121.     On October 25, 2013, four (4) days after the Trustee filed motions to conduct the SALDT 2004 Exams and to obtain document discovery from SAL, Sally LaBonte Dynasty Trustee and J. Sparveri, CPA Dynasty Trustee concerning the SALDT, and three (3) days after counsel appeared for each of them in relation to the SALDT 2004 Exams, SAL handwrote three checks totaling nearly $600,000.00 which Sally LaBonte, Dynasty Trustee endorsed.

122.     First, SAL handwrote a check to Marketplace Port St. Lucie LP, an entity dominated and controlled by SAL, in the amount of $155,000.00.  Sally LaBonte, Dynasty Trustee endorsed the check.

123.     SAL then handwrote a check to Devcon Commons, LLC, an entity that SAL also dominated and controlled, in the amount of $40,000.00.  Sally LaBonte, Dynasty Trustee endorsed the check.

124.     Lastly, and most significantly, SAL handwrote a check payable to Sally LaBonte in the amount of $400,000.00.  Sally LaBonte, Dynasty Trustee endorsed the check, deposited it into her personal checking account and utilized the funds to pay SAL's personal and business expenses from her checking account, rather than the SALDT account which the Trustee was then seeking to investigate.

125.     As discussed herein, the nearly $600,000.00 paid out of the SALDT Account on October 25, 2013, was part of more than $900,000.00 in proceeds received by the SALDT from the sale of SAL NH Investments, LLC's interest in Centerplan College Square, LLC to an entity controlled by R. Landino.

       *vi.*    *Accounting Irregularities and J. Sparveri, CPA's Resignation*

126.     In a thinly veiled attempt to bolster the false impression that the Dynasty Trust Transfers had been *bone fide*, J. Sparveri, CPA prepared schedules purporting to apply "credits"

on the "debt" owed by the SALDT to the SAL Rev. Trust pursuant to the Notes.  These "credits" purported to mirror payments made from the SALDT for SAL's benefit, thereby purporting to satisfy the SALDT's obligations to the SAL Rev. Trust while ensuring that the Goldberg Trustee could never receive any value therefrom.

127.    The accounting was haphazard at best, began in March 2011 after the PJR Attachment issued against SAL, and ceased no later than September 2013, a few weeks before J. Sparveri, CPA resigned as a SALDT trustee.  Moreover, the accounting did not allocate large expenses, such as personal income tax payments and line-of-credit payments, to the Notes, thereby giving the false impression that the Notes retained some value, and providing SAL with greater and longer-lived access to SALDT income and principal.

128.    J. Sparveri, CPA resigned as a SALDT trustee in mid-October 2013, the day after the Goldberg Trustee served him with an order related to the PJR that garnisheed the Notes.

129.    Following J. Sparveri, CPA's resignation, Sally LaBonte Dynasty Trustee and Roland LaBonte Dynasty Trustee, the remaining trustees of the SALDT, ceased accounting for any payments made for SAL's benefit, even though the payments continued, and, even though, upon information and belief, the SALDT still owed money to SAL on both Notes, and both Notes were garnisheed once the Goldberg Trustee served the garnishment order on J. Sparveri, CPA Dynasty Trustee.

130.    Setting off the amounts SAL utilized from the SALDT against the balance of the Notes provided cover for writing down the balances owed without the SALDT paying the SAL Rev. Trust or SAL cash, or anything else of value, that the Goldberg Trustee could ever attach or utilize to satisfy a judgment.

131.    Despite their thirty-year terms, in just a few years the trustees of the SALDT wrote down to $0 the balances of the Notes without making a single cash payment to SAL.  Thus, after stipulating to the PJR in February 2011, SAL spent at least $2.9 million from the SALDT to pay his personal and business expenses, all with the consent and assistance of the SALDT trustees.

132.    Absent the Dynasty Trust Transfers, SAL personally would have received the vast majority of the deposits to the Dynasty Account during the years 2011, 2012, and 2013, representing the earnings of the Fraudulently Transferred Interests, and those deposits would have been available to the Goldberg Trustee to secure and subsequently satisfy the SAL Judgment.

133.    Utilizing the SALDT as the vehicle, SAL, J. Sparveri, CPA, J. Sparveri, CPA, Dynasty Trustee, P. Bourdeau, Esq., Roland LaBonte, Trustee, and Sally LaBonte Trustee, shielded and insulated SAL's assets from attachment while allowing SAL unfettered access to them to pay his substantial personal and business expenses.

134.     However, knowing that the Goldberg Trustee could ultimately claw back the Dynasty Trust Transfers from the Dynasty Trust, beginning in 2012 and continuing thereafter, Defendants worked and conspired to render the SALDT insolvent, and further dissipate the Fraudulently Transferred Interests while allowing SAL and his family to control them and/or their proceeds.

C.    The 2012-2013 SAL/R. Landino Transactions

135.    Between approximately 2006 and 2012, SAL and R. Landino jointly developed many commercial properties.

136.    SAL and R. Landino structured their joint developments using an upper tier single purpose entity (each a "Joint Venture"), which they generally owned together through their own

limited liability companies (each a "LaBonte JV Entity" or a "Landino JV Entity," as hereinafter defined).

137.     The Joint Ventures included:

a.    A Rite Aid pharmacy in Cranston, Rhode Island with RA Cranston, LLC ("RA Cranston") as the Joint Venture, SAL Cranston, LLC ("SAL Cranston") as the LaBonte JV Entity, and Centerplan Cranston, LLC ("Centerplan Cranston") as the Landino JV Entity;

b.    A Rite Aid pharmacy in North Haven, Connecticut with RA North Haven, LLC ("RA North Haven") as the Joint Venture, SAL North Haven, LLC ("SAL North Haven") as the LaBonte JV Entity, and Centerplan North Haven, LLC ("Centerplan North Haven") as the Landino JV Entity;

c.    Real property acquired for development in New Haven, Connecticut with an address of 188 and 196 College St. and 285 George St, under the ownership of Centerplan College Square, LLC ("Centerplan CS") as the Joint Venture Entity, SAL NH Investments, LLC ("SAL NH Investments") as the LaBonte JV Entity and, unlike the other Joint Ventures, R. Landino owning the Landino side individually (not through an entity);

d.    A Rite Aid pharmacy anchored shopping center in Middletown, Connecticut with RA Middletown, LLC ("RA Middletown") as the Joint Venture Entity, SAL Middletown, LLC ("SAL Middletown") as the LaBonte JV Entity and Centerplan Middletown, LLC ("Centerplan Middletown") as the Landino JV Entity; and

e.    A Rite Aid pharmacy in Smithfield, Rhode Island with RA Smithfield Development, LLC ("RA Smithfield") as the Joint Venture Entity, SAL Smithfield,

LLC ("SAL Smithfield") as the LaBonte JV Entity and Centerplan Smithfield, LLC ("Centerplan Smithfield") as the Landino JV Entity.

138.    SAL initially owned interests in the LaBonte JV Entities, personally or through the SAL Rev. Trust, until he transferred his interests therein to the SALDT in connection with the Dynasty Trust Transfers.  R. Landino was the sole member of each of the Landino JV Entities.

139.    SAL was the sole manager of the LaBonte JV Entities and he dominated and controlled each of those entities, personally making all decisions regarding them, including, as discussed herein, the decision to sell the LaBonte JV Entities' interest in each Joint Venture to Landino.

140.    By 2012, SAL and R. Landino had known each other for many years, and had partnered in ventures in addition to those described above, including investing together in a movie titled I Really Hate My Job, jointly investing in development property in eastern Connecticut, and partnering together in a development in New Britain, Connecticut through an entity known as Cakemaker, LLC ("Cakemaker"), with SAL NB Investments, LLC ("SAL NB") as the LaBonte JV Entity and Centerplan NB, LLC ("Centerplan NB") as the Landino JV Entity.

141.    Cakemaker developed a manufacturing facility at One Celebration Way ("One Celebration Way") in New Britain, Connecticut.  Cakemaker sold One Celebration Way in or about the late winter or early spring of 2012.

142.    After Cakemaker sold One Celebration Way, a dispute developed between R. Landino and SAL over the sale proceeds.

143.    On April 24, 2012, Centerplan NB commenced a lawsuit (the "Centerplan NB Lawsuit") in Connecticut Superior Court against SAL NB, SAL, and Devcon, which provided

property management and other services for all of the Joint Ventures, alleging that SAL wrongfully withheld the proceeds from the sale of One Celebration Way.

144.    Centerplan NB sought injunctive relief and filed a Verified Complaint (the "Verified Complaint").

145.    In the Verified Complaint, R. Landino personally verified, without limitation, that:

a.    "[SAL], who is the sole signatory of the Cakemaker Bank of America Account, who with the other Defendants is in control of the Cakemaker financial records and who with the other Defendants is exercising unlawful control over more than $2,000,000.00 of Centerplan's funds, is, on information and belief, currently subject to a $5,000,000.00 federal prejudgment remedy in relation to his alleged involvement in a $130,000,000 Ponzi scheme and he has transferred all or substantially all of his assets out of his name." (Centerplan NB Lawsuit Verified Complaint, at pg. 2).

b.    "[SAL] is a named defendant in an adversary proceeding pending in United States Bankruptcy Court in the District of Connecticut, bearing docket number 10-02082 [the Malley-LaBonte Action] related to the Ponzi scheme led by Michael S. Goldberg and others that resulted in tens of millions of dollars in losses to investors (hereinafter the "Goldberg Action"). (Centerplan NB Lawsuit Verified Complaint, at pg. 9, ¶ 32).

c.    "In the Goldberg Action, [SAL] is alleged to have engaged in various fraudulent transfers intended to hinder, delay or defraud creditors." (Centerplan NB Lawsuit Verified Complaint, at pg. 9, ¶ 34).

d.    "Notably, a pre-judgment remedy in the amount of $5 million ($5,000,000.00) was entered against [SAL] in the Goldberg Action on February 11, 2011." (Centerplan NB Lawsuit Verified Complaint, at pg. 9, ¶ 35).

e.    "The Goldberg Action was tried to the bankruptcy court in June 2011.  A decision has not yet issued." (Centerplan NB Lawsuit Verified Complaint, at pg. 10, ¶ 37).

f.    "On information and belief, in April 2011, [SAL] began transferring his assets to friends, family and trusts." (Centerplan NB Lawsuit Verified Complaint, at pg. 10, ¶ 40).

g.   "On information and belief, [SAL] has transferred all or nearly all of his assets and currently holds little or no assets in his own name." (Centerplan NB Lawsuit Verified Complaint, at pg. 10, ¶ 41).

146.    During a lunch meeting in the fall of 2011, SAL told R. Landino that the Goldberg Trustee had sued him for receiving fraudulent transfers due to SAL's involvement in the Goldberg Scheme, but the Goldberg Trustee was wasting his time because SAL had already transferred his assets and had little or nothing left.

147.    In early February 2012, Jason Rudnick ("Rudnick"), the President of R. Landino-owned Centerplan Development, received a call from SAL's personal counsel, who, at that time, also represented the Landino and LaBonte JVs in the sale of One Celebration Way.

148.    SAL's counsel told Rudnick that she could no longer represent the Cakemaker JV Entity because her firm had represented SAL in connection with his Goldberg Scheme investments.

149.    In response, J. Rudnick asked Paul Proto ("Proto"), an attorney who represented R. Landino and/or his entities, to run a docket search on SAL.  Proto's docket search located, *inter alia¸* the Goldberg Trustee's Malley-LaBonte Action complaint and the PJR Application.

150.    Proto provided copies of the pleadings and other documents he retrieved to Rudnick, who is also a licensed attorney.  Rudnick reviewed the documents and reported on their contents to R. Landino, noting in a February 2, 2012, email: "this is not pretty . . . remedies are sought for $8 million plus."

151.    R. Landino also knew by late 2011 or early 2012 that SAL refused to provide a personal financial statement to the JV Entities' lenders because he did not have any assets.

152.     Rudnick questioned SAL regarding his refusal to provide lenders with a personal financial statement and SAL stated:  "Well, what do you want me to do?  I can send them a piece of paper with a big zero on it.  I've moved all of my assets out of my name."

153.     Before commencing the Centerplan NB Lawsuit, R. Landino knew that the Goldberg Trustee had named both SAL Cranston and SAL North Haven as defendants in the Malley-LaBonte Action, which was tried to the Bankruptcy Court in June 2011, and also knew that the Trustee had obtained prejudgment remedies against each of those entities.

i.     *The Joint Venture Transfers*

154.     Despite transferring all of his assets to the SALDT, SAL continued to serve as the sole manager of each of the LaBonte JV Entities.

155.     Pursuant to the Operating Agreement of each LaBonte JV Entity, SAL, as the sole manager, had the power and authority to, among other things, "sell or otherwise dispose of all or substantially all of the assets of the [respective entity] as part of a single transaction or plan or series of transactions or plans."

156.     Beginning in May 2012 and continuing through October 2013, R. Landino and SAL caused a series of transactions to occur pursuant to which the LaBonte JV Entities transferred their interests in the respective Joint Venture Entities to the Landino JV Entities in exchange for cash.

157.     The SALDT received at least its share of the cash generated by the sale of its ownership interests to R. Landino.  SAL and the trustees of the SALDT quickly dissipated this cash beyond the Goldberg Trustee's reach, using it to pay SAL's personal and business expenses.

158.     R. Landino thereafter "washed" the purchased assets by transferring them further, in some instances funneling them through multiple entities in a single day, to further impede the Goldberg Trustee.

40

159.   R. Landino participated in this series of transactions knowing of the Enterprise to Obstruct the Goldberg Trustee and with the intent to further it.

*1.   The SAL North Haven Transfer*

160.   On May 18, 2012, Centerplan North Haven paid $850,000 for SAL North Haven's ownership interest in the RA North Haven Joint Venture (the "SAL North Haven Transfer").

161.   The SAL North Haven Transfer transformed an illiquid asset into cash and allowed the Defendants to further obstruct and impede the Goldberg Trustee by dissipating it to pay SAL's personal obligation to RCZS.

162.   The SALDT received $245,376.94 in proceeds from the SAL North Haven Transfer based on its interest in SAL North Haven.   In connection with the Dynasty Trust Transfers, J. Sparveri, CPA assigned no value to SAL's interest in SAL North Haven.

163.   SAL's brother, Chad LaBonte, who was a member of SAL North Haven, received $221,190.31 in proceeds from the sale.

164.   In July 2012, within two months of receiving his SAL North Haven distribution, and almost a year after being sued by the Goldberg Trustee to recover subsequent transfers he received from SAL as a Sub-Investor, Chad LaBonte filed for bankruptcy protection in the Southern District of Florida.   Chad LaBonte received a discharge from the Bankruptcy Court on June 18, 2014.   As a result of the discharge, the Goldberg Trustee withdrew Goldberg Scheme related claims that he had asserted against Chad LaBonte.

165.   At the time of the SAL North Haven Transfer, L. Marks, Esq. represented SAL and SAL North Haven in connection with the SAL North Haven Transfer.   L. Marks, Esq. knew of the Enterprise to Obstruct the Goldberg Trustee and that the Goldberg Trustee had claims against both SAL and SAL North Haven, that the Goldberg Trustee had secured prejudgment remedies against

both SAL and SAL North Haven, and that the Goldberg Trustee's claims against both SAL and SAL North Haven had been tried to Judge Dabrowski nearly a year earlier, in June 2011.

166.    In connection with his representation of SAL and SAL North Haven in the SAL North Haven Transfer, L. Marks, Esq. drafted and revised a certain Assignment of Membership Interest Agreement (the "North Haven Assignment Agreement") to memorialize the $850,000 purchase of SAL North Haven's ownership interest in the RA North Haven Joint Venture. With this knowledge in mind, L. Marks, Esq. inserted language into the North Haven Assignment Agreement that expressly excepted any "liens, claims, encumbrances, security interests, applicable court orders and charges" that "may exist pursuant to the Prejudgment Remedy Order By Stipulation As To Defendant SAL North Haven, LLC dated February 17, 2011."

167.    After L. Marks, Esq. alerted R. Landino's counsel, including Proto and others, to the changes in the North Haven Assignment Agreement, R. Landino's litigation counsel wrote to Rudnick, R. Landino, and Proto on May 17, 2012, advising that L. Mark, Esq.'s reference to the prejudgment remedy against SAL North Haven was a "true statement" and further stating that "as we discussed… everyone is aware of the risk."

168.    Upon information and belief, L. Marks, Esq. also knew that SAL would use the proceeds payable to the SALDT from the SAL North Haven Transfer to pay his obligation to RCZS because, by the time of the SAL North Haven Transfer, Bank of America had sued RCZS and its guarantors, including SAL, and the resolution of that lawsuit required SAL, who by that time had transferred all of his assets out of his own name and the name of the SAL Rev. Trust, to wire money to L. Marks, Esq., who would then wire that money to Bank of America.

169.    Following the SAL North Haven Transfer, L. Marks, Esq., knowing of the Enterprise to Obstruct the Goldberg Trustee and that the Goldberg Trustee had a claim pending

against SAL North Haven, dissolved SAL North Haven without informing the Goldberg Trustee of the dissolution, and, upon information and belief, without advising SAL to take any action to reserve any of the funds received from the SAL North Haven Transfer to satisfy the Goldberg Trustee's claim against SAL North Haven.

170.    L. Marks, Esq., knowing of the existence and purpose of the Enterprise to Obstruct the Goldberg Trustee, took the aforementioned actions and engaged in the aforementioned conduct to frustrate and impede the Goldberg Trustee.

*2.      The SAL Smithfield Transfer*

171.    On May 18, 2012, Centerplan Smithfield paid $1,200,000 for SAL Smithfield's ownership interest in the RA Smithfield Joint Venture.

172.    The SAL Smithfield Transfer transformed an illiquid asset into cash and allowed the Defendants to further obstruct and impede the Goldberg Trustee by dissipating it to pay SAL's personal obligation to RCZS.

173.    The SALDT received $169,979.66 in proceeds from the SAL Smithfield Transfer based on its interest in SAL Smithfield.

174.    L. Marks, Esq. represented SAL and SAL Smithfield in connection with the SAL Smithfield Transfer.  At the time of the SAL Smithfield Transfer, L. Marks, Esq. knew of the Enterprise to Obstruct the Goldberg Trustee and that the Goldberg Trustee had claims against SAL, that the Goldberg Trustee had secured the Prejudgment Remedy, and that the Goldberg Trustee's claims against SAL had been tried to Judge Dabrowski nearly a year earlier, in June 2011.

175.    Upon information and belief, L. Marks, Esq. also knew that SAL would use the proceeds payable to the SALDT from the SAL Smithfield Transfer to pay his obligation to RCZS because, by the time of the SAL Smithfield Transfer, Bank of America had sued RCZS and its

guarantors, including SAL, and the resolution of that lawsuit, which coincided with the SAL Smithfield Transfer, required SAL, who by that time had transferred all of his assets out of his own name and the name of the SAL Rev. Trust, to wire money to L. Marks, Esq., who would then wire that money to Bank of America.

176.    L. Marks, Esq., knowing of the existence and purpose of the Enterprise to Obstruct the Goldberg Trustee, took the aforementioned actions and engaged in the aforementioned conduct to frustrate and impede the Goldberg Trustee.

3.    *The SAL Cranston Transfer*

177.    In or about December 2012, Centerplan Cranston paid $1,003,704 for SAL Cranston's ownership interest in the RA Cranston Joint Venture.

178.    The SAL Cranston Transfer transformed an illiquid asset into cash and allowed the Defendants to further obstruct and impede the Goldberg Trustee by dissipating it to pay SAL's personal and business obligations.

179.    The SALDT received $102,875.05 in proceeds from the SAL Cranston Transfer based on its interest in SAL Cranston. In connection with the Dynasty Trust Transfers, J. Sparveri, CPA assigned no value to SAL's interest in SAL Cranston.

180.    The Anthony T. Bianca, Sr. Family Trust received $645,590.59 in proceeds from the SAL Cranston Transfer.  Anthony T. Bianca is Marilyn LaBonte's father.

181.    At the time of the SAL Cranston Transfer in January 2013, L. Marks, Esq. represented SAL and SAL Cranston in connection with the SAL Cranston Transfer.  L. Marks, Esq. knew of the Enterprise to Obstruct the Goldberg Trustee and that the Goldberg Trustee had claims against both SAL and SAL Cranston, that the Goldberg Trustee had secured prejudgment remedies against both SAL and SAL Cranston, and that the Goldberg Trustee's claims against both

SAL and SAL Cranston had been tried to Judge Dabrowski more than 1½ years earlier, in June 2011.

182.    Following the SAL Cranston Transfer, L. Marks, Esq., knowing that the Goldberg Trustee had a claim pending against SAL Cranston, dissolved SAL Cranston without informing the Goldberg Trustee of the dissolution, and, upon information and belief, without advising SAL to take any action to reserve any of the funds received from the SAL Cranston Transfer to satisfy the Goldberg Trustee's claim, which as of September 2017 was reduced to judgment in the amount of $221,000.00 with interest at the rate of 3.25% from November 12, 2010.

183.    L. Marks, Esq., knowing of the existence and purpose of the Enterprise to Obstruct the Goldberg Trustee, took the aforementioned actions and engaged in the aforementioned conduct to frustrate and impede the Goldberg Trustee.

### 4.    *The SAL Middletown Transfer*

184.    On or about May 31, 2013, Centerplan Middletown paid $2,750,000 for SAL Middletown's ownership interest in the RA Middletown Joint Venture.

185.    The SAL Middletown Transfer transformed an illiquid asset into cash and allowed the Defendants to further obstruct and impede the Goldberg Trustee by dissipating it to pay SAL's personal and business obligations.

186.    Following the SAL Middletown transfer, the SALDT Account received a deposit of $120,508.03 based on its interest in SAL Middletown.  The SALDT Account statement indicates that the deposit emanated from SAL Middletown.

187.    L. Marks, Esq. represented SAL and SAL Middletown in connection with the SAL Middletown Transfer. L. Marks, Esq. advised SAL to proceed with the SAL Middletown Transfer knowing that the intent of the transaction was to frustrate and impede the Goldberg Trustee, and

following the closing of the SAL Middletown Transfer, dissolved SAL Middletown without informing the Goldberg Trustee of the dissolution.

188.    L. Marks, Esq., knowing of the existence and purpose of the Enterprise to Obstruct the Goldberg Trustee, took the aforementioned actions and engaged in the aforementioned conduct to frustrate and impede the Goldberg Trustee.

5.    *The College Square Transfer*

189.    In October 2013, Acquisitions Holdings, LLC ("Acquisition Holdings"), a single member limited liability company of which R. Landino was the sole member paid $5,500,000 for SAL NH Investment's ownership interest in the College Square Joint Venture (the "College Square Transfer").

190.    The College Square Transfer transformed an illiquid asset into cash and allowed the Defendants to further obstruct and impede the Goldberg Trustee by dissipating it to pay SAL's personal and business obligations.

191.    The SALDT received $904,651.45 in proceeds from the College Square Transfer based on its interest in SAL NH Investments.  In connection with the Dynasty Trust Transfers, J. Sparveri, CPA assigned a value of $283,603.00 to that same interest. The LFDT was also a member of SAL NH Investment's; the LFDT received $916,833.76 in proceeds from the College Square Transfer.

192.    L. Marks, Esq. represented SAL and SAL NH Investments in connection with the College Square Transfer.  L. Marks, Esq. advised SAL to proceed with the College Square Transfer knowing of the Enterprise to Obstruct the Goldberg Trustee and that the intent of the transaction was to further it, and following the closing of the College Square Transfer dissolved SAL NH Investments without informing the Goldberg Trustee of the dissolution.

193.     At the time of each of the SAL North Haven, SAL Smithfield, SAL Cranston, SAL Middletown, and College Square Transfers, L. Marks, Esq. knew that at least some of the SALDT's interests in the LaBonte Joint Venture Entities were subject to claw back by the Goldberg Trustee because SAL transferred them to the SALDT to impede the Goldberg Trustee and render himself insolvent.  L. Marks, Esq. nevertheless worked with SAL to further dissipate SAL's assets to impede and frustrate the Goldberg Trustee by rendering the SALDT insolvent.

194.     By advising the LaBonte Joint Venture Entities to transfer their assets and thereafter dissolving them when the Goldberg Trustee had claims against each of them and/or to the SALDT's interests in the distributions from each of them, L. Marks, Esq. intended to and indeed did facilitate and further the Enterprise to Obstruct the Goldberg Trustee with knowledge of its fraudulent purpose and thereby caused significant harm to the Goldberg Trustee and the Goldberg Victims.

ii.     *Landino's Further Transfer of the LaBonte JV Entities' Interests*

195.     R. Landino entered into the Joint Venture Transfers with SAL knowing that SAL had transferred his assets to impede the Goldberg Trustee.  R. Landino intended to insulate the Landino JV Entities that received transfers of assets from the LaBonte JV Entities.

196.     After the Joint Venture Transfers, R. Landino further dissipated the assets that the LaBonte Joint Venture Entities transferred to the Landino Joint Venture Entities.  In some instances, R. Landino merely sold the assets previously held by his Joint Venture Entities as expeditiously as possible, but in at least two instances (those in which he retained indirect interests in the transferred property for a longer period of time), he caused a series of transactions designed to "wash" the assets.

*1.     The Middletown Washing Transaction*

197.     Following the SAL Middletown Transfer, R. Landino caused Centerplan Middletown to transfer SAL Middletown's sixty percent (60%) ownership interest in RA Middletown to Siebar Middletown, LLC ("Siebar").

198.     The transfer to Siebar involved a multi-step transaction whereby R. Landino first caused RA Middletown to transfer all of its assets to a newly formed, R. Landino-controlled, entity known as 10 Main Middletown LLC ("10 Main").

199.     In exchange for transferring all of its assets to 10 Main, RA Middletown received a one-hundred percent (100%) ownership interest in 10 Main.

200.     RA Middletown then transferred its one-hundred percent (100%) ownership interest in 10 Main to Centerplan Middletown for no consideration.  R. Landino thereafter dissolved RA Middletown.

201.     Due to these transfers, Center Plan Middletown owned a one-hundred percent (100%) interest in 10 Main.

202.     Centerplan Middletown then transferred a sixty percent (60%) ownership interest in 10 Main to Siebar in exchange for $2,700,000, slightly less than Centerplan Middletown paid to SAL Middletown for the initial transfer of SAL Middletown's interest in RA Middletown.

203.     Each branch of the above-described transaction, hereinafter the "Middletown Washing Transaction," became effective on May 31, 2013.

204.     Its gymnastics aside, the Middletown Washing Transaction simply transferred SAL Middletown's, *i.e.,* SAL's, ownership interest in the Middletown Joint Venture to Siebar.

205.     R. Landino executed the Middletown Washing Transaction with knowledge of and in furtherance of the Enterprise to Obstruct the Goldberg Trustee.

2.     *The College Square Washing Transaction*

206.   The SAL NH Transfer was effectuated through a series of simultaneous and convoluted transactions intended to accomplish two fraudulent objectives: (i) liquidate SAL NH Investments' interest in Centerplan CS into $5.5 million so the Defendants could disburse and divert the SALDT's portion of those proceeds beyond the Goldberg Trustee's reach and for SAL's benefit; and (ii) place SAL NH Investments' interest in Centerplan CS beyond the Goldberg Trustee's reach thereby insuring that R. Landino could retain the profit when he later sold the property.  These transactions occurred as follows:

207.   R. Landino solicited investors (the "Investors") who provided $9.6 million to a newly formed R. Landino entity, College Square, LLC ("College Square").  In exchange, the Investors received interests in College Square.

208.   SAL NH Investments transferred its 50% interest in Centerplan CS to Acquisition Holdings and at or about the same time, R. Landino transferred his 50% interest in Centerplan CS and $900,000 in cash to another R. Landino owned entity, RJY College Square, LLC ("RJY").  R. Landino then immediately caused RJY to further transfer these assets to College Square in exchange for a 20% membership interest in College Square.

209.   College Square then transferred at least $6 million to Acquisition Holdings II, LLC ("Acquisition Holdings II"), which transferred the funds to Acquisition Holdings.  Acquisition Holdings used most of these funds to acquire SAL NH Investments' ownership interest in Centerplan CS.

210.   Thus, after these transfers, College Square owned 50% of Centerplan CS directly, which interest it received from R. Landino through RJY College Square, and College Square

indirectly owned the other 50% of Centerplan CS through Acquisition Holdings II and Acquisition Holdings.

211.   R. Landino then caused Centerplan CS to transfer all of its assets (collectively, the "College Square Assets"), including the real property it owned in New Haven, Connecticut to College Square, without receiving any consideration in return.

212.   Immediately thereafter, R. Landino dissolved Centerplan CS.  Thus, the transferee of SAL NH Investments (Acquisition Holdings) had no assets and was judgment proof.

213.   R. Landino conceived and perpetrated the SAL NH Transfer, together with the foregoing transactions between and among College Square, Centerplan CS, RJY, Acquisition Holdings, Acquisition Holdings II, and the Investors (collectively, the "College Square Washing Transactions"), with knowledge of and to further the Enterprise to Obstruct the Goldberg Trustee.

## D.   The 2015 Devcon/DEIPM Transaction

214.   Devcon was founded in 1976. Devcon provided property development and management services for retail, residential, office, and industrial developments, primarily those owned and/or controlled by LaBonte Family members.  Devcon touted itself on its website in July 2010 as "a full-service real estate development, management and investment company [that had] been building relationships for over 30 years."

215.   Devcon's employees also performed accounting, bookkeeping and other functions for the LaBonte Family real estate business.

216.   SAL was Devcon's President and Chief Executive Officer.  Roland LaBonte was Devcon's chairman.  Since at least June 2009, SAL and Roland LaBonte were the only two members of Devcon's Board of Directors.

217.    In or about June 2004, SAL and the LFDT, a trust created by J. Sparveri, CPA and settled by Roland LaBonte, entered into a stock purchase agreement pursuant to which the SAL Rev.  Trust (i) purchased the Devcon stock then owned by his brothers Chad and Shawn with the consideration paid over time, and (ii) would obtain one hundred percent of Devcon's stock over time by transfers to it from the LFDT.

218.    In connection with the Dynasty Trust Transfers, the SAL Rev. Trust transferred all of the equity that it owned in Devcon, 10 shares of Devcon's Class A Common Stock and 100 shares of Devcon's Class B Common Stock to the SALDT.  Following this Dynasty Trust transfer, Devcon had two shareholders:  the SALDT and the LFDT.

219.    In or about January 2015, the SALDT received the final outstanding Devcon shares from the LFDT, at which point the SALDT owned one hundred percent of Devcon's stock.

220.    In May 2014, the Goldberg Trustee commenced the SALDT Action against, among others, Sally LaBonte Dynasty Trustee, Roland LaBonte Dynasty Trustee, Devcon, and Sally LaBonte individually to avoid and recover the Fraudulently Transferred Interests, and avoid and recover subsequent transfers from the SALDT to, among others, Sally LaBonte and Devcon.

221.    The Goldberg Trustee also alleged in the SALDT Action that the SALDT is the alter ego of SAL such that any transfers from the SALDT to Devcon, Sally LaBonte, and others constitute initial fraudulent transfers from SAL.

222.    In the SALDT Action, the Goldberg Trustee sought to avoid and recover $1,147,404 in transfers from SAL and/or the SALDT to Devcon.

223.    On July 30, 2014, the Goldberg Trustee filed a Prejudgment Remedy Application (the "Dynasty Trust PJR Application") in the SALDT Action seeking to attach, *inter alia*, $1,147,404 of Devcon's property.

224.    Judge Dabrowski held hearings on the Dynasty Trust PJR Application on November 10 and 12, 2014, and December 15, 2014.  The parties thereafter submitted post-hearing briefing and the court heard oral argument in February 2015.  Judge Dabrowski retired from the bench on March 31, 2015, without issuing a decision on the Dynasty Trust PJR Application. Following its transfer to various judges, the Dynasty Trust PJR Application remains *sub judice* before Judge Thompson.

225.    Unbeknownst to the Goldberg Trustee, as he prosecuted the Dynasty Trust PJR Application, Devcon, through its President and Chief Executive Officer (SAL) and Chairman (Roland LaBonte), rendered itself worthless and transferred its business and all of its assets to newly created DEIPM.  SAL subsequently dissolved Devcon.

226.    Upon information and belief, Sally LaBonte, Dynasty Trustee, who was a named defendant in the SALDT Action, was aware of and, in her capacity as a SALDT trustee, approved the transfer of Devcon's business to DEIPM.  Roland LaBonte, Dynasty Trustee also approved, in his capacity as SALDT trustee, the transfer of Devcon's business to DEIPM.

227.    L. Marks, Esq. and J&M advised SAL and Roland LaBonte on all facets of DEIPM's formation and the transfer of Devcon's business to DEIPM.

228.    L. Marks, Esq. and SAL developed and began implementing the "restructuring" of Devcon during the months of November and December 2014, the very months that Judge Dabrowski was conducting hearings on the Dynasty Trust PJR Application.

229.    J&M invoices for services rendered to SAL evidence discussions of "restructuring" between L. Marks, Esq. and SAL and the preparation of "LLC formation documents" as early as November 6, 2014, four (4) days before the first hearing date on the Dynasty Trust PJR Application.

230.    L. Marks, Esq. registered DEIPM as a Connecticut Limited Liability Company effective January 9, 2015.

231.    L. Marks, Esq. and J&M drafted DEIPM's operating agreement beginning in the fall of 2014.  The first DEIPM operating agreement was dated and signed on January 9, 2015, with the MPL Rev. Trust as a member.  The operating agreement was changed, but not amended or restated, by L. Marks, Esq. with guidance from P. Bourdeau, Esq. on February 26, 2015, with the MPL 2015 Rev. Trust, instead of the MPL Rev. Trust, as the majority member.

232.    Ultimately, DEIPM's members are the MPL 2015 Rev. Trust (a trust settled by Marilyn LaBonte, who also serves as its trustee) and the RGL Rev. Trust (a trust settled by Roland LaBonte, who also serves as its trustee).  Roland LaBonte is, and has always been, the sole manager of DEIPM.

233.    For its trouble of holding the membership seat warm for the MPL 2015 Rev. Trust for a few weeks, the MPL Rev. Trust received a $100,000 distribution from DEIPM.

234.    L. Marks, Esq., J&M, P. Bourdeau, Esq., and J. Sparveri, CPA, established the MPL 2015 Rev. Trust in February 2015 to own 99.99% of DEIPM.  L. Marks, Esq., J&M, P. Bourdeau, Esq., and J. Sparveri, CPA all knew at that time that DEIPM served no purpose other than to "park" Devcon's business for SAL until he could settle with the Goldberg Trustee for pennies on the dollar based on his purported insolvency.

235.    As evidenced by a February 20, 2015, email from P. Bourdeau, Esq. to Roland LaBonte and others, SAL was directly involved in the transfer of DEIPM and how its assets, of which neither he nor the SALDT would have any ownership interest, would be distributed if he predeceased Roland LaBonte and Marilyn LaBonte:

Roland,

I prepared the amendment to Marilyn's existing revocable trust to provide that if Scott is deceased at the time when you and Marilyn are both deceased, the interest in the new DEI entity [DEIPM] would pass to all of your descendants in the same proportions as your other assets. Scott has requested that if he is then deceased that this new DEI interest pass exclusively to Sally. Please confirm that this is what you and Marilyn want and we will make the appropriate change.

My best

*Paul L. Bourdeau. Esq.*
*Principal*
*West Hartford Private Clients Group*

236.    Roland LaBonte responded to P. Bourdeau, Esq.'s email that same day, copying L. Marks, Esq. and SAL, stating:

Paul:  I have received the drafts of the amendments a couple of days ago.  I have not read them yet.  However, I agree with Scott's request.  We have an understanding between us to transfer the new company [DEIPM] membership interests to Scott as soon as [h]is current situation allows since he owned 100% of the old DEI corporation [Devcon].  Therefore, the new company should pass to Sally or his heirs in the event of a catastrophe as described below. Please make the changes accordingly.  STAY WARM!  Thanks. R.

237.    In a June 2018 deposition Roland LaBonte confirmed the agreement he had reached with SAL as memorialized in the February 20, 2015, email:

Q. You had an understanding with your son Scott that as soon as his legal troubles with the Trustee allowed, 100 percent of the interest in DEI Property Management, LLC would be transferred to him, correct?

A. We had that discussion, yes.

Q. You had an understanding, right?

A. Yes.

54

238.    P. Bourdeau, Esq. drafted the MPL Rev. trust instruments to achieve the February 20, 2015, email's stated goal.   Upon information and belief, based on his relationship with J. Sparveri, CPA and the LaBonte Family, and communications with L. Marks, P. Bourdeau, Esq. was aware in February 2015 that the Trustee had recently filed and was prosecuting the Dynasty Trust PJR Application which sought a $1.1 million attachment against Devcon.

239.    DEIPM's business is exactly the same as Devcon's was; DEIPM has never provided services to a client who was not previously a Devcon client.

240.    DEIPM's employees are, or at least were when SAL and Roland LaBonte transferred Devcon's business and assets to DEIPM in or about February or March 2015, the same individuals who Devcon employed immediately before that time.

241.    Devcon assigned its material vendor and employee benefits contracts to DEIPM.

242.    DEIPM acquired office space in the same building at which Devcon maintained its office space, 433 South Main Street, West Hartford, Connecticut 06110.   After DEIPM acquired this space, Devcon transferred much of its office furniture and equipment to DEIPM's office space, one floor below Devcon's office space.

243.    L. Marks, Esq., his partner James Juliano, and J&M negotiated the lease for DEIPM's office space knowing that DEIPM was a vehicle to defraud the Goldberg Trustee by concealing Devcon's value and parking it for SAL's benefit and intending to further the Enterprise to Obstruct the Goldberg Trustee.

244.    In February 2015, SAL "informed" Devcon's customers that "due to circumstances out of its control," Devcon was ceasing operations and customers needed to locate a new property management company.   SAL did so by sending these letters to himself or Roland LaBonte, since they controlled Devcon's customers.

245.    Upon information and belief, L. Marks, Esq. drafted the termination letters and advised SAL to send them to himself and Roland LaBonte to lend a façade of credibility to the transfer of Devcon's assets to DEIPM.

246.    Roland LaBonte subsequently admitted during a deposition that the "circumstances out of Devcon's control" that was forcing it to cease business, as referenced in the Devcon termination letters, was the Dynasty Trust PJR Application against Devcon.

247.    L. Marks, Esq. dissolved Devcon effective March 30, 2015, knowing that the Goldberg Trustee had a claim pending against Devcon in an amount greater than $1 million for which the Goldberg Trustee was actively seeking a PJR, without informing the Goldberg Trustee, and without advising SAL or the trustees of the SALDT to reserve any funds to satisfy the Trustee's claim.

248.    If Devcon had not fraudulently transferred its assets to DEIPM, all net-revenue Devcon generated, whether through property management contracts or otherwise, including a fee of nearly $850,000 paid to DEIPM in January 2016 from a real estate transaction closing, would have been available for the Goldberg Trustee to attach and potentially recover.

249.    Devcon was in business for nearly forty (40) years before L. Marks, Esq. dissolved it.  SAL, Roland LaBonte, Roland LaBonte Dynasty Trustee, Sally LaBonte Dynasty Trustee, and the Professionals transferred Devcon's assets, including its operating business, to DEIPM and dissolved Devcon solely to place Devcon's assets beyond the Goldberg Trustee's reach.

250.    DEIPM is Devcon's successor; all income and revenue generated by DEIPM is and was generated by Devcon's assets.

251.    In July 2015 the Connecticut Department of Labor ("CTDOL") informed DEIPM that it considered DEIPM to be Devcon's successor for purposes of unemployment compensation.

252.    L. Marks, Esq. knew that a finding of successor liability by the CTDOL would be harmful to DEIPM when the Goldberg Trustee discovered the transfer of Devcon's assets to DEIPM and sought to hold DEIPM liable for Devcon's obligations as Devcon's successor.  L. Marks, Esq. thus drafted a letter of appeal to the CTDOL, appealing its determination that DEIPM was a successor of Devcon (the "Appeal Letter").

253.    In the Appeal Letter L. Marks, Esq, misrepresents numerous material facts, including that Devcon was forced to dissolve because it lost its management contracts.  In fact, as Roland LaBonte admitted under oath, Devcon dissolved because the Trustee was seeking a prejudgment remedy against it.  The termination of the Devcon management contracts was nothing more than a rouse to try to lend some legitimacy to the fraudulent transfer of Devcon's assets to DEIPM.

254.    L. Marks, Esq. also represented in the Appeal Letter that '[DEIPM's] Manager and Devcon Enterprises, Inc.'s President are different individuals."   L. Marks, Esq. failed to disclose that the manager of DEIPM was the father of Devcon's president and that the Manager of DEIPM had been, until the summer of 2014, the Chairman of Devcon.

255.    L. Marks, Esq. also failed to inform the CTDOL that SAL, the former president of Devcon, was making decisions regarding the business of DEIPM, including the amount that it would distribute to its members on a monthly basis.  As discussed herein, SAL was particularly interested in the amount distributed to the 2015 MPL Rev. Trust, as he was using those funds to pay his personal and business expenses.

256.    Lastly, the theme struck by L. Marks, Esq. in the Appeal Letter, both directly and by implication, is that DEIPM did not acquire the business of Devcon, and was therefore not a mere continuation of Devcon.  This overarching primary theme of the Appeal Letter is false and

completely at odds with the experience of Devcon's employees, all of whom became DEIPM

employees. As former Devcon and DEIPM employee Barbara Pursley testified during a June 14,

2018, deposition:

> Q. Is it fair to say, Ms. Pursley, that you
> showed up for work one day on the third floor of this
> building as an employee of Devcon Enterprises, and a day
> or two thereafter you showed up for work on the second
> floor of this building as an employee of DEI Property
> Management?
>
> A. Yes.
>
> Q. And is it fair to say on the day you showed up
> for work as an employee of Devcon Enterprises, you were
> the director of accounting, and on the day you showed up
> for work at DEI Property Management, you were the
> director of accounting?
>
> A. Yes.
>
> Q. So the only thing that changed was the
> geographic location of the office, the office size, and
> the name of the company, right?
>
> A. And my benefits.

(June 14, 2018, deposition of Barbara Pursley, at 118(12)-119(3), conducted in *James Berman,*

*Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM)).

      **E.**      **SAL Continues to Enjoy Unfettered Access to**
                    **Income Generated by Devcon's Transferred Assets**

      257.    SAL continues to receive income that Devcon n/k/a DEIPM generates via his

unfettered access to the assets of the MPL 2015 Rev. Trust.

      258.    To aid and abet her son's ongoing efforts and with knowledge of the Enterprise to

Obstruct the Goldberg Trustee, Marilyn LaBonte settled the MPL 2015 Rev. Trust on February

26, 2015, and caused it to become a 99.99% member of DEIPM solely to funnel money to SAL in

order to allow SAL and his family to maintain their affluent lifestyle.

259.    After settling the MPL 2015 Rev. Trust, Marilyn LaBonte opened a checking account in the trust's name at People's Bank.

260.    Upon information and belief, Marilyn LaBonte opened a checking account in the name of the MPL 2015 Rev. Trust with People's Bank, rather than Farmington Bank, the banking institution that the LaBonte Family regularly used, because a Farmington Bank employee questioned why SAL was transferring assets to his parents as part of his purported estate planning. Of course, P. Bourdeau, Esq. never asked that same basic question because he already knew that the transfer of Devcon's assets to DEIPM had nothing whatsoever to do with estate planning, but was intended solely to further the Enterprise to Obstruct the Trustee.

261.    Upon further information and belief, L. Marks, Esq. assisted Marilyn LaBonte to open the MPL 2015 Rev. Trust's checking account at People's Bank knowing of the Enterprise to Obstruct the Goldberg Trustee and that the account would be used as a vehicle to funnel money to SAL below board and beyond the Goldberg Trustee's reach.

262.    After the MPL 2015 Rev. Trust checking account was opened, Marilyn LaBonte provided SAL with the account's checkbook and a stamp of her signature.

263.    Since Marilyn LaBonte settled the MPL 2015 Rev. Trust, SAL has freely used its assets, all of which, upon information and belief, are generated by distributions from DEIPM, to pay his living expenses, often using credit cards to pay expenses and then paying the credit card debt with checks drawn on the MPL 2015 Rev. Trust's bank account which he "signs" with the stamp of Marilyn LaBonte's signature that she gave him.

264.    In the 2½ year period between March 2015 and October 2017, SAL paid $623,876 in credit card bills alone from the MPL 2015 Rev. Trust.

265.    Upon information and belief, SAL continues to utilize the MPL 2015 Rev. Trust to pay his credit card statements and other living expenses.

266.    Marilyn LaBonte parked and funneled assets to SAL through DEIPM and the MPL 2015 Rev. Trust because, as she recently testified at her deposition, "if there was anything [she] can do to help Scott [LaBonte] and his family – which is [her] family, too – … [she] would be willing to do so."

267.    In that same vein, Roland LaBonte testified under oath that if the Goldberg Trustee tried to attach DEIPM's assets, he and his family would transfer DEIPM's business to a new entity, just as they had transferred Devcon's business to DEIPM.

F.    **The 2015-2016 DEIPM Refinance Transactions**

268.    Before fraudulently transferring its assets to DEIPM in or about February and March of 2015, Devcon maintained management agreements (the "Devcon Management Agreements") with a number of entities owned or controlled by SAL and/or Roland LaBonte, either directly or indirectly by way of trusts (each a "Managed Entity" and collectively the "Managed Entities").

269.    Devcon's Management Agreements included a provision (the "Transaction Fee Provision") entitling Devcon to a 5% fee based off of the sales price of property owned by a Managed Entity. Thus, if the LaBonte Family real estate business sold one its shopping centers, Devcon received a 5% fee.

270.    When Devcon fraudulently transferred its assets to DEIPM in or about February and March of 2015, DEIPM entered into new management agreements (the "DEIPM Management Agreements") with the same Managed Entities.

271.    The DEIPM Management Agreements included the Transaction Fee Provision, with only slight modifications. The DEIPM Management Agreements also entitled DEIPM to a percentage of "any new or refinanced debt" on a property owned by a Managed Entity (the "Refinance Fee Provision").

272.    The Refinance Fee Provision allowed the LaBonte Family to strip equity from LaBonte Family real estate business shopping centers and funnel money to SAL through the MPL 2015 Rev. Trust and further impede the Goldberg Trustee.

273.    Shortly after Devcon fraudulently transferred its assets to DEIPM and DEIPM entered into the DEIPM Management Agreements with various LaBonte Family controlled entities, SAL and DEIPM refinanced the debt on properties owned by at least three Managed Entities (Devcon Commons, Devcon Shops, and Devcon Manchester).

274.    On June 25, 2015, one day before SAL, Roland LaBonte and DEIPM refinanced the debt on the properties owned by Devcon Commons and Devcon Shops, DEIPM amended and restated its management agreements with Devcon Commons and Devcon Shops. L. Marks, Esq. helped effectuate the amendments and restatements by sending signature pages to Roland LaBonte via email and directing him to sign them.

275.    The purpose of the amended and restated management agreements was to increase DEIPM's refinance fee from three percent (3%) to four percent (4%).  DEIPM was to pay from its 4% fee any mortgage origination fee. In the transactions described in the following paragraphs DEIPM paid a .6% broker's fee.  Thus, DEIPM received a net fee of 3.4%.

276.    On June 26, 2015, Devcon Commons refinanced an outstanding mortgage of $17,413,159.90 with a new mortgage in the amount of $19,200,000.00.  This refinance transaction

resulted in the payment of a fee to DEIPM in the amount of $652,800.00 solely due to the newly added Refinance Fee Provision in DEIPM's Management Agreement with Devcon Commons.

277.   On June 26, 2015, Devcon Shops refinanced an outstanding mortgage of $23,407,468.92 with a new mortgage in the amount of $24,700,000.00.  The refinance transaction resulted in the payment of a fee to DEIPM in the amount of $839,800.00 solely due to the newly added Refinance Fee Provision in DEIPM's Management Agreement with Devcon Shops.

278.   On January 7, 2016, Devcon Manchester refinanced an outstanding mortgage of $13,281,873.88 with a new mortgage in the amount of $14,000,000.  The refinance transaction resulted in the payment of a fee to DEIPM in the amount of $476,000.00 solely due to the Refinance Fee Provision in DEIPM's Management Agreement with Devcon Manchester.

279.   DEIPM received a total of $1,968,600 pursuant to the Refinance Fee Provisions in its Management Agreements with Devcon Commons, Devcon Shops, and Devcon Manchester that SAL, Roland LaBonte, and L. Marks, Esq. inserted into the amended and restated DEIPM Management Agreements after they caused Devcon to fraudulently transfer its assets to DEIPM.

280.   Roland LaBonte, as manager of DEIPM, caused DEIPM to distribute the entire amount of the refinance fees to DEIPM's members: the RGL Rev. Trust, which owned .1%, and the MPL 2015 Rev. Trust, which owned 99.9%.  Upon information and belief, the MPL 2015 Rev. Trust continues to pay SAL's and Sally LaBonte's living expenses with this money.

281.   The refinance transactions did not provide sufficient funds to the borrower to pay the Refinance Fees to DEIPM in full at the time when the transactions closed.  Thus, Devcon Commons, Devcon Shops, and Devcon Manchester paid the Refinance Fees over time.  By paying the Refinance Fees over time, funds that otherwise would have been available for distribution to the members of Devcon Commons, Devcon Shops, and Devcon Manchester, including the

SALDT, were instead distributed to the MPL 2015 Rev. Trust via DEIPM and then funneled to SAL.

282.    Neither Sally LaBonte, Dynasty Trustee nor Roland LaBonte, Dynasty Trustee took any action to protect or preserve the SALDT's rights vis-à-vis the payment of the Refinance Fees that could have, and likely should have, been available for distribution to the SALDT based on its ownership interest in the respective entities because taken any such action would be adverse to the goals of the Enterprise to Obstruct the Goldberg Trustee.

### G.    THE DEFENDANTS HAVE SUCCESSFULLY FRUSTRATED THE GOLDBERG TRUSTEE'S COLLECTION EFFORTS

#### i.    The Continued Pursuit of Recoveries Through Pending Adversary Proceedings is Futile

283.    The purpose of the Enterprise to Obstruct the Goldberg Trustee is to obstruct and impede the Goldberg Trustee from enforcing the SAL Judgment, a judgment that the LaBonte Family and the Professionals expected would enter from at least the time they learned that the Goldberg Trustee had sued E. Malley.

284.    The Enterprise to Obstruct the Goldberg Trustee has been highly successful in obstructing and impeding the Goldberg Trustee.

285.    Since November 2010, in order to recover for the Goldberg Victims and to protect the Goldberg Debtors' Estate's claims and secure the SAL Judgment, the Goldberg Trustee has commenced and prosecuted four separate fraudulent conveyance actions, including i) the Malley-LaBonte Action, ii) the SALDT Action, iii) an adversary proceeding commenced in May 2016, captioned *James Berman, Trustee v. Robert A. Landino, et. al.*, Adv. Pro. No. 16-02042(JAM) (the "Landino Action"), and iv) an adversary proceeding commenced in June 2017, captioned *James Berman, Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM) (the "DEIPM Action" and collectively with the SALDT Action, and the Landino Action, the "SAL Enforcement

Actions"). Further, the Goldberg Trustee commenced and prosecuted an adversary proceeding filed in 2011 captioned *James Berman, Trustee v. Carl Pavano, et al.*, Adv. Pro. No. 11-02071 (JAM) (the "Pavano Action"), seeking to recover subsequent transfers of Debtor funds from SAL to the SAL Sub-Investors.

286.    In connection with the SAL Enforcement Actions, all of which the Defendants' conduct necessitated, the Goldberg Trustee has elicited more than one hundred hours of testimony, conducted a three-day evidentiary hearing on the Dynasty Trust PJR Application, engaged in substantial motion practice, and reviewed tens of thousands of pages of documents produced during discovery.   These efforts by the Goldberg Trustee and his professionals, all of which resulted from the Defendants' racketeering activity, are collectively referred to herein as the "Judgment Protection/Collection Efforts."

287.    The Goldberg Trustee had no choice but to engage in the Judgment Protection/Collection Efforts because the Defendants, through both their words and their conduct, confirmed that SAL would not pay the SAL Judgment and that they would continue the racketeering activity as long as necessary to further the purpose of the Enterprise to Obstruct the Goldberg Trustee, *i.e.* to obstruct and impede the Goldberg Trustee in his efforts to enforce the SAL Judgment.

288.    After nearly a decade of Judgment Protection/Collection Efforts chasing one fraudulent conveyance after another and as a result of the Defendants' continual racketeering activity, the SAL Judgment remains unpaid, and the Goldberg Victims remain uncompensated

289.    In addition, as a result of the Defendants' conduct, the Goldberg Debtors' Estate has incurred millions of dollars in costs and attorneys' fees that would not have otherwise been incurred.

290.     The Enterprise to Obstruct the Goldberg Trustee has thus far successfully concealed and/or dissipated SAL's assets and there is no real possibility of collecting upon any judgments that might enter in the pending SAL Enforcement Actions.   Indeed, SAL transferred the vast majority of his ownership interests in LaBonte Family-controlled shopping centers to the SALDT in the summer of 2010, and the Defendants have caused the SALDT to further transfer or otherwise dissipate many of those assets.

291.     The Goldberg Trustee pursued claims against each of the SAL Sub-Investors in the Pavano Action.   All of those claims, save for the two discussed below, have been resolved by settlement or withdrawn based upon an inability to pay, and all settlement proceeds have been set off against the SAL Judgment.

292.     The Trustee asserted a claim against Roland LaBonte in the Pavano action seeking to recover $425,000 in transfers he received from the Goldberg Debtors as a subsequent transferee of SAL.   The Trustee's claim against Roland LaBonte was tried to the Hon. Julie Manning on December 10, 2018, was fully briefed in February 2019, and remains *sub judice*.

293.     The Trustee asserted a claim against LaBonte Sub-Investor Alfred Fincher.   The Trustee has obtained a default judgment against Mr. Fincher in the amount of $141,820.37.   Mr. Fincher resides in Florida, and the Goldberg Trustee's preliminary asset search indicates that he likely is unable to satisfy that judgment.

294.     The named defendants in the SALDT Action include Sally LaBonte (who only recently obtained full-time employment with a local church in Farmington, Connecticut and whose primary asset is a luxury home in Portsmouth, Rhode Island that is presently listed for sale and, upon information and belief, is encumbered by a mortgage that is greater than the house is worth), Devcon (which as discussed herein transferred its assets to DEIPM and was dissolved by the first

quarter of 2015 while the Goldberg Trustee was actively pursuing a prejudgment remedy), Marketplace Port St. Lucie L.P. (an entity whose single asset, a shopping center in Port St. Lucie Florida, was recently repossessed), RCZS, LLC (an entity that was dissolved in 2012 after its single asset, a private plane, was sold), and the SALDT (which presently owns interests in three shopping centers, one of which recently lost its anchor tenant to bankruptcy, and neither of the other two generate any meaningful cashflow to the SALDT).

295.    The named defendants in the Landino Action include thirteen entities, all of which have been dissolved, and R. Landino, who within the last several months had a $39 million-dollar judgment entered against him in connection with construction failures at Dunkin Donuts Park in Hartford.

296.    DEIPM, a named defendant in the DEIPM Action, presently has two (2) employees and, upon information and belief, provides management services to three shopping centers, one of which has an anchor tenant that recently filed for bankruptcy and none of which generate meaningful cash-flow.  Roland LaBonte and Marilyn LaBonte are named defendants in the DEIPM Action as aiders and abettors of Devcon's fraudulent transfers to DEIPM.  Roland LaBonte and Marilyn LaBonte have moved to dismiss the claim against them in the DEIPM Action on the grounds that Connecticut does not recognize a cause of action for aiding and abetting a fraudulent transfer.

297.    The Goldberg Trustee has pursued multiple avenues of recovery, seeking to untangle the vast web of transfers and other fraud that the Defendants perpetrated to obstruct the Goldberg Trustee.  At this point prosecuting these actions is futile.

298.    The Goldberg Trustee has also conducted post-judgment discovery related to SAL's assets.  Other than a boat which the Goldberg Trustee has seized and is in the process of

selling and expects to realize approximately $89,000.00 for the benefit of the Debtors' bankruptcy estate, the post-judgment discovery did not uncover any assets against which the Goldberg Trustee can enforce the SAL Judgment.  SAL has no assets because Defendants operated (and continue to operate) an Enterprise to Obstruct the Goldberg Trustee that has rendered SAL judgment proof and placed the fruits of his assets beyond the Trustee's reach while enabling SAL to use them or their proceeds to fund his and his family's extravagant lifestyle.

299.    As evidenced by the Defendants' predilection for serial fraudulent conveyances and other racketeering activity, there is no real possibility that any *additional* fraudulent conveyance actions or other Judgment Protection/Collection Efforts would result in any recovery for the Goldberg Debtors' Estate and the Goldberg Victims.  Indeed, Roland LaBonte testified that if the Trustee sought a prejudgment remedy against DEIPM, he would transfer the assets of DEIPM to a new entity, just as Devcon transferred its assets to DEIPM to obstruct, frustrate and impede the Goldberg Trustee.

300.    Meanwhile, the necessary Judgment Protection/Collection Efforts in which the Goldberg Trustee engaged have exhausted resources of the Goldberg Debtors' Estate. As a result of the Defendants' racketeering activity, the Goldberg Trustee is financially unable to continue the hopeless cat and mouse game with the Defendants.

301.    The Defendants have successfully thwarted, frustrated, and impeded the Goldberg Trustee's ability to enforce and collect the SAL Judgment thereby causing injury to the Goldberg Trustee and, by extension, the Goldberg Victims.

302.    After nearly a decade of Judgment Protection/Collection Efforts, the Goldberg Trustee's damages are reasonably ascertainable, clear, and definite: no less than $26,122,727.58 in trebled unrecoverable portions of the SAL Judgment plus trebled post-judgment interest at

$954.60 per day, and millions of dollars in trebled attorneys incurred as a direct and proximate result of the Defendants' predicate acts described herein, which amount is also subject to trebling (collectively, the "RICO Damages"). The Trustee may also recover reasonable attorneys' fees pursuant to 18 U.S.C. § 1964.

303.     The Goldberg Trustee (and, by extension, the Goldberg Victims) continue to suffer from the nonpayment of the SAL Judgment and as a result are entitled to recover the RICO Damages.

304.     Additional Judgment Protection/Collection Efforts, including the prosecution of the pending SAL Enforcement Actions, would be futile.  Thus, the Trustee's RICO claim based on lost debt is ripe.

## V.     SUMMARY OF THE RICO CLAIM ELEMENTS

305.     **Predicate Acts.** The conduct of the Defendants described herein constitutes various predicate acts within the meaning of racketeering activity set forth in 18 U.S.C. § 1961(1), including obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512, concealment and fraudulent transfer of property in violation of 18 U.S.C. § 152, money laundering in violation of 18 U.S.C. § 1956, transaction of money involved in unlawful activity under 18 U.S.C. § 1957, wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341,

306.     **Pattern of Racketeering Activity.** As described herein, the Defendants engaged in numerous acts of racketeering activity within ten years of each other. The predicate acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events.  Further, there was continuity of conduct in that the predicate acts and other wrongful activities of the Defendants described herein extended over

a considerable period of time and involved conduct with the threat of continuing wrongful activities.

307.   **Enterprise.** Pursuant to 18 U.S.C. § 1962(c), the Defendants named herein have participated in the Enterprise to Obstruct the Goldberg Trustee, an association-in-fact enterprise affecting interstate commerce under 18 U.S.C. § 1961(4).  The Enterprise to Obstruct the Goldberg Trustee is devoted to fraudulently transferring and concealing SAL's assets and taking other actions to obstruct and impede the Goldberg Trustee from satisfying the SAL Judgment, while permitting SAL to continue to enjoy and benefit from such assets, and was formed for the purpose of carrying out the activities alleged in this Complaint.

308.   **Enterprise Participants.** The Defendants named herein participated in varying capacities in the Enterprise to Obstruct the Goldberg Trustee.  Specifically, SAL, SAL Rev. Trustee, Roland LaBonte, Roland LaBonte Dynasty Trustee, Roland LaBonte RGL Rev. Trustee, Sally LaBonte, Sally LaBonte Dynasty Trustee, Sally LaBonte Rev. Trustee, J. Sparveri, CPA and J. Sparveri Dynasty Trustee were principals in the Enterprise to Obstruct the Goldberg Trustee and participated in the operation and management of the same through a pattern of racketeering activity as described herein.  Likewise, all Defendants, knowing of at least the general contours of the Enterprise to Obstruct the Goldberg Trustee and each committing at least one predicate act in furtherance thereof, with the intent to further the same, conspired with the other Defendants named herein to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  In all instances, the Defendants willfully associated themselves with the Enterprise to Obstruct the Goldberg Trustee and willfully participated in the scheme.

309.   **Injury.** Although the Defendants' conduct described herein was directed at the Goldberg Trustee and did indeed cause damage to the Goldberg Trustee in his business and

property, the victims of such conduct extend beyond the Goldberg Trustee to the Goldberg Victims in that the distributions made to Goldberg Victims have been materially smaller as a result of the Defendants' conduct. The Goldberg Trustee, at a minimum, has been injured in his business or property by reason of a violation of 18 U.S.C. § 1964.

310.    **Interstate Commerce.**  The Defendants' racketeering activities as described herein included the use of wire transfers to transfer, transmit and move money, electronic mail to transmit the assignment, assumption and consent agreements to effectuate the transfers of the Fraudulently Transferred Interests, the use of the United States Post Office to transfer, transmit and move money, the use of electronic mail to transmit agreements necessary to form and operate DEIPM, including agreements necessary to permit the DEIPM Refinance Transactions discussed herein that gave SAL access to millions of dollars from the MPL 2015 Rev. Trust checking account, and involved the transfer of ownership interests in entities incorporated in various states within the United States including Connecticut and Rhode Island.  Thus, the activities of the Enterprise to Obstruct the Goldberg Trustee affect interstate commerce.

## VI.    CLAIMS FOR RELIEF

### COUNT 1
### SUBSTANTIVE RACKETEERING
### (AGAINST SAL, INDIVIDUALLY AND AS TRUSTEE OF THE SAL REV. TRUST)

311.    The Goldberg Trustee realleges and incorporate by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

312.    At all times material hereto, each Defendant named in this action was a "person" as that term is defined in 18 USC § 1961(3), engaged in, and the activities of which affected, interstate commerce.

313.    Beginning in or about 2010 and continuing at least until the filing of this Complaint, SAL individually and as trustee of the SAL Rev. Trust (collectively "SAL/Trustee") did knowingly

maintain, directly or indirectly, control of, and conducted and participated in, directly or indirectly, the Enterprise to Obstruct the Goldberg Trustee, which was each engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity, as those terms are defined in 18 USC §§ 1961(1) and (5).

314.    SAL/Trustee, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the Enterprise to Obstruct the Goldberg Trustee, including by SAL making perjurious statements concerning the reasons for the Dynasty Trust Transfers.

315.    The racketeering activity in which SAL/Trustee engaged in violation of 18 USC § 1962(c) consisted, *inter alia*, of:

        a.    Multiple acts of wire fraud in violation of 18 USC § 1343;

        b.    Multiple acts of concealment and fraudulent transfer of property in violation of 18 USC § 152;

        c.    Multiple acts of obstruction of justice in violation of 18 USC §§ 1503 and 1512; and

        d.    Multiple acts of money laundering in violation of 18 USC § 1956

316.    Specifically, SAL/Trustee engaged in a pattern of racketeering activity consisting of at least the following predicate acts:

<u>Statutory Violations of 18 USC § 1343 – Wire Fraud</u>

317.    On or about the dates set forth below, SAL/Trustee, in violation of 18 USC § 1343, for the purpose of executing and attempting to execute the Enterprise to Obstruct the Goldberg Trustee, did knowingly transmit and/or cause to be transmitted, in interstate commerce, by means

of wire communication, the writings, signs, and signals set forth below, proof of any one of which is a predicate act, with the intent to further a scheme or artifice to defraud the Goldberg Trustee:

a.    Monthly between June of 2010 and December of 2010, SAL/Trustee via the Fraudulently Transferred Interests, sent, or caused to be sent, to SAL/Trustee's personal Bank of America account wire transfers representing monthly distributions from said Fraudulently Transferred Interests;

b.    On May 18, 2012, SAL/Trustee via SAL Smithfield, LLC and/or Devcon, sent, or caused to be sent, to L. Marks, Esq., in connection with obligations owed by SAL/Trustee to RCZS, LLC's secured lender, a wire transfer of $151,060.52;

c.    On May 18, 2012, SAL/Trustee via SAL North Haven, LLC, and/or Devcon, sent, or caused to be sent, to L. Marks, Esq., in connection with obligations owed by SAL/Trustee to RCZS, LLC's secured lender, a wire transfer of $245,046.94;

d.    Beginning on or about June 26, 2015, SAL/Trustee via Devcon Commons, LLC, sent, or caused to be sent, to DEI Property Management, LLC wire transfers totaling $492,800.00;

e.    Beginning on or about June 26, 2015, SAL/Trustee via Devcon Shops, LLC, sent, or caused to be sent, to DEI Property Management, LLC wire transfers totaling $332,800.00; and

     f.     Beginning on or about January 7, 2016, SAL/Trustee via Devcon Manchester, LLC, sent, or caused to be sent, to DEI Property Management, LLC a wire transfer of $476,000.00.

<u>Statutory Violations of 18 USC § 152(1) – Concealment of Property</u>

318.    SAL/Trustee, in violation of 18 USC § 152(1), knowingly and fraudulently concealed from the Goldberg Trustee, charged with the control or custody of property of the Debtors' bankruptcy estate, property that belonged to the Goldberg Debtors' bankruptcy estate, namely property that could be used to satisfy the SAL Judgment.  Specifically, SAL/Trustee violated 18 USC § 152(1) when he, while retaining a secret interest therein and with intent to deceive, performed the acts described below, proof of any one of which is a predicate act:

     a.     Knowingly transferred, or caused to be transferred, his 50% interest in Devwest, LLC to the SALDT, effective June 2, 2010;

     b.     Knowingly transferred, or caused to be transferred, his 34.69999% interest in SAL NH Investments, LLC to the SALDT, effective June 2, 2010;

     c.     Knowingly transferred, or caused to be transferred, his .00001% interest in SAL NH Investments, LLC to the SALDT, effective June 2, 2010;

     d.     Knowingly transferred, or caused to be transferred, his 27.2727% interest in SAL Cranston, LLC to the SALDT, effective June 2, 2010;

     e.     Knowingly transferred, or caused to be transferred, his 15% interest in SAL East Haven, LLC to the SALDT, effective June 2, 2010;

     f.     Knowingly transferred, or caused to be transferred, his 30% interest in SAL North Haven, LLC to the SALDT, effective June 2, 2010;

g.      Knowingly transferred, or caused to be transferred, his 25.0450% interest in Devcon Shops, LLC to the SALDT, effective June 2, 2010;

h.      Knowingly transferred, or caused to be transferred, his 35% interest in Devcon Fairhaven, LLC to the SALDT, effective June 2, 2010;

i.      Knowingly transferred, or caused to be transferred, his 50% interest in Devcon Berdon, LLC to the SALDT, effective June 2, 2010;

j.      Knowingly transferred, or caused to be transferred, his 19.5% interest in Devcon Manchester, LLC to the SALDT, effective June 2, 2010;

k.      Knowingly transferred, or caused to be transferred, his 50% interest in Devman, LLC to the SALDT, effective June 2, 2010;

l.      Knowingly transferred, or caused to be transferred, his 20.5% interest in Devcon Commons, LLC to the SALDT, effective June 2, 2010;

m.      Knowingly transferred, or caused to be transferred, his 50% interest in Devfresh, LLC to the SALDT, effective June 2, 2010;

n.      Knowingly transferred, or caused to be transferred, his 39.5% interest in RSC Gilford, LLC to the SALDT, effective June 2, 2010;

o.      Knowingly transferred, or caused to be transferred, his 29.7% interest in Marketplace Port St. Lucie, LP to the SALDT, effective June 2, 2010;

p.      Knowingly transferred, or caused to be transferred, his 100 shares of Marketplace Development Corp. to the SALDT, effective June 2, 2010;

q.      Knowingly transferred, or caused to be transferred, his 50% interest in Devford, LLC to the SALDT, effective June 2, 2010;

r.     Knowingly transferred, or caused to be transferred, his 10 Class A shares and 100 Class B shares of Devcon Enterprises, Inc. to the SALDT, effective June 2, 2010;

s.     Knowingly transferred, or caused to be transferred, $143,623.06 payable to the SALDT to RCZS on or about May 17, 2012, to satisfy a personal obligation he owed to RCZS;

t.      Knowingly transferred, or caused to be transferred, $243,376.94 payable to the SALDT to RCZS, on or about MAY 17, 2012, to satisfy a personal obligation he owed to RCZS;

u.     Knowingly transferred, or caused to be transferred, on or about May 17, 2012, SAL North Haven's sole asset and thereafter dissolving SAL North Haven on or about June 5, 2012;

v.     Knowingly transferred, or caused to be transferred, SAL Smithfield's sole asset, or about May 17, 2012, and thereafter dissolving SAL Smithfield on or about February 27, 2013;

w.     Knowingly transferred, or caused to be transferred, SAL Cranston's sole asset, on or about January 14, 2013, and thereafter dissolving SAL Cranston on or about May 14, 2014;

x.     Knowingly transferred, or caused to be transferred, SAL Middletown's sole asset, on or about May 31, 2013, and thereafter dissolving SAL Middletown on or about June 14, 2013;

y.      Knowingly transferred, or caused to be transferred, SAL NH's sole asset, in October 24, 2013, and thereafter dissolving SAL NH on or about November 7, 2013; and

z.      Knowingly assisted, as President and CEO of Devcon Enterprises, Inc., in the transfer of Devcon Enterprises, Inc.'s assets, including its operating business, to DEI Property Management, LLC in February and March, 2015.

Statutory Violations of 18 USC § 152(7) – Fraudulent Transfer or Concealment

319.    SAL/Trustee, in violation of 18 USC § 152(7), knowingly and fraudulently transferred and concealed his own property and the property of entities that he controlled with the intent to defeat the provisions of title 11, namely by rendering property that could be used to satisfy the SAL Judgment uncollectable by the Goldberg Trustee.  Specifically, SAL/Trustee violated 18 USC § 152(7) when he, with intent to deceive, performed the acts described herein, including but not limited to the allegations contained in paragraph 387(a), proof of any one of which is a predicate act.

Statutory Violations of 18 USC § 1503 – Obstruction of Justice

320.    SAL/Trustee corruptly endeavored to impede the Goldberg Trustee as an officer of a court of the United States of America in the discharge of his duties, in violation of 18 USC § 1503(a), by engaging in the conduct described herein, including but not limited to the allegations contained in paragraph 387(a), which conduct placed his assets, and the assets of entities that he controlled, beyond the reach of the Goldberg Trustee and rendered SAL judgment proof.

321.    SAL/Trustee corruptly endeavored to impede the Goldberg Trustee as an officer of a court of the United States of America with knowledge of ongoing judicial proceedings, namely the Goldberg Debtors' bankruptcy proceeding and with knowledge that the Goldberg Trustee

would pursue claims against him to recover the millions of dollars of fraudulent transfers he received from the Goldberg Debtors.

322.    The natural and probable effect of SAL/Trustee's conduct, and SAL/Trustee's intent, was substantial and ongoing interference with the Goldberg Trustee's ability to discharge his duties.

<u>Statutory Violations of 18 USC § 1512 – Obstruction of Justice</u>

323.    By engaging in the conduct described herein which had the practical impact of rendering his assets, and the assets of entities that he controlled, beyond the reach of the Goldberg Trustee, SAL/Trustee corruptly obstructed and impeded the Goldberg Debtors' bankruptcy proceeding by engaging in the conduct described herein, including but not limited to the allegations contained in paragraph 387(a).

324.    Furthermore, SAL violated 18 USC § 1512(c)(2) when he knowingly and egregiously destroyed evidence, namely emails, documenting his role in the Goldberg Scheme.

325.    SAL destroyed his Goldberg Scheme related emails with the intent to impair their integrity or availability for use in any proceeding that might be brought as a result of his investments or participation in the Goldberg Scheme.

<u>Statutory Violations of 18 USC § 1956 – Money Laundering</u>

326.    In violation of 18 USC § 1956(a)(1), SAL/Trustee:

    a.    Conducted the series of financial transactions described herein, including but not limited to the allegations contained in paragraph 387(a), proof of any one of which is a predicate act:

        i.    knowing that the property involved represented the proceeds of unlawful activity, namely violations of 18 USC §§ 152, 1341, 1343,

1503, and/or 1512, and which transactions in fact involved the proceeds of violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512 as alleged elsewhere in this Complaint;

ii.   with the intent to promote the carrying on of specified unlawful activity, namely the violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512 described herein in furtherance of the Enterprise to Obstruct the Goldberg Trustee; and,

iii.   knowing and having reason to know that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, as detailed elsewhere in this Complaint.

327.   As a direct and proximate result and by reason of the foregoing violations of 18 USC § 1962(c), the Goldberg Trustee has been impeded in the discharge of his duty to "collect and reduce to money the property of the estate for which such trustee serves" pursuant to 11 USC § 704(1)(1), and "receive and collect any and all sums of money due to the defendant," and he has been injured as a result.

328.   Likewise, the Goldberg Victims have been harmed as a direct and proximate result of the foregoing violations of 18 USC § 1962(c) inasmuch as they continue to be deprived of monies that are rightfully theirs.

329.   Lastly, the Goldberg Trustee has been impeded because he has been forced to expend considerable time and resources, and incur substantial cost, attempting to enforce the SAL Judgment including by pursuing multiple actions against the various individuals and entities to

whom SAL has transferred his assets, none of which would have been expended or incurred but for SAL/Trustee's conduct as set forth herein.

330.   The Goldberg Trustee is the representative of the Goldberg Victims who are the ultimate beneficiaries of the Goldberg Trustee's claims and judgments, including the SAL Judgment.   Thus, each and every effort to impede the Goldberg Trustee causes injury to the Goldberg Victims.

331.   As a consequence of the foregoing, the Goldberg Trustee is entitled to recover herein treble damages, as well as the costs and attorneys' fees incurred in bringing this suit.

### COUNT 2
### SUBSTANTIVE RACKETEERING
### (AGAINST R. LABONTE, INDIVIDUALLY, AS TRUSTEE OF
### THE SALDT, AS TRUSTEE OF THE RGL REV. TRUST)

332.   The Goldberg Trustee realleges and incorporates by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

333.   Beginning in or about 2010 and continuing at least until the filing of this Complaint, Roland LaBonte, individually and in his capacity as trustee of the SALDT and the RGL Rev. Trust (collectively "Roland LaBonte/Trustee"), a defendant herein, being a "person" as that term is defined in 18 USC § 1961(3), did knowingly maintain, directly or indirectly, control of, and conducted and participated in, directly or indirectly, the Enterprise to Obstruct the Goldberg Trustee which was engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity, as that term is defined in 18 USC §§ 1961(1) and (5).

334.   Roland LaBonte/Trustee, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the Enterprise to Obstruct the Goldberg Trustee.

335.    The racketeering activity in which Roland LaBonte/Trustee engaged in violation of 18 USC §§ 1962(c) consisted, *inter alia*, of:

      a.    Wire fraud in violation of 18 USC § 1343;

      b.    Multiple acts of concealment and fraudulent transfer of property under 18 USC § 152;

      c.    Multiple acts of obstruction of justice under 18 USC §§ 1503 and 1512; and

      d.    Multiple acts of money laundering under 18 USC § 1956.

336.    Specifically, Roland LaBonte/Trustee engaged in a pattern of racketeering activity consisting of at least the following predicate acts:

<u>Statutory Violations of 18 USC § 1343 – Wire Fraud</u>

337.    On or about the dates set forth below, Roland LaBonte/Trustee, in violation of 18 USC § 1343, for the purpose of executing and attempting to execute the Enterprise to Obstruct the Goldberg Trustee, did knowingly transmit and cause to be transmitted, in interstate commerce, by means of wire communication, the writings, signs, and signals set forth below, each one of which is a predicate act, with the intent to further a scheme or artifice to obstruct and defraud the Goldberg Trustee:

      a.    On or about January 13, 2015, Roland LaBonte/Trustee caused an Application for Employer Identification Number for DEIPM to be sent via electronic mail;

      b.    On or about January 15, 2015, Roland LaBonte/Trustee sent to L. Marks, Esq. via electronic mail the signature page for the DEIPM Operating Agreement executed by Roland LaBonte Rev. Trustee, Marilyn LaBonte Rev. Trustee, and Roland LaBonte;

c.      On or about January 16, 2015, Roland LaBonte/Trustee sent to L. Marks, Esq. via electronic mail the executed signature page for DEIPM's lease for office space, executed by Roland LaBonte;

d.      On or about February 11, 2015, Roland LaBonte/Trustee sent to L. Marks, Esq. via electronic mail five letters addressed to SAL as President of Devcon, informing him that DEIPM would be taking over management responsibilities from five Devcon managed properties;

e.      On or about February 18, 2015, Roland LaBonte/Trustee transmitted to Roxanne Blaze, office manager at Devcon and subsequently DEIPM, the necessary signature pages to, among other things, transfer Devcon's vendor contracts to DEIPM;

f.      On or about February 20, 2015, Roland LaBonte/Trustee transmitted to P. Bourdeau, Esq. via electronic mail an instruction to amend an existing trust instrument, and/or draft a new trust instrument for Marilyn LaBonte, to ensure that ownership of the assets of DEIPM would pass to SAL's heirs because SAL and Roland LaBonte had agreed that the assets of Devcon, which had been transferred to DEIPM, would be returned to SAL once his legal issues with the Goldberg Trustee were resolved;

g.      On February 26, 2015, Roland LaBonte/Trustee sent via electronic mail to Cummings & Lockwood, LLC the signature pages for, *inter alia*, the MPL 2015 Rev. Trust thereby creating the MPL 2015 Rev. Trust; and

h.      Upon information and belief, on February 26, 2015, Roland LaBonte/ Trustee sent to L. Marks, Esq. via electronic mail the signature page for the

81

DEIPM Operating Agreement executed by Roland LaBonte Rev. Trustee,

Marilyn LaBonte 2015 Rev. Trustee, and Roland LaBonte.  The February

26, 2015, DEIPM Operating Agreement changed the 99.99% member of

DEIPM from the MPL Rev. Trust to the MPL 2015 Rev. Trust.

<u>Statutory Violations of 18 USC § 152(7) – Fraudulent Transfer or Concealment</u>

338.    Roland LaBonte/Trustee, in violation of 18 USC § 152(7), knowingly and

fraudulently transferred and concealed the property of entities that he controlled with the intent to

defeat the provisions of title 11, namely by rendering property that could be used to satisfy the

SAL Judgment uncollectable by the Goldberg Trustee.  Specifically, Roland LaBonte/Trustee

violated 18 USC § 152(7) when he, with intent to deceive, performed the acts described below,

proof of any one of which is a predicate act:

   a.    Knowingly issued, or caused to be issued, in the summer of 2010, the June

         2010 Note issued in favor of the SAL Rev. Trust by the SALDT knowing

         that the purpose of said note was to provide purported legitimacy to SAL's

         transfer of all of his assets to the SALDT effective June 2, 2010;

   b.    Knowingly accepting the transfer of the Fraudulently Transferred Interests

         to the SALDT by executing, in July or August 2010, certain Assignment

         and/or Assumption Agreements related to each such Fraudulently

         Transferred Interest as alleged herein;

   c.    On or about June 2, 2010, knowingly issuing, or causing to be issued, the

         Restated 2006 Note issued in favor of the SAL Rev. Trust by the SALDT

         knowing that the purpose of said note was to impede the Goldberg Trustee

         by extending the term of the 2006 Note;

    d.      In or about February or March of 2015, knowingly transferred, or caused to be transferred, Devcon Enterprise, Inc.'s assets and property to DEI Property Management, LLC by accepting said transfer as manager and member of DEIPM;

    e.      Knowingly transferring, or causing to be transferred, $955,838.88 to the MPL 2015 Rev. Trust from DEIPM in 2015 knowing that said funds would be used by SAL to pay his expenses and finance his lifestyle;

    f.      Knowingly transferring, or causing to be transferred, $2,127,870.00 to the MPL 2015 Rev. Trust from DEIPM in 2016 knowing that said funds would be used by SAL to pay his expenses and finance his lifestyle; and

    g.      Knowingly transferring, or causing to be transferred, $239,760.00 to the MPL 2015 Rev. Trust from DEIPM in 2017 knowing that said funds would be used by SAL to pay his expenses and finance his lifestyle.

<u>Statutory Violations of 18 USC § 1503 – Obstruction of Justice</u>

339. The Goldberg Trustee is an officer of the Court having been duly appointed by Judge Dabrowski.

340. Roland LaBonte/Trustee corruptly endeavored to impede the Goldberg Trustee as an officer of a court of the United States of America in the discharge of his duties, in violation of 18 USC § 1503(a), by engaging in the conduct alleged herein, including but not limited to the allegations contained in paragraph 387(b), which conduct had the practical impact of placing property to which the Goldberg Trustee was entitled beyond his reach. Roland LaBonte/Trustee did so with knowledge of ongoing judicial proceedings and with knowledge and intent that the

natural and probable effect of his conduct was the interference with the Goldberg Trustee's ability to discharge his duties.

Statutory Violations of 18 USC § 1512 – Obstruction of Justice

341.    The foregoing conduct of Roland LaBonte/Trustee as alleged herein, including but not limited to the allegations contained in paragraph 387(b), corruptly obstructed and impeded an official proceeding:  The Goldberg Debtors' bankruptcy proceeding and related proceedings to protect and collect the SAL Judgment.

Statutory Violations of 18 USC § 1956 – Money Laundering

342.    The actions of Roland LaBonte/Trustee as alleged herein, which allegations are incorporated herein by reference, violated 18 USC § 1956(a)(1) by:

    a.    Conducting the series of financial transaction alleged herein, including but not limited to the allegations contained in paragraph 387(b):

        i.    knowing that the property involved represented the proceeds of some form of unlawful activity, namely violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512;

        ii.    which transactions in fact involved the proceeds of such unlawful activity as alleged throughout this Complaint;

        iii.    with the intent to promote the carrying on of said specified unlawful activity in furtherance of the Enterprise to Obstruct the Goldberg Trustee; and,

        iv.    knowing and having reason to know that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of

84

specified unlawful activity, all as alleged elsewhere in this Complaint.

343.   As a direct and proximate result and by reason of the foregoing violations of 18 USC § 1962(c) the Goldberg Trustee has been impeded in the discharge of his duty to "collect and reduce to money the property of the estate for which such trustee serves" pursuant to 11 USC § 704(1)(1), and "receive and collect any and all sums of money due to the defendant," and he has been injured as a result.

344.   Likewise, the Goldberg Victims have been harmed as a direct and proximate result of the foregoing violations of 18 USC § 1962(c) inasmuch as they continue to be deprived of monies that are rightfully theirs.

345.   Lastly, the Goldberg Trustee has been impeded because he has been forced to expend considerable time and resources, and incur substantial cost, attempting to enforce the SAL Judgment, as well as pursuing multiple actions against the various individuals and entities to whom SAL has transferred his assets, none of which would have been expended or incurred but for Roland LaBonte/Trustee's conduct as set forth herein.

346.   The Goldberg Trustee is the representative of the Goldberg Victims who are the ultimate beneficiaries of the Goldberg Trustee's claims and judgments, including the SAL Judgment.  Thus, each and every effort to impede the Goldberg Trustee causes injury to the Goldberg Victims.

347.   As a consequence of the foregoing, the Goldberg Trustee is entitled to recover herein treble damages, as well as the costs and attorneys' fees incurred in bringing this suit.

<u>C</u><u>OUNT</u> <u>3</u>
<u>S</u><u>UBSTANTIVE</u> <u>R</u><u>ACKETEERING</u>
<u>(A</u><u>GAINST</u> <u>J. S</u><u>PARVERI</u><u>, I</u><u>NDIVIDUALLY AND AS</u> <u>T</u><u>RUSTEE OF THE</u> <u>SALDT</u><u>)</u>

348.    The Goldberg Trustee realleges and incorporates by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

349.    Beginning in or about 2010 and continuing at least until the filing of this Complaint, J. Sparveri both individually and, until his resignation in 2013, as trustee of the SALDT (collectively "J. Sparveri/Trustee"), a defendant herein, being a "person" as that term is defined in 18 USC § 1961(3), did knowingly maintain, directly or indirectly, control of, and conducted and participated in, directly or indirectly, the Enterprise to Obstruct the Goldberg Trustee which was engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity, as that term is defined in 18 USC §§ 1961(1) and (5).

350.    J. Sparveri/Trustee, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the Enterprise to Obstruct the Goldberg Trustee.

351.    The racketeering activity in which J. Sparveri/Trustee engaged in violation of 18 USC §§ 1962(c) consisted, *inter alia*, of:

    a.    Multiple acts of wire fraud in violation of 18 USC § 1343;

    b.    Multiple acts of concealment and fraudulent transfer of property under 18 USC § 152;

    c.    Multiple acts of obstruction of justice under 18 USC §§ 1503 and 1512; and

    d.    Multiple acts of money laundering under 18 USC § 1956.

352.    Specifically, J. Sparveri/Trustee engaged in a pattern of racketeering activity consisting of at least the following predicate acts:

<u>Statutory Violations of 18 USC § 1343 – Wire Fraud</u>

353.     On or about the dates set forth below, J. Sparveri/Trustee, in violation of 18 USC § 1343, for the purpose of executing and attempting to execute the Enterprise to Obstruct the Goldberg Trustee did knowingly transmit and cause to be transmitted, in interstate commerce, by means of wire communication, the writings, signs, and signals set forth below, proof of any one of which is a predicate act, with the intent to further a scheme or artifice to defraud the Goldberg Trustee:

a.      On June 9, 2010, J. Sparveri sent to P. Bourdeau, Esq. and SAL via email the Revised 2006 Note for review.  P. Bourdeau, Esq. responded to J. Sparveri's email on June 10, 2010 stating "I have reviewed the note and it is in excellent shape."

b.      On or about June 9, 2010, J. Sparveri spoke with SAL by telephone concerning the artificially deflated, and, therefore false, values to be assigned to each of the assets transferred to the SALDT in connection with the transfer of the Fraudulently Transferred Interests.

c.      On June 11, 2010, J. Sparveri sent an email to SAL's counsel attaching information for use in SAL's counsel's preparation of the assignment, assumption and consent agreements to effectuate the transfer of the Fraudulently Transferred Interests.

d.      On June 11, 2010, J. Sparveri sent to SAL via email the Revised 2006 Note.

e.      On July 21, 2010, J. Sparveri sent to SAL's counsel and SAL via email comments to the assignment, assumption and consent agreements intended to effectuate the transfer of the Fraudulently Transferred Interests.

f.  On July 28, 2010, J. Sparveri sent an email to Barbara Pursley of Devcon confirming that distributions from the Fraudulently Transferred Interests should be paid to SAL personally, even though the income producing assets had been transferred to the SALDT, and even though J. Sparveri later testified that paying the income directly to the SALDT was the right thing to do.

g.  On August 10, 2010, J. Sparveri sent an email to an individual who was a trustee of a trust that was a member of several SAL dominated and controlled entities.  In the email J. Sparveri, who was also a trustee of that trust, informs his co-trustee that he has reviewed the assignment agreements effectuating the transfer of the Fraudulently Transferred Interests and they are "good to go for signature."  J. Sparveri's August 10, 2010, email was in response to an email from SAL's counsel to the same trustee in which SAL's counsel falsely represented that SAL was transferring his assets to the SALDT for "estate planning reasons."

<u>Statutory Violations of 18 USC § 152(7) – Fraudulent Transfer and Concealment</u>

354.  J. Sparveri/Trustee, in violation of 18 USC § 152(7), knowingly and fraudulently transferred and concealed the property of the SALDT with the intent to defeat the provisions of title 11, namely by rendering property that could be used to satisfy the SAL Judgment uncollectable by the Goldberg Trustee though the actions described herein, including but not limited to the allegations contained in paragraph 387(c).

Statutory Violations of 18 USC § 1503 – Obstruction of Justice

355.   J. Sparveri/Trustee further corruptly obstructed, impeded, and endeavored to obstruct and impede, the due administration of justice, namely the orderly collection and reduction to money of the property of the Goldberg Debtors' estate by the Goldberg Trustee, an officer of a court of the United States of America, in violation of 18 USC § 1503(a), by engaging  in the conduct alleged herein, including but not limited to the allegations contained in paragraph 387(c).

356.   The conduct of J. Sparveri/Trustee alleged herein rendered property to which the Goldberg Trustee was entitled beyond his reach.

357.   J. Sparveri/Trustee engaged in the foregoing conduct with knowledge of ongoing judicial proceedings and that the natural and probable effect of his conduct was the interference with the Goldberg Trustee's ability to discharge his official duties.

Statutory Violations of 18 USC § 1512 – Obstruction of Justice

358.   By engaging in the heretofore alleged conduct, including but not limited to the allegations contained in paragraph 387(c), which had the practical effect of rendering property to which the Goldberg Trustee was entitled beyond his reach, J. Sparveri/Trustee corruptly obstructed and impeded an official proceeding: The Goldberg Debtors' bankruptcy proceeding.

Statutory Violations of 18 USC § 1956 – Money Laundering

359.   The actions of J. Sparveri/Trustee as alleged herein constitute a violation of 18 USC § 1956(a)(1).

360.   J. Sparveri/Trustee violated 18 USC § 1956(a)(1) by:

a.   Conducting the series of financial transactions alleged herein, including but not limited to the allegations contained in paragraph 387(c):

i.   knowing that the property involved represented the proceeds of some form of unlawful activity, namely violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512;

ii.   which transactions in fact involved the proceeds of such unlawful activity as alleged elsewhere in this Complaint;

iii.   With the intent to promote the carrying on of said specified unlawful activity in furtherance of the Enterprise to Obstruct the Goldberg Trustee; and,

iv.   Knowing and having reason to know that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, all as alleged herein.

361.   As a direct and proximate result and by reason of the foregoing violations of 18 USC § 1962(c), the Goldberg Trustee has been impeded in the discharge of his duty to "collect and reduce to money the property of the estate for which such trustee serves" pursuant to 11 USC § 704(1)(1), and "receive and collect any and all sums of money due to the defendant," and he has been injured as a result.

362.   Likewise, the Goldberg Victims have been harmed as a direct and proximate result of the foregoing violations of 18 USC § 1962(c) inasmuch as they continue to be deprived of monies that are rightfully theirs.

363.   Lastly, the Goldberg Trustee has been impeded because he has been forced to expend considerable time and resources, and incur substantial cost, attempting to enforce the SAL Judgment including by pursuing multiple actions against the various individuals and entities to

whom SAL has transferred his assets, none of which would have been expended or incurred but for J. Sparveri/Trustee's conduct as set forth herein.

364. The Goldberg Trustee is the representative of the Goldberg Victims who are the ultimate beneficiaries of the Goldberg Trustee's claims and judgments, including the SAL Judgment. Thus, each and every effort to impede the Goldberg Trustee causes injury to the Goldberg Victims.

365. As a consequence of the foregoing, the Goldberg Trustee is entitled to recover herein treble damages, as well as the costs and attorneys' fees incurred in bringing this suit.

### COUNT 4
### SUBSTANTIVE RACKETEERING
### (AGAINST SALLY LABONTE, INDIVIDUALLY, AS TRUSTEE OF THE SALDT AND AS TRUSTEE OF THE SAL REV. TRUST)

366. The Goldberg Trustee realleges and incorporates by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

367. Beginning in or about 2010 and continuing at least until the filing of this Complaint, Sally LaBonte individually and in her capacity as trustee of the SALDT and the SAL Rev. Trust (collectively "Sally LaBonte/Trustee"), a defendant herein, being a "person" as that term is defined in 18 USC § 1961(3), did knowingly maintain, directly or indirectly, control of, and conducted and participated in, directly or indirectly, the Enterprise to Obstruct the Goldberg Trustee which was engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity, as that term is defined in 18 USC §§ 1961(1) and (5).

368. Sally LaBonte/Trustee, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the Enterprise to Obstruct the Goldberg Trustee.

369.    The racketeering activity in which Sally LaBonte/Trustee engaged in violation of 18 USC §§ 1962(c) consisted, *inter alia*, of:

       a.    Multiple acts of mail fraud in violation of 18 USC § 1341;

       b.    Multiple acts of concealment and fraudulent transfer of property under 18 USC § 152;

       c.    Multiple acts of obstruction of justice under 18 USC §§ 1503 and 1512;

       d.    Multiple acts of money laundering under 18 USC § 1956; and,

       e.    Multiple acts of transaction of money involved in unlawful activity under 18 USC § 1957.

370.    Specifically, Sally LaBonte/Trustee engaged in a pattern of racketeering activity consisting of at least the following predicate acts:

<u>Statutory Violations of 18 USC § 152(7) – Fraudulent Transfer and Concealment</u>

371.    Sally LaBonte/Trustee, in violation of 18 USC § 152(7), knowingly and fraudulently transferred and concealed the property of the SAL Rev. Trust and the SALDT with the intent to defeat the provisions of title 11, namely by rendering property that could be used to satisfy the SAL Judgment uncollectable by the Goldberg Trustee by engaging in the conduct described herein, including but not limited to the allegations contained in paragraph 387(d).

<u>Statutory Violations of 18 USC § 1503 – Obstruction of Justice</u>

372.    By engaging in the conduct alleged herein, including but not limited to the allegations contained in paragraph 387(d), Sally LaBonte/Trustee further corruptly obstructed, impeded, and endeavored to obstruct and impede, the due administration of justice, namely the orderly collection and reduction to money of the property of the Goldberg Debtors' estate by the

Goldberg Trustee, an officer of a court of the United States of America, in violation of 18 USC § 1503(a).

373.     The heretofore alleged conduct of Sally LaBonte/Trustee rendered property to which the Goldberg Trustee was entitled beyond his reach.

374.     Sally LaBonte/Trustee engaged in the foregoing conduct with knowledge of ongoing judicial proceedings and with knowledge and intent that the natural and probable effect of her conduct was the interference with the Goldberg Trustee's ability to discharge his official duties.

<u>Statutory Violations of 18 USC § 1512 – Obstruction of Justice</u>

375.     By engaging in the heretofore alleged conduct, including but not limited to the allegations contained in paragraph 387(d), which rendered property to which the Goldberg Trustee was entitled beyond his reach, Sally LaBonte/Trustee corruptly obstructed and impeded an official proceeding: The Goldberg Debtors' bankruptcy proceeding.

<u>Statutory Violations of 18 USC § 1956 – Money Laundering</u>

376.     The actions of Sally LaBonte/Trustee as alleged in this Complaint constitute a violation of 18 USC § 1956(a)(1) inasmuch as, Sally LaBonte/Trustee:

    a.     Conducted the series of financial transactions as alleged herein, including but not limited to the allegations contained in paragraph 387(d):

        i.     Knowing that the property involved represented the proceeds of some form of unlawful activity, namely violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512;

        ii.     Which transactions in fact involved the proceeds of such unlawful activity as alleged herein;

iii.   With the intent to promote the carrying on of said specified unlawful activity in furtherance of the Enterprise to Obstruct the Goldberg Trustee; and,

iv.   Knowing and having reason to know that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, all as alleged herein.

<u>Statutory Violations of 18 USC § 1957 –</u>
<u>Monetary Transactions in Property Derived from Unlawful Activity</u>

377.   Sally LaBonte/Trustee, in violation of 18 USC § 1957(a), while in the United States of America, knowingly engaged in multiple monetary transactions in criminally derived property, namely violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512, the value of which was greater than $10,000, and the property was in fact derived from specified unlawful activity, namely violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512 by performing the acts alleged herein, including but not limited to the allegations contained in paragraph 387(d), proof of any one of which is a predicate act.

378.   As a direct and proximate result and by reason of the foregoing violations of 18 USC § 1962(c) the Goldberg Trustee has been impeded in the discharge of his duty to "collect and reduce to money the property of the estate for which such trustee serves" pursuant to 11 USC § 704(1)(1), and "receive and collect any and all sums of money due to the defendant," and he has been injured as a result.

379.   Likewise, the Goldberg Victims have been harmed as a direct and proximate result of the foregoing violations of 18 USC § 1962(c) inasmuch as they continue to be deprived of monies that are rightfully theirs.

380.    Lastly, the Goldberg Trustee has been impeded because he has been forced to expend considerable time and resources, and incur substantial cost, attempting to enforce the SAL Judgment including by pursuing multiple actions against the various individuals and entities to whom SAL has transferred his assets, none of which would have been expended or incurred but for Sally LaBonte/Trustee's conduct as set forth herein.

381.    The Goldberg Trustee is the representative of the Goldberg Victims who are the ultimate beneficiaries of the Goldberg Trustee's claims and judgments, including the SAL Judgment.   Thus, each and every effort to impede the Goldberg Trustee causes injury to the Goldberg Victims.

382.    As a consequence of the foregoing, the Goldberg Trustee is entitled to recover herein treble damages, as well as the costs and attorneys' fees incurred in bringing this suit.

### COUNT 5
### RACKETEERING CONSPIRACY
**(AGAINST ALL NAMED DEFENDANTS)**

383.    The Goldberg Trustee realleges and incorporates by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

384.    The Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 USC §§ 1962(c) as described above, in violation of 18 USC § 1962(d).

385.    By and through each Defendant's close personal and/or professional relationship with SAL and involvement in the LaBonte Family real estate business, each defendant knew the nature of the Enterprise to Obstruct the Goldberg Trustee and each Defendant knew that the Enterprise to Obstruct the Goldberg Trustee extended beyond each Defendant's respective role.

386.    Each Defendant engaged in the acts as alleged herein, possessing knowledge of at least the general contours of the conspiracy, with the intent to further or facilitate the Enterprise to Obstruct the Goldberg Trustee and the purpose thereof.

387.    Such acts by the named defendants are as alleged in this Complaint, including but not limited to:

a.    As to SAL/Trustee: the acts of SAL/Trustee articulated herein, including at Paragraphs 57-282, 317(a)-(g), and 318(a)-(z), which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, 1512, and/or 1956.

b.    As to Roland LaBonte/Trustee: the acts of Roland LaBonte/Trustee articulated herein, including at Paragraphs 76(a)-(p), 109, 129-134, 214-282, 337(a)-(h), 338(a)-(g), which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, 1512, and/or 1956.

c.    As to J. Sparveri/Trustee: the acts of J. Sparveri/Trustee articulated herein, including at Paragraphs 57-134, 234-266, and 353(a)-(g), which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, 1512, and/or 1956.

d.    As to Sally LaBonte/Trustee: the acts of Sally LaBonte/Trustee articulated herein, including at Paragraphs 76(a)-(p), 79, 97, 102, 109, 120-125, and 226, which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, 1512, 1956, and/or 1957.

e.   As to Marilyn LaBonte, Marilyn LaBonte Rev. Trustee, and Marilyn LaBonte 2015 Rev. Trustee (collectively Marilyn LaBonte/Trustee"): the acts articulated herein, including at Paragraphs 78 and 257-266, which are incorporated herein by reference, and by engaging in the acts necessary to i) settle or create the MPL 2015 Rev. Trust, ii) open a checking account in the name of the MPL 2015 Rev. Trust, and iii) authorize SAL's continuous and ongoing use of said checking account to pay his and his family's living expenses to maintain their affluent lifestyle using the proceeds of Devcon's ongoing business activities to which the Goldberg Trustee is entitled, while at the same time dissolving Devcon and concealing its continuing business through DEIPM. These acts constitute violates of, *inter alia*, 18 USC § 1503, 1512, 152, and/or 1956.

f.   As to L. Marks, Esq.: the acts of L. Marks, Esq. articulated herein, including at Paragraphs 165-194 and 214-281, which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, and/or 1512.

g.   As to P. Bourdeau, Esq.: the acts of P. Bourdeau, Esq. articulated herein, including at Paragraphs 57-81, 89-100, 133-134, 214-242, 249, and 257-267, which are incorporated herein by reference, and constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, and/or 1512.

h.   As to R. Landino: the acts of R. Landino articulated herein, including at Paragraphs 135-213, which are incorporated herein by reference, and

97

constitute violations of, *inter alia*, 18 USC §§ 1343, 152, 1503, 1512, and/or 1956.

388.    Each Defendant knew about and agreed to facilitate the Enterprise to Obstruct the Goldberg Trustee by way of the acts in which he or she engaged as alleged herein and/or through explicit agreement amongst some or all of the Defendants.  Further evidence of an agreement among the Defendants is particularly within the knowledge and control of each Defendant.

389.    As a direct and proximate result and by reason of the foregoing violations of 18 USC § 1962(d) the Goldberg Trustee has been impeded in the discharge of his duty to "collect and reduce to money the property of the estate for which such trustee serves" pursuant to 11 USC § 704(1)(1), and "receive and collect any and all sums of money due to the defendant," and he has been injured as a result.

390.    Likewise, the Goldberg Victims have been harmed as a direct and proximate result of the foregoing violations of 18 USC § 1962(d) inasmuch as they continue to be deprived of monies that are rightfully theirs.

391.    Lastly, the Goldberg Trustee has been impeded because he has been forced to expend considerable time and resources, and incur substantial cost, attempting to enforce the SAL Judgment including by pursuing multiple actions against the various individuals and entities to whom SAL has transferred his assets, none of which would have been expended or incurred but for the Defendant's conduct as set forth herein.

392.    The Goldberg Trustee is the representative of the Goldberg Victims who are the ultimate beneficiaries of the Goldberg Trustee's claims and judgments, including the SAL Judgment.  Thus, each and every effort to impede the Goldberg Trustee causes injury to the Goldberg Victims.

393.    As a consequence of the foregoing, the Goldberg Trustee is entitled to recover herein treble damages, as well as the costs and attorneys' fees incurred in bringing this suit.

**COUNT 6**
**VICARIOUS LIABILITY**
**(AGAINST J&M)**

394.    The Goldberg Trustee realleges and incorporates by reference the allegations made in each of the proceeding paragraphs, specifically paragraphs 1 through 310.

395.    Beginning on or about October 1, 2012, L. Marks, Esq. was a partner, member and/or agent of J&M.

396.    L. Marks, Esq. engaged in the various wrongful acts, errors, and omissions set out in this Complaint in the ordinary course of business of J&M.  L. Marks, Esq.'s wrongful acts, errors, and omissions were made within the regular scope of his employment and authority at J&M and for the benefit and to further the interests of J&M.  For example:

    a.    J&M billed SAL and other members of the LaBonte Family, as well as entities controlled by LaBonte Family members, for L. Marks, Esq.'s work related to the Enterprise to Obstruct the Goldberg Trustee, and J&M received payment for such work.

    b.    In furtherance of the Enterprise to Obstruct the Goldberg Trustee, L. Marks, Esq. transmitted correspondence using J&M's letterhead and his firm email address and received correspondence at J&M's address and at his firm email address.

397.    L. Marks, Esq.'s wrongful acts, errors, and omissions impeded the Goldberg Trustee and thereby caused significant harm to the Goldberg Victims by:

       a.      Causing the Goldberg Trustee to expend substantial sums to uncover the Enterprise to Obstruct the Goldberg Trustee; and

       b.      Preventing the Goldberg Trustee from satisfying his claims against SAL and associated entities.

398.    As a result of the foregoing, the Goldberg Trustee and the Goldberg Victims have been injured.

399.    J&M is liable to the Goldberg Trustee to the same extent as L. Marks, Esq.

**WHEREFORE**, the Goldberg Trustee pray for judgment as follows:

1. Awarding the Goldberg Trustee compensatory damages in an amount to be proven at trial, consisting of lost debt damages and the attorneys' fees and costs expended as a result of the unlawful conduct alleged herein, together with pre-judgment interest;

2. Awarding the Goldberg Trustee treble damages pursuant to 18 USC § 1964(c);

3. Awarding the Goldberg Trustee his costs and expenses incurred in this action, including reasonable attorneys' fees and expenses;

4. Awarding the Goldberg Trustee punitive damages to the extent allowable by law; and,

5. Such other and further relief as the Court deems just and proper.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE SUBSTANTIVELY CONSOLIDATED
ESTATE OF MICHAEL S. GOLDBERG, LLC AND
MICHAEL S. GOLDBERG

By: */s/ James M. Moriarty*
Eric A. Henzy (ct12849)
James M. Moriarty (ct21876)
Christopher H. Blau (ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Tele: (203) 368-4234
Fax: (203) 367-9678
Email: ehenzy@zeislaw.com
jmoriarty@zeislaw.com
cblau@zeislaw.com