# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES BERMAN, Chapter 7 Trustee for
the Substantively Consolidated Estate
of Michael S. Goldberg, LLC and
Michael S. Goldberg,

        Plaintiff,

        v.

SCOTT A. LABONTE *et al.*,

        Defendants.

Case No. 19-cv-1533

## JOINT MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT</u>

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ......................................................................... 1

THE TRUSTEE'S ALLEGATIONS .................................................................. 6

STANDARD ..................................................................................................... 8

ARGUMENT ................................................................................................. 10

I.   THE TRUSTEE LACKS STANDING TO ASSERT A RICO CLAIM AGAINST THIRD PARTIES FOR POST-PETITION CONDUCT THAT DID NOT INJURE THE DEBTOR ................................................................. 10

II.  THE TRUSTEE'S "LOST DEBT" CLAIM IS NOT RIPE BECAUSE HIS PRIOR ACTIONS TO RECOVER ASSETS IN SATISFACTION OF THE DEBT HAVE NOT CONCLUDED ................................................... 12

III. IF THE LOST DEBT CLAIM IS RIPE, IT IS BARRED BY THE STATUTE OF LIMITATIONS .......................................................................... 18

    A.   The Trustee Learned of His Alleged Lost Debt Injury in 2011 ........... 18

    B.   The Trustee Did Not Learn of Any "New and Independent" Injury within the Limitations Period ...................................... 21

IV.  THE TRUSTEE'S CLAIM FOR COLLECTION EXPENSES INCURRED PRIOR TO JULY 28, 2015 IS BARRED BY THE STATUTE OF LIMITATIONS ........... 25

V.   THE TRUSTEE HAS FAILED TO ALLEGE A RICO VIOLATION ..................... 26

    A.   The Trustee Has Failed to Allege Any Predicate Acts of Racketeering ......................................................................... 26

        1.   The Asset Transfers Do Not Violate 18 U.S.C. § 152(1) ........... 27

        2.   The Asset Transfers Do Not Violate 18 U.S.C. § 152(7). .......... 28

        3.   The Asset Transfers Do Not Constitute Obstruction of Justice ...................................................................... 32

        4.   The Asset Transfers Do Not Constitute Wire Fraud ................. 35

        5.   The Asset Transfers Do Not Constitute Money Laundering .................................................................... 41

    **B.**      **The Trustee's Failure to Allege that the 2010 Transfers by Scott LaBonte Were Predicate Acts Requires Dismissal of the Lost Debt Claim** ...................................................................................... 44

    **C.**      **The Trustee Has Failed to Allege an Enterprise Distinct from the Alleged Pattern of Racketeering Activity** ...................................... 47

    **D.**      **The Conduct Alleged by the Trustee Does Not Amount to or Pose a Threat of Continuing Criminal Activity** .................................... 51

           **1.**      **The Alleged Conduct Does Not Exhibit Open-Ended Continuity Because a Scheme to Avoid a Creditor Is "Inherently Terminable"** ............................................................. 52

           **2.**      **The Alleged Conduct Does Not Exhibit Closed-Ended Continuity Because It Consisted of a Single Scheme, a Single Victim, Limited Participants, and Sporadic Acts of a Single Type** .......................................................................... 55

**CONCLUSION** ........................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
483 U.S. 143 (1987)............................................................................... 18

*Al-Abood v. El-Shamari*,
217 F.3d 225 (4th Cir. 2000) ................................................................ 58

*Apollon Waterproofing & Restoration, Inc. v. Bergassi*,
No. 01 Civ. 8388, 2003 WL 1397394 (S.D.N.Y. Mar. 20, 2003)................. 24, 27, 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................... 9

*Ashland Oil, Inc. v. Arnett*,
875 F.2d 1271 (7th Cir. 1989) .............................................................. 41

*Bankers Trust Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ..................................................... 12, 14, 18, 25

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
754 F.2d 57 (2d Cir. 1985) ................................................................... 10

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................ 47, 51

*Burke v. Dowling*,
944 F. Supp. 1036 (E.D.N.Y. 1995)....................................................... 31

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
67 F.3d 463 (2d Cir. 1995) ......................................... 41, 51, 52, 53, 56

*Cadle Co. v. Schultz*,
779 F. Supp. 392 (N.D. Tex. 1991) ...................................................... 41

*Carpenter v. United States*,
484 U.S. 19 (1987)................................................................................ 37

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
187 F.3d 229 (2d Cir. 1999) ................................................................ 52

*Comm. to Defend U.S. Constitution v. Moon*,
776 F. Supp. 568 (D.D.C. 1991) ........................................................... 57

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018) ........................................................ 13, 14, 25

*Dale v. Banque SCS Alliance, S.A.*,
    No. 02 Civ 3592, 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) ........................... 48

*DDR Const. Servs., Inc. v. Siemens Indus., Inc.*,
    770 F. Supp.2d 627 (S.D.N.Y. 2011) ...................................................... 46

*DeFalco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001) ............................................................... 26

*Democratic Nat'l Comm. v. Russian Federation*,
    392 F. Supp.3d 410 (S.D.N.Y. 2019) ........................................... 26, 51, 52

*Dempster v. Dempster*,
    No. 03-CV-1127, 2005 WL 8169590 (E.D.N.Y. Mar. 30, 2005) ............................ 22

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
    206 F. Supp.2d 362 (E.D.N.Y. 2002) ...................................................... 55

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    219 F. Supp.2d 576 (S.D.N.Y. 2002) ........................................... 29, 58, 54

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ...................................... 48, 52, 53, 54, 55, 56

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ................................................................ 13

*First Nationwide Bank v. Gelt Funding Corp.*,
    820 F. Supp. 89 (S.D.N.Y. 1993) .......................................................... 50

*Goldfine v. Sichenzia*,
    118 F. Supp. 2d 392 (S.D.N.Y. 2000) ....................................................... 9

*Grimes v. Fremont Gen. Corp.*,
    785 F. Supp.2d 269 (S.D.N.Y. 2011) ........................................................ 9

*H.J. Inc. v. Nw. Bell. Tel. Co.*,
    492 U.S. 229 (1989) .................................................................... 56, 58

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010) ....................................................................... 44, 46

*Hirsch v. Arthur Andersen & Co.*,
    178 B.R. 40, 43 (D. Conn. 1994) .................................................. 10, 11, 12

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) .................................................................... 44

*In re Colonial Realty Co.*,
   980 F.2d 125 (2d Cir. 1992) ...................................................... 28

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
   731 F.2d 1032 (2d Cir. 1984) ............................................... 34, 35

*In re Hunt*,
   149 B.R. 96 (Bankr. N.D. Tex. 1992) ........................................ 10

*In re Merrill Lynch Ltd. P'Ships. Litig.*,
   154 F.3d 56 (2d Cir. 1998) ................................................ 18, 25, 38

*In re Merrill Lynch Ltd. P'Ships. Litig.*,
   7 F. Supp.2d (S.D.N.Y. 1997) .................................................... 22

*In re Sheehan*,
   187 B.R. 669 (Bankr. D. Ariz. 1995) ........................................ 29

*In re Teligent, Inc.*,
   307 B.R. 744 (Bankr. S.D.N.Y. 2004) ...................................... 10

*In re Trilegiant Corp., Inc.*,
   11 F. Supp.3d 82 (D. Conn. 2014)..................................... 9, 18, 19, 21

*JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*,
   No. 06 Civ. 6095, 2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007) ...................... 49, 50

*Katzman v. Victoria's Secret Catalogue*,
   167 F.R.D. 649 (S.D.N.Y. 1996) ................................................ 9

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997).................................................................. 24

*Koch v. Christie's Int'l. PLC*,
   699 F.3d 141 (2d Cir. 2012) ...................................................... 19

*Lamont v. Pilkington*,
   No. 18-CV-11632, 2019 WL 5067128 (S.D.N.Y. Oct. 8, 2019) ...................... 8, 9

*Leung v. Law*,
   387 F. Supp.2d 105 (E.D.N.Y. 2005) ........................................ 45

*Lorber v. Winston*,
   962 F. Supp. 2d 419 (E.D.N.Y. 2013) ........................................ 23

v

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ............................................................. 8, 9

*McNally v. United States*,
    483 U.S. 350 (1987) .......................................................................... 36

*Midwest Grinding Co., Inc. v. Spitz*,
    976 F.2d 1016 (7th Cir. 1992) ........................................................... 58

*Motorola Credit Corp. v. Uzan*,
    322 F.3d 130 (2d Cir. 2003) .................................................. 13, 15, 17

*Pavlov v. Bank of N.Y. Co., Inc.*,
    135 F.Supp.2d 426 (S.D.N.Y. 2001) ............................................. 48, 49

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) .................................................. 27, 28, 37

*Red Ball Interior Demolition Corp. v. Palmadessa*,
    874 F. Supp. 576 (S.D.N.Y. 1995) ................................................ 45, 46

*Ritter v. Klisivitch*,
    No. 06-CV-5511, 2008 WL 2967627 (E.D.N.Y. July 30, 2008) ............ 53

*Rotella v. Wood*,
    528 U.S. 549 (2000) .............................................................. 18, 20, 21

*Rothberg v. Chloe Foods Corp.*,
    No. CV-06-5712, 2007 WL 2128376 (E.D.N.Y. July 25, 2007) ... 40, 53, 54

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ................................................................ 57

*Schlesinger v. Schlesinger*,
    No. 05-CV-5016, 2007 WL 9706975 (E.D.N.Y. Nov. 15, 2007) ............ 22

*Schnell v. Conseco, Inc.*,
    43 F. Supp.2d 438 (S.D.N.Y. 1999) ................................................... 58

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) .......................................................................... 13

*Shamis v. Ambassador Factors Corp.*,
    No. 95-cv-9818, 1997 WL 473577 (S.D.N.Y. Aug. 18, 1997) .............. 56

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ........................................................ 10, 11

*Skilling v. United States*,
    561 U.S. 358 (2010)...................................................................... 30, 32

*Stein v. N.Y. Stair Cushion Co., Inc.*,
    04-cv-4741, 2006 WL 319300 (E.D.N.Y. Feb. 10, 2006)............................ 27, 40, 48

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir. 1993) ....................................................... 14, 40, 46

*Sutliff, Inc. v. Donovan Cos., Inc.*,
    727 F.2d 648 (7th Cir. 1984) ............................................................... 41

*Targum v. Citrin Cooperman & Co., LLP*,
    No. 12 Civ. 6909, 2013 WL 6087400 (S.D.N.Y. Nov. 19, 2013) ............................ 35

*Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*,
    842 F. Supp. 1567 (S.D.N.Y. 1994)........................................................ 53

*United States v. Aguilar*,
    515 U.S. 593, 599 (1995).................................................................. 33

*United States v. Alsugair*,
    256 F. Supp.2d 306 (D.N.J. 2003) ......................................................... 37

*United States v. Archibald*,
    212 F. App'x 788 (11th Cir. 2006) ......................................................... 27

*United States v. Bishop*,
    825 F.2d 1278 (8th Cir. 1987) ......................................................... 40, 41

*United States v. Brennan*,
    395 F.3d 59 (2d Cir. 2005) ................................................................ 35

*United States v. Christo*,
    129 F.3d 578 (11th Cir. 1997) ............................................................. 43

*United States v. Evans*,
    844 F.2d 36 (2d Cir. 1988) ................................................................ 36

*United States v. Greenwood*,
    74 F.3d 1241 (6th Cir. 1996) .............................................................. 27

*United States v. Griffiths*,
    750 F.3d 237 (2d Cir. 2014) ............................................................... 33

*United States v. Hale*,
    762 F.3d 1214 (10th Cir. 2014) ............................................................ 27

**United States v. Henry,**
29 F.3d 112 (3d Cir. 1994) ........................................................ 36, 38

**United States v. Howard,**
569 F.2d 1331 (5th Cir. 1978) .................................................. 33, 35

**United States v. Int'l Longshoremen's Ass'n,**
518 F. Supp.2d 422 (E.D.N.Y. 2007) .................................... 49

**United States v. Knight,**
800 F.3d 491 (8th Cir. 2015) .................................................. 31, 40

**United States v. Lanier,**
520 U.S. 259 (1997) .................................................................. 29

**United States v. Ledee,**
772 F.3d 21 (1st Cir. 2014) ...................................................... 30

**United States v. Maali,**
358 F. Supp.2d 1154 (M.D. Fla. 2005) .................................. 43

**United States v. McCarthy,**
271 F.3d 387 (2d Cir. 2001) .............................................. 41, 42, 43

**United States v. Moody,**
923 F.2d 341 (5th Cir. 1991) .................................................. 30

**United States v. Parkhill,**
775 F.2d 612 (5th Cir. 1985) .................................................. 30

**United States v. Peters,**
732 F.3d 93 (2d Cir. 2013) .................................................. 42, 43

**United States v. Regan,**
713 F. Supp. 629 (S.D.N.Y. 1989) ........................................ 29

**United States v. Reifler,**
446 F.3d 65 (2d Cir. 2006) ...................................................... 39

**United States v. Sabbeth,**
262 F.3d 207 (2d Cir. 2001) .................................................... 28

**United States v. Savage,**
67 F.3d 1435 (9th Cir. 2011) .................................................. 43

**United States v. Tashjian,**
660 F.2d 829 (1st Cir. 1981) .................................................. 30

*United States v. Turkette*,
    452 U.S. 576 (1981) ......................................................................... 47, 49

*United States v. Walker*,
    No. 09-cv-478, 2011 WL 3417110 (E.D. Pa. July 28, 2011) .................................. 39

*United States v. West*,
    22 F.3d 586 (5th Cir. 1994) ...................................................................... 30

*USA Network v. Jones Intercable, Inc.*,
    729 F. Supp. 304 (S.D.N.Y. 1990) ............................................................... 53

*Veltri v. Building Service 32B-J Pension Fund*,
    393 F.3d 318 (2d Cir. 2004) ...................................................................... 21

*Wang v. Yien-Koo King*,
    No. 18 Civ 8948, 2019 WL 1763230 (S.D.N.Y. Apr. 22, 2019) ............................... 23

*Weizmann Institute of Science v. Neschis*,
    229 F. Supp.2d 234 (S.D.N.Y. 2002) ........................................................... 55

*World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*,
    530 F. Supp.2d 486 (S.D.N.Y. 2007) ........................................................... 22

**Statutes**

11 U.S.C. § 541 ............................................................................................ 27

18 U.S.C. § 152(1) ....................................................................................... 27

18 U.S.C. § 152(7) ....................................................................................... 28

18 U.S.C. § 1341 ......................................................................................... 36

18 U.S.C. § 1343 ......................................................................................... 36

18 U.S.C. § 1503 ...................................................................................... 32, 33

18 U.S.C. § 1512(c)(2) .................................................................................. 32

18 U.S.C. § 1956 ......................................................................................... 41

18 U.S.C. § 1957 ......................................................................................... 42

18 U.S.C. § 1964(c) ............................................................................. 18, 25, 38

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................... 36

**Fed R. Civ. P. 12(b)(1)** ................................................................................................ 8

**Fed R. Civ. P. 12(b)(6)** ................................................................................................ 8

Defendants Scott LaBonte, Sally LaBonte, Marilyn LaBonte, Roland LaBonte, Joseph W. Sparveri, Jr., Lawrence J. Marks Esq., Juliano & Marks, LLC, Paul Bourdeau, Esq., and Robert Landino (collectively, the "Defendants") respectfully submit this memorandum of law in support of their respective Motions to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

This action is a baseless attempt by the Trustee to contrive a RICO case where none exists. When stripped of its conclusory assertions, the Complaint alleges nothing more than a patchwork of allegedly fraudulent asset transfers that are governed by state civil remedies and do not constitute criminal predicate acts under RICO. In fact, the Trustee has filed at least four fraudulent conveyance actions, all of which remain ongoing, to recover assets that he asserts were fraudulently conveyed and may be used to satisfy a judgment he obtained against Scott LaBonte in 2017. The Trustee has been aware of the alleged fraudulent conveyances described in the Complaint for many years. Instead of diligently pursuing his available avenues of recovery in the four pending actions, the Trustee is now attempting to shelve those actions and open another front in the litigation by characterizing the conveyances—which occurred years before the Trustee obtained a judgment against Scott LaBonte—as a racketeering conspiracy, involving not only Scott LaBonte but his wife, mother, father, and a number of professionals who provided legal and accounting services to members of the family. By doing so the Trustee hopes he can circumvent the requirement that he exhaust his available remedies in the pending

fraudulent conveyance actions, gain the leverage of a potential (but baseless) treble damages award under RICO, and add deep-pocketed professionals as "conspirator" defendants. But the RICO Complaint is subject to dismissal as a matter of law on several grounds: the Court lacks subject matter jurisdiction over this action, the claims are time-barred, and the Trustee has failed to state a cognizable RICO claim.

First, it is well-established that a bankruptcy trustee has no standing to sue third parties on behalf of the estate's creditors, yet the Trustee, as he acknowledges, is attempting to do just that. The Trustee has standing only to bring certain avoidance actions enumerated in the Bankruptcy Code, and to assert claims against third parties that the bankrupt debtor could have instituted at the time of the creation of the estate. But unlike the pending fraudulent conveyance actions, in which the Trustee undoubtedly has standing, this action does not merely seek to obtain from transferees any property to which the estate allegedly has a right by virtue of the judgment against Scott LaBonte. Instead, the Trustee seeks *treble damages* on behalf of the estate's *creditors* for post-petition conduct that is not alleged to have injured the debtor. There is no basis to confer standing on the Trustee to convert the pending fraudulent conveyance actions into a RICO claim for treble damages against individuals who had no pre-petition interaction with the debtor.

Second, even if the Trustee is found to have standing to assert the RICO claim generally, well-established Second Circuit law precludes the Trustee from asserting a RICO claim for his "lost debt" injury, *i.e.*, his alleged inability to

collect on the judgment obtained against Scott LaBonte, while separate proceedings to recover the amount owed remain ongoing. A lost debt injury under the RICO statute does not accrue until damages are "clear and definite," and the Second Circuit has consistently held that the possibility of recovery in separate proceedings renders a RICO claim for lost debt *unripe*. The Trustee cannot show "clear and definite" injury and resort to the RICO statute's treble damages provision when four separate fraudulent conveyance actions remain pending against multiple defendants, including defendants in this action, who may possess assets that can be used to satisfy, in whole or in part, the judgment against Scott LaBonte.

Third, even if the Trustee had standing and the lost debt injury is deemed sufficiently definite despite the ongoing fraudulent conveyance actions, the lost debt claim still must be dismissed as untimely. The Trustee knew by June 2011, at the absolute latest, that Scott LaBonte had made the alleged fraudulent conveyances in 2010. The Trustee also knew by that time the precise amount that was recoverable from Scott LaBonte. The Trustee thus learned of his injury well before the applicable four-year limitations period, and his RICO claim is time-barred. Further, the vast majority of the Trustee's alleged collection expenses were incurred more than four years prior to the filing of this action, and are therefore also time-barred.

Lastly, putting aside the Complaint's clear jurisdictional and timeliness deficiencies, the Trustee's Complaint fails to allege a cognizable RICO claim. The conduct alleged in the Complaint, if taken as true, amounts to a modest number

of discrete, potentially voidable asset transfers to avoid a single creditor, not a pattern of racketeering activity.  The Trustee alleges that, in 2010, before the Trustee had filed or even threatened a claim, Scott LaBonte rendered himself insolvent by transferring all of his assets to a family trust for less than fair consideration.  In subsequent years, his family, in their capacities as trustees, allegedly allowed Scott LaBonte to continue to benefit from the transferred assets, and in 2012 and 2013, certain interests in the transferred assets were sold to Landino.  Then, in 2015, a family-owned real estate company allegedly transferred its assets when it was targeted in a fraudulent conveyance action by the Trustee.  All of this conduct occurred prior to the Trustee obtaining a judgment against Scott LaBonte in 2017.

The Trustee takes this rather simple chain of events and attempts to transform it into a multiplicity of alleged predicate acts, all in a tortured effort to paint a picture of a complex scheme involving an "association-in-fact" enterprise with the common purpose of frustrating the Trustee.  But the Trustee has failed to plead a single predicate act of racketeering.  A fraudulent conveyance is not a predicate act under RICO, and the Trustee's position that the asset transfers described in the Complaint constitute bankruptcy fraud, obstruction of justice, wire fraud, and money laundering, rests on erroneous and unsupported interpretations of the relevant criminal statutes.

The Trustee also fails to allege the formation of a RICO "enterprise."  The transactions at issue involved various legitimate trusts and businesses, and the involvement and role of the four "principals" of the alleged enterprise varied

widely. At best, the alleged conduct by almost all of the Defendants amounts to no more than sporadic aiding or facilitation of asset transfers subject to a potential avoidance action under state civil remedies. These allegations fail to meet the pleading requirements for a RICO enterprise and do not support a plausible conclusion that these four individuals functioned as a continuing criminal unit with a common purpose. The Trustee has simply grouped discrete events, occurring years apart and with varying involvement of different parties, and applied the label of a RICO enterprise.

Even if the Trustee were found to have adequately pleaded the existence of an enterprise and two or more related predicate acts, as the RICO statute requires, the Complaint is still subject to dismissal because the alleged conduct does not amount to or pose a threat of continuing criminal activity. The Complaint describes, at bottom, one set of asset transfers in 2010, one set between May 2012 and October 2013, and another transfer in 2015. All of the intervening conduct consists of alleged payments for Scott LaBonte's benefit or subsequent sales of transferred assets, none of which caused incremental injury to the Trustee. Sporadic asset transfers in June 2010, between May 2012 and October 2013, and in February 2015 do not amount to the type of continuous criminal activity that is within the scope of the RICO statute. Moreover, as the Second Circuit has recognized, schemes to avoid creditors are "inherently terminable," and therefore do not pose a threat of continued criminal activity. The conduct that allegedly impeded the Trustee's collection efforts ended years ago.

For all these reasons, the Trustee's Complaint is deficient as a matter of law and should be dismissed.

<u>THE TRUSTEE'S ALLEGATIONS</u>

The Trustee alleges that Scott LaBonte, Roland LaBonte (Scott LaBonte's father), Sally LaBonte (Scott LaBonte's wife), and Sparveri (Scott LaBonte's accountant), were "principals" of an association-in-fact enterprise whose purpose was to frustrate the Trustee's ability to collect a judgment the Trustee obtained against Scott LaBonte in September 2017 (the "SAL Judgment"). The RICO claim is premised on these Defendants' alleged involvement, in different roles, at different times, and to varying degrees, in a purported pattern of racketeering consisting of the following transactions:

(1) In August and September 2010, shortly after learning that the Trustee had filed a fraudulent conveyance action against his cousin Ed Malley seeking to recover the proceeds of a Ponzi scheme (the "Malley-LaBonte Action"), but before the Trustee had threatened or filed suit against him, Scott LaBonte transferred substantially all of his assets, which were largely in the form of ownership interests in a number of limited liability companies holding commercial real estate, to the Scott A. LaBonte Dynasty Trust (the "SALDT"). Compl. ¶¶ 71-81.

(2) In exchange for the transferred assets, the SALDT issued a note to Scott LaBonte that allegedly undervalued the assets, and restated a note issued to Scott LaBonte for previously transferred assets to extend its duration. *Id.* at ¶¶ 82-100.

6

(3) Over the course of subsequent years, Scott LaBonte allegedly retained the benefit of the assets transferred to the SALDT, in the form of direct payments and payments on his behalf by the SALDT, which were authorized by the SALDT's trustees:  Sally LaBonte, Roland LaBonte, and, for a time, Sparveri.  *Id.* at ¶¶ 101-134.

(4) Scott LaBonte, as manager of certain LLCs, interests in which were transferred to the SALDT, caused the LLCs to sell certain joint venture interests to their joint venturers, which were LLCs managed by Landino, in 2012 and 2013 in exchange for cash paid to the Scott LaBonte-managed LLCs.  *Id.* at ¶¶ 135-194.

(5) In 2015, Scott and Roland LaBonte's real estate management company, Devcon Enterprises, Inc. ("Devcon"), transferred its assets, allegedly to avoid attachment in a pending fraudulent transfer action filed by the Trustee, to a new entity, DEI Property Management, LLC ("DEIPM"), owned by trusts settled by Marilyn and Roland LaBonte.  *Id.* at ¶¶ 214-249.

(6) Following the transfer of Devcon's assets, DEIPM took over certain real estate management contracts to which Devcon was previously party and, pursuant to amended contracts, received certain refinancing fees in 2015 and 2016 from LLC interests held by the SALDT.  *Id.* at ¶¶ 268-82.

According to the Trustee, the foregoing transactions constitute bankruptcy fraud, obstruction of justice, wire fraud, and money laundering.  In addition, the

Trustee asserts racketeering conspiracy claims against Bourdeau and Marks, attorneys who provided legal services in connection with certain of the foregoing transactions; Landino, who purchased joint venture interests in 2012 and 2013 from LLCs managed by Scott LaBonte; and Marilyn LaBonte, Scott LaBonte's mother.

As discussed further below, the Trustee filed four fraudulent conveyance actions—in 2011, 2014, 2016, and 2017—seeking to recover assets in satisfaction of the SAL Judgment. Three of these actions relate to the same transactions that are the subject of this Complaint, and all four actions remain pending. Instead of pursuing judgments allowing recovery of the allegedly fraudulently conveyed property, the Trustee has sought to stay certain of the pending cases in favor of the instant RICO claim.

## STANDARD

Each of the Defendants moves to dismiss the Complaint pursuant to Rule 12(b)(1), because the Trustee lacks standing, and Rule 12(b)(6), because the Trustee has failed to state a claim upon which relief can be granted. Where a defendant moves to dismiss a complaint "both for lack of subject matter jurisdiction and . . . [for] failure to state a claim upon which relief can be granted, the court must address the issue of subject matter jurisdiction first." *Lamont v. Pilkington*, No. 18-CV-11632, 2019 WL 5067128, at *2 (S.D.N.Y. Oct. 8, 2019).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The

plaintiff "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists." *Id.*; *Lamont* 2019 WL 5067128, at *2.

The Court is familiar with the general standards applicable to a motion to dismiss pursuant to Rule 12(b)(6), as set forth in *In re Trilegiant Corp., Inc.*, 11 F. Supp.3d 82, 95-96 (D. Conn. 2014) (Bryant, J.), *aff'd sub nom.*, *Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018). Of particular relevance to this motion is the Supreme Court's holding that "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" are inadequate "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and alterations omitted). Moreover, numerous courts have recognized that close scrutiny of a civil RICO complaint is particularly important "[b]ecause the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, . . . [and] courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *see also, e.g., Grimes v. Fremont Gen. Corp.*, 785 F. Supp.2d 269, 299 (S.D.N.Y. 2011) (in "civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants," and "should look with particular scrutiny at [these] claims to ensure that the RICO statute is used for the purposes intended by Congress") (internal quotation marks omitted); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 397 (S.D.N.Y. 2000)

("This Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purposes intended by Congress.").

ARGUMENT

I.  **THE TRUSTEE LACKS STANDING TO ASSERT A RICO CLAIM AGAINST THIRD PARTIES FOR POST-PETITION CONDUCT THAT DID NOT INJURE THE DEBTOR**

A trustee in bankruptcy "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy."  *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).  *See also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 n.4 (2d Cir. 1985) (the trustee "has standing to represent only the interests of the debtor corporation").[1]  The Bankruptcy Code does not "expand the debtor's rights against others beyond those that existed at the commencement of the case."  *In re Hunt*, 149 B.R. 96, 101 (Bankr. N.D. Tex. 1992).  Therefore, "[a] trustee has standing to sue third parties only if the *debtor itself* was damaged by the conduct of the third parties."  *Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40, 43 (D. Conn. 1994), aff'd, 72 F.3d 1085 (2d Cir. 1995) (emphasis added).

The Trustee's RICO claim is premised entirely on conduct that is alleged to have occurred after the creation of the Goldberg bankruptcy estate, and there is no alleged injury to the debtor.  The debtor, therefore, plainly could not have brought the instant RICO claim at the time of his bankruptcy petition.  Instead, the

---

[1] The Bankruptcy Code also confers standing on the trustee to pursue certain actions to recover voidable transfers and preference payments, which is not relevant here.  *See In re Teligent, Inc.*, 307 B.R. 744, 747-48 (Bankr. S.D.N.Y. 2004).

Trustee acknowledges that he is attempting to assert a claim on behalf of Goldberg's creditors, stating that the alleged injury in this case is "that the distributions made to the Goldberg Victims have been materially smaller as a result of the Defendants' conduct," Compl. ¶ 309, and that these creditors "continue to be deprived of monies that are rightfully theirs," *id.* at ¶ 328.

But "[i]t is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt . . . itself." *Wagoner*, 944 F.2d at 118. As stated by the Second Circuit, "the bankruptcy code precludes a trustee from seeking to collect money not owed to the bankruptcy estate . . . ." *Hirsch*, 72 F.3d at 1093 (emphasis added) (citing *E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 986 (11th Cir. 1990)). Unlike the ongoing fraudulent conveyance actions brought by the Trustee, this action does not seek to obtain property to which the Trustee allegedly has a right by virtue of the SAL Judgment, but rather to recover treble damages for post-petition conduct that is not alleged to have injured the debtor.

The Trustee's cursory references to injury to the estate are insufficient to confer standing. For example, the Trustee states that "[t]he Goldberg Trustee (and, by extension, the Goldberg Victims) continue to suffer from the nonpayment of the SAL Judgment and as a result are entitled to recover the RICO Damages." Compl. ¶ 303; see also *id.* at ¶ 309 ("Although the Defendants' conduct . . . cause[d] damage to the Goldberg Trustee . . . , the victims of such conduct extend beyond the Goldberg Trustee to the Goldberg Victims . . . ."). This Court has specifically held that an allegation of "damage to the debtor" consisting of

"the unpaid obligations of the debtor[] to the creditors," does not confer standing on the trustee. *Hirsch*, 178 B.R. at 43. Here, as in Hirsch, "the trustee has not alleged any distinct way in which the debtors were injured by the asserted wrongdoing," and instead "alleges that the debtors suffered injuries identical to those of the creditors." *Id.* In such circumstances, "it is the individual creditors, rather than the trustee, who may seek recovery from the defendants." *Id.*[2]

The Trustee indisputably has standing to pursue the ongoing fraudulent conveyance actions against recipients of allegedly fraudulently conveyed property. But there is no basis to confer on the Trustee standing to convert those actions into a claim for treble damages, against not only the transferees of the allegedly fraudulently conveyed property, but various other individuals who had no pre-petition interaction with the debtor.

II.  **THE TRUSTEE'S "LOST DEBT" CLAIM IS NOT RIPE BECAUSE HIS PRIOR ACTIONS TO RECOVER ASSETS IN SATISFACTION OF THE DEBT HAVE NOT CONCLUDED**

The Trustee has alleged two injuries: (1) his inability to collect the SAL Judgment (*i.e.*, the "lost debt" injury), and (2) costs incurred in seeking to collect, from Scott LaBonte and other individuals and entities, assets that could allegedly be used to satisfy the SAL Judgment. The Trustee's lost debt claim is plainly not ripe under clear and well-established Second Circuit precedent. Specifically, the Trustee's efforts to recover assets to satisfy the SAL Judgment are ongoing in at

_____

[2] Indeed, the Second Circuit has held that a creditor of a bankrupt entity "has standing to bring a RICO claim" seeking damages for alleged racketeering acts to avoid the creditor. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988).

least four currently pending litigations, and therefore his lost debt damages are not yet "clear and definite," as required under RICO.

"[T]o satisfy RICO's standing requirements," a plaintiff must allege, *inter alia*, an "injury to business or property." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (holding that a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"). And in the Second Circuit "a cause of action does not accrue under RICO until the amount of damages becomes *clear and definite*." *First Nationwide*, 27 F.3d at 768 (emphasis added).

Accordingly, the Second Circuit "has consistently ruled in the RICO context that claims for 'lost debt' injuries—that is, for damages in the form of an owed, but as-yet-uncollected, amount—are unripe when parallel proceedings to collect the amount owed are ongoing in another forum." *D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018). The Second Circuit recently stated that its "jurisprudence on this point is long- and well-established." *Id.* at 93-94 (dismissing as unripe plaintiff's claim for share of estate because "[p]roceedings regarding the Estate are underway in Connecticut Probate Court" and "the amount of [the plaintiff's] ultimate distribution from the Estate [] and, thus, the amount of her damages . . . is remarkably uncertain"); *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003) (dismissing as unripe RICO claim for injury based on unpaid loans where the loans were not yet foreclosed and related arbitrations were pending); *First Nationwide*, 27 F.3d at 767-69 (dismissing as

unripe RICO claim for lost debt injury arising from fraudulently induced loans that were not yet foreclosed because "[o]nly when [the plaintiff's] actual loss becomes clear and definite will the claims be ripe for suit"); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165-66 (2d Cir. 1993) (dismissing as unripe RICO claim based on defendant's fraudulent transfer of assets to prevent the plaintiff from collecting on judgments because "the amount of its 'lost debt' cannot be determined at this time because of the ongoing efforts to collect those judgments," and "to the extent of a successful collection, the RICO claim is abated *pro tanto*, prior to any application of trebling"); *Bankers Trust*, 859 F.2d at 1105-06 (dismissing as unripe claim for lost debt based on defendants' fraudulent transfer of assets because "it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered").

The basis for the Second Circuit's rule is clear: because "'RICO [treble] damages are netted against recovery obtained from collateral and other sources,' the outcome of the parallel proceedings could significantly affect the total amount owed in the case at bar, and . . . this fundamental uncertainty renders the claim not ready for adjudication." *D'Addario*, 901 F.3d at 93 (quoting *Motorola*, 322 F.3d at 135-36) (alteration in original).

The Trustee has attempted to plead around this bar to his lost debt claim by asserting that his collection efforts have been "successfully frustrated" because "there is no real possibility of collecting upon any judgments that might

**14**

enter in the pending . . . [a]ctions."  Compl. at 63, ¶ 290.  As an initial matter, the Trustee's argument that the collection efforts are futile is belied by the fact that he has not dismissed or abandoned the pending actions.  Regardless, the Second Circuit has held that an ongoing collateral proceeding renders a lost debt claim unripe even where "[i]t may be that [the proceeding] is a forlorn hope" and "the collateral will yield little of value."  *Motorola*, 322 F.3d at 137.  The pending fraudulent conveyance actions present far more than a "forlorn hope" because (as the Trustee acknowledges in his Complaint) the defendants in those actions retain substantial assets that may be used to satisfy the SAL Judgment.  Compl. ¶¶ 291-98.

At least four actions by the Trustee to recover assets to satisfy the SAL Judgment remain ongoing, and three of them are premised on the very same transactions that are the subject of this case:  (1) the "SALDT Action," in which the Trustee sued (i) Roland and Sally LaBonte, in their capacities as trustees of the SALDT, to recover alleged fraudulent transfers by Scott LaBonte to the SALDT, and (ii) individuals and entities that allegedly received fraudulent transfers from the SALDT, including Scott LaBonte, Sally LaBonte, Devcon, and others;[3] (2) the "Landino Action," in which the Trustee sued Robert Landino, Scott LaBonte, and the LLCs that sold joint venture interests to Landino in 2012 and 2013, to recover alleged fraudulent transfers by Scott LaBonte;[4] (3) the "DEIPM Action," in which the Trustee sued DEIPM, Roland LaBonte, and Marilyn

---

[3] Complaint, *Berman v. Sally A. LaBonte et al.*, Adv. Proc. No. 14-cv-2026 (Bankr. D. Conn. May 31, 2014).
[4] Complaint, *Berman v. Landino et al.*, 16-cv-2042 (Bankr. D. Conn. May 16, 2016).

LaBonte (Scott LaBonte's mother), in their individual capacities and as trustees of trusts that own DEIPM, to recover alleged fraudulent transfers made by the SALDT and Devcon;[5] and (4) the "Pavano Action," in which the Trustee sued various individuals to whom Scott LaBonte allegedly transferred assets prior to the transactions at issue in this case.[6] Compl. ¶ 285.

The Trustee acknowledges that, in the Pavano Action, he retains a claim against Roland LaBonte to recover $425,000 he allegedly received from Scott LaBonte, which "remains *sub judice*," and obtained an as-yet-uncollected judgment against Albert Fincher for $141,820.37. Compl. ¶ 292. The defendants in the SALDT Action include Sally LaBonte, Scott LaBonte's wife, who is fully employed and owns "a luxury home in Portsmouth, Rhode Island," and the SALDT, which (as the Trustee acknowledges) owns interests in *three shopping centers*. *Id.* at ¶ 294. The Trustee also has ongoing claims against Roland and Marilyn LaBonte in the DEIPM Action, and against Robert Landino in the Landino Action. The Trustee does not allege that Roland and Marilyn LaBonte lack assets to satisfy a potential judgment. And the fact that a judgment was recently entered against Landino, *id.* at ¶ 295,[7] does not establish an inability to recover significant assets in the Landino Action. Under Second Circuit precedent, the Trustee must

---

[5] Complaint, *Berman v. DEI Property Management, LLC et al.*, 17-cv-2029 (Bankr. D. Conn. June 2, 2017).
[6] Complaint, *Berman v. Pavano et al.*, No. 11-2071 (Bankr. D. Conn. Aug. 29, 2011).
[7] The judgment is joint and several against Landino and eight companies. *See* Judgment, *Arch Ins. Co. v. Centerplan Constr. Co., LLC et al.*, 16-cv-1891 (D. Conn. July 18, 2019), Dkt. No. 202. The judgment has been appealed. *Id.* at Dkt. No. 211.

exhaust these collection efforts in order to have "clear and definite" damages and a ripe claim under RICO.

The Trustee's attempt to artificially ripen his lost debt claim by applying to stay certain of the fraudulent conveyance actions is also unavailing.[8]  First, the Trustee's decision to stay, rather than dismiss, the pending actions belies the assertion that they present "no real possibility of collect[ion]."  Compl. ¶ 290. Second, the Second Circuit has held that a stay of a collateral proceeding does not "force the RICO claim to ripen" because a collateral proceeding "does not cease to be a possible influence . . . on the amount of loss simply because . . . [it is] stayed . . . ."  *Motorola*, 322 F.3d at 137 (rejecting plaintiffs' argument that their lost debt claim was ripe because a district court stayed an arbitration proceeding through which plaintiffs may have been able to recover assets toward satisfaction of the debt).  Moreover, each of the stays were entered subject to the parties' rights to withdraw their consent and continue the litigations.[9]  To allow the Trustee to proceed on the basis of his decision to stay the prior actions would mean that a plaintiff can unilaterally cause a RICO claim for treble damages to

---

[8] The SALDT, Landino, and DEIPM Actions were all temporarily stayed on consent of the Trustee and the defendants.  *Berman v. LaBonte*, No. 3:15-cv-01687 (AWT) (D. Conn.), Dkt. Nos. 113-14.  *See Berman v. Landino*, Adv. Proc. No. 16-02042 (Bankr. D. Conn.), Dkt. Nos. 166-70; *Berman v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM), 69, 70, 77 (Bankr. D. Conn.).  The consents were not waivers, and in each case the stay was entered subject to the right of any party to move to lift it.

[9] Indeed, Landino has objected to the Trustee's motion for a permanent stay in the Landino Action, as has Scott LaBonte and the LLCs managed by him, *see Berman v. Landino*, Adv. Proc. No. 16-02042 (Bankr. D. Conn.), Dkt. Nos. 173, 177, and Scott and Sally LaBonte have filed a notice with the court withdrawing their consent to a stay in the SALDT Action, *Berman v. LaBonte et al.*, No. 15-cv-1687 (D. Conn.), Dkt. No. 115.

ripen by simply deciding not to pursue available avenues to recovery. That is plainly contrary to Second Circuit law.

The pending fraudulent conveyance actions make it "impossible to determine the amount of damages that would be necessary to make [the Trustee] whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered." *Bankers Trust*, 859 F.2d at 1106. Therefore, the Trustee's damages are "speculative and unprovable," and his lost debt claim must be dismissed. *Id.*

## III. IF THE LOST DEBT CLAIM IS RIPE, IT IS BARRED BY THE STATUTE OF LIMITATIONS

To the extent the Court determines that the Trustee's lost-debt claim is ripe because his injury is sufficiently "definite," the claim must be dismissed as untimely because the Trustee knew of his injury *over eight years ago*.

### A. The Trustee Learned of His Alleged Lost Debt Injury in 2011

RICO claims are governed by a four-year statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). A civil RICO claim accrues, and the statute of limitations begins to run, "when the plaintiff discovers or should have discovered the RICO injury," *i.e.*, when the plaintiff has "inquiry notice" of the "injur[y] in his business or property by reason of" the RICO violation. *In re Merrill Lynch Ltd. P'Ships. Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); 18 U.S.C. § 1964(c).

"[A]ctual knowledge of the fraudulent scheme is not necessary; an objective standard is used to impute knowledge to the victim when sufficient 'storm clouds' are raised to create a duty to inquire." *In re Trilegiant Corp.,* 11 F.

Supp. 3d at 106. "[T]he storm warnings need not detail every aspect of the alleged fraudulent scheme, but must suggest to a person of ordinary intelligence the probability of fraudulent activity." *Id.* (internal quotation marks omitted). Where "a RICO plaintiff makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 153 (2d Cir. 2012) (quotation marks omitted). "Where a RICO plaintiff does begin or has begun to inquire once the duty arises, the Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence . . . ." *Id.*

The Trustee's Complaint makes clear that he cannot feign ignorance of the lost debt injury that constitutes the core of this RICO action. The Trustee alleges that in 2010 Scott LaBonte fraudulently transferred all of his assets to the SALDT in order to render himself insolvent and avoid a potential claw-back action by the Trustee. These transfers were allegedly completed by September 2010, and the Trustee learned of them shortly thereafter.[10] By the time he learned of the alleged

---

[10] The transcript of the Malley-LaBonte Action, tried in June 2011, demonstrates that the Trustee was aware by that time, *at the latest*, that Scott LaBonte had transferred away all of his assets. *See* Hearing Transcript, *Berman v. Goldberg et al.*, Adv. Proc. No. 10-2082 (Bankr. D. Conn. June 22, 2011), Dkt. No. 635 ("Hearing Tr."), at 33:15-34:1 ("Q. On or about June 2nd, 2010, you entered into a series of transactions where you transferred out of your name virtually every asset that was held in your name individually, correct? A. I transferred multiple LLC interests and the interest I owned in Devcon Enterprises out of my name, yes. Q. And in so doing, Mr. LaBonte, you transferred virtually every asset out of your name, didn't you? A. Yes."). Moreover, in a post-trial brief dated July 22, 2011, the Trustee asked the Court to consider that Scott LaBonte "transferred virtually all of his assets to an irrevocable trust, the Scott A. LaBonte Dynasty Trust, in June 2010." *Berman v. Goldberg et al.*, Adv. Proc. No. 10-2082 (Bankr. D. Conn.), Dkt. No. 446.

fraudulent transfers, the Trustee had also already calculated the exact amount that was recoverable from Scott LaBonte—$7.2 million.[11]  Therefore, by no later than 2011, the Trustee knew (i) the exact amount he could recover, and (ii) that Scott LaBonte had executed a series of allegedly fraudulent transfers that rendered him insolvent and unable to satisfy any judgment, resulting in a "clear and definite" injury.[12]

The Trustee has argued in pre-litigation communications with Defendants that his RICO claim did not accrue until he obtained the SAL Judgment in 2017, and he accordingly characterizes his injury as having been "prevented . . . from collecting the judgment entered in his favor against [Scott LaBonte] . . . [on] September 27, 2017."  (Compl. ¶ 5).  But the amount of the judgment entered against Scott LaBonte—$7.2 million—is the exact same amount that the Trustee identified as recoverable from him *eight years earlier.*  And the Trustee cannot be heard to argue that it only learned the SAL Judgment was uncollectible after it was entered; the Trustee knew at least as early as June 2011 that Scott LaBonte had rendered himself insolvent.  The entry of the judgment in 2017 is thus

---

[11] *See, e.g.*, Hearing Tr. at 150:8-15.

[12] It is noteworthy that the Trustee was also aware by 2011 of the precise form of the allegedly fraudulent transfers, the parties and entities allegedly involved, and the alleged conduct to allow Scott LaBonte to continue to benefit from the transferred assets.  *See, e.g.*, Hearing Tr. at 234:2-22.  However, a plaintiff's knowledge of the particulars of the alleged racketeering scheme is irrelevant to the statute of limitations analysis.  *Rotella*, 528 U.S. at 558 (adopting the "injury discovery" rule of accrual and rejecting the proposition that a plaintiff must know that the injury was caused by racketeering before the limitations period begins to run).

irrelevant to the Trustee's knowledge of his injury, which is the only relevant inquiry when assessing the timeliness of his claim.

The Trustee is effectively attempting to toll his claim for six years by simply describing his injury in reference to the judgment rather than the actual allegedly fraudulent transfers that rendered Scott LaBonte insolvent. Accepting this artifice would render the statute of limitations and the "injury discovery" rule entirely ineffective when applied to civil RICO claims involving allegations of fraudulent transfer and concealment of assets. Such a result, effectively tolling the statute of limitations indefinitely, would "undermine the purpose of statutes of limitations of allowing potential defendants predictability and ultimate repose." *Veltri v. Building Service 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004). It is also contrary to the Supreme Court's emphasis on the importance of the statute of limitations in civil RICO actions: the statute's "objective of encouraging civil litigation to supplement Government efforts to deter and penalize . . . racketeering activity" is undermined by "provid[ing] an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." *Rotella*, 528 U.S. at 557-58.

B.    The Trustee Did Not Learn of Any "New and Independent" Injury within the Limitations Period

Any argument that the separate accrual rule saves the Trustee's claim is also unavailing. The Second Circuit "'recognizes a 'separate accrual' rule under which a new claim accrue[s] and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury.'" *In re Trilegiant*, 11 F. Supp.3d at 104 (quoting *In re Merrill Lynch*, 154

F.3d at 58). The Trustee has failed to allege that it learned of any "new and independent" injury within four years of filing this action.

The conduct alleged by the Trustee subsequent to the 2010 transfers—Scott LaBonte's continuing enjoyment of the proceeds of the assets transferred to the SALDT, the conversion of certain transferred assets into cash through sales to Landino (allegedly to facilitate payments for Scott LaBonte's benefit), and Scott LaBonte's deposit of income from those assets into the SALDT rather than his own accounts—all flows directly from the initial transfers and is part of the same alleged scheme to shelter his assets. "[A]llegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp.2d 486, 524 (S.D.N.Y. 2007). It is well-established in the Second Circuit that continuing efforts to reap the benefits of, or to conceal, a single scheme are derivative and do not give rise to a "new and independent" injury. *See, e.g., In re Merrill Lynch Ltd. P'Ships. Litig.*, 7 F. Supp.2d at 256, 265 (S.D.N.Y. 1997) (holding that conduct "to cover up the earlier fraud, which had already caused plaintiffs' injury . . . caused no new and independent losses"); *Schlesinger v. Schlesinger*, No. 05-CV-5016, 2007 WL 9706975, at *7 (E.D.N.Y. Nov. 15, 2007) (holding that RICO claim accrued at the time the plaintiff learned of the original fraudulent transfer of the property, and the plaintiff did not "discover a new injury" when the defendants sold and mortgaged the fraudulently transferred property, as these actions were only an effort to "continue to conceal and cover up ownership" of the fraudulently transferred property); *Dempster v. Dempster*, No. 03-CV-1127,

2005 WL 8169590, at *6 (E.D.N.Y. Mar. 30, 2005) (dismissing RICO claim as untimely where "the fraudulent transfer of assets occurred" outside the limitations period, the plaintiff was "well aware of any injury arising from these transactions" at the time, as evidenced by her commencement of a fraudulent conveyance action, and a subsequent bankruptcy filing by the defendant did not give rise to a new and independent injury).[13]

Moreover, even if Scott LaBonte's continued benefit from the assets transferred to the SALDT in 2010 constituted a "new and independent injury," the Trustee learned of his benefit from the assets long before August 2015. Indeed, the Trustee filed a fraudulent transfer action against the SALDT on May 31, 2014, in which it alleged, in detail, the transactions by which the "Fraudulently Transferred Interests were deposited into the [SALDT] Account and then withdrawn for [Scott LaBonte's] benefit." Compl. 114.[14] The Trustee further acknowledges that the conduct ceased prior to the limitations period, alleging

---

[13] *See also, e.g., Wang v. Yien-Koo King*, No. 18 Civ. 8948, 2019 WL 1763230, at *6 (S.D.N.Y. Apr. 22, 2019) (holding that injury related to original transfer of estate assets was time-barred, and defendants' subsequent transfer and sale of assets did not revive the untimely claim because "these new predicate acts did not proximately cause the injury for which Plaintiffs are seeking relief. . . . All these predicate acts did, therefore, was further an 'injury that happened or could have happened independently' of them, which is insufficient to create a new and independent injury"); *Lorber v. Winston*, 962 F. Supp. 2d 419, 447-48 (E.D.N.Y. 2013) ("[T]he [p]laintiff alleges one singular scheme . . . which was fraudulent at the outset. . . . [A]ny advances that were taken from the [fraudulently obtained] Credit Line . . . simply followed from the execution of that scheme.").

[14] *See* Complaint, *Berman v. Sally A. LaBonte et al.*, Adv. Proc. No. 14-cv-2026 (Bankr. D. Conn. May 31, 2014), Dkt. No. 1, at ¶ 3 ("Despite having transferred his ownership interests in these entities to the Dynasty Trust, Scott LaBonte continued to exercise dominion and control over them and directly receive the income they generated . . . .").

that "[t]he inflows and outflows [to and from the SALDT] decreased markedly in 2014." *Id.* at ¶ 115.  Therefore, the Trustee learned of any new injury from the transfers for Scott LaBonte's benefit more than five years before initiating this action, and any claim on such basis is therefore barred.

The transfer of Devcon's assets to DEIPM in 2015 is the only post-2010 conduct alleged by the Trustee that is arguably not derivative of the alleged scheme to shelter and allow Scott LaBonte to benefit from assets transferred in 2010, and the Defendants cannot establish definitively at this stage when the Trustee became aware of the transfer to DEIPM.  Regardless, the Trustee has never established a right to attach or recover Devcon's assets, and therefore he has not been injured by the transfer.  *See* Compl. ¶¶ 224-25 (conceding that the prejudgment remedy application seeking to attach Devcon's assets has not been granted).  Moreover, as discussed below, the Trustee has failed to allege that the Devcon-DEIPM transaction constituted a predicate act of racketeering, and therefore it does not give rise to a new limitations period.  *Apollon Waterproofing & Restoration, Inc. v. Bergassi*, No. 01 Civ. 8388, 2003 WL 1397394, at *4 (S.D.N.Y. Mar. 20, 2003) ("The limitations period only begins anew each time a plaintiff discovers or should have discovered an injury *caused by a defendant's violation of § 1962*.")  (emphasis in original).[15]

---

[15] In any event, it is well-established that the occurrence of a new predicate act within the limitation period does not allow plaintiffs to recover for injury caused by acts outside the limitation period.  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("[T]he plaintiff cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period.").  Therefore, even if the Devcon-DEIPM transaction included a predicate act and gave rise to a new and independent injury of which the Trustee

**IV.    THE TRUSTEE'S CLAIM FOR COLLECTION EXPENSES INCURRED PRIOR TO JULY 28, 2015 IS BARRED BY THE STATUTE OF LIMITATIONS**

The Trustee alleges that since November 2010 it has prosecuted four fraudulent conveyance actions which "resulted from the Defendants' racketeering activity":  the Malley-LaBonte Action, the SALDT Action, the Landino Action, and the DEIPM Action.  Compl. ¶¶ 285-87.  The Trustee's claim for any collection expenses incurred in connection with these actions prior to July 28, 2015, which accounts for the vast majority of any such expenses, is time-barred.[16]

As explained above, a civil RICO claim accrues when the plaintiff has "inquiry notice" of the "injur[y] in his business or property by reason of" the RICO violation.  *In re Merrill Lynch*, 154 F.3d at 58; 18 U.S.C. § 1964(c).  The Trustee, of course, discovered any collection expense injury as the expenses were incurred in connection with its efforts to recover the alleged fraudulent transfers, and therefore he has a timely claim only for those expenses incurred on or after July 28, 2015.  *See D'Addario*, 901 F.3d at 96 (only permitting the plaintiff's claim for collection expenses "that she allegedly incurred over the four years before she filed the Complaint (as allowed by the RICO statute of limitations)"); *see also Bankers Trust*, 859 F.2d at 1105 (holding that the plaintiff "may recover any of the[] [legal] expenses which it discovered or should have

_____

did not learn until after August 2015, it does not revive the Trustee's claim for injuries caused by earlier alleged predicate acts, namely the 2010 transfers.
[16] Although the Trustee's Complaint was served on October 3, 2019, the parties agreed to a two-month tolling of the statute of limitations, from February 22, 2019 to April 30, 2019, in connection with their efforts to reach a settlement.  Therefore, the Trustee's four-year limitations period began to run on July 28, 2015, rather than October 3, 2015.

discovered on or after [the date four years prior to filing]," and that plaintiff "suffered injury as to each expense when it became obligated to pay that expense").

Accordingly, the Trustee's claim for collection expenses incurred prior to July 28, 2015 must be dismissed.

## V.     THE TRUSTEE HAS FAILED TO ALLEGE A RICO VIOLATION

Even if the Court determines that the Trustee's lost debt claim is ripe and not time-barred, or that the Trustee has incurred collection expenses within the four-year limitations period, the Complaint must nonetheless be dismissed because it fails to allege a RICO violation.  To allege a RICO violation, the Trustee must show conduct (1) "of an enterprise" (2) "through a pattern" of (3) "racketeering activity."  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). To satisfy the latter two elements, the Trustee "must plead at least two predicate acts [of racketeering], show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  *Democratic Nat'l Comm. v. Russian Federation*, 392 F. Supp.3d 410, 442 (S.D.N.Y. 2019) (citing *H.J. Inc. v. Nw. Bell. Tel. Co.*, 492 U.S. 229, 239 (1989)).  The Complaint utterly fails to satisfy each of the foregoing pleading requirements.

### A.     The Trustee Has Failed to Allege Any Predicate Acts of Racketeering

The allegations in the Complaint, even if true, do not show the commission of "at least two predicate acts" of racketeering.  *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 442.  The Trustee has alleged, at most, a series of voidable fraudulent conveyances.  But a "fraudulent conveyance cannot be a basis for a RICO claim" because "[u]nenumerated acts . . . such as a fraudulent conveyance . . . are not

'racketeering activities'" under the RICO statute. *Apollon*, 2003 WL 1397394, at *4; *see also Stein v. N.Y. Stair Cushion Co., Inc.*, 04-cv-4741, 2006 WL 319300, at *5 n.1 (E.D.N.Y. Feb. 10, 2006) ("[A] fraudulent conveyance does not constitute an act of racketeering."). The Trustee's attempt to characterize the alleged fraudulent conveyances as criminal acts rests on erroneous and unsupported interpretations of the cited criminal statutes.

       1.    <u>The Asset Transfers Do Not Violate 18 U.S.C. § 152(1)</u>

Section 152(1) criminalizes the knowing and fraudulent concealment of "*property belonging to the estate of a debtor*." 18 U.S.C. § 152(1) (emphasis added). To determine whether property falls within the scope of Section 152(1), courts look to 11 U.S.C. § 541, the provision of the Bankruptcy Code defining "property of the debtor's estate." *See, e.g.*, *United States v. Hale*, 762 F.3d 1214, 1223 (10th Cir. 2014) ("[T]he dispositive question with respect to [Section 152(1)] is whether the [property at issue] falls within the definitions of property contained in 11 U.S.C. § 541(a)(6) or (7)."); *United States v. Archibald*, 212 F. App'x 788, 792 (11th Cir. 2006) ("[I]n order for [the defendant] to have violated 18 U.S.C. § 152[(1)], he would have had to have knowingly concealed 'property belonging to the [bankruptcy estate]' from either his creditors or the trustee in bankruptcy[,] [and] 'Property' is defined [by 11 U.S.C. § 541(a)(1)] as including 'all legal or equitable interests of the debtor.'"); *United States v. Greenwood*, 74 F.3d 1241 (6th Cir. 1996) (same).

It is well-established in this Circuit that property which is the subject of a fraudulent conveyance action is *not* part of the debtor's estate under Section 541 until the trustee obtains a judgment. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d

199, 212 (2d Cir. 2014) ("Our case law is clear that assets targeted by a fraudulent conveyance action do not become property of the debtor's estate under the Bankruptcy Code *until the Trustee obtains a favorable judgment*.") (emphasis added); *see also In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992).

The Trustee alleges that the asset transfers described in the Complaint—each of which occurred well before the Trustee obtained a judgment against Scott LaBonte in September 2017—violated Section 152(1). But until the Trustee obtained a judgment against Scott LaBonte in 2017, the property at issue in these various transactions could not possibly have involved "property belonging to the [Goldberg] estate." The property in each transaction belonged to no one other than the individual or entity making the transfers. Therefore, none of the conduct alleged in the Complaint could have violated Section 152(1).

### 2.    The Asset Transfers Do Not Violate 18 U.S.C. § 152(7).

There is no support or precedent for the Trustee's assertion that the asset transfers described in the Complaint violate Section 152(7). Section 152(7) criminalizes the knowing and fraudulent concealment or transfer of property "in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11." 18 U.S.C. § 152(7).[17] "In order to make out a violation of [Section] 152(7) . . . plaintiffs must allege specific facts demonstrating that [the defendant] made the transfer in contemplation of bankruptcy or otherwise with an intent to defraud a United

---

[17] Unlike Section 152(1), Section 152(7) has been interpreted not to require that the property in question belong to the estate of a debtor at the time of the transfer. *See United States v. Sabbeth*, 262 F.3d 207, 215 (2d Cir. 2001).

States bankruptcy court or defeat the bankruptcy laws." *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp.2d 576, 582 (S.D.N.Y. 2002) (emphasis in original), *aff'd sub nom.*, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2016). "[T]he principal objective of [Section 152(7)] is to allow identification of a debtor's assets and affairs *to prevent the debtor* from hiding or fraudulently transferring any assets." *In re Sheehan*, 187 B.R. 669, 671 (Bankr. D. Ariz. 1995) (citing Colliers on Bankruptcy, 7A.02[1][i] and [7] (15th ed. 1987)) (emphasis added). We are not aware of any authority holding that Section 152(7) applies to the type of conduct alleged by the Trustee—the transfer of assets by one who is not a debtor, an insider or agent of a debtor, or even contemplating filing bankruptcy, to allegedly impede a claw-back action by a trustee. To do so would constitute an unprecedented expansion of the scope of the criminal statute, contravening the rule of lenity and fair notice.

The rule of lenity "ensures fair warning by so resolving any ambiguity in a criminal statute as to apply it only to conduct clearly covered. . . . [D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citations omitted); *see also United States v. Regan*, 713 F. Supp. 629, 639 (S.D.N.Y. 1989) ("The purpose of the 'fair notice' doctrine is to give a person of 'ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'") (quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)). The rule of lenity "is *especially appropriate* in construing . . . predicate offenses under the

Racketeer Influenced and Corrupt Organizations Act." *Skilling v. United States*, 561 U.S. 358, 411 (2010) (internal quotation marks and alterations omitted) (emphasis added).

The Defendants have been unable to identify a single conviction under Section 152(7) of an individual who is neither a debtor, an employee or agent of a debtor, or an individual contemplating filing for bankruptcy. Convictions under Section 152(7) typically involve post-petition transfers by debtors, or insiders or agents of the debtor, who had some existing duty to the bankruptcy court at the time of the transfers. *See, e.g.*, *United States v. Ledee*, 772 F.3d 21 (1st Cir. 2014) (debtor and debtor's bankruptcy attorney, who was also the debtor's sister, convicted for post-petition transfers); *United States v. Moody*, 923 F.2d 341 (5th Cir. 1991) (debtor convicted for post-petition receipt and concealment of proceeds of estate property); *United States v. Parkhill*, 775 F.2d 612 (5th Cir. 1985) (debtor, insider of corporate debtors, and debtors' bankruptcy attorney convicted for post-petition transfers). Section 152(7) has also been charged in cases of pre-petition transfers by individuals who were themselves contemplating bankruptcy, or who were insiders of a corporation contemplating bankruptcy. *See, e.g.*, *United States v. Tashjian*, 660 F.2d 829 (1st Cir. 1981); *United States v. West*, 22 F.3d 586 (5th Cir. 1994). The Trustee does not allege that any of the transferors in this case were contemplating bankruptcy at the time of the asset transfers, and any such allegation would be baseless given that years have elapsed since the transfers and there has been no bankruptcy filing by any of the Defendants.

At the time of the alleged transfers none of the transferors (i) was a party to the Goldberg bankruptcy or any other bankruptcy proceeding, (ii) had any duty to disclose information to either the Trustee or the bankruptcy court, (iii) is alleged to have been contemplating bankruptcy, or (iv) is alleged to have provided false or misleading information. Although the SALDT had been sued in a fraudulent conveyance action in 2014, before certain real estate entities owned by the SALDT paid refinancing fees to DEIPM, and Devcon had been sued when it transferred its assets to DEIPM in 2015, the pending litigations do nothing to bring the transfers within the scope of Section 152(7) because there is still no basis to conclude that the transfers constituted bankruptcy fraud.

Even if the various asset transfers were made with the purpose of evading the Trustee, "[a]n intention to engage in a transfer for the purpose of hindering potential creditors does not alone rise to the level of bankruptcy fraud." *First Cap.*, 219 F. Supp.2d at 582 (holding that plaintiff failed to allege predicate act under Section 152(7) where pre-petition transfer by debtor was not made "in contemplation of bankruptcy"); *see also United States v. Knight*, 800 F.3d 491, 506 (8th Cir. 2015) (holding that debtor's pre-petition transfers "to impede creditors from learning about and pursuing these funds" were not "*fraudulent* as to [the debtor's] creditors," noting that "[t]he government certainly does not claim that debtors generally must keep creditors apprised of where their assets are located, particularly before the creditor has obtained a judgment against the debtor or utilized lawful means to locate and execute upon the debtor's assets"); *Burke v. Dowling*, 944 F. Supp. 1036, 1066 (E.D.N.Y. 1995) (holding that plaintiff

failed to allege predicate act under Section 152(7) where defendants transferred assets "with the ultimate intent to escape their creditors through bankruptcy proceedings," but no "defendant ever gave any thought to the prospect of filing for bankruptcy in a U.S. court").

The Trustee apparently believes that his status as a trustee in a bankruptcy proceeding renders criminal any action to shelter assets by a target (or potential target) of his fraudulent transfer actions. There is no precedent for such an interpretation of Section 152(7), and it would constitute a wide-ranging expansion of criminal liability in violation of the rule of lenity and the Supreme Court's directive that application of the rule is "especially appropriate" in construing alleged RICO predicate acts. *Skilling*, 561 U.S. at 411. Accordingly, the Trustee has failed to allege any violation of Section 152(7).

### 3. The Asset Transfers Do Not Constitute Obstruction of Justice

Like the allegation of bankruptcy fraud, the Trustee's assertion that the asset transfers at issue constitute the crime of obstruction of justice relies on an entirely unsupported interpretation of the relevant statutes which, if found applicable in this context, would represent a vast expansion of the existing scope of criminal liability. The obstruction statutes relied upon by the Trustee, in relevant part, impose criminal penalty on one who "corruptly" influences, obstructs, or impedes: (i) "any official proceeding," 18 U.S.C. § 1512(c)(2); (ii) "the due administration of justice," 18 U.S.C. § 1503; or (iii) "any . . . officer in

or of any court of the United States . . . in the discharge of his duty," *id.*[18]  But the Trustee has not alleged that the various asset transfers obstructed or impeded the Goldberg bankruptcy *proceedings*; there is no alleged misrepresentation to a court, falsification of evidence, influence of witnesses, or threat or intimidation of court officers.  Instead, the Trustee asserts that the various asset transfers constituted obstruction of justice because they placed Scott LaBonte's "assets, and the assets of entities that he controlled, beyond the reach of the Goldberg Trustee and rendered Scott LaBonte judgment proof."  Compl. ¶ 320.

While the Trustee has alleged that the transactions described in the Complaint had the effect of impeding his ability to *collect* on the judgment he obtained in 2017, the Trustee has *not* alleged that the integrity of the judicial proceedings resulting in that judgment, or the integrity of the other actions he has pursued, was somehow compromised by the asset transfers.  "Section 1503 does not forbid interferences with doing 'justice,' in the sense of 'fairness' and 'rightness[]' . . . . Instead, it forbids interference with the 'administration of justice,' which means *judicial procedure*."  *United States v. Howard*, 569 F.2d 1331, 1337 (5th Cir. 1978) (citations omitted) (emphasis in original).  *See also United* States *v. Aguilar*, 515 U.S. 593, 599 (1995) ("The action taken by the accused must be with an intent to influence judicial . . . proceedings . . . .").  *C.f., e.g.*, *United States v. Griffiths*, 750 F.3d 237 (2d Cir. 2014) (holding that director's *fabrication of evidence* to falsely reflect approval of transfers of money from the

---

[18] Although 18 U.S.C. § 1512 and § 1503 differ in language and purpose, the Trustee relies on the "omnibus" obstruction provision of each statute, and the relevant analysis here is materially the same under both statutes.

corporation to himself, which actually were never approved, was sufficient for conviction for obstruction of justice under 18 U.S.C. § 1512(c)(2)).

There is simply no authority for the proposition that placing assets beyond the reach of a bankruptcy trustee constitutes criminal obstruction of justice. Indeed, the Second Circuit has recognized that the mere fraudulent transfer of assets, even when intended to avoid an existing court order or judgment, does not constitute obstruction of justice. In *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, the government sought to compel production of privileged documents relating to a transaction whereby a corporation, following entry of a contempt judgment against it, disposed of its assets in order to render itself judgment-proof. 731 F.2d 1032, 1035-36 (2d Cir. 1984). The government argued that the documents sought fell within the crime-fraud exception because they may have shown that the transaction was an obstruction of justice in violation of Section 1503. *Id.* at 1039. While holding that the government had shown "adequate reason to believe that the sale was a fraudulent conveyance" in violation of New York statutory law, the Second Circuit noted its skepticism that such a fraudulent conveyance implicates Section 1503. *Id.*

The Court stated that Section 1503 is "directed toward attempts to deflect jurors, witnesses, or judicial officials from the proper performance of their duties, rather than generally to reach efforts to frustrate the intended effect of an already rendered judgment." *Id.* at 1040. Not surprisingly, therefore, the Second Circuit's "research . . . disclosed no case upholding a conviction for violation of § 1503 based on conduct intended to remove an unattached asset from the jurisdiction

of the court but not to sway a judicial officer, juror, or witness by threat, promise, or deception." *Id.* (emphasis added). *See also United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005) (holding, in addressing obstruction of justice sentencing enhancement, that transferring money frozen by a court order for the benefit of a party to litigation "was more akin to stealing from creditors than hindering or corrupting the proceeding"); *Howard*, 569 F.2d at 1337 ("[I]t is wholly irrelevant [to the obstruction of justice analysis] whether defendants' actions had any ultimate effect on the *outcome* of the [judicial procedure]: the question is whether they disturbed the procedure . . . .") (emphasis added).

Our research has not revealed a single case where a defendant was convicted of obstruction of justice for the mere transfer of assets which were subject to a claim by a bankruptcy trustee. The Trustee's position would criminalize the transfer of property to which the transferor has legal title and which is not the subject of a forfeiture order or judgment. Acceptance of this entirely novel interpretation of the statutes would constitute a vast expansion of criminal liability and would violate the rule of lenity. Accordingly, the Trustee has failed to allege that the asset transfers constituted the predicate act of obstruction of justice.

### 4.     The Asset Transfers Do Not Constitute Wire Fraud

The essential elements of mail or wire fraud are "(1) a scheme to defraud, (2) to get money or property, (iii) furthered by the use of interstate mail or wires." *Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909, 2013 WL 6087400, at *6 (S.D.N.Y. Nov. 19, 2013) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)); 18 U.S.C. § 1343. The Trustee alleges that the various asset transfers

described in the Complaint, as well as communications incidental to those transactions, violated the wire fraud statute.[19]  These allegations fail because the Trustee has not alleged that the transfers and communications furthered a "scheme to defraud" to "get money or property."

The Supreme Court has explained that a scheme to defraud contemplates "wronging one *in his property rights* by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching."  *McNally v. United States*, 483 U.S. 350, 358 (1987) (emphasis added).  Therefore, to determine whether conduct is encompassed by the wire and mail fraud statutes, courts look to whether the particular interest that is the object of the alleged scheme is "traditionally . . . recognized and enforced . . . as a property right."  *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994) ("[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right."); *see also United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988) ("That the right at issue . . . has not been treated as a property right in other contexts and that there are many basic differences between it and common-law

---

[19] Although the Complaint also contains passing references to the mail fraud statute (18 U.S.C. § 1341), *see, e.g.*, Compl. ¶¶ 305, 369, the Trustee does not expressly allege any particular violation of this statute, and it is unclear whether the Trustee intended to assert predicate violations of mail fraud as well as wire fraud.  The failure to include any particularized allegations alone would require dismissal of any such mail fraud claims pursuant to FED. R. CIV. P. 9(b).  Regardless, the relevant analysis under the wire and mail fraud statutes is identical, and the transactions and communications described in the Complaint cannot constitute mail fraud for the same reasons they cannot constitute wire fraud.

property are relevant considerations in determining whether the right is property under the federal fraud statutes."). The "hallmarks of traditional property are exclusivity and transferability." *United States v. Alsugair*, 256 F. Supp.2d 306 (D.N.J. 2003); *see also Carpenter v. United States*, 484 U.S. 19, 26 (1987) (affirming a wire fraud conviction where the property interest was "a species of property to which the [owner] has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.").

Here, the Trustee had no property interest that was injured by the alleged asset transfers. Fraudulently transferred property is not part of the debtor's estate "*until the Trustee obtains a favorable judgment*," *Picard*, 762 F.3d at 212 (emphasis added), and it was not until 2017 that the Trustee obtained a judgment against Scott LaBonte. All of the alleged asset transfers—including Scott LaBonte's transfers to the SALDT in 2010; the subsequent transfers and payments by the SALDT for Scott LaBonte's benefit; the sale of certain joint venture interests by LLCs managed by Scott LaBonte to LLCs managed by Landino in 2012 and 2013; the receipt by DEIPM of refinancing fees in 2015 and 2016, and the transfer of Devcon's assets in 2015—occurred before the Trustee obtained the SAL Judgment.

The Complaint does not even attempt to allege that the Trustee possessed a relevant property interest prior to 2017.[20] Instead, the Trustee alleges only that

---

[20] It should be noted that, even if the Trustee had a property interest that was injured at the time of the asset transfers, his RICO claims premised on the transfers would be plainly barred by the applicable four-year statute of limitations because the Trustee learned of any injury shortly after the transfers were completed, prior to the beginning of the limitations period. *See supra* § III. A civil

37

the asset transfers deprived him of an opportunity to utilize the transferred assets to satisfy his judgment against Scott LaBonte—obtained years later—and thus "impede[d]" the Trustee.  Compl. ¶ 283.  The Trustee's opportunity to utilize assets to satisfy a right to payment he did not yet have is not a recognized and enforced property right, and therefore this "injury' cannot give rise to wire fraud liability.

The Third Circuit's decision in *United States v. Henry* is instructive.  There, the defendant was convicted of wire fraud on the basis of his alleged corruption of the process by which banks competed to be depositories of certain government revenues, and the harm alleged by the government was the deprivation of the banks' fair opportunity to bid for the funds.  29 F.3d at 113-14.  The Court held that although the condition of a fair bidding process was "valuable to [the banks]," the condition "is not a traditionally recognized, enforceable property right" because "[i]t is not a grant of a right of exclusion, which is an important aspect of traditional property."  *Id.* 114-15.  Instead, it was, "[a]t most, . . . a promise to the bidding banks from those in charge of the process that they would not interfere with [the bidding process]."  *Id.* at 115.  While "[v]iolation of this condition may have affected each bidding bank's *possible future receipt of property*, . . . that does not make the condition property."  *Id.* (emphasis added).

---

RICO claim accrues, and the statute of limitations begins to run, when the plaintiff has "inquiry notice" of the "injur[y] in his business or property by reason of" the RICO violation.  *In re Merrill Lynch*, 154 F.3d at 58; 18 U.S.C. § 1964(c).

Likewise, here, the asset transfers alleged "may have affected [the trustee's] possible future receipt of property," but the Trustee had no traditionally recognized, enforceable property interest that was taken from him by the transfers at the time they were completed. *See, e.g*, *United States v. Walker*, No. 09-cv-478, 2011 WL 3417110, at *11 (E.D. Pa. July 28, 2011) (holding that defendant's scheme to receive kickbacks from his employer's vendor, although fraudulent as to his employer, did not cause harm to other vendors, who had "not been deprived of a property interest" and thus were not "victims for the purposes of federal mail and wire fraud"). Absent a recognized and enforceable property interest, the asset transfers—as well as related communications and transactions, such as the SALDT's acceptance of the transfers and its issuance of the promissory note to Scott LaBonte—cannot give rise to federal criminal liability.

Moreover, the "scheme to defraud" element encompasses conduct "designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (citation omitted). The Trustee has failed to allege that the asset transfers and related communications were part of a scheme that utilized misrepresentation or deceit. None of the parties to the asset transfers is alleged to have had a duty of disclosure to the Trustee or the bankruptcy court, or to have made any misrepresentation of fact to the Trustee or anyone else. *See Knight*, 800 F.3d at 505 (holding that debtor's pre-petition transfers "to impede creditors from learning about and pursuing the[] funds" were not "*fraudulent* as

to [the debtor's] creditors," and therefore did not comprise a "scheme to defraud," as required under 18 U.S.C. § 157). Accepting the Trustee's position would mean that a transfer voidable under the Connecticut Uniform Fraudulent Transfer Act is alone sufficient to subject the transferor and transferee to federal criminal liability. But, as explained above, a mere "fraudulent conveyance cannot be a basis for a RICO claim" because "[u]nenumerated acts . . . such as a fraudulent conveyance . . . are not 'racketeering activities'" under the RICO statute. *Apollon*, 2003 WL 1397394, at *4.

The cases in which courts have held that plaintiffs adequately pleaded wire or mail fraud in connection with a scheme to put assets beyond the reach of creditors do not involve mere alleged fraudulent transfers of unattached property, like this case, but *misrepresentation or deceit*, and *property interests* that were *injured* at the time of the alleged racketeering activity. *See, e.g.*, *Stochastic*, 995 F.2d at 1161-64 (noting that trial court found acts of wire and mail fraud in defendants' scheme to avoid a creditor who was owed money under the parties' contract); *Rothberg v. Chloe Foods Corp.*, No. CV-06-5712, 2007 WL 2128376, at *12 (E.D.N.Y. July 25, 2007) (holding that wire fraud was adequately alleged based on defendants' submission of a "fraudulent" UCC-1 financing statement in scheme to avoid a lender); *Stein*, 2006 WL 319300 (dismissing RICO claim but holding that wire and mail fraud adequately alleged where fraudulent transfers were made to avoid collection on forthcoming summary judgment regarding unpaid promissory note); *United States v. Bishop*, 825 F.2d 1278 (8th Cir. 1987) (holding that a scheme involving "misrepresent[ations] to lenders," "the removal

of secured collateral," and false promises falls within the scope of the wire fraud statute); *Cadle Co. v. Schultz*, 779 F. Supp. 392, 399 (N.D. Tex. 1991) (holding that a scheme to fraudulently transfer assets where the plaintiff already *had a judgment* against the transferor at the time of the transfers could constitute a "scheme to defraud"); *Sutliff, Inc. v. Donovan Cos., Inc.*, 727 F.2d 648, 653 (7th Cir. 1984) (holding that a "classic 'bust-out'" scheme "[t]o create a false impression of solvency in order to induce the extension of credit" included adequate allegations of mail and wire fraud) (emphasis added); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1272 (7th Cir. 1989) (same); *c.f. GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (holding that defendant's alleged undisclosed transfer of assets *prior to* inducing plaintiff's acceptance of a promissory note did not adequately plead mail or wire fraud).

The Trustee had no relevant property interest at the time of the alleged fraudulent transfers, and none of the alleged conduct involved misrepresentation or deceit. Accordingly, the Trustee has failed to allege predicate acts of wire fraud.

### 5. The Asset Transfers Do Not Constitute Money Laundering

To establish a violation of 18 U.S.C. § 1956, the Trustee must show, *inter alia*, that the participants in the alleged financial transaction knew that the property involved in the transaction "represent[ed] the proceeds of some form of unlawful activity," and that the transaction did, in fact, "involve[] the proceeds of specified unlawful activity." 18 U.S.C. § 1956; *see also United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001) ("To prevail under the money laundering statutes, the government must show that defendant (1) acquired the proceeds of a

specified unlawful activity and then (2) engaged in a financial transaction with those proceeds.") (citation and alterations omitted).[21]

The assets transferred by Scott LaBonte to the SALDT in 2010 allegedly consisted of his partial ownership interests in a number of "income-producing and valuable" commercial real estate assets. Compl. ¶¶ 73, 101, 318(a)-(r). The Trustee fails to adequately allege that Scott LaBonte's interests in these commercial real estate properties represented the proceeds of unlawful activity, and therefore their transfer cannot constitute money laundering. The Trustee alleges, in conclusory fashion, only that the property transferred by Scott LaBonte in 2010 "involved the proceeds of unlawful activity, namely the violations of 18 USC §§ 152, 1341, 1343, 1503, and/or 1512 [*i.e.*, bankruptcy fraud, wire and mail fraud, and obstruction of justice] *as alleged elsewhere in this Complaint*." Compl. ¶ 326(a)(i) (emphasis added). That is, the Trustee has alleged that the 2010 transfers themselves violated these statutes. But it is well-established that the unlawful activity must *precede* the alleged laundering transactions. Therefore, the 2010 transfers cannot be both the underlying crime as well as the laundering of the "proceeds" of that crime. *See, e.g.*, *United States v. Peters*, 732 F.3d 93, 100 (2d Cir. 2013) ("Congress could not have intended

---

[21] The Trustee also alleges that Sally LaBonte, but not the other defendants, violated 18 U.S.C. § 1957, which prohibits the knowing engagement in a monetary transaction "in criminally derived property [that is] of a value greater than $10,000 and is derived from specified unlawful activity." Both statutes require that the transaction be known to involve, and actually involve, property derived from unlawful activity, and therefore the allegations of Sally LaBonte's violation of Section 1957 fail for the same reasons that the other allegations of money laundering fail.

violations of the money-laundering statute to 'merge' in this way with violations of other statutes."); *McCarthy*, 271 F.3d at 395 ("[F]unds become proceeds when they are derived from an already completed offense, or a completed phase of an ongoing offense."); *United States v. Savage*, 67 F.3d 1435 (9th Cir. 2011) ("'[P]roceeds' are funds obtained from *prior, separate* criminal activity.") (emphasis added); *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997) ("[T]he underlying criminal activity must be *complete* before money laundering can occur."); *United States v. Maali*, 358 F. Supp.2d 1154 (M.D. Fla. 2005) (holding that "a money laundering charge based on a financial transaction which is an essential element of the underlying criminal act" is precluded).

The post-2010 transactions alleged in the Complaint could only conceivably involve the "proceeds of . . . unlawful activity" if Scott LaBonte's transfer of the assets to the SALDT was itself criminal, as the Trustee has not alleged any other preceding unlawful activity related to the property involved in the post-2010 transactions. But, as explained above, the Trustee has failed to allege that the 2010 asset transfers were criminal, or that they involved the proceeds of unlawful activity. Therefore, there is no basis to find that the subsequent transactions, even if they involved the property transferred by Scott LaBonte in 2010, constituted money laundering.[22] Accordingly, the Trustee has

---

[22] In an example of the overreaching that pervades the Complaint, the Trustee also alleges in conclusory fashion that Devcon's transfer of its assets to DEIPM in 2015 constituted money laundering. Devcon was a real estate management company and earned revenue through property management contracts and other fees. Compl. ¶ 248. The Trustee does not even attempt to explain how Devcon's assets represented the proceeds of unlawful activity. Therefore, the Trustee has

failed to allege that any of the transactions described in the Complaint constituted money laundering.

**B.** **The Trustee's Failure to Allege that the 2010 Transfers by Scott LaBonte Were Predicate Acts Requires Dismissal of the Lost Debt Claim**

The Trustee's failure to allege any predicate acts of racketeering requires dismissal of the Complaint in its entirety. However, the specific failure to allege that the 2010 transfers by Scott LaBonte were predicate acts alone requires dismissal of the Trustee's lost debt claim. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (internal quotation marks omitted). *See also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) ("[T]he compensable injury flowing from a RICO violation . . . necessarily is the harm *caused by the predicate acts*.") (emphasis in original).

The "but for" cause of the Trustee's alleged inability to collect the SAL Judgment was Scott LaBonte's transfer of all of his assets to the SALDT in August and September 2010, which "render[ed] him[] insolvent." Compl. ¶ 193. Upon the completion of those transfers, the Trustee claims he had no recourse against Scott LaBonte. And in the various actions initiated by the Trustee to recover assets in satisfaction of the SAL Judgment, the Trustee has failed to establish a right to recover against any individual or entity other than Scott

_____

failed to state a money laundering violation with respect to this transaction as well.

LaBonte.  Therefore, the only alleged predicate acts relevant to the Trustee's "lost debt" injury are those acts that were necessary to effect the transfer of Scott LaBonte's property to the SALDT.

The Trustee has alleged a number of predicate acts that were purportedly related to the 2010 transfers in some manner but were not necessary to effect the transfers.  In particular, the Trustee alleges that the SALDT's issuance of a note to Scott LaBonte in exchange for the property he transferred, and various communications related to the note and the valuation of the property transferred, were predicate acts.  Compl. ¶¶ 89-100.  Putting aside the fact that these acts did not violate any federal criminal statute, as explained above, the acts are in any case irrelevant to the Trustee's lost debt injury.

"An act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act."  *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995).  Therefore, "a predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act."  *Leung v. Law*, 387 F. Supp.2d 105, 122 (E.D.N.Y. 2005).  Whether Scott LaBonte continued to enjoy the benefit of the assets he transferred to the SALDT, and whether he received fair value in exchange for the assets, are only relevant if the Trustee was seeking to prove that the transfers were fraudulent conveyances under the Connecticut Uniform Fraudulent Transfer Act.  For

purposes of the Trustee's RICO claim, however, these acts, at most, "facilitated" or "concealed" the injury-causing acts—the 2010 transfers. *Red Ball*, 874 F. Supp. at 584. They are neither the "but for" nor proximate cause of Scott LaBonte's insolvency. *Hemi Grp.*, 559 U.S. at 9; *see also DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp.2d 627, 652 (S.D.N.Y. 2011) ("[A] theory of causation . . . in which the alleged violation is not 'directly responsible' for the injury but rather allows it to have occurred more easily, cannot meet RICO's standing requirements.").

Similarly, there is no causal connection between the Trustee's lost debt injury and the various alleged predicate acts relating to transactions entered by the SALDT, Landino, DEIPM, and Devcon in the years following the transfer of all of Scott LaBonte's assets in 2010. "[A] debt is 'lost' and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) '*by reason of*' a RICO violation." *Stochastic* , 995 F.2d at 1165 (quoting 18 U.S.C. § 1964(c)) (emphasis added). The Trustee has no judgment against the SALDT, Landino, Devcon, or DEIPM; the Trustee has a judgment against Scott LaBonte alone, and Scott LaBonte was rendered insolvent in 2010. The transactions between the SALDT, Landino, DEIPM, and Devcon may have provided grounds for the Trustee to pursue additional fraudulent conveyance actions, but they do not provide a basis for a RICO claim seeking redress for the lost debt injury.

Because, as explained above, the 2010 transfers were not predicate acts of racketeering, the Trustee cannot recover for its "lost debt" injury in this RICO action.

C.    **The Trustee Has Failed to Allege an Enterprise Distinct from the Alleged Pattern of Racketeering Activity**

Even if the Trustee adequately alleged the commission of predicate acts of racketeering, he fails to allege the existence of a RICO enterprise, *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct" that is "separate and apart from the racketeering activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981). An "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Trustee alleges an association-in-fact enterprise comprised of Scott LaBonte, his father, his wife, and his accountant, "devoted to fraudulently transferring and concealing Scott LaBonte's assets and taking other actions to obstruct and impede the . . . Trustee from satisfying the SAL Judgment, while permitting Scott LaBonte to continue to enjoy the benefit from such assets," which "was formed for the purpose of carrying out the activities alleged in this Complaint." Compl. ¶ 307. These allegations are inadequate to show the existence of a RICO enterprise that is "separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583.

Specifically, the Second Circuit has held that allegations of an association-in-fact enterprise devoted to the fraudulent transfer and sheltering of assets, nearly identical to the allegations here, are inadequate. In *First Capital Asset Management, Inc. v. Satinwood, Inc.*, the plaintiff alleged that the purpose of the alleged association-in-fact enterprise, comprised of various family members,

47

related entities, and professionals, was to "conceal . . . [the debtor's] assets from his creditors, the bankruptcy court[,] and [the] Chapter 7 Trustee." 385 F.3d 159, 174 (2d Cir. 2004). The Court held that the plaintiffs failed to offer "any factual allegations that the [enterprise] was an ongoing organization, formal or informal, or any evidence that the various associates of the alleged enterprise functioned as a continuing unit," and that there were no allegations regarding the "hierarchy, organization, and activities from which [the Court] could fairly conclude that its members functioned as a unit." *Id.* at 174-75 (internal quotation marks and citations omitted).

Similarly, in *Stein v. New York Stair Cushion Co., Inc.*, the alleged association-in-fact enterprise consisted of an owner of a corporation, the owner's family members, and various affiliated entities, and had the purpose of "accomplish[ing] the fraudulent transfer and continuing custodianship of . . . assets to shield those assets from the claims of Plaintiff." 2006 WL 319300, at *4. The Court noted that the "[p]laintiff alleges an enterprise whose purpose is to conceal assets from Plaintiff and the predicate acts involve alleged fraudulent conveyances aimed at accomplishing that goal." *Id.* The Court concluded that "the enterprise alleged *is* the pattern of racketeering activity," and therefore the Complaint "fails to sufficiently allege the existence of an enterprise." *Id.*[23]

---

[23] *See also, e.g.*, *Dale v. Banque SCS Alliance, S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *7 (S.D.N.Y. Sept. 22, 2005) ("The plaintiffs do not allege that the association-in-fact enterprise had any purpose or activities other than the execution of Frankel's scheme. Consequently, the association-in-fact enterprise does not have any alleged existence apart from the pattern of racketeering activity alleged in the amended complaint, and it does not satisfy the requirement noted in *First Capital*." ); *Pavlov v. Bank of N.Y. Co., Inc.*, 135 F.Supp.2d 426, 430

"The existence of an enterprise at all times remains a separate element which must be proved," *Turkette*, 452 U.S. at 583, because "[o]ne element addresses group organization, while the other addresses conduct," *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06 Civ. 6095, 2007 WL 1159637, at *10 (S.D.N.Y. Apr. 18, 2007). *See also United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp.2d 422, 473 (E.D.N.Y. 2007) ("[A] RICO enterprise and the pattern of racketeering activity are conceptually distinct elements with distinct characteristics that must be alleged separately in a well-pleaded RICO complaint, notwithstanding the fact that the evidence necessary to prove those elements may in some cases overlap or coalesce.").

Here, the alleged enterprise consists of individuals who have a variety of personal and legitimate business ties that long pre-dated the alleged racketeering activity and whose alleged interests and participation varied across the alleged racketeering period. The SALDT, which was allegedly used to shelter Scott LaBonte's assets, existed well before the commencement of the alleged scheme, and Scott LaBonte had transferred property to the trust prior to 2010. Compl. ¶ 87. Sally LaBonte's alleged role is limited to her consent, as Trustee of the SALDT, to the acceptance of transfers, as she had done prior to the commencement of the alleged scheme, and the allowance of Scott LaBonte to allegedly continue to benefit from the transferred property. *See id.* at ¶¶ 76, 109,

---

(S.D.N.Y. 2001) ("[T]here must be more to an 'enterprise' than simply an aggregation of predicate acts of racketeering activity. In other words, an 'enterprise' must exhibit more structure than is inherent simply in the alleged pattern or [sic] racketeering activity.").

121.  The alleged role of Roland LaBonte, Scott LaBonte's father, is similarly limited to his consent, in his capacity as trustee of the SALDT, to transfers of assets and to Scott LaBonte's alleged continuing benefit from the transferred property, and his consent to the transfer of Devcon's assets, an entirely separate and legitimate real estate management company.  *Id.* at ¶¶ 76, 109, 225-26.

Sparveri, one of the "principals" of the alleged association-in-fact enterprise, provided accounting services to the LaBonte family long before the alleged racketeering activity began.  Compl. ¶ 35.  He is not alleged to have benefitted from the scheme, beyond his receipt of standard fees for his professional services.  And Sparveri's alleged role as a trustee of the SALDT, one of the primary means by which he allegedly participated in the enterprise, ceased in 2013, years before the end of the alleged racketeering conduct.  *Id.* at ¶ 127. Therefore, unlike in *JSC Foreign*, where an accountant was found to have formed an association-in-fact enterprise with his clients for the purpose of laundering criminal proceeds, Sparveri's participation was not continuous across the period of alleged racketeering, he is not alleged to have personally benefitted from the scheme, and his association with the LaBontes cannot be construed as "wholly illegitimate."  2007 WL 1159637, at *10 (S.D.N.Y. Apr. 18, 2007).

"For an association of individuals to constitute an 'enterprise,' the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to address such purposes."  *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994) (internal quotation marks omitted); *see also Boyle*, 556

U.S. at 948 (holding that there must be "a continuing unit that functions with a common purpose"). As alleged here, the purported enterprise is simply the sum of the allegedly fraudulent acts by the "principals"; there is no enterprise distinct from the alleged fraudulent acts or from the individuals who allegedly engaged in the fraudulent conduct. Concluding that this amounts to a "continuing unit" with a "common purpose" would require the Court to consider the alleged racketeering acts alone and ignore the principals' variegated interests, relationships, and conduct. Accordingly, the Trustee has failed to allege the existence of an enterprise.

> **D.** **The Conduct Alleged by the Trustee Does Not Amount to or Pose a Threat of Continuing Criminal Activity**

To allege a RICO violation, the Trustee must allege that the predicate acts of racketeering "amount to, or pose a threat of, continuing criminal activity." *Democratic Nat'l Comm.*, 392 F. Supp.3d at 442 (citing *H.J. Inc.*, 492 U.S. at 239). To satisfy this element, the Trustee "must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')." *GICC Cap.*, 67 F.3d at 466. The Trustee's Complaint alleges a single "inherently terminable" scheme, with a single purpose and a single alleged victim, accomplished through a discrete set of property transfers. These allegations fail to establish either an "open-ended" or "closed-ended" pattern of racketeering.

1.  **The Alleged Conduct Does Not Exhibit Open-Ended Continuity Because a Scheme to Avoid a Creditor Is "Inherently Terminable"**

Open-ended continuity may be shown by allegations of "criminal activity that by its nature projects into the future with a threat of repetition." *Democratic Nat'l Comm.*, 392 F. Supp.3d at 445 (citing *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017)); *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) ("To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed"). Both "the nature of the RICO enterprise and of the predicate acts are relevant" in assessing whether open-ended continuity has been alleged. *Cofacredit*, 187 F.3d at 242.

The Trustee alleges a scheme to place Scott LaBonte's assets beyond its reach. The Second Circuit has held that a scheme to fraudulently transfer a debtor's assets is "'*inherently terminable*'" and, therefore, "does not imply a threat of continued criminal activity." *Satinwood*, 385 F.3d at 180-81 (quoting *GICC Cap.*, 67 F.3d at 466) (emphasis added). The Trustee himself concedes that the scheme's purpose has been accomplished and is now complete: (1) Scott LaBonte rendered himself insolvent in 2010, Compl. ¶ 193; (2) the SALDT is now insolvent and has no valuable assets, *id.*; and (3) "there is no real possibility of collecting upon any judgments that might enter in the pending" fraudulent conveyance actions, *id.* at ¶ 290. Therefore, according to the Trustee, "the Defendants have successfully frustrated the Goldberg Trustee's collection efforts." *Id.* at 63. As the Second Circuit held in *Satinwood* and *GICC*, "it 'defies logic to suggest that a threat of continued looting activity exists when,' as

Plaintiffs admit, 'there is nothing left to loot.'" *Satinwood*, 385 F.3d at 181 (quoting *GICC*, 67 F.3d at 466). *See also Ritter v. Klisivitch*, No. 06-CV-5511, 2008 WL 2967627, at *13 (E.D.N.Y. July 30, 2008) (holding that scheme to evade judgment creditor through fraudulent transfers was "inherently terminable").

The terminable nature of the alleged scheme is further illustrated by the fact that the last predicate acts alleged by the Trustee occurred almost four years ago, in *January 2016*, when certain refinance fees were paid to DEIPM. Compl. ¶ 278. *See Satinwood*, 385 F.3d at 181 (holding that the absence of alleged predicate acts since almost two years prior to the filing of the RICO complaint "suggests that the scheme has wound to a close"). Although the Trustee alleges that Scott LaBonte continues to benefit from fraudulently conveyed assets, *see, e.g.*, Compl. ¶ 265, these allegations are conclusory and do not imply a threat of continued criminal activity. *See Satinwood*, 385 F.3d at 181 ("[C]ontinued silent concealment of assets is not a predicate act."); *Ritter*, 2008 WL 2967627, at *13; *Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*, 842 F. Supp. 1567, 1570-72 (S.D.N.Y. 1994) (continuing concealment and transfer of converted assets did not support open-ended continuity because "such activities do not constitute continuing criminal conduct"); *USA Network v. Jones Intercable, Inc.*, 729 F. Supp. 304, 318 (S.D.N.Y. 1990) (holding that a fraudulent scheme to mislead plaintiff about defendant's intentions to terminate a contract was "essentially accomplished" upon termination, and defendant's subsequent acts to conceal the alleged fraud did not constitute "continuing criminal activity"). *C.f. Rothberg*, 2007 WL 2128376, at *13 (holding that threat of continuing criminal activity "to

prevent . . . other creditors from collecting valid debts" could be inferred from allegations that defendants "sent fraudulent notices to at least three creditors regarding the status of their loans," "submitted fraudulent statements to at least two different courts, and filed fraudulent documents with at least three different government offices").[24]

The alleged predicate acts clearly do not "pose a threat of continued criminal activity," which is not surprising given the absence of a true "enterprise." Whatever conduct the Trustee believes occurred to impede his collection efforts ended years ago. Therefore, the Complaint fails to allege an open-ended pattern of racketeering activity.

---

[24] The Trustee's lone allegation that "Roland LaBonte testified that if the Trustee sought a prejudgment remedy against DEIPM, he would transfer the assets of DEIPM to a new entity, just as Devcon transferred its assets to DEIPM," Compl. ¶ 299, does not imply a continuing threat of criminal activity. The Trustee's complaint against DEIPM was filed in 2017, and the Trustee has never sought a prejudgment remedy or any other injunctive relief seeking to enjoin any transfer of DEIPM's assets. *See Berman v. DEI Property Mgmt., LLC et al.*, No. 17-2029 (Bankr. D. Conn. June 2, 2017). Instead, the Trustee has agreed to stay the action against DEIPM indefinitely. *Id.* at Dkt. No. 84. Nor does the Complaint in this action contain any allegations that DEIPM engaged in any fraudulent transfers since the complaint was filed against it in June 2017. Indeed, the Trustee asserts that DEIPM has no meaningful assets to transfer, alleging that DEIPM "has two (2) employees" and "provides management services to three shopping centers, one of which has an anchor tenant that recently filed for bankruptcy and none of which generate meaningful cash flow." Compl. ¶ 296. These facts belie any contention that there is a threat that DEIPM will engage in racketeering activity in the future. *See Satinwood*, 385 F.3d at 181 ("[I]t 'defies logic to suggest that a threat of continued looting activity exists when,' as Plaintiffs admit, 'there is nothing left to loot.'"); *Brickellbush*, 219 F. Supp. 2d at 585 (S.D.N.Y. 2002) ("[W]hile it arguably is true that one who shifts his money around to avoid creditors is likely to continue to do so long as they pursue him, the crux of plaintiffs' allegations is that [the debtor] has no assets left with which to repay them, and consequently no assets left to transfer in violation of the bankruptcy laws.").

### 2. The Alleged Conduct Does Not Exhibit Closed-Ended Continuity Because It Consisted of a Single Scheme, a Single Victim, Limited Participants, and Sporadic Acts of a Single Type

"A closed-ended pattern of racketeering activity involves predicate acts 'extending over a substantial period of time.'" *Satinwood*, 385 F.3d at 181 (quoting *GICC*, 67 F.3d at 466). "Although continuity is 'primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.'" *Id.* (quoting *DeFalco*, 244 F.3d at 321). "Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity." *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp.2d 362, 372 (E.D.N.Y. 2002) (collecting cases); *see also, e.g.*, *Weizmann Institute of Science v. Neschis*, 229 F. Supp.2d 234, 257 (S.D.N.Y. 2002) ("[N]one of the . . . indicia of closed-ended continuity—*i.e.* a large number and variety of predicate acts, a large number of either participants or victims, and the presence of separate schemes— is present in this case."). Each of the relevant factors identified by the Second Circuit in *Satinwood* weighs against finding closed-ended continuity here.

Even assuming the alleged predicate acts are adequately pleaded and sufficiently related, the Trustee has only alleged a single scheme, targeting a single victim. The enterprise is alleged to consist of only four individuals, one of whom is an accounting professional not alleged to have personally benefitted from the scheme, and two others who are alleged to have simply consented to or

facilitated Scott LaBonte's alleged efforts to shelter his assets.  *See GICC Cap.*, 67 F.3d at 468 (holding that "activities alleged involv[ing] only a handful of participants" weighed against closed-ended continuity).  And although the Trustee has asserted that multiple federal criminal statutes were violated by the same asset transfers, there is no "variety" of predicate acts at all; each is premised on the transfer of assets which the Trustee believes he may use to satisfy his judgment against Scott LaBonte.  *See Satinwood*, 385 F.3d at 182 (finding no closed-ended continuity where, "[a]t bottom, Plaintiffs have alleged that [the debtor] engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding").

Nor does the number of predicate acts weigh in favor of finding continuity. "[A]cts . . . [that] are unrelated to the predicate acts which allegedly injured [the] plaintiff . . . cannot be considered as part of the activity to extend the scope of the pattern." *Shamis v. Ambassador Factors Corp.*, No. 95-cv-9818, 1997 WL 473577, at *15 (S.D.N.Y. Aug. 18, 1997); *see also H.J. Inc.*, 492 U.S. at 240 (holding that the "pattern" requirement in the RICO statute "requires the showing of a relationship between predicates," which is established where "criminal acts . . . have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events").

The only acts that conceivably caused the Trustee's lost debt injury are the 2010 transfers of Scott LaBonte's assets to the SALDT, which rendered Scott

LaBonte insolvent and incapable of satisfying the SAL Judgment, as the Trustee has established no right to recover or attach the assets of any other individual or entity.  *See supra* § V.B.  And the only acts which conceivably caused the Trustee to incur additional collection expenses, by providing a purported basis for the filing of additional fraudulent conveyance actions, are the sales of joint venture interests by LLCs managed by Scott LaBonte to LLCs managed by Landino in 2012 and 2013, and Devcon's alleged transfer of its assets to DEIPM in 2015.  The alleged predicate acts that can be legitimately considered in assessing the existence of a pattern of racketeering thus relate to a discrete set of asset transfers, years apart.

The Trustee attempts to ring up the number of predicate acts by alleging that various transactions and communications incidental to these transfers— such as alleged communications about the transfers, the SALDT's issuance of a note to Scott LaBonte, and payments for Scott LaBonte's benefit—advanced the "scheme to defraud" and were therefore criminal.  *See* Compl. ¶¶ 337, 353.  But the Second Circuit has directed that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  *See also, e.g.*, *Comm. to Defend U.S. Constitution v. Moon*, 776 F. Supp. 568, 573 (D.D.C. 1991) ("One cannot turn a state law claim . . . into a RICO claim by merely counting up the number of times defendants pick up a telephone or adding the number of stamps they use.  It is far more relevant to the inquiry that the defendants['] actions, however numerous they may be, result in a single

instance of injury."). Such care is particularly important where, as here, the fragmentary predicate acts alleged are violations of the wire fraud statutes, and the wires themselves are not deceptive or misleading. *See Schnell v. Conseco, Inc.*, 43 F. Supp.2d 438, 446 (S.D.N.Y. 1999) ("[T]he fact that [the defendant] allegedly used mail and wire communications that in themselves contained no deceptive or misleading statements to further its single goal does not mandate a finding of closed-ended continuity."); *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("[M]ail and wire fraud allegations are unique among predicate acts because multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity."); *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) ("[W]e are cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice. This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity.") (citation and quotation marks omitted).

Discrete asset transfers, occurring years apart, do not show "sustained and continuous criminal activity," but rather, at most, "sporadic bursts of activity at key points in time." *Brickellbush*, 219 F. Supp.2d at 587; *see also H.J. Inc.*, 492 U.S. at 239 ("A pattern is not formed by 'sporadic activity' . . . ."). Accordingly,

even if each of the alleged predicate acts are adequately pleaded, the alleged pattern of racketeering in the Complaint fails to show closed-ended continuity.[25]

## CONCLUSION

The deficiencies in the Trustee's Complaint are numerous: (1) the Trustee lacks standing to assert the RICO claim; (2) the lost debt claim is unripe; (3) even if the Trustee has standing and the lost debt claim is ripe, the lost debt claim and the vast majority of the collection expense claims are barred by the statute of limitations; (4) there are no adequately alleged predicate acts; (5) there is no adequately alleged "enterprise" separate and apart from the alleged acts of racketeering; and (6) the alleged conduct does not amount to or pose a threat of continuing criminal activity.

Accordingly, the Defendants respectfully request that the Court grant their respective motions to dismiss.

Dated:     December 13, 2019

---

[25] The conclusion that the Trustee has failed to allege either open-ended or closed-ended continuity is, of course, only strengthened given that the alleged conduct does not violate federal law and thus does not show any predicate acts of racketeering. *See supra* § V.

FINN DIXON & HERLING LLP

By: /s/ Alfred U. Pavlis
    Alfred U. Pavlis (ct08603)
    David R. Allen (ct30827)
    Finn Dixon & Herling LLP
    Six Landmark Square
    Stamford, CT 06901-2704
    Tel: (203) 325-5000
    Fax: (203) 325-5001
    apavlis@fdh.com
    dallen@fdh.com

*Attorneys for Paul Bourdeau, Esq.*

PULLMAN & COMLEY LLC                    MARK H. DEAN, PC

By:  /s/ James T. Shearin              By:  /s/ Mark Dean
     James T. Shearin (ct01326)             Mark Dean (ct01935)
     Thomas S. Lambert (ct29561)            Mark H. Dean, PC
     Pullman & Comley LLC                   241 Main Street, Suite 501
     850 Main Street                        Hartford, CT 06106
     P.O. Box 7006                          mdean@mhdpc.net
     Bridgeport, CT 06601-7006
     jtshearin@pullcom.com            *Attorneys for Roland G. LaBonte,*
                                      *individually and as Trustee of the Roland*
Of Counsel                           *G. LaBonte Revocable Trust and the*
     David M.S. Shaiken (ct02297)     *Scott A. LaBonte Dynasty Trust, and*
     Shipman, Shaiken & Schwefel,     *Marilyn P. LaBonte, individually and as*
     LLC                              *Trustee of the Marilyn P. LaBonte 2015*
     433 South Main Street            *Revocable Trust and Trustee of the*
     West Hartford, CT 06110          *Marilyn P. LaBonte Revocable Trust*
     david@shipmanlawct.com

*Attorneys for Scott A. LaBonte,*
*individually and as Trustee of the*
*Scott A. LaBonte Revocable Trust,*
*and Sally A. LaBonte, individually and*
*as Trustee of the Scott A. LaBonte*
*Revocable Trust and Trustee of the*
*Scott A. LaBonte Dynasty Trust*

60

**CARMODY TORRANCE SANDAK HENNESSEY LLP**

By: /s/ Thomas J. Sansone
       Thomas J. Sansone (ct00671)
       Carmody Torrance Sandak
       Hennessey LLP
       195 Church Street
       New Haven, CT 06509
       tsansone@carmodylaw.com

*Attorneys for Robert A. Landino*

**NATALE & WOLINETZ**

By: /s/ Anthony Natale
       Anthony Natale (ct08451)
       Natale & Wolinetz
       116 Oak Street
       Glastonbury, CT 06033
       anatale@natalelawfirm.com

*Attorneys for Lawrence J. Marks, Esq. and Juliano & Marks, LLC*

**COWDERY & MURPHY LLC**

By: /s/ Thomas J. Murphy
       Thomas J. Murphy (ct07959)
       James J. Healy
       Cowdery & Murphy LLC
       280 Trumbull Street, 22nd Floor
       Hartford, CT 06103
       tmurphy@cowderymurphy.com
       jhealy@cowderymurphy.com

*Attorneys for Joseph W. Sparveri, Jr.*

<u>**CERTIFICATION**</u>

**I hereby certify that on December 13, 2019 a copy of the foregoing Joint Memorandum of Law in Support of Defendants' Motions to Dismiss the Complaint was filed electronically through the Court's electronic filing system and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.**

<u>**/s/ Alfred U. Pavlis**</u>
**Alfred U. Pavlis (ct08603)**
**FINN DIXON & HERLING LLP**
**Six Landmark Square**
**Stamford, CT 06901-2704**
**Tel: (203) 325-5000**
**Fax: (203) 325-5001**
**E-mail: apavlis@fdh.com**