## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED ESTATE OF MICHAEL S. GOLDBERG, LLC AND MICHAEL S. GOLDBERG | : Case No. 3:19-cv-01533-VLB |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| SCOTT A. LABONTE; ET AL. | : |
| | : |
| Defendants. | : February 28, 2020 |
| | : |

### THE TRUSTEE'S MAIN MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTIONS TO DISMISS THE COMPLAINT</u>

**ORAL ARGUMENT REQUESTED**

## **Table of Contents**

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    STATEMENT OF FACTS AND NATURE OF THE PROCEEDINGS ...................... 3

   A.   SAL's Knowing Participation in the Goldberg Scheme .................................. 3

   B.   The Enterprise Begins .............................................................................. 4

   C.   The Trial in the Malley-LaBonte Action and Defendants' Contemptuous
   Concealment of the Dynasty Trust Transfers ......................................................... 9

   D.   The Landino Transactions ........................................................................ 11

       i.   *The Joint Venture Transfers* ............................................................... 13

   E.   The Dynasty Trust Action ........................................................................ 14

   F.   The February 2015 Transfer of Devcon's Business and Assets .................... 15

   G.   Judge Dabrowski's Decisions ................................................................... 18

   H.   The Trustee Continued To Prosecute the Dynasty Trust Action .................. 19

   I.    The Trustee's Action to Avoid the Landino Transfers ................................. 20

   J.    The Commencement and Prosecution of the DEIPM Action ......................... 20

   K.   SAL's Unfettered Access to Income Generated by Devcon's Transferred
   Assets .................................................................................................................. 21

   L.   The 2015-2016 DEIPM Refinance Transactions ........................................... 22

III.   STANDARD ............................................................................................... 25

IV.    ARGUMENT .............................................................................................. 26

   A.   The Trustee has Standing to Assert a RICO Claim ..................................... 26

   B.   The Trustee's Lost Debt Claim is Ripe ...................................................... 28

i.   The SAL Enforcement Actions Do Not Render the Trustee's Lost Debt

RICO Claim Unripe .................................................................. 28

C.   The Trustee's Lost Debt Claim is Not Barred by the Statute of Limitations 35

D.   The Trustee's Collection Expenses Claim is Not Time Barred .................... 36

E.   The Trustee Alleges That the Defendants Committed Numerous Predicate

Acts of Racketeering ................................................................. 38

1.   Bankruptcy Fraud Under 18 U.S.C. § 152(7) ............................ 39

a.   Section 152(7) Applies to the Defendants ............... 39

2.   Obstruction of Justice Under 18 U.S.C. §§ 1503 and 1512 ..... 42

3.   Wire Fraud Pursuant to 18 U.S.C. § 1343 ........................... 47

a.   The Complaint Alleges That the Defendants' Engaged in a Scheme to

Defraud that Injured the Trustee ...................... 47

b.   A Wire Fraud Claim Does Not Require a Misrepresentation or

Deceptive Conduct Separate from A Scheme to Defraud ............. 50

4.   Money Laundering Pursuant to 18 U.S.C. § 1956 .................... 51

F.   The Trustee Adequately Alleges Causation ................................. 53

G.   The Trustee Alleges an Enterprise ............................................ 54

H.   The Complaint Alleges Closed-Ended Continuity ......................... 56

V.   CONCLUSION ................................................................. 58

## Table of Authorities

**Cases**

*131 Main Street Assoc.'s v. Manko*, 54 F. App'x 507 (2d Cir. 2002)......................... 37

*AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001) 31

*Allstate Ins. Co. v. Etienne*, 2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. Oct. 22, 2010) ................................................................................................................................. 56

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 25, 26

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988)........................ 30, 33, 37

*BC Liquidating, LLC v. Weinstein (In re BC Funding, LLC)*, 519 B.R. 394 (Bankr. E.D.N.Y. 2014) .............................................................................................. 26, 51

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................ 25

*Berman, Chapter 7 Trustee v. Edward Malley, et al.*, Adv. Pro. No. 10-2082 .............. 4

*Boyle v. United States*, 556 U.S. 938 (2009) ............................................. 31, 54, 55, 56

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) ................................ 50

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ............................. 9

*City Sanitation, LLC v. Burdick (In re Am. Cartage, Inc.)*, 438 B.R. 1 (D. Mass., 2010) ................................................................................................................ 27, 28

*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013) .................................... 36

*D'Addario* v. *D'Addario*, 901 F.3d 80 (2d Cir. 2018)...........................................passim

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ...................................................... 57

*DePierre v. United States*, 564 U.S. 70 (2011) .......................................................... 42

*Dexia Credit Local v. Cuppy,* 2010 U.S. Dist. LEXIS 83289 (N.D. Ill. Aug. 16, 2010) ............................................................................................................................. 49, 53

*Doe v. Connecticut*, 2011 U.S. Dist. LEXIS 125288 (D. Conn. Oct. 31, 2011) .......... 25

*DT Boring, Inc. v. Chicago Public Building Commission*, 2016 U.S. Dist. LEXIS 83539 (N.D. Ill. June 28, 2016) ........................................................... 33, 34

*First Capital Asset Mgmt. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002) ................................................................................................................ 40, 58

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ........ 32, 36

*Gutierrez v. Givens*, 989 F. Supp. 1033 (S.D. Cal. 1997) ..................................... 48, 49

*Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401 (E.D.N.Y. 2013) ................... 56

*Huddleston v. United States*, 415 U.S. 814, 831 (1974) .............................................. 42

*In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032 (2d Cir. 1984) ......... 44, 45

*In re Michael S. Goldberg L.L.C. et al.*, Case No. 09-23370 ................................ 10, 37

*James Berman, Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM) ................................................................................................................... 20

*Kleinman v. Elan Corp.*, 706 F.3d 145 (2d Cir. 2013) .................................................... 9

*Koch v. Christie's Intern'l Public Ltd. Co.*, 699 F.3d 141 (2d Cir. 2012) .................. 36

*Lanza v. Merrill Lynch & Co.*, 154 F.3d 56 (2d Cir. 1998) .................................... 28, 32

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ................................. 9, 25, 29

*McBeth v. Porges*, 171 F. Sup. 3d 216 (S.D.N.Y. 2016) ................................................ 9

*McHale v. Alvarez (In re 1031 Tax Group, LLC)*, 397 B.R. 670 (Bankr. S.D.N.Y. 2008) ................................................................................................................................ 27

*Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129 (2d Cir. 1984) ...................... 27, 47

*Moskal v. United States*, 498 U.S. 103 (1990) ........................................................... 42

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003) .............................. 32, 34

*Nye v. U.S.*, 137 F.2d 73 (4th Cir. 1943) ...................................................................... 44

*Nutovic & Assocs. v. Scher Law Firm LLP (In re Parklex Assocs.)*, 2011 U.S. Dist. LEXIS 63135 (S.D.N.Y., June 13, 2011) .................................................................. 37

*Parr v. United States,* 363 U.S. 370 (1960) ................................................................. 50

iv

*Reich v. Lopez*, 858 F.3d 55 (2d Cir. 2017) ................................................ 56

*Rosenshein v. Jeffrey Meshel*, 688 F. App'x 60 (2d Cir. 2017) ................................. 36

*Schmuck v. United States*, 489 U.S. 705 (1989) ................................................ 47, 50

*Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd. (In re Platinum-Beechwood Litig.)*, 377 F. Supp. 3d 414 (S.D.N.Y. 2019) ........................................... 38

*Smith v. United States*, 508 U.S. 223 (1993) ................................................ 42

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178 (2d Cir. 2008) .............. 56

*Stegeman v. United States*, 425 F.2d 984 (9th Cir. 1970) ......................................... 40

*Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir. 1993) ......... 28, 31

*Town of Islip v. Datre*, 245 F. Supp. 3d 397 (E.D.N.Y. 2017) ...................................... 30

*U.S. v. Crispo*, 306 F.3d 71 (2d Cir. 2002) ........................................... 43, 45

*United States v. Aguilar*, 515 U.S. 593 (1995) ................................................ 43

*United States v. Baum*, 32 F. Supp. 2d 642 (S.D.N.Y. 1999) ..................................... 46

*United States v. Cioffi*, 493 F.2d 1111 (2d Cir. 1974) ................................................ 43

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ................................................ 42

*United States v. Colon Ledee*, 772 F.3d 21 (1st Cir. 2014) ................................. 40, 53

*United States v.* Connolly, 2019 U.S. Dist. LEXIS 77099, at *74 (S.D.N.Y. May 2, 2019) ................................................................................................ 50

*United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011) ........................................... 42

*United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70 (2d Cir. 1986) .. 41

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) ........................................ 58

*United States v. Johns*, 686 F.3d 438 (7th Cir. 2012) ................................................ 40

*United States v. Joyner*, 23 F.2d 884 (W.D. La. 1927) ................................................ 39

*United States v. Lanier*, 520 U.S. 259 (1997) ................................................ 41

v

*United States v. Lundwall*, 1 F. Supp. 2d 249 (S.D.N.Y. 1998) ................................... 46

*United States v. Neal*, 951 F.2d 630 (5th Cir. 1992) ...................................................... 44

*United States v. Newton*, 452 F. App'x 288 (4th Cir. 2011) ......................................... 44

*United States v. Polakoff*, 121 F.2d 333 (2d Cir. 1941) ............................................... 43

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .............................................. 47, 50

*United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001) ............................................... 39

*United States v. Szur*, 289 F.3d 200 (2d Cir. 2002) ............................................... 51, 52

*United States* v. *Turkette*, 452 U.S. 576 (1981) .................................................... 34, 55

*Yelverton v. Marm (In re Yelverton)*, 2014 Bankr. LEXIS 5011 (Bankr. D.D.C., Dec 11, 2014) .................................................................................................... 27, 28

## Statutes

11 U.S.C. § 330 ............................................................................................................ 37

11 U.S.C. § 330(a) ...................................................................................................... 37

11 U.S.C. § 704(a)(1) .................................................................................................. 43

11 U.S.C. §323(a) ....................................................................................................... 27

11 U.S.C. §541(a)(7) .............................................................................................. 27, 48

18 U.S.C. §1512 .......................................................................................................... 42

18 U.S.C. § 1343 ......................................................................................................... 47

18 U.S.C. § 152(1) ...................................................................................................... 53

18 U.S.C. § 152(7) .................................................................................................. 39, 52

18 U.S.C. § 1956 .................................................................................................... 51, 53

18 U.S.C. § 1503 .................................................................................................... 42, 52

18 U.S.C. § 1961(1) .................................................................................................... 38

18 U.S.C. §1512(c)(2) ................................................................................................. 42

18 U.S.C. § 1964(c) ............................................................... 28

**Other Authorities**

*2* Collier on Bankruptcy 1151 (14th ed. 1968) .......................................... 40

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................ 24, 25

D. Conn. L. Civ. R. 7(a) ............................................................... 1

Fed. R. Civ. P.  12(b)(1) ......................................................... 24, 29

Pursuant to D. Conn. L. Civ. R. 7(a) and this Court's Pretrial Preferences, the plaintiff, James Berman, Chapter 7 Trustee, (the "Trustee"), for the substantively consolidated bankruptcy estates of the debtors, Michael S. Goldberg, LLC, d/b/a Acquisitions Unlimited Group (the "Debtor LLC"), and Michael S. Goldberg ("Goldberg" and collectively with the Debtor LLC (the "Goldberg Debtors"), by and through his undersigned counsel, respectfully submits his Memorandum in Opposition to the Defendants' December 13, 2019, Joint Memorandum of Law in Support of the Defendants' motions to dismiss the Complaint [Doc. No. 58] (the "Joint Memorandum").

## I.  <u>PRELIMINARY STATEMENT</u>

The Defendants' motions to dismiss this action are an unfortunate but entirely characteristic effort by Scott A. LaBonte ("SAL") and his enablers to continue their thus far successful frustration of the fair and equitable administration of justice and enforcement of the rule of law. If SAL, and his close family members, decades-long legal and accounting professionals and business partner are ultimately permitted to escape liability for their enterprise to obstruct the Trustee from collecting the SAL Judgment and distributing it to Goldberg Scheme victims, then Ponzi scheme feeders like SAL (and other financial fraudsters) will be encouraged to forever avoid paying fair restitution to victims by blatantly and repeatedly fraudulently transferring, concealing and dissipating their assets until their pursers (be they bankruptcy trustees, restitution receivers, SEC receivers or any other government enforcement official) are forced to give up. This Court should not countenance that result.

1

Notwithstanding the unfortunately voluminous and dense compilation of information and pleadings that have been put before this Court, the *bona fides* and merit of this RICO action are founded upon a simple and well-documented tale of greed, complete indifference to the financial suffering of others, and total disregard for the rule of law, *even by legal and accounting professionals*.

This "lost debt" civil RICO action is unique for a number of reasons. Because of the Trustee's status as a bankruptcy trustee, it is factually distinct from any reported "lost debt" case either side has been able to identify. It is also unique given that even at the pleadings stage the Trustee has already accumulated significant and shocking evidence concerning all of the Defendants' culpability under RICO for participating in the repeated obstruction of justice.

Furthermore, this case is unique among lost debt RICO cases because the same court officer, acting not on behalf of himself but on behalf of Goldberg Scheme victims entitled to approximately $30,000,000 in restitution, has been repeatedly and illegally thwarted in his pursuit of a now over $8,000,000 judgment against SAL by the same cohort of principal actors and conspirators for years. The Defendants have accomplished this obstruction through the orchestrated, intentional and repeated transfer, re-transfer and dissipation of SAL's assets and other predicate acts, which would otherwise have been available to compensate Goldberg's victims.

Long prior to filing the Complaint (and well-documented in bankruptcy pleadings) the Trustee determined that the pursuit of his stayed fraudulent conveyance actions (other than as a vehicle for settlement) was futile, given the

2

Defendants' documented history of serial obstructive conduct and their sworn testimony (and out of court statements) that the Trustee would never recover on the SAL Judgment. Those Defendants' recent tactical decision to ask the courts to re-activate those long consensually-stayed fraudulent conveyance actions against them was a blatant and obvious attempt to make this action "not ripe". But the Trustee has repeatedly informed the bankruptcy court (The honorable Julie A. Manning) that he has been successfully frustrated in those actions by the RICO Defendants' years' long shell game with SAL's assets and their proceeds.

The Defendants' coordinated and serial obstruction of the Trustee, which has taken place since 2010, has necessitated this action and the Trustee's well-plead allegations in the Complaint (many of which articulate facts already indisputably established by prior judicial determinations or by sworn admissions), conclusively establish both the propriety of the Complaint, the ripeness of all the Trustee's claims and the Defendants' liability under RICO.

## II.  STATEMENT OF FACTS AND NATURE OF THE PROCEEDINGS

### A.  SAL's Knowing Participation in the Goldberg Scheme

SAL was a successful and sophisticated businessman who concentrated his wealth in family-owned real-estate ventures. Between January 2006 and May 2009, he participated in the Goldberg Scheme, originally as an investor, but primarily as a feeder who profited by soliciting third-parties to invest and charging them large fees. (Complaint ("Compl."), at ¶31). Judge Dabrowski found that SAL "knowingly participated" in the Goldberg Scheme and "knew [it] was a

fraud." (*Id.*, at ¶43). Indeed, even though he had direct access to Goldberg, SAL invested on behalf of himself and his investors through his cousin, E. Malley, hoping to insulate himself from liability. (*Id.*, at ¶32). SAL was a "net winner" in the Goldberg Scheme because he received back all of his investment plus significant false profits. (*Id.*, at ¶44). Between January 2008, and May 2009, SAL received $7,241,797.52 from the Goldberg Debtors at the Goldberg Victims' expense. (*Id.*).

Goldberg turned himself in to the FBI In November 2009.  His creditors filed involuntary bankruptcy petitions against the Debtors, and the Bankruptcy Court promptly confirmed James Berman as chapter 7 Trustee. (*Id.*, at ¶¶47-48).

B. <u>The Enterprise Begins</u>

On May 20, 2009, six months before the public discovered the Goldberg Scheme, SAL and his families' accountant, J. Sparveri, CPA[1] ("Sparveri"), compiled a 2009 PFS[2] that SAL provided to New Alliance Bank. (*Id.*, at ¶86). The 2009 PFS valued SAL's assets at $13,138,000, including $2.5 million in cash and $7,568,000 in business interests. (*Id.*, at ¶87). After deducting a $3 million mortgage debt, the 2009 PFS represented SAL's net worth at $10,138,000. (*Id.*).

On May 14, 2010, the Trustee commenced the "Malley-LaBonte Action" (*Berman, Chapter 7 Trustee v. Edward Malley, et al.*, Adv. Pro. No. 10-2082), originally seeking to recover fraudulent transfers from the Goldberg Debtors to, *inter alia*, E. Malley. (*Id.*, at ¶57). E. Malley told SAL about the Malley-LaBonte

---

[1] Unless otherwise stated, references to natural persons include all capacities that person held, such as a trustee.

[2] Unless expressly defined otherwise, the Trustee incorporates by reference the definitions of terms set forth in the Complaint [Doc. No. 1].

Action shortly after the Trustee commenced it. (*Id*.). SAL immediately understood that the Trustee sought to 'claw-back' for the benefit of creditor-victims the money that E. Malley had received from the Goldberg Scheme. (*Id*.). SAL promptly reached out to Roland LaBonte, Sparveri, and P. Bourdeau, Esq. ("Bourdeau," and with SAL, Roland LaBonte, and Sparveri, the "RICO Meeting Participants") to devise a plan to insulate his assets from the Trustee. (*Id*., at ¶60).

The RICO Participants met on June 2, 2010, at Devcon Enterprises, Inc.'s ("Devcon") office. (*Id*., at ¶¶62-63). Devcon was the LaBonte Family's closely held real estate management company. (*Id*.). Judge Thompson later entered an order (the "Crime-Fraud Order") determining that the Trustee had established "probable cause to believe that a fraud was committed [by SAL] and that the communications at [*inter alia*, the RICO Meeting] were in furtherance of that fraud." (*Id*., at ¶64). In response to the Crime-Fraud Order, C&L produced Bourdeau's notes from the RICO Meeting (the "RICO Notes"), which reference a potential "claw back" by a "Hartford Trustee," and detail many strategies that SAL could utilize to shield his assets from the Trustee while allowing SAL unfettered control over and access to them. (*Id*.). Bourdeau and Sparveri later admitted under oath that the RICO Meeting Participants attended the RICO Meeting to devise a strategy to move SAL's assets beyond the Trustee's reach. (*Id*., at ¶¶65-67).

Following the RICO Meeting, the RICO Meeting Participants and other Defendants began obstructing the Trustee as they had planned. (*Id*., at ¶71). SAL first transferred all of his assets, including those that he held through a revocable

Trust (the "SAL Rev. Trust"), to the Scott A. LaBonte Dynasty Trust (the "SALDT") (hereinafter the "Dynasty Trust Transfers"). SAL, Roland LaBonte, Sparveri, Marilyn LaBonte, and Sally LaBonte (in various capacities) effectuated the Dynasty Trust Transfers through instruments that they executed in July or August 2010, but backdated to June 2, 2010. (*Id.*, at ¶¶72-78). By way of the Dynasty Trust Transfers, some of the Defendants transferred interests in eighteen (18) distinct income-producing and valuable LaBonte Real Estate Entities (the "Fraudulently Transferred Interests") to the SALDT. (*Id.*, at ¶¶72-73). Judge Thompson later determined that Sally LaBonte testified to a false pretextual excuse for the Dynasty Transfers, hoping to explain them as innocent estate planning in advance of an overseas trip. (*Id.*, at ¶68-69). Judge Thompson knew that Sally LaBonte's testimony was false because she and the other signatories executed the transfer documents after the trip notwithstanding that they backdated the documents to a date shortly before the trip, *i.e.*, the date of the RICO Meeting. (*Id.* at 69).

Sparveri collectively valued the Fraudulently Transferred Interests at $1,168,214 using capitalization rates that SAL provided. (*Id.*, at ¶84). After SAL made a "gift" to the SALDT equal to 10% of that "value," SAL and Sparveri decided that the SALDT owed SAL $1,051,391 for the Fraudulently Transferred Interests. (*Id.*, at ¶85). Approximately one-year earlier, the 2009 PFS valued these same assets at $7,568,000 (a more than $6.5 million difference). (*Id.*, at ¶¶85-88).

The SAL Rev. Trust received a note (the "2010 Note") in the amount of $1,051,391 in exchange for the Fraudulently Transferred Interests. (*Id.*, at ¶89). To

ensure that the 2010 Note provided little to no meaningful value to the Trustee, SAL, Sparveri and Bourdeau structured the 2010 Note to be payable interest only until its thirty-year maturity date in June 2040. (*Id*., at ¶90).

In 2006, the SALDT had issued a separate promissory note (the "2006 Note") to the SAL Rev. Trust in exchange for other assets. (*Id*., at ¶92). As of June 2, 2010, the balance of the 2006 Note was $1,881,836.44 and it matured on July 27, 2015. (*Id*., at ¶¶92-94). To further impede the Trustee, the RICO Meeting Participants amended and restated the 2006 note (the "Restated 2006 Note" and with the 2010 Note, the "Notes"), effective June 2, 2010, so it also became payable interest-only until it matured on June 2, 2040. (*Id*., at ¶ 93-94). Following the Dynasty Trust Transfers, Sparveri prepared a 2010 PFS that stated SAL's net worth as negative $1,381,000 as of June 2, 2010—nearly $11.5 million less than the 2009 PFS that valued the same assets approximately one year earlier. (*Id*., at ¶98).

SAL retained *de facto* control over the Fraudulently Transferred Interests notwithstanding the Dynasty Trust Transfers and Roland LaBonte, Sparveri, and Sally LaBonte – the SALDT trustees – allowed him unfettered access to them. (*Id*., at ¶¶102-04). The Fraudulently Transferred Interests generated monthly income that the SALDT trustees continued to allow SAL to receive directly between June and December of 2010. Sparveri coordinated these payments to SAL's individual bank account even though the SALDT owned the interests that generated them after the Dynasty Trust Transfers. (*Id*., at ¶¶105-09). On November 12, 2010, the Trustee filed a PJR Application against SAL seeking to attach assets in an

7

amount up to $7,241,797.52. (*Id*., at ¶110). SAL continued to directly receive the income from the Fraudulently Transferred Interests until the end of December, 2010. (*Id*., at ¶107).

SAL stipulated to a $5 million PJR Attachment in February 2011. (*Id*., at ¶111). SAL knew that he would be stipulating to a PJR, so in January 2011, he and the SALDT trustees began to deposit the income generated by the Fraudulently Transferred Interests into the Dynasty Account so the Trustee could not attach it. (*Id*., at ¶111-113). Judge Dabrowski also ordered SAL to disclose his assets to the Trustee. (*Id*., at ¶111). SAL did not disclose the Fraudulently Transferred Interests even though he retained complete and unfettered use and control over them and their proceeds after the Dynasty Trust Transfers. (*Id*.).

In a thinly veiled attempt to bolster the façade of the Dynasty Trust Transfers' *bone fides*, starting in March 2011, Sparveri began preparing schedules purporting to apply "credits" on the "debts" owed by the SALDT to the SAL Rev. Trust pursuant to the Notes. (*Id*., at ¶126). These "credits" purported to mirror certain payments made from the SALDT for SAL's benefit, which further eroded any value that the Trustee could ever realize from the Notes toward satisfying SAL's liability. (*Id*.).

Sparveri's accounting was haphazard at best and ceased no later than September 2013, shortly before he resigned as a SALDT trustee. (*Id*., at ¶127). Despite the Notes' thirty-year terms, in just a few years the trustees of the SALDT wrote down the balance of the Notes to zero, despite the fact that the SALDT failed to make a single cash payment to SAL. (*Id*., at ¶131).

Between January 2011 and December 2013, the Fraudulently Transferred Interests generated millions of dollars, which the SALDT Trustees and L. Marks, Esq. ("L. Marks") diverted and dissipated for SAL's benefit. (*Id*., at ¶¶114, 168, 175). The SALDT's revenue decreased markedly in 2014, which, not surprisingly, is the same year that the Trustee commenced *James Berman, Trustee v. Sally LaBonte, et al.*, Adv. Pro. 14-02026 (the "Dynasty Trust Action") seeking, *inter alia,* to avoid the Dynasty Trust Transfers. (*Id*., at ¶115.).

C. **The Trial in the Malley-LaBonte Action and Defendants' Contemptuous Concealment of the Dynasty Trust Transfers**

In June, 2011, Judge Dabrowski presided over a five-day trial of the Trustee's claims in the Malley-LaBonte action to recover, *inter alia,* the fraudulent transfers that SAL received from the Goldberg Scheme. (*Id*., at ¶51). The parties completed post-trial briefing on through November 17, 2011, and Judge Dabrowski then took the matter under advisement.[3]

Between May 2012 and May 2014, the month in which the Trustee commenced the Dynasty Trust Action, the Trustee vigorously pursued multiple avenues to discover the location of SAL's assets, including serving subpoenas on financial institutions and seeking discovery of the SALDT via Bankruptcy Rule

---

[3] "In considering a Rule 12(b)(6) motion, a court …. may… consider documents attached to the complaint; statements or documents incorporated into the complaint by reference; matters of which judicial notice may be taken, such as public records; and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit." *McBeth* v. *Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016), *citing Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (applying that rule to district courts). Moreover, the Court may consider matters outside the pleadings in adjudicating a motion to dismiss for lack of subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court… may refer to evidence outside the pleadings.")

2004 from i) SAL, and ii) Sally LaBonte and Sparveri in their capacities as trustees of the SALDT and/or SAL Rev. Trust (the "2004 Exam Parties"). (*In re Michael S. Goldberg L.L.C. et al.*, Case No. 09-23370 (the "Debtors' Bankruptcy Proceeding"), at D.I. 1177-80. In response to the Trustee's efforts to obtain information, the Rule 2004 Exam Parties filed serial objections, motions to quash, appeals, motions to stay pending appeal and motions for reconsideration, all of which they lost. (*Id.*, at D.I. 1187, 1208-10, 1214-16, 1247-48). The Trustee eventually obtained the information that he sought from the financial institutions and also from the Rule 2004 Exam Parties, but only after Judge Dabrowski found the Rule 2004 Exam Parties in contempt twice for failing to comply with court orders. (*Id.*, at D.I. 1198-1202, 1241-42, 1261, 1266, 1305; Compl., ¶116).

Through these Rule 2004 Exams, the Trustee eventually obtained evidence establishing that SAL diverted millions of dollars through the SALDT with the cooperation and consent of the SALDT Trustees. (Compl., ¶117). For example, on or about May 18, 2012, SAL and L. Marks diverted $386,000, to which the SALDT was entitled from the sale of a Fraudulently Transferred Interest, and paid SAL's personal obligation that he owed to RCZS, LLC ("RCZS"), an entity that owned a private jet for use by SAL and its other members, including Roland LaBonte, Landino, and E. Malley. (*Id.*). The SALDT owned no interest in RCZS and owed no obligation to RCZS. (*Id.*).

As the settlor of the SALDT, SAL could not endorse checks drawn from the Dynasty Account. Because Sally LaBonte was a Trustee of the SALDT, SAL

routinely drafted checks drawn on the Dynasty Account for whatever purpose he chose and Sally LaBonte, as Trustee, endorsed them. (*Id.*, at ¶120).

On October 25, 2013, four (4) days after the Trustee filed motions to obtain documents from and examine the 2004 Exam Parties, and three (3) days after counsel appeared on their behalf, SAL handwrote three checks totaling nearly $600,000 which Sally LaBonte endorsed as Trustee.[4] (*Id.*, at ¶121).  These checks included $195,000 collectively to entities that SAL dominated and controlled (but in which he owned no interests after the Dynasty Trust Transfers), and, most significantly, $400,000 to Sally LaBonte's personal checking account. (*Id.*, at ¶¶122-24). Sally LaBonte utilized those funds to pay SAL's personal and business expenses. (*Id.*, at ¶124).

D. <u>The Landino Transactions</u>

SAL and all or some of the Defendants conspired to liquidate many Fraudulently Transferred Interests into cash, which the Defendants dissipated for SAL's benefit. (*Id.*, at ¶157). Landino, SAL's business partner for years, knowingly participated in and facilitated that process. (*Id.*, at ¶213).

Between approximately 2006 and 2012, SAL and Landino jointly developed many commercial properties. (*Id.*, at ¶135). SAL and Landino structured their joint developments using upper tier single purpose entities that owned real-estate (each a "Joint Venture"), which they generally owned together indirectly through

---

[4] As discussed herein, the nearly $600,000 paid out of the Dynasty Account on October 25 was part of more than $900,000 in proceeds received by the SALDT from the sale of SAL NH Investments, LLC's interest in Centerplan College Square, LLC to an entity controlled by R. Landino. (Compl., ¶125).

their own separate LLCs (each a "LaBonte JV Entity" or a "Landino JV Entity"). (*Id.*, at ¶136; ¶137 (listing the Joint Ventures)).

SAL initially owned interests in the LaBonte JV Entities (personally or through the SAL Rev. Trust) until he transferred those interests to the SALDT through the Dynasty Trust Transfers. (*Id.*, at ¶138).  Landino was the sole member of each Landino JV Entity. (*Id.*).

SAL and Landino partnered together on many ventures over many years, including, *inter alia*, a development in New Britain, Connecticut, through an entity known as Cakemaker, LLC ("Cakemaker"). SAL NB Investments, LLC ("SAL NB") was the LaBonte JV Entity and Centerplan NB, LLC ("Centerplan NB") was the Landino JV Entity. (*Id.*, at ¶140). Cakemaker developed a manufacturing facility at One Celebration Way ("One Celebration Way") in New Britain, Connecticut, which Cakemaker sold in or about the late winter or early spring of 2012. (*Id.*, at ¶141).

On April 24, 2012, Centerplan NB commenced a lawsuit (the "Centerplan NB Lawsuit") against SAL NB, SAL, and Devcon to recover its share of One Celebration Way's sale proceeds. (*Id.*, at ¶¶141-44). Landino personally verified Centerplan NB's Verified Complaint, which alleged, *inter alia*, that (i) SAL was a defendant in the Malley-LaBonte Action that had been tried; (ii) SAL was subject to the Trustee's $5 million PJR Attachment; and (iii) beginning in April 2011, SAL fraudulently transferred all of his assets to friends, family, and trusts. (*Id.*, at ¶145). SAL had revealed all of these facts to Landino during a lunch meeting in the fall of 2011, when SAL told Landino that the Trustee was wasting his time in the Malley-LaBonte Action, because SAL had already transferred all of his assets.

(*Id*., at ¶146). Landino also knew by February 2012 that the Trustee had sued and obtained PJRs against SAL Cranston and SAL North Haven (two other LaBonte JV Entities). (*Id*., at ¶153).

### i.   *The Joint Venture Transfers*

Between May 2012 and October 2013—after Landino had publicly attested that SAL transferred all of his assets to the SALDT to defraud the Trustee—SAL liquidated the LaBonte JV Entities by transferring their interests in the remaining Joint Venture Entities to the Landino JV Entities (the "Joint Venture Transfers") in exchange for cash, which SAL, the SALDT Trustees and L. Marks quickly dissipated to pay for SAL's and his family's extravagant lifestyle. (*Id*., at ¶¶121-25; 156-57, 168, 175). The proceeds from these transactions paid to the SALDT totaled approximately $1.5 million, which alone exceeded the values that Sparveri contrived for all of the Fraudulently Transferred Interests in connection with the Dynasty Trust Transfers. (*Id*., at ¶¶84, 154-94).

Landino also knew that the Trustee could claw-back the interests that the Landino JV Entities acquired from the LaBonte JV Entities if the Landino JV Entities continued to hold them. (*Id*., at ¶¶145, 167). He and the Landino Entities could never establish a "good faith" defense to a fraudulent transfer action arising from the JV Transfers, because Landino had already publicly attested that he knew SAL had fraudulently transferred his interests in the LaBonte JV Entities. (*Id*., at ¶¶144-45). For that reason, Landino further dissipated as expeditiously as possible all of the assets that the Landino Joint Venture Entities acquired from the LaBonte Joint Venture Entities. (*Id*., at ¶¶195-96). Moreover, in at least two

instances (where he or the Landino Joint Venture Entities retained indirect interests in the transferred property for a longer period of time), Landino orchestrated complicated webs of transfers through many different shell-entities on the same day in order to "wash" the assets from the Trustee's claims by creating hyper-technical defenses. (*Id*., at ¶¶196-213).

**E.** **The Dynasty Trust Action**

After the Trustee determined through an exhaustive discovery process that the SALDT Trustees had already begun further dissipating the Fraudulently Transferred Interests, on May 31, 2014, the Trustee commenced the Dynasty Trust Action to avoid the Dynasty Trust Transfers and the following subsequent transfers that SAL and the SALDT had made to further hinder, delay and defraud the Trustee:

      a.  **Transfers totaling $1,004,953 made to Sally LaBonte;**

      b.  **Transfers totaling $1,147,404 to Devcon, which at the time was the LaBonte family's closely held property management company;**

      c.  **Transfers totaling $411,000 to Marketplace Port St. Lucie;**

      d.  **Transfers totaling $328,671 to RCZS; and**

      e.  **Transfers totaling $200,000 to Cakemaker.**

(Compl., ¶220). The Trustee also sought to pierce the SALDT's veil and hold it liable for the full amount of SAL's debt to the Trustee. (*Id*., ¶221).

On July 30, 2014, the Trustee filed an application for prejudgment remedy (the "SALDT PJR Application") against the defendants in the Dynasty Trust Action (the "SALDT Defendants"), including Devcon. (*Id*., at ¶223-24). The SALDT

Defendants rigorously opposed the SALDT PJR Application by conducting an evidentiary hearing on November 10 and 12 and December 15, 2014, completing post-hearing briefing on January 20, 2015, and presenting oral argument on February 19, 2015.[5] (*Id.*).

F. **The February 2015 Transfer of Devcon's Business and Assets**

Unbeknownst to the Trustee, as he prosecuted the SALDT PJR Application in November and December of 2014, Devcon, through its President and Chief Executive Officer (SAL) and Chairman (Roland LaBonte), transferred its business and all of its assets to a newly created entity, DEIPM (the "DEIPM Transfer"), and dissolved Devcon. (*Id.*, at ¶ 225). As Trustees of the SALDT, which was at that time Devcon's sole shareholder, Sally LaBonte and Roland LaBonte knew of and approved the DEIPM Transfer and they also knew about the Trustee's pending SALDT PJR Application, because the Trustee named both of them as defendants to the Dynasty Trust Action. (*Id.*, at ¶226).

L. Marks and SAL began developing a strategy to effectuate the DEIPM Transfer no later than November 6, 2014, four (4) days before the first hearing date on the Dynasty Trust PJR Application. (*Id.*, at ¶¶228-29).

L. Marks and J&M drafted DEIPM's operating agreement beginning in the fall of 2014. (*Id.*, at ¶231). L. Marks registered DEIPM, a Connecticut LLC, effective January 9, 2015. (*Id.*, at ¶230). The first DEIPM operating agreement, dated January 9, 2015, listed the MPL Rev. Trust as the member holding 99.99% of DEIPM's membership interest. (*Id.*). Presumably realizing their mis-step when

---

[5] Judge Dabrowski did not rule on the SALDT PJR Application before he retired shortly after oral argument. (Compl., at ¶224).

they named the existing MPL Rev. Trust as the vehicle to perpetrate this fraud (an existing trust with several beneficiaries and contingent beneficiaries other than SAL), on February 26, 2015, Bourdeau helped the LaBontes create and substitute a new trust, the MPL 2015 Rev. Trust, that Marilyn LaBonte ostensibly settled, as DEIPM's 99.99% member. (*Id.*, at ¶¶231-34). Not surprisingly under these circumstances, DEIPM's January 9, 2015, operating agreement was not amended and restated to admit the MPL 2015 Rev. Trust as the 99.99% member. (*Id.*, at ¶231). They simply substituted a new signature page to the January 9, 2015, operating agreement as if the MPL 2015 Rev. Trust always owned 99.99% of DEIPM's membership interest. (*Id.*).[6]

A series of emails between Roland LaBonte, Bourdeau and Marks from February 20, 2015, illustrate why the original MPL Rev. Trust was an unsuitable vehicle to park DEIPM for SAL's exclusive benefit—because it treated Roland and Marilyn LaBonte's children equally:

> Roland,
> I prepared the amendment to Marilyn's existing revocable trust to provide that if Scott is deceased at the time when you and Marilyn are both deceased, the interest in the new DEI entity [DEIPM] would pass to all of your descendants in the same proportions as your other assets. Scott has requested that if he is then deceased that this new DEI interest pass exclusively to Sally.  Please confirm that this is what you and Marilyn want and we will make the appropriate change.
>
> My best
>
> *Paul L. Bourdeau. Esq.*
> *Principal*
> *West Hartford Private Clients Group*

---

[6] The RGL Rev. Trust (a trust settled by Roland LaBonte, who also serves as its trustee), owns the other .01% of DEIPM. (*Id.*, at ¶¶232, 234). Roland LaBonte has also always been DEIPM's sole manager. (*Id.*, at ¶232).

(*Id*., at ¶235). Roland LaBonte responded to Bourdeau's email the same day, copied Marks and SAL, and stated:

> Paul:  I have received the drafts of the amendments a couple of days ago.  I have not read them yet.  However, I agree with Scott's request. We have an understanding between us to transfer the new company [DEIPM] membership interests to Scott as soon as [h]is current situation allows since he owned 100% of the old DEI corporation [Devcon].  Therefore, the new company should pass to Sally or his heirs in the event of a catastrophe as described below.  Please make the changes accordingly.  STAY WARM!  Thanks. R.

(*Id*., at ¶236). Bourdeau, knowing that the Trustee had filed and was prosecuting the Dynasty Trust PJR Application, drafted the MPL 2015 Rev. Trust instrument to effectuate SAL's and Roland LaBonte's fraudulent purpose without Marilyn LaBonte's input, despite the fact that she ostensibly settled the MPL 2015 Rev. Trust. (*Id*., at ¶238).

DEIPM's business is exactly the same as Devcon's was, it never provided services to a client who was not previously a Devcon client, its employees immediately after the DEIPM Transfer were the same as Devcon's before the DEIPM Transfer, and Devcon assigned its vendor and employee benefits contracts to DEIPM. (*Id*., at ¶¶239-41). Marks and his partner, James Juliano, negotiated DEIPM's office lease in the same building that Devcon had maintained its office space in West Hartford, Connecticut.  Devcon simply moved its furniture and equipment to an office one (1) floor below the office space that Devcon had occupied. (*Id*., at ¶¶242-43).

In February 2015, SAL "informed" Devcon's customers that "due to circumstances out of its control," Devcon was ceasing operations and customers needed to locate a new property management company. (*Id*., at ¶244). SAL sent

17

these letters to himself and/or Roland LaBonte, since they collectively controlled all of Devcon's customers. (*Id.*). Roland LaBonte later admitted during a deposition that the SALDT PJR Application was the "circumstances out of Devcon's control" that forced Devcon to ceas[e] operations." (*Id.*, at ¶246). L. Marks drafted the Devcon termination letters and advised SAL to send them to himself or Roland LaBonte to provide cover for their fraudulent purpose for the DEIPM Transfer. (*Id.*, at ¶245). He also dissolved Devcon effective March 30, 2015, without informing the Trustee, knowing that the Trustee had a claim and PJR Application pending against Devcon that exceeded $1 million, and he failed to inform the trustees of the SALDT to reserve any funds to satisfy the Trustee's claim. (*Id.*, at ¶247). The fraudulent transfer of Devcon's business and assets to DEIPM also rendered worthless SALDT's equity interest in Devcon which the Trustee had sought to recover as part of the Dynasty Trust Action.

G. <u>Judge Dabrowski's Decisions</u>

On March 31, 2015 – the day after L. Marks dissolved Devcon – Judge Dabrowski entered his ninety-six (96) page Proposed Findings of Fact and Conclusions of Law in the Malley-LaBonte Action.[7] (Malley-LaBonte Action, D.I. 726 (the "Judge Dabrowski Findings")). Judge Dabrowski recommended that the United States District Court grant judgment in favor of the Trustee and against SAL in the sum of $7,241,797.52, together with prejudgment interest at the prime rate of 3.25% commencing November 12, 2010. (Judge Dabrowski Findings, at p. 96). Judge Dabrowski retired on March 31, 2015.

---

[7] Judge Dabrowski amended these Proposed Findings of Fact and Conclusions of Law on May 11, 2015, solely to correct a misnomer of trial counsel in the decision.

H. **The Trustee Continued To Prosecute the Dynasty Trust Action**

Between July 2014 and the December 2018, the Trustee prosecuted the Dynasty Trust Action. On September 24, 2015, the Trustee Moved to Withdraw the Reference to the District Court. (Dynasty Trust Action, at D.I. 134). Despite having previously moved to withdraw the reference when the matter was pending before Judge Dabrowski, the Dynasty Trust Action defendants objected to the Trustee's motion to withdraw the reference filed after Judge Dabrowski retired. (Case No. 3:15-cv-01687-AWT (the "Dynasty Trust District Court Action"), D.I. 5).

While the Trustee's Motion to Withdraw the Reference was pending, on April 5, 2016, Judge Trust ordered the parties to participate in mediation, which the parties unsuccessfully conducted over three days in June and July, 2016. (*Dynasty Trust Action*, at D.I. 161). On September 26, 2016, Judge Thompson granted the Motion to Withdraw the Reference. (*Id.*, at D.I. 210).

On December 29, 2017, shortly after the court vacated a multi-month stay to allow the parties to purse settlement, the Trustee filed a motion to compel the production of documents that SAL's various professionals had withheld from production on the basis of the attorney-client privilege. The Trustee argued that the crime-fraud exception applied to these documents. SAL and Sally LaBonte (the holders of the purported privilege) adamantly objected. (Dynasty Trust District Court Action, at D.I. 41-42, 51, 59).

On September 30, 2018, Judge Thompson issued the Crime-Fraud Order. Judge Thompson "conclude[d] that there is probable cause to believe that fraud has been committed by [SAL]… [and] [t]here is probable cause to believe that

[SAL] made the [Dynasty Trust Transfers, as defined herein] with actual intent to hinder, delay, or defraud the Trustee." (Compl., ¶34). Judge Thompson also determined that there is "probable cause to believe that the documents and communications at issue here [between certain of the defendants and third-parties] were in furtherance of a transfer of assets made by [SAL] with actual fraudulent intent." (*Id.*). Judge Thompson ordered the production of all documents previously withheld on the basis of privilege. (*Id.*).

I.   <u>The Trustee's Action to Avoid the Landino Transfers</u>

On May 16, 2016, the Trustee commenced the Landino Action to avoid and recover the JV Transfers. (*Id.*, at ¶285; Landino Action, D.I. 1). The Trustee amended his complaint on two occasions to cite-in additional subsequent-transferee defendants that the Trustee identified during discovery. (Landino Action, D.I. 54, 81).

J.   <u>The Commencement and Prosecution of the DEIPM Action</u>

On June 2, 2017, the Trustee commenced *James Berman, Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM) (the "DEIPM Action") to avoid and recover the fraudulent transfer of Devcon's business to DEIPM. (DEIPM Action, D.I. 1). In the DEIPM Action, the Trustee also asserted claims against (i) Roland LaBonte, for aiding and abetting fraudulent transfers, (ii) the RGL Rev. Trust to avoid and recover subsequent transfers that it received from DEIPM, (iii) Marilyn LaBonte for aiding and abetting fraudulent transfers, (iv) the MPL Rev. Trust to avoid and recover subsequent transfers that it received from DEIPM, (v) the MPL 2015 Rev. Trust to avoid and recover subsequent transfers that it

received from DEIPM, and (vi) SAL, for injunctive and equitable relief.[8] (*Id.*).

K. **SAL's Unfettered Access to Income Generated by Devcon's Transferred Assets**

SAL continues to receive income that Devcon n/k/a DEIPM generates via his unlimited access to the assets of the MPL 2015 Rev. Trust. (Compl., ¶257). Despite her knowledge of the Enterprise, Marilyn LaBonte settled the MPL 2015 Rev. Trust on February 26, 2015 solely to funnel money from DEIPM to SAL. (*Id.*, at ¶258). After Marilyn LaBonte settled the MPL 2015 Rev. Trust, L. Marks helped the MPL 2015 Rev. Trust open a checking account at People's Bank. (*Id.*, at ¶259, 261). They opened the account at People's Bank, rather than Farmington Bank (where the LaBonte Family and their businesses regularly banked), after a Farmington Bank employee questioned why SAL would transfer assets to his parents for "estate planning" (and not vice versa). (*Id.*, at ¶260). Bourdeau and L. Marks never asked that same basic question because they always knew the answer. (*Id.*).

Marilyn LaBonte gave SAL the checkbook for the MPL 2015 Rev. Trust's account and a stamp of her signature. (*Id.*, at ¶262-63). Thereafter, SAL has freely funded his lifestyle using the MPL 2015 Rev. Trust's assets, all of which, upon information and belief, consist of distributions from DEIPM. (*Id.*). In the 2½ year period between March 2015 and October 2017, SAL paid $623,876 in credit card bills, alone, from the MPL 2015 Rev. Trust using the stamp of Marilyn's signature that Marilyn gave him, and he continues to use the MPL 2015 Rev. Trust to fund his family's living expenses. (*Id.*, at ¶263-65).

---

[8] In July 2018, the Trustee, after obtaining leave, filed an amended complaint citing-in SAL as a defendant. (DEIPM Action, D.I. 40).

Marilyn LaBonte parked and funneled assets to SAL through DEIPM and the MPL 2015 Rev. Trust because, as she recently testified at her DEIPM Action deposition, "if there was anything [she] can do to help Scott [LaBonte] and his family – which is [her] family, too – … [she] would be willing to do so." (*Id.*, at ¶266). In that same vein, Roland LaBonte testified under oath that if the Trustee tried to attach DEIPM's assets, he and his family would transfer DEIPM's business to a new entity, just as they had transferred Devcon's business to DEIPM. (*Id.*, at ¶267).

**L.   The 2015-2016 DEIPM Refinance Transactions**

Before Devcon fraudulently transferred its assets to DEIPM in early 2015, Devcon maintained management agreements (the "Devcon Management Agreements") with a number of entities that SAL and/or Roland LaBonte controlled (each a "Managed Entity" and collectively the "Managed Entities"). (*Id.*, at ¶268). Devcon's Management Agreements included a provision (the "Transaction Fee Provision") entitling Devcon to a 5% fee based off of the sales price of property owned by a Managed Entity. (*Id.*, at ¶269). Thus, if a Managed Entity sold its shopping center, Devcon received a 5% fee. (*Id.*). In or about February and March of 2015, after Devcon fraudulently transferred its assets to DEIPM, DEIPM entered into management agreements (the "DEIPM Management Agreements") with the same Managed Entities, which Roland LaBonte signed on DEIPM's behalf and SAL or Roland LaBonte signed on the Managed Entities' behalf. (*Id.*, at ¶270).

The DEIPM Management Agreements modified the Transaction Fee Provisions to also entitle DEIPM to a percentage of "any new or refinanced debt" on a property owned by a Managed Entity (the "Refinance Fee Provision"). (*Id*., at ¶271). Thus, the Refinance Fee Provisions created a mandatory mechanism for the Managed Entities to pay massive fees to DEIPM simply for refinancing existing debt using money that otherwise would have funded distributions from the Managed Entities to their members, *e.g.*, the SALDT, which enabled some of the Defendants to strip equity from the Managed Entities and funnel money to SAL through the MPL 2015 Rev. Trust to further impede the Trustee. (*Id*., at ¶272).

On June 25, 2015, SAL, Roland LaBonte, and Marks further amended and restated DEIPM's management agreements with Devcon Commons and Devcon Shops to increase DEIPM's refinance fee from three percent (3%) to four percent (4%). (*Id*., at ¶¶274-75). Marks sent the signature pages for the restated management agreements to Roland LaBonte via email on that same day and directed him to sign them. (*Id*., at ¶274). The next day, Devcon Commons and Devcon Shops refinanced the debt on the properties they owned. (*Id*., at ¶¶276-77). Between June 25, 2015 and January 2016, SAL and Roland LaBonte caused three Managed Entities to refinance the debt on the properties they owned (Devcon Commons, Devcon Shops, and Devcon Manchester), which prompted those entities to pay DEIPM $1,968,600, which Roland LaBonte, as DEIPM's manager, and Marilyn LaBonte as the trustee of its 99.99% member, funneled back to SAL through the MPL 2015 Rev. Trust. (*Id*., at ¶¶276-79). Upon information

and belief, the MPL 2015 Rev. Trust continues to pay SAL's and Sally LaBonte's living expenses. (*Id.*, at ¶280).

The refinance transactions did not even provide sufficient funds to the borrower to pay the Refinance Fees "owed" to DEIPM. (*Id.*, at ¶281). As a result, Devcon Commons, Devcon Shops, and Devcon Manchester paid the Refinance Fees to DEIPM over time using funds that they otherwise would have distributed to their members, including the SALDT. (*Id.*). Sally LaBonte and Roland LaBonte, as SALDT Trustees, allowed SAL and DEIPM to divert the SALDT distributions to SAL through this scheme and took no action to protect or preserve the SALDT's rights that the Refinance Fees extinguished, thereby knowingly furthering the Enterprise to Obstruct the Goldberg Trustee (the "Enterprise"). (*Id.*, at ¶282).

The Enterprise has thus far successfully concealed and/or dissipated SAL's Assets while allowing him and his family to use them to support his family's extravagant lifestyle, notwithstanding the Trustee's claims against SAL to recover the fraudulent transfers that he received from the Goldberg Scheme, the Trustee's $5 million PJR against SAL, and the SAL Judgment that now exceeds $8 million. (*Id.*, at ¶¶5, 111, 298). The Trustee has fought tirelessly to preserve and protect all avenues to enforce his rights against SAL and the Defendants, and to untangle the vast web of fraud that they perpetuated to obstruct and impede him. (*Id.*, at ¶297).  Indeed, the Goldberg Estate has thus far incurred millions of dollars in attorneys' fees and costs as a direct result of the Defendants conduct (excluding the fees incurred to obtain the SAL Judgment). (*Id.*, at ¶¶ 290, 297, 300, 302). The Defendants have demonstrated their willingness

24

to exceed all imaginable limits to further the Enterprise and the Trustee can no longer afford to continue their never-ending shell-game.

### III. STANDARD

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Doe v. Connecticut*, Docket No. 3:10cv1981(VLB), 2011 U.S. Dist. LEXIS 125288, at *5 (D. Conn. Oct. 31, 2011) (citations omitted). However, "on a motion to dismiss under Rule 12(b)(1), the party invoking the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Id*. "In deciding both types of motions, the Court 'must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff.'" *Id.*, at *5-6 (citations omitted). A court's review of a motion contesting the court's subject matter jurisdiction is not, however, limited to the complaint's well-plead facts and documents incorporated by reference. *Makarova*, 201 F.3d at 113.

To survive a motion to dismiss for failure to state a claim, the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . .. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.* "Determining whether a complaint states a plausible claim is 'context specific, requiring the court to draw on its experience and common sense.'" *BC Liquidating, LLC v. Weinstein (In re BC Funding, LLC)*, 519 B.R. 394, 417 (Bankr. E.D.N.Y. 2014), *quoting Ashcroft*, 556 U.S. at 668. For the reasons set forth herein and those stated in the Trustee's oppositions to the Defendants' individual motions to dismiss, the Trustee respectfully requests that this Court deny the Defendants' motions to dismiss.

## IV. ARGUMENT

### A. The Trustee has Standing to Assert a RICO Claim

The Defendants illogically argue that the Trustee lacks standing to assert RICO claims predicated on a lost debt owed to the Trustee. (Joint Memorandum, at 10-12). They assert that the RICO claim belongs to the Debtors' Estate's creditors even though they concede, as they must, that the Trustee "indisputably has standing to pursue the . . . fraudulent conveyance actions" that are predicated on the same debt. (*Id.* at 12). Defendants' standing argument is nonsensical.

RICO authorizes a creditor to recover treble damages against defendants who render a debt uncollectible through a pattern of racketeering activity. *D'Addario* v. *D'Addario*, 901 F.3d 80, 93-94 (2d Cir. 2018). The Trustee had fraudulent transfer claims against SAL for receiving fraudulent transfers from the Goldberg Debtors, which serves as the basis for the SAL Judgment that now exceeds $8 million. The Trustee cannot collect the SAL Judgment because the Defendants rendered SAL insolvent through a pattern of racketeering activity that

shielded his assets from the Trustee while allowing him to retain beneficial ownership and control over those assets. Because the Trustee owns the claims to recover the fraudulent transfers that SAL received from the Goldberg Scheme, and the Defendants' conduct has rendered uncollectible the SAL Judgment that the Trustee obtained on those claims, the Trustee necessarily owns the RICO claim against the Defendants. *See e.g.*, 11 U.S.C. § 541(a)(3)&(7) (a Debtor's Estate includes, *inter alia*, "(3) [a]ny interest in property that the trustee recovers under section . . . 550, . . . of this title . . . [as well as] (7) [a]ny interest in property that the estate acquires after the commencement of the case;" *see also Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984) (property so acquired under 11 U.S.C. §541(a)(7) "includes all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property…."); *City Sanitation, LLC v. Burdick (In re Am. Cartage, Inc.)*, 438 B.R. 1, 14 (D. Mass., 2010) ("It is well-settled that the Trustee has exclusive standing to bring post-petition actions alleging harm to a debtor's estate.") (citations omitted); *Yelverton v. Marm (In re Yelverton)*, Case No. 09-00414, 2014 Bankr. LEXIS 5011, at *17 (Bankr. D.D.C., Dec 11, 2014) ("The exclusive right to sue for injuries to the estate rests in [the Chapter 7 Trustee] as the representative of the estate under 11 U.S.C. §323(a) and [the debtor] thus lacks standing to sue.") (citations omitted); *McHale v. Alvarez (In re 1031 Tax Group, LLC)*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) ("If the cause of action belongs to the estate, the trustee has exclusive standing to assert it"). Therefore, the Trustee has standing to pursue the RICO claims.

Moreover, 18 U.S.C. Section 1964(c) allows the Trustee to recover

27

attorneys' fees and expenses "incurred in one or more attempts to combat a defendant's RICO violations through the legal system …." *D'Addario*, 901 F.3d 80, at 96; *see also City Sanitation, LLC* 438 B.R. 1, at 14; *Yelverton* 2014 Bankr, LEXIS 5011, at *17. The fact that the Goldberg Victims will ultimately receive money that the Trustee recovers from the Defendants is irrelevant. This is true in every instance that a bankruptcy trustee asserts a claim on the estate's behalf or a plaintiff asserts a claim in a fiduciary capacity. Such a dynamic does not deprive a bankruptcy trustee of standing to assert claims on the estate's behalf. Therefore, the Court should deny the Defendants motions to dismiss insofar as they challenge the Trustee's standing to assert the RICO claims alleged in the Complaint.

### B.  The Trustee's Lost Debt Claim is Ripe

####   i.   The SAL Enforcement Actions Do Not Render the Trustee's Lost Debt RICO Claim Unripe

A creditor's lost debt RICO claim becomes ripe when the defendants' conduct "successfully frustrate[s]" the creditor from collecting the debt; *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166 (2d Cir. 1993); there is no "real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced," *Lanza v. Merrill Lynch & Co.*, 154 F.3d 56, 59 (2d Cir. 1998), and the amount of the debt is "reasonably ascertainable." *D'Addario*, 901 F.3d at 95. The Trustee's lost debt claim as plead satisfies each of these elements.

The Defendants serially and fraudulently transferred SAL's assets before concealing and dissipating them further, despite the fact that the Trustee obtained a $5 million PJR against SAL in early 2011. (Compl., at ¶111). The Trustee initiated the Dynasty Trust Action, the Landino Action, and the DEIPM Action (collectively, the "SAL Enforcement Actions") to preserve, protect, and collect the SAL Judgment in the face of the Defendants' serial fraudulent conduct. However, as more fully set forth in the Trustee's Motion for Authority to Authorize Moving to Dismiss Fraudulent Transfer Claims (the "Motion for Authority"),[9] filed on February 28, 2020, it would be futile for the Trustee to continue to prosecute the SAL Enforcement Actions.

Indeed, the Trustee cannot collect against SAL directly (or the SALDT) because of the racketeering activity described in the Complaint. Similarly, the assets remaining in the SALDT (and thus available to recover in the Dynasty Trust Action) are worthless. (Compl., at ¶294).

Sally LaBonte also has no assets from which to pay the Trustee. The Sally Rev. Trust owns a home in Portsmouth, Rhode Island encumbered by a $3 million mortgage, which is listed for sale at $2.8 million. In addition, her hourly employment at a local church could not possibly reduce the amount of damages owed to the Trustee, particularly after accounting for the cost to prosecute the claims against her. (*Id.*).

---

[9] This Court may consider the Motion for Authority in adjudicating the ripeness of the Trustee's lost debt claim under Fed. R. Civ. P. 12(b)(1). *See Makarova*, 201 F.3d at 113 ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court… may refer to evidence outside the pleadings.").

Similarly, all of the Joint Venture entities named in the Landino Action have liquidated their assets and dissolved. Landino, individually, recently became liable for a judgment that entered in an unrelated litigation and exceeds $39 million. He is hopelessly insolvent. (*Id.*, at ¶295).

The Trustee likewise cannot recover anything from the DEIPM Action that is anywhere near the cost of prosecuting the Trustee's claims therein. DEIPM has already dissipated all of the funds that it received from the refinance transactions and sales that the Complaint details. (*Id.*, at ¶296).

Furthermore, *even if* the named defendants to the SAL Enforcement Actions had assets to pay judgments obtained in those actions, which they do not, Roland LaBonte has confirmed that they would simply continue to serially transfer assets to obstruct and impede the Trustee instead of paying those judgments. (*Id.*, at ¶¶267, 299).

There is no requirement that the Trustee "exhaust" every potential avenue of recovery and pursue every fraudulent transfer before he can assert a RICO lost debt claim, particularly where the cost to prosecute those fraudulent transfer actions would exceed any realistic recovery that the Trustee could obtain from the defendants therein. *See Town of Islip v. Datre*, 245 F. Supp. 3d 397, 409-10 (E.D.N.Y. 2017) (*Bankers Trust* and *Stochastic*, among other cases, do not "stand for the broad principle that, before bringing a RICO claim, all plaintiffs must exhaust every alternative means of recovery"). Moreover, the "Trustee is financially unable to continue the hopeless cat and mouse game with the Defendants," (Compl. at ¶300), and the law does not require that he do so before

pursuing recovery under RICO.[10] *Id.; See also Boyle v. United States*, 556 U.S. 938, 944 (2009) ("[T]he RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes."); *AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 (2d Cir. 2001) (the United States Supreme Court has "made clear that it would not interpret civil RICO narrowly").

The cases relied upon by Defendants do not militate in favor of dismissal on ripeness grounds. In *Stochastic Decisions*, the Court held that "a RICO claim does not accrue until it is established that collection of the claim or judgment has been successfully frustrated." 995 F.2d at 1166. The plaintiff in that case failed to demonstrate successful frustration because it had received payment for one portion of the lost debt and had received security protecting the other portion. *Id.*, at 1165-66. Here, by contrast, as detailed in the Complaint, the SAL Judgment remains unpaid and the Trustee has no mechanism "to assure payment of the judgment." Thus, unlike in *Stochastic Decisions*, the Trustee's collection efforts have been "successfully frustrated." *Id.*, at 1166.

In *D'Addario*, the Second Circuit echoed *Stochastic Decisions*, writing that a lost debt RICO plaintiff must have "suffered reasonably ascertainable damages" before the lost debt claim is ripe. 901 F.3d at 95. There, the Court held that the plaintiff's claims were "remarkably uncertain… given the variability of the [probate e]state's assets and liabilities and the unpredictability of the market

---

[10] In this case, the Trustee has not collected any amounts on account of the Trustee's claims against SAL for receiving fraudulent transfers from the Goldberg Scheme except for approximately $89,000 that he realized from the sale of SAL's boat that he seized and $297,000 in aggregate funds that the Trustee obtained through settlement with certain of SAL's Sub-Investors. (Compl., at ¶5). The Trustee has credited those amounts to SAL's debt.

forces at play." *Id*, at 94. Here, unlike the plaintiffs in *D'Addario*, the Trustee *can* calculate the lost debt claim with "reasonable certainty" and the Trustee has in fact "suffered reasonably ascertainable damages." The SAL Judgment is a fixed sum at a fixed interest rate with no downward "variability" and is not subject to "market forces." (Compl., at ¶¶52, 302).

In *Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003), on which the Defendants heavily rely, the Court held that a RICO plaintiff could not pursue its lost debt claim until it foreclosed on the assets securing the debt and otherwise sought to enforce its contractual rights. *Id*., at 132-36. Likewise, in *First Nationwide Bank v. Gelt Funding Corp*., 27 F.3d 763 (2d Cir. 1994), the Court held that a RICO claim, brought by a plaintiff that had extended secured loans to the defendants but had not foreclosed on the loans prior to initiating the RICO action, was unripe. *Id*., at 769. In the absence of utilizing such "bargained-for remedies," the Court held that a secured lender could not proceed under RICO. *Id*. at 768. The Trustee is not a secured creditor of SAL. There is no collateral for the SAL Judgment on which the Trustee could foreclose. Likewise, the Trustee has no independent contractual relationship with any of the Defendants. *See Lanza*, 154 F.3d at 59 (holding that RICO damages are "clear and definite," and therefore "ripe," when the plaintiff has "no contractual or other legal remedies which could assuage the injury"). Thus, the ripeness analysis in *Motorola* and *First Nationwide* are of little value to this Court.

The Trustee has determined that the SAL Enforcement Actions would yield no net-recovery because the cost to prosecute them would exceed the amounts,

if any, that the Trustee could realistically recover from the named defendants. In addition, after entry of consensual orders staying the SAL Enforcement Actions, in two instances because the parties did not want to incur costs and fees prosecuting and defending the action during the pendency of the RICO action, some of the Defendants recently sought to reactivate those actions, effectively weaponizing them to further deplete the Debtors' Estate's already limited resources and synthetically generate ripeness arguments to support their motions to dismiss – there is no other rational reason why a defendant would seek to reactive an action against itself, particularly an action that the parties had previously agreed to stay on multiple occasions.

Thus, to conclusively resolve any potential ambiguity as to whether the Trustee's lost debt RICO claim is ripe, the Trustee filed the Motion for Authority seeking leave to dismiss the SAL Enforcement Actions. While the Motion for Authority is presently *sub judice*, in the event the Bankruptcy Court grants the motion there will not even be a technical argument that collateral actions remain pending and in the interim, the Defendants' argument is hyper-technical at best. Indeed, as the Court recognized in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), when lost debt claims "are dealt with by the bankruptcy court– through recovery of all or part of [the debtor's] assets, an order of abandonment, or some other final disposition of the lost-debt claims–[a RICO plaintiff's lost debt] injury will be ascertainable, [and] an action as to the injury will accrue." *Id.*, at 1106. *See also DT Boring, Inc. v. Chicago Public Building Commission*, Docket No. 15 C 11222, 2016 U.S. Dist. LEXIS 83539, at *23 (N.D. Ill. June 28, 2016)

("*Motorola* was not as broad as requiring a plaintiff to exhaust every collateral source of recovery before pursuing RICO claims…. [T]he rule in *Motorola* applies and the plaintiff lacks RICO standing, only where a plaintiff seeks repayment on the same debt through two different sources"). In *DT Boring*, the Court held that the plaintiff had standing to pursue RICO after it "abandoned its Mechanic's Lien and settled its bond case in state court." 2016 U.S. Dist. LEXIS 83539, at *23. Even the Defendants suggest that such an order permitting the Trustee to dismiss the SAL Enforcement Actions would render the Trustee's claim ripe, arguing that "the Trustee's arguments that the collection efforts are futile is belied by the fact that he has not dismissed or abandoned the pending actions." (Joint Memorandum, at 15.).

Moreover, precluding the Trustee from prosecuting his lost debt damages on ripeness grounds, where some of the Defendants have serially fraudulently transferred SAL's assets and concealed them while SAL and his family retained beneficial ownership of them for years, and further dissipated them and their proceeds with Defendants' assistance—and Roland LaBonte testified that he will continue to transfer DEIPM's assets if necessary to prevent the Trustee from attaching them, (Compl., at ¶299)—would signal to all judgment debtors that they can avoid treble damages under RICO by repeatedly re-transferring assets before their creditors can attach them and would reward such illegal behavior. *See generally United States* v. *Turkette*, 452 U.S. 576, 585 (1981) (the purpose of civil RICO is remedial, "[t]he aim [being] to divest the association of the fruits of its ill-gotten gains").

34

Finally, the question of whether the Trustee's lost debt claim is ripe merely implicates that amount of damages that the Trustee may seek at this time. The issue does not implicate the substance or viability of the Trustee's claims against the Defendants, because there is no dispute that at least some of the Trustee's claim to recover his collection expenses is ripe. *D'Addario*, 901 F.3d at 95-96. Therefore, the Court should deny the motions to dismiss the Trustee's Complaint insofar as they concern ripeness.[11]

### C. The Trustee's Lost Debt Claim is Not Barred by the Statute of Limitations

The Defendants simultaneously argue that the Trustee's RICO lost debt claim is not yet ripe, but if it is ripe, then it is barred by RICO's four-year statute of limitations because the Trustee knew of the SALDT transfers by 2011. (Joint Memorandum, at 18-21). Defendants' argument is illogical. Indeed, the Defendants' reasoning underscores their ongoing refusal to accept any responsibility for the damages that their racketeering activity has caused.

"[T]he first step in the [RICO] statute of limitations analysis is to determine when the plaintiff sustained the alleged injury for which the plaintiff seeks redress. The court then determines when the plaintiff discovered or should have

---

[11] The existence of a potential judgment against Roland LaBonte (the "Potential RGL Judgment") and a default judgment against Alfred Fincher (the "Fincher Judgment") is wholly irrelevant to the ripeness of the Trustee's lost debt claim for two reasons. (Compl., at ¶¶292-93). First, the Potential RGL Judgment is almost certainly uncollectable due to some of the Defendants' admitted willingness to continually fraudulently transfer assets to avoid the payment of judgments. (*Id*., at ¶267). Similarly, the Fincher Judgment will go unsatisfied because the judgment debtor is "likely unable to satisfy the judgment." (*Id*., at ¶293). Second, the Trustee can simply remove the aggregate value of the Potential RGL Judgment and the Fincher Judgment from the Trustee's lost debt claims thereby preventing any double-recovery. The absence of any pending proceeding to collect the Potential RGL Judgment and the Fincher Judgment underscores their irrelevance on the issue of ripeness. *Town of Islip*, 245 F. Supp. 3d at 409-10.

discovered the injury and begin[s] the four-year statute of limitations period at that point." *Koch v. Christie's Intern'l Public Ltd. Co.*, 699 F.3d 141, 150 (2d Cir. 2012) (quotations and citations omitted). Thus, "[t]he timeliness of a civil RICO claim depends on a twin determination of (1) when the plaintiff sustained the alleged injury for which he seeks redress, and (2) when the plaintiff discovered or should have discovered the injury, with the latter date triggering the four-year statute of limitations." *Rosenshein v. Jeffrey Meshel*, 688 F. App'x 60, 62 (2d Cir. 2017); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) ("[t]he statute of limitations for a civil RICO claim is four years").

Here, the largest component of the Trustee's RICO claim is a lost debt: SAL's inability to repay fraudulent transfers he received from the Goldberg Debtors. By definition, that claim could not have matured until the Court fixed the amount of SAL's indebtedness to the Trustee. *D'Addario*, 901 F.3d 80, at 93; *Gelt Funding Corp.*, 27 F.3d 763, at 768 ("[w]e have concluded that no civil RICO cause of action for treble damages accrues 'until the amount of damages becomes clear and definite'"). Judge Thompson entered the SAL Judgment on September 27, 2017, and it became enforceable thirty days later, on October 27, 2017. The Trustee commenced this action on September 27, 2019, well within the four-year limitations period applicable to RICO claims. Therefore, the Court should deny the motions to dismiss insofar as they argue that the Trustee's lost debt claim is barred by the applicable statute of limitations.

D. **The Trustee's Collection Expenses Claim is Not Time Barred**

The Trustee's RICO damages claim include more than $2 million in

attorneys' fees and expenses that he incurred combatting the Defendants' predicate acts (the "Collection Expenses"). *See D'Addario*, 901 F.3d at 96 ("a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action"). "[E]ach time a plaintiff suffers an injury caused by a violation of [RICO], a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." *Bankers Trust Co.*, 859 F.2d at 1102. The four-year statute of limitations began to run on the Collection Expenses claim when the Trustee became obligated to pay them. *Id.* at 1105; *see also 131 Main Street Assoc.'s v. Manko*, 54 F. App'x 507, 511 (2d Cir. 2002) ("a plaintiff suffers an injury when he becomes obligated to pay that expense . . .").

The Trustee was not obligated to pay collection expenses (and could not have paid them) until the Bankruptcy Court approved them. *See* 11 U.S.C. § 330; *see also Nutovic & Assocs. v. Scher Law Firm LLP (In re Parklex Assocs.*), 10-CV-7473 (DAB), 2011 U.S. Dist. LEXIS 63135, at *8 (S.D.N.Y., June 13, 2011) ("Bankruptcy courts may deny fee applications or order disgorgement of fees where an attorney fails to seek approval for fees as required by 11 U.S.C. § 330(a).") (citations omitted). The Bankruptcy Court independently reviews a trustee's professional's fees and expenses and often adjusts them. In this case, the Bankruptcy Court approved the earliest fees and expenses that the Trustee seeks to recover from the Defendants on November 12, 2015. (*In re Michael S. Goldberg, L.L.C., et al.*, Case No. 09-23370, D.I. 1395). On February 22, 2019,

within four years of that date, the parties entered into a tolling agreement that extended the statute of limitations that applies to the Trustee's claims by sixty-seven days. Accordingly, the four-year statute of limitations that applies to the earliest attorney's fees and expenses that the Trustee seeks to recover through this action would have run on January 18, 2020, if the Trustee had not timely commenced this action on September 27, 2019. Therefore, the Court should deny the Defendants' motions to dismiss based upon the statute of limitations that applies to the Trustee's claim to recover Collection Expenses.

### E.  The Trustee Alleges That the Defendants Committed Numerous Predicate Acts of Racketeering

It is well-settled that, "[t]o plead a RICO violation, a plaintiff must allege that the defendant engaged in at least two predicate acts of 'racketeering activity,' where 'racketeering activity' is defined to include a host of state and federal offenses." *Senior Health Ins. Co. of Pa. v. Beechwood Re Ltd. (In re Platinum-Beechwood Litig.)*, 377 F. Supp. 3d 414, 424 (S.D.N.Y. 2019), *citing* 18 U.S.C. §§ 1961(1), (5). As set forth below, the Trustee alleges that the Defendants committed bankruptcy fraud, wire fraud, obstructed justice, and/or laundered money, all of which are predicate acts under 18 U.S.C. § 1961(1).

1. **Bankruptcy Fraud Under 18 U.S.C. § 152(7)**[12]

   a. **Section 152(7) Applies to the Defendants**[13]

Section 152(7) provides:

> [a] *person* who... *in a personal capacity or as an agent or officer of any person or corporation*, in contemplation of a case under title 11 by or against the person or any other person or corporation, or *with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation*... shall be fined [and/or] imprisoned . . .

18 U.S.C. § 152(7) (emphasis added). "[B]y its plain language, therefore, Section 152(7) makes it a crime for a person to transfer or conceal knowingly and fraudulently either (1) his property; (2) the property of another person; or (3) the property of a corporation" with intent to defeat the provisions of title 11. *United States v. Sabbeth*, 262 F.3d 207, 212-13 (2d Cir. 2001).

The Defendants argue that Section 152(7) only applies if the defendant is, or conceals the property of, a bankruptcy debtor, someone contemplating bankruptcy or an insider. Section 152's legislative history, along with its plain meaning, confirms that the statute is far broader. Congress amended Section 152 and its predecessor multiple times during the twentieth century. Before 1926, only a debtor could violate the operative statute. *See e.g.*, *United States v. Joyner*, 23 F.2d 884 (W.D. La. 1927). In 1926, Congress broadened the statute to extend to

---

[12] The Complaint alleged violations of 18 U.S.C. §152(1) as a predicate act. The Trustee is not pursing a claim that any Defendant's conduct violated 18 U.S.C. §152(1).

[13] The Trustee addresses herein only the arguments advanced by all Defendants in the Joint Memorandum. The Trustee addresses individual arguments concerning the predicate acts and whether the Trustee has asserted a *prima facie* violation against a particular defendant in the oppositions to the Defendants' respective individual motions to dismiss filed contemporaneously herewith.

non-debtors. *Id.* at 884-85. The operative statute, enacted in 1994, thus criminalizes all knowing and fraudulent transfers and concealment of property made with the intent to "defeat the provisions of title 11." Indeed, Section 152 "cover[s] all the possible methods by which a bankrupt *or any other person* may attempt to defeat the Bankruptcy Act through an effort to keep assets from being equitably distributed among creditors." *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970), *quoting* 2 Collier on Bankruptcy 1151 (14th ed. 1968) (emphasis in original); *see also United States v. Johns*, 686 F.3d 438 (7th Cir. 2012) (affirming the conviction of an individual not affiliated with a debtor under other portions of Section 152); *United States v. Colon Ledee*, 772 F.3d 21 (1st Cir. 2014) ("although the transfer or concealment prohibited by [Section] 152(7) must relate to a bankruptcy case -- i.e., it must be intended to defeat the provisions of the Bankruptcy Code -- the statute reaches beyond the bankruptcy estate itself.").

The fact that Section 152(7) requires proof of intent to defeat the provisions of title 11 does not limit the statute's scope to transfers of a debtor's property, and the cases on which the Defendants rely do not hold otherwise. For example, *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002), states that Section 152(7) requires proof that the defendant intended his actions to impact a bankruptcy but it does not require that bankruptcy to be his own or the person whose property the defendant transferred. *Id.* at 582 (finding no connection between a transfer and the transferor's bankruptcy petition that he filed two-years later). Rather, *Brickellbush* expressly states that Section 152(7) extends beyond transfers made in contemplation of a bankruptcy. *Id.* ("Plaintiff

must allege facts demonstrating that Sohrab made the transfer *in contemplation of bankruptcy or otherwise with an intent to defraud a United State bankruptcy court or defeat the bankruptcy laws.*") (emphasis in original). Here, the Complaint alleges that the Defendants repeatedly transferred and concealed property to defraud a court-appointed bankruptcy trustee tasked with, *inter alia*, unwinding the damage caused by a Ponzi scheme in which SAL was a knowing investor and feeder and to whom SAL owes more than $8 million, which clearly constitutes "intent to defeat the provisions of title 11." Indeed, Bankruptcy Code Section 704(a)(1) requires the Trustee to "collect and reduce to money the property of the [Goldberg Debtors' estate[s,]" which includes the Trustee's claims, and more recently the judgment entered, against SAL.

The Defendants baselessly claim that applying Section 152(7) to knowingly fraudulent transfers and concealment of property undertaken to avoid a debt to a court-appointed bankruptcy trustee "would constitute an unprecedented expansion of the scope of the criminal statute, contravening the rule of lenity and fair notice." (Joint Memorandum, at 29.).

The rule of lenity is "a doctrine of last resort," *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986), intended to stop the application of "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). "The rule… is reserved for cases where, 'after seizing everything from which aid can be derived, the Court is left with an ambiguous statute.'" *DePierre v. United States*, 564 U.S. 70,

88 (2011), *quoting Smith v. United States*, 508 U.S. 223, 239 (1993). Courts "have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (quotation and citation omitted). The rule "applies where there exists a 'grievous ambiguity' in a statute." *United States v. Cohen*, 260 F.3d 68, 76 (2d Cir. 2001), *quoting Huddleston v. United States*, 415 U.S. 814, 831 (1974).

Here there is no basis to apply the rule of lenity to Section 152(7). Section 152(7) clearly requires the Trustee to plead, and ultimately prove, that the Defendants transferred or concealed property with intent to defeat the provisions of title 11. If congress intended to limit Section 152(7) to transfers and concealment of a debtor's property, it would not have specifically amended the statute many times since 1925 to broaden it by removing the language that originally limited its scope to fraudulent transfers and concealment of a debtor's property. Therefore, the Court should deny the Defendants' motions to dismiss the Complaint insofar as the Trustee alleges that the Defendants violated Section 152(7).

2.   <u>Obstruction of Justice Under 18 U.S.C. §§ 1503 and 1512</u>

"The elements of [Section] 1503 are analogous to the elements of [Section] 1512(c)(2)," *United States v. Friske*, 640 F.3d 1288, 1291 n.3 (11th Cir. 2011). Section 1503 is broader than Section 1512(c)(2) in that Section 1512(c)(2) only applies to acts to obstruct "official proceedings," 18 U.S.C. §1512(c)(2), whereas

Section 1503 also includes within its scope acts to obstruct any "officer in or of any court of the United States." 18 U.S.C. §1503(a).

Section 1503 provides, in pertinent part:

> Whoever [a] corruptly[14]… endeavors to… impede any… officer in or of any court of the United States… in the discharge of his duty… or [b] corruptly… obstructs, or impedes, or endeavors to… obstruct, or impede, the due administration of justice, shall be punished….

A duly appointed bankruptcy trustee, such as the Trustee, is an "officer of the court" for purposes of Section 1503. *U.S. v. Crispo*, 306 F.3d 71, 81 (2d Cir. 2002) ("a trustee in bankruptcy is also a conventional court officer protected by the court-officer prong of § 1503"). Thus, the plain language of Section 1503 proscribes, *inter alia*, endeavors to impede a bankruptcy trustee from discharging his duty to "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1). In this case, at all relevant times, the Trustee's fraudulent transfer claims, which merged into the SAL Judgment, have been property of the Debtors' Estate, the Trustee has had a duty to monetize them, and the Defendants repeatedly impeded the Trustee from discharging that duty by serially fraudulently transferring and concealing SAL's property while enabling him and his family to freely access it to support their extravagant lifestyle. Therefore, the Defendants violated Section 1503.

---

[14] The "corruptly" element is satisfied when there is "a connection between the defendant's intentional acts and the likelihood of potentially affecting the administration of justice" or, by extension, obstructing an officer of the Court. *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *see also United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir. 1974) (corruptly includes "any effort or any act, however contrived, to obstruct, impede or interfere"); *United States v. Polakoff*, 121 F.2d 333, 335 (2d Cir. 1941) ("we think any endeavor to impede and obstruct the due administration of justice in the inquiries specified is corrupt").

The Defendants also violated Section 1503 by obstructing the due administration of justice inasmuch as their fraudulent conduct has extended the duration of the Debtors' Bankruptcy cases by many years. The Goldberg Debtors' bankruptcy case opened more than ten years ago and the Defendants' conduct is the only material matter for the Trustee to address before he can close the Estate. Therefore, the delay and related expense caused by Defendants' conduct gives rise to a *prima facie* Section 1503 violation. *See generally Nye v. U.S.*, 137 F.2d 73, 75 (4th Cir. 1943) (affirming conviction of individual under the predecessor to Section 1503 whose conduct caused a "delay in the trial of the action and great expense in connection therewith"); *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992) (affirming conviction under Section 1503 for actions that "interrupted and delayed the criminal appeal"). Moreover, the Defendants' conduct violates Section 1512(c)(2) in that their conduct "obstruct[ed], influenc[ed], or imped[ed] a[n] official proceeding." 18 U.S.C. § 1512(c)(2). *See United States v. Newton*, 452 F. App'x 288, 291 (4th Cir. 2011) (a delay of arrests as a result of the defendant's conduct was sufficient to support a conviction under Section 1512(c)(2)).

Defendants contend that *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032 (2d Cir. 1984) supports their argument that their conduct does not constitute obstruction of justice. (Joint Memorandum, at 34) *In re Grand Jury Subpoena* involved application of the crime-fraud exception to the attorney-client privilege to certain allegedly privileged documents. *Id.* at 1039. However, the court declined to decide whether the defendants conduct violated Section 1503, because the court concluded that there was an adequate showing of a fraudulent

conveyance that triggered the crime-fraud exception independent of a Section 1503 violation. *Id*. *In re Grand Jury Subpoena* does include dicta which suggests that Section 1503 "appears to be directed toward attempts to deflect jurors, witnesses, or judicial officials from the proper performance of their duties." *Id*. at 1040. But that language merely confirms that the Defendants' conduct violated Section 1503, because the Second Circuit has since held that a bankruptcy trustee is a judicial officer within the meaning of Section 1503. *Crispo*, 306 F.3d at 81.

Lastly, the Defendants argue that the rule of lenity precludes application of Sections 1503 and 1512 to their conduct, because doing so "would criminalize the transfer of property to which the transferor has legal title and which is not the subject of a forfeiture order or judgment." (Joint Memorandum, at 35) Defendants are wrong. Applying Sections 1503 and 1512 to the Defendants' conduct appropriately criminalizes fraudulent transfers and concealment of property perpetrated with the intent to obstruct a court-appointed bankruptcy trustee from discharging his duty to collect and liquidate property of the estate. This same conduct also inevitably extends the duration of the bankruptcy case that the court appointed the trustee to administer and harms the estate's creditors (in this case victims of fraud).[15] Thus, the Trustee alleges conduct that plainly falls within

---

[15] The Defendants have *never* offered a legitimate explanation for their obstructive conduct. Judge Thompson rejected Sally LaBonte's "estate planning" excuse as "pretextual." (Compl., at ¶69). Likewise, Bourdeau and Sparveri both independently confirmed, in sworn testimony, that the purpose of the RICO Meeting was to evaluate strategies (which the Defendants later implemented) to put SAL's assets beyond the Trustee's reach. (*Id.* at, ¶¶65-66). Further, Roland LaBonte admitted that he and SAL shut down Devcon to avoid the Trustee's then pending Dynasty Trust PJR Application and

the scope of Sections 1503 and 1512.

Section 1503 "has been interpreted broadly in accordance with the congressional intent to promote the due administration of justice and to prevent the miscarriage of justice." *United States v. Baum*, 32 F. Supp. 2d 642, 647 (S.D.N.Y. 1999). Indeed:

> [c]ases analyzing [Section] 1503 reinforce an understanding that [Section] 1503 reaches an extensive range of misconduct. The broad scope of the statute and the evils it sought to combat was the outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted which are limited only by the imagination of the criminally inclined. The omnibus clause of [Section] 1503 is broad enough to cover any act committed corruptly, in an endeavor to impede or obstruct justice. The statute … reaches all corrupt conduct capable of producing an effect that prevents justice from being duly administered.

*United States v. Lundwall*, 1 F. Supp. 2d 249, 252 (S.D.N.Y. 1998) (internal quotations and citations omitted). The Trustee's application of Sections 1503 and 1512 does nothing more than hold the Defendants accountable for the harm they caused by the "acts [they] committed corruptly, in an endeavor to impede or obstruct" the Trustee and the Debtors' Bankruptcy. *Id.* The Trustee's application is not novel. The Court should deny the Defendants' motions to dismiss the Section 1503 and 1512(c)(2) predicate acts alleged in the Complaint.

---

that he would just transfer DEIPM's assets to a new entity if the Trustee sought to attach them. (*Id.*, at ¶267).

### 3.  Wire Fraud Pursuant to 18 U.S.C. § 1343[16]

To state a cause of action for wire fraud, a plaintiff must allege "(a) that there was a scheme or artifice to defraud, (b) that the defendant participated in the scheme with fraudulent intent, (c) that there was a wire transmission, (d) that the wire transmission was in furtherance of the scheme, and (e) that the defendant caused that transmission." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006). "These requirements are not to be given a cramped or narrow interpretation. Rather, [courts] consider the scope of the fraudulent scheme, and give appreciation to its full flavor." *Id.*, at 95, *citing Schmuck*, 489 U.S. at 711-12 (brackets and quotations omitted).

The Defendants argue that the Trustee's wire fraud claims are legally deficient because he fails to allege that the Defendants 1) engaged in a scheme to defraud that injured the Trustee's property rights, (Joint Memorandum, at 36-37) and 2) made misrepresentations or engaged in deceptive conduct. (*Id.*, at 41).

### a.  The Complaint Alleges That the Defendants' Engaged in a Scheme to Defraud that Injured the Trustee

The Defendants appear to argue that their scheme to fraudulently transfer and conceal SAL's property did not injure a recognized property interest that belonged to the Trustee, because they transferred and dissipated SAL's property before Judge Thompson entered the SAL Judgment. That is preposterous. A chose in action is the plaintiff's property. *See e.g., Mitchell Excavators, Inc.*, 734

---

[16] The Complaint does not contain substantive allegations that the Defendants committed mail fraud and the Trustee is not pursuing a claim at this time that any Defendant violated the federal mail fraud statute.

F.2d 129, at 131 (property so acquired under 11 U.S.C. §541(a)(7) "includes all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property…."). Moreover, conduct that renders a defendant judgment proof unquestionably injures the plaintiff, and courts have allowed RICO plaintiffs alleging lost debt RICO claims to assert predicate acts of wire fraud based on the defendant's fraudulent transfer and concealment of property that occurred before the plaintiff obtained a judgment against the transferor. *See e.g.*, *Gutierrez v. Givens*, 989 F. Supp. 1033 (S.D. Cal. 1997).[17]

In *Gutierrez*, the plaintiff obtained a judgment in 1996. *Id*., at 1036. "[A]t some point in 1991 or 1992, [d]efendants recognized [the judgment debtor's] and [his company's] vulnerability to judgment creditors, and began to conspire to place [the judgment debtor's] assets beyond the reach of these anticipated creditors." *Id*. The defendants in the RICO suit that followed, (the judgment debtor, "and four of his family members, four of his attorneys, and his accountant") moved to dismiss arguing "that they cannot be convicted of mail or wire fraud because all of the actions alleged in the [c]omplaint occurred before July 22, 1996, the date of the California Superior Court judgment against [the judgment debtor], and therefore before [p]laintiffs had definite rights to [the judgment debtors'] assets as judgment creditors." *Id*.

The court squarely rejected the argument:

> [i]f [p]laintiffs' factual allegations are true, then [d]efendants knew or should have known that their actions were illegal even as they were committing them.

---

[17] The Defendants also ignore that the Trustee obtained a PJR against SAL in early 2011, the value of which the Defendants' conduct injured because it prevented the Trustee from attaching SAL's property.

> The [p]laintiffs were injured by these actions, and should not be barred from recovery merely because time passed before they recognized the situation, organized a lawsuit, and then waited nearly three years for the resolution of their state court suit. If [p]laintiffs' allegations are accepted, then throughout the process of [p]laintiffs' mobilization and subsequent lawsuit, [d]efendants were in a position to preempt the danger, and acted to protect [the judgment debtors'] assets in anticipation of judgments such as the one obtained by [p]laintiffs. Defendants were on notice throughout the course of these events….

*Id.* at 1040. Similarly, in *Dexia Credit Local v. Cuppy,* Docket No. 10-CV-1563, 2010 U.S. Dist. LEXIS 83289 (N.D. Ill. Aug. 16, 2010), decided 13 years after *Gutierrez*, the RICO plaintiff alleged that the defendants engaged in a "scheme[] to defraud" a defendant's "creditors and potential creditors" that began well before the plaintiff obtained a judgment. *Id.* at *2, *5. The court denied the defendants' motion to dismiss the alleged wire fraud predicate acts, stating that:

> [t]he alleged fraud consisted of setting up concealed mechanisms that allowed [the judgment debtor] to have the benefit of and keep control over his assets though they were ostensibly held by trusts and thus unavailable to creditors. Concealment of assets from creditors via means such as those alleged in [the plaintiff's] complaint may constitute a scheme to defraud within the meaning of the mail and wire fraud statutes.

*Id.* at *6.

Similar to *Gutierrez* and *Cuppy*, the Defendants conspired to fraudulently transfer and conceal SAL's assets specifically to prevent the Trustee from seizing them. (*See* Compl., at ¶307). The RICO Meeting Participants met in 2010 to specifically discuss their intention to obstruct the Trustee, and the hand-written RICO Notes from that meeting refer to the Trustee and detail many of the

strategies utilized to defraud him over the years that followed. (Compl., at ¶¶59, 62-64). The Defendants' conduct unquestionably harmed the Trustee's right and ability to claw-back the millions of dollars that SAL received from the Goldberg Scheme. Therefore, the Trustee has alleged that the Defendants fraudulent scheme injured the Trustee's property.

### b.  A Wire Fraud Claim Does Not Require a Misrepresentation or Deceptive Conduct Separate from A Scheme to Defraud

The Defendants' argue that the Complaint's wire fraud allegations are deficient because they "fail to allege that the asset transfers and related communications were part of a scheme that utilized misrepresentation or deceit." (Joint Memorandum, at 39). However, unlike common law fraud, the federal wire fraud statue does not require a fraudulent misrepresentation. *Reifler*, 446 F.3d 65, at 95 ("Nor need the wire communication itself have been false; even 'innocent' transmissions, *i.e.,* 'ones that contain no false information -- may supply the transmission element.' *Schmuck [v. United States, 489 U.S. 705,] 715 [(1989)]*; *see, e.g., Parr v. United States,* 363 U.S. 370, 390 (1960)." *See also United States v.* Connolly, 16 Cr. 370 (CM), 2019 U.S. Dist. LEXIS 77099, at *74 (S.D.N.Y. May 2, 2019) ("It is black letter law … that . . . the mailing or wire need only have been "a step in the plot") (citations omitted) (emphasis in original). Similarly, unlike common law fraud, a RICO plaintiff need not allege reliance to allege mail or wire fraud. *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 649 (2008).

Because the Trustee alleges that the Defendants engaged in a scheme to

defraud the Trustee by denuding SAL of his assets while allowing him and his family to retain beneficial ownership of them, and that the use of the wires was a "step in plot," the Court should deny the motions to dismiss the Trustee's predicate acts of wire fraud.

### 4.  Money Laundering Pursuant to 18 U.S.C. § 1956

Section 1956 provides:

> Whoever, knowing that the property involved in a financial transaction[18] represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[19]—
>
> (A) (i) with the intent to promote the carrying on of specified unlawful activity; or …
>
> (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; …. [shall be punished] [20]

"[F]unds become proceeds [for purposes of Section 1956] when they are derived from an already completed offense, or a completed phase of an ongoing offense." *United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) (quotations and

---

[18] The term "financial transaction" is defined in Section 1956(c)(4) as "(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

[19] The term "specified unlawful activity" is defined in Section 1956(c)(7) and includes a wide array of conduct, such as any activity that can be a RICO predicate act under 18 USC § 1961(1) and Section 152.

[20] "Money laundering claims under RICO are assessed under the less stringent notice pleading requirements of Rule 8(a)." *BC Liquidating, LLC)*, 519 B.R. 394, at 424.

citations omitted). "In determining whether the underlying crime, or a discrete phase of that crime, has been completed so as to generate 'proceeds,' the central inquiry is one of distinctness, not timing.… [M]oney laundering does not focus on the specifics of the predicate offense, it does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in transactions distinct from those transactions allegedly constituting money laundering." *Id*.

The Trustee's allegations satisfy the distinctiveness element of a Section 1956 violation. The requisite "predicate offenses" that generated proceeds include the Dynasty Trust Transfers and Devcon Transfer, both of which constitute "unlawful activity" in that those transfers violated, *inter alia*, 18 U.S.C. §§ 152(7), 1503, and 1512. The Dynasty Trust Transfers and the Devcon Transfer were "completed phase[s] of an ongoing offense," namely the Enterprise. *Szur*, 289 F.3d at 214. The assets transferred in connection with the Dynasty Trust Transfers "generate[d]" millions of dollars in "proceeds" between 2011 and 2013, with many of the proceeds deposited into the Dynasty Account. (Compl., at ¶¶114, 125). The Devcon Transfer also resulted in Fraudulently Transferred Interests paying millions of dollars to DEIPM that otherwise would have funded distributions to members, including the SALDT. (*Id*., at ¶281). SAL, Roland LaBonte, and L. Marks enabled these payments by adding Refinance Fee Provisions into DEIPM's management agreements that entitled DEIPM to large fees from refinance transactions that striped equity from certain Managed Entities. (Compl., at ¶¶268-282). The Defendants engaged in a number of

"financial transaction[s]" involving those proceeds. (*See Id.*, at ¶¶109, 120-25, 135-213, 214-82, 317, 338, 387(e)).

The Trustee's application of Section 1956 is analogous to the court's application of Section 1956 in *Colon Ledee*, 772 F.3d 21, at 35. In *Ledee*, the court affirmed a conviction under Section 1956 where a defendant "knowingly transformed the proceeds of a property transfer that was unlawful under bankruptcy law [Section 152(7)]" by transferring the money obtained from the transfer to four of his relatives. Likewise, in *Cuppy*, the Court held that the defendant attorney "assisted [the judgment debtor] in concealing assets from [the] bankruptcy estate, in violation of the bankruptcy fraud statute, 18 U.S.C. § 152(1), and then conducted or caused financial transactions involving the proceeds of that alleged crime, in violation of the money laundering statute, 18 U.S.C. § 1956…." *Cuppy*, 2010 U.S. Dist. LEXIS 83289, at *7.

The Trustee's allegations clearly evidence the two distinct components of a Section 1956 violation: a discrete and completed phase of a crime which generated proceeds and a subsequent financial transaction involving those proceeds. Thus, the Trustee has alleged a plausible violation of Section 1956.

## F. The Trustee Adequately Alleges Causation

The Defendants appear to argue that the Trustee has failed to allege that their predicate acts injured the Trustee. (Joint Memorandum, at 44-46). The Trustee has alleged that the Defendants helped SAL fraudulently transfer and conceal all of his assets, worth many millions of dollars, to the SALDT, and then serially re-conveyed, concealed, and dissipated those assets over a period of

many years while SAL used them and the proceeds they generated to fund his family's lifestyle. If the RICO Meeting Participants, Sally LaBonte and Marilyn LaBonte had not effectuated the Dynasty Trust Transfers to the SALDT the Trustee could have attached them to satisfy his $5 million PJR in 2011 and ultimately enforce the SAL Judgment in 2017. Moreover, the Defendants had not engaged in all of the subsequent transfers of the Fraudulently Transferred Interests the SAL Judgment would not be lost.

The Defendants' pattern of racketeering caused the Trustee to incur millions of dollars of legal fees and expenses trying to unwind the fraudulent transfers they caused and to locate and claw back SAL's assets. Therefore, in addition to the value of the Fraudulently Transferred Interests and their proceeds, the Defendants' predicate acts proximately caused the Trustee to incur millions of dollars of Collection Expenses for which the Defendants are liable under RICO.[21] *D'Addario*, 901 F.3d 80, at 96 ("a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action").

G. **The Trustee Alleges an Enterprise**

The Complaint alleges an association-in-fact enterprise to impede the Trustee from recovering on his claims (and eventual Judgment) against SAL. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*,

---

[21] The Defendants do not appear to contest that the Complaint alleges that their conduct caused the Trustee to incur these legal fees and expenses.

556 U.S. 938, at 946. The Complaint alleges that the purpose of the Enterprise is to impede and obstruct the Trustee's efforts to recover the fraudulent transfers that SAL received from the Goldberg Scheme. The Complaint also alleges each Defendants' involvement and participation in that Enterprise, their relationships to each other, and their common interests. Lastly, the Enterprise began in 2010 at the RICO Meeting and continued for years. Therefore, the Trustee has alleged an association-in-fact enterprise.

The Defendants rely on an interpretation of *Turkette*, 452 U.S. 576 (1981), that is not viable in the face of more recent United States Supreme Court precedent. *See Boyle*, 556 U.S. 938. *Turkette* held that a RICO plaintiff must prove both the existence of an enterprise and a pattern of racketeering activity. 452 U.S. at 583 ("The 'enterprise' is not a pattern of racketeering activity'; it is an entity separate and apart from the activity in which it engages."). However, the Supreme Court recognized in *Turkette* that "the proof used to establish these separate elements may in particular cases coalesce." *Id.*

In *Boyle*, almost thirty years later, the Supreme Court rejected any interpretation of *Turkette* that suggests "the existence of an enterprise may never be inferred from the evidence showing that persons engaged in a pattern of racketeering activity." 566 U.S. at 947. *Turkette* merely held that the "enterprise" and "pattern of racketeering activity" are separate elements and "proof of one does not necessarily establish the other." *Id. Boyle* also rejected the notion that an association in fact enterprise required a "hierarchal structure" or that members of the group needed to have "fixed roles." *Id.* at 948. The enterprise

55

**"does not need to be ascertainably distinct from the pattern of racketeering activity."** *Allstate Ins. Co. v. Etienne*, Docket No. 09-CV-3582 (SLT)(RLM), 2010 U.S. Dist. LEXIS 113995, at \*22 (E.D.N.Y. Oct. 22, 2010) (rejecting an argument identical to that made by the Defendants). Indeed, an "enterprise may be formed 'solely for the purpose of carrying out a pattern of racketeering acts,' so long as it embodies the requisite structure to make it an enterprise." *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 414 (E.D.N.Y. 2013) (quoting *Boyle*).

The Complaint alleges a RICO enterprise that began with the RICO Meeting in June of 2010, when the RICO Meeting Participants devised a plan to obstruct the Trustee from recovering the fraudulent transfers that SAL received from the Goldberg Scheme, and continued for years.

### H. The Complaint Alleges Closed-Ended Continuity

"To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time. . .. [C]losed-ended continuity is primarily a temporal concept." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). Generally, courts in this Circuit require "that the crimes extend over at least two years" to satisfy closed-ended continuity. *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017).

The Trustee alleges a pattern of predicate acts that span approximately six years. From the Enterprise's inception in June of 2010 to the most recent series of specifically alleged predicate acts (that the Trustee knows of) related to the DEIPM refinance transactions in 2015 and 2016, the Complaint succinctly alleges that the Defendants engaged in a prolonged and ongoing pattern of predicate

acts of racketeering. Therefore, the Trustee has satisfied the temporal component of closed-ended continuity.

In addition to the temporal analysis, "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001). These factors all confirm that the Trustee has alleged closed-ended continuity.

First, the Trustee alleges violations of seven discrete criminal statutes that some or all of the Defendants violated in many ways over the course of approximately six years–from serially fraudulently transferring and concealing assets to transferring Devcon's business to DEIPM and parking it in the MPL 2015 Rev. Trust. Second, the Defendants' racketeering activity has harmed (and harms) not only the Trustee but also the hundreds of Goldberg Victims (in the form of smaller distributions to satisfy their claims). Likewise, the Complaint alleges that numerous Defendants, in multiple capacities, committed many predicate acts in furtherance of the Enterprise. Finally, while the Enterprise had one overarching purpose (obstructing the Trustee from receiving the fraudulent transfers that SAL received from the Goldberg Scheme), the Defendants thus far achieved that purpose by implementing a series of discrete schemes (initially transferring assets to the SALDT, then liquidating those assets and dissipating their proceeds, shuttering and transferring Devcon's business to DEIPM, and most recently using DEIPM to strip value from Fraudulently Transferred Interests and funnel it back to SAL through the MPL 2015 Rev. Trust).

The predicate acts that the Complaint details were not sporadic. The Defendants collectively committed predicate acts in every year between 2010 and 2016, which amounted to "sustained and continuous criminal activity." *First Capital Asset Mgmt.* 219 F. Supp. 2d 576, at 587. While every transfer of property and every email communication that furthered the Enterprise is a separate predicate act, the aggregate, lengthy history and varied nature of the predicate acts would easily satisfy closed-ended continuity *even if* the Court collapsed all of the Defendants' conduct performed in connection with any particular transaction into one predicate act. *See e.g.*, *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (Congress did not mean "to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme"). Therefore, the Complaint alleges closed-ended continuity.

## V.  CONCLUSION

The Trustee respectfully requests that the Court deny the Defendants' motions to dismiss [Doc. Nos. 51, 52, 53, 54, 55, 56, and 57] and grant the Trustee such other and further relief that this Court deems just and proper.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE SUBSTANTIVELY CONSOLIDATED
ESTATE OF MICHAEL S. GOLDBERG, LLC
AND MICHAEL S. GOLDBERG

By: */s/ Aaron A. Romney*

58

Aaron A. Romney (ct28144)
James M. Moriarty (ct21876)
Christopher H. Blau (ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Tele: (203) 368-4234
Fax: (203) 367-9678
Email: aromney@zeislaw.com
jmoriarty@zeislaw.com
cblau@zeislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)

59