## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES BERMAN, Chapter 7 Trustee for the Substantively Consolidated Estate of Michael S. Goldberg, LLC and Michael S. Goldberg, | : : : : : : | No. 3:19-CV-1533(VLB) |
| | : : | September 30, 2020 |
| Plaintiff, | : : | |
| v. | : : | |
| SCOTT A. LABONTE, et al. Defendants. | : | |

### MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS

As discussed in the Court's recent decision denying the Defendants' motion to stay discovery during the pendency of the Defendants' motions to dismiss [Dkt. 87], this matter is a private action brought pursuant to the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c).  In short, Michael S. Goldberg pled guilty to operating a Ponzi scheme that defrauded investors of $30 million dollars [Dkt. 1 (Compl.) ¶¶ 3, 25-28, 45-46]. Thereafter, Plaintiff James Berman ("Plaintiff" and the "Trustee"), the bankruptcy trustee, obtained judgments against the Ponzi scheme's "net-winners," including Defendant Scott A. LaBonte (hereinafter "Scott"). [*Id.* ¶¶ 2, 52, 283-399].[1] This action alleges that Scott, his family members, retained professionals, and a former business partner, conspired with and on behalf of Scott to hinder the Trustee's attempts to collect the judgment, allegedly constituting a RICO

---

[1] Since this action is brought against four members of the LaBonte family, all of whom share the surname, the Court will refer to LaBonte family members by their first names only after initial identification. To avoid confusion, the Court will refrain from abbreviating the names of the various trusts at issue.

violation. Now, each of the Defendants have moved to dismiss the action, arguing both common [Dkt. 58 (Joint Mem. in Supp. of Mots. to Dismiss) and separate defenses [Dkts. 78-83 (Separate Mots. to Dismiss.)]. For reasons discussed below, the Court GRANTS in part and DENIES in part the Defendants' motions to dismiss.

Background

For the purpose of deciding Defendants' Motions to Dismiss, the Court "draw[s] all reasonable inferences in Plaintiff['s] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d. Cir. 2011) (citations omitted).

I.    General Background

Between 1997 and 2009, Michael Goldberg operated a "pure" Ponzi scheme, meaning that it had no legitimate investments. [Compl. ¶¶ 25-26]. Before the scheme could be unwound, investors suffered $30 million in losses. [Compl. ¶ 28]. The Goldberg Ponzi scheme was maintained by "feeders," who were paid finders fees or charged a loan fee to a sub-investor. [Compl. ¶ 27]. Non-party Edward S. Malley, Scott's cousin, was a feeder. Scott was an investor and operated as a sub-feeder through Mr. Malley, meaning that Scott also recruited investors and invested their money. [Compl. ¶¶ 29-30].

From January 16, 2006 through October 11, 2017, Scott invested in the Goldberg scheme through Mr. Malley using six promissory notes drafted by Scott's counsel. The notes had interest rates of 25-40%, plus a 20% mandatory loan fee upon execution, executed in Connecticut, applying Nevada law. [Compl. ¶¶ 32-34]. Five of the six notes included a clause that they were for investment with Mr. Goldberg's

2

company. [Compl. ¶ 31]. Only the first note, which was for the smallest amount, did not contain this clause. [*Id.*].

Defendant Joseph W. Sparveri, Scott's accountant, calculated the interest on the notes as compounding. [Compl. ¶¶ 35-38]. He is a licensed securities broker. [Compl. ¶ 36]. He also recommended that the notes use Nevada law because the terms would violate Connecticut's usury law. [Compl. ¶ 37]. Scott used third party funds to lower his investment risk. [Compl. ¶¶ 39-40]. He issued promissory notes to his investors which mirrored the notes with Mr. Malley. Scott knew at the time that it was a fraud. [Compl. ¶ 43] (citing *In re Michael S. Goldberg, LLC*, 595 B.R. 119, 121 (D. Conn. 2018)(Thompson, J)("Because Scott LaBonte knew the Goldberg Scheme was a fraud, he structured his own investments in the Goldberg Scheme, as well as those of individuals he introduced to the Goldberg Scheme, as loans memorialized by promissory notes issued to his cousin Edward Malley")). When the Ponzi scheme was unwound, Scott was a net winner because he recovered his investment, plus income from fees charged to his sub-investors. [Compl. ¶ 44].

After Mr. Goldberg was sued by investors and turned himself in to the FBI, an involuntary bankruptcy proceeding commenced. [Compl. ¶¶ 45-50]. Mr. Berman was elected and confirmed as the Chapter 7 Bankruptcy Trustee and was appointed as the receiver for restitution in the criminal case against Mr. Goldberg. [Compl. ¶¶ 46-48](bankruptcy election and confirmation); [Compl. ¶ 12](appointed receiver for restitution). In the bankruptcy, the Trustee filed approximately 200 adversarial proceedings to clawback funds paid by the Ponzi scheme to "net winners." [Compl. ¶ 49]. One of the adversarial proceedings in the bankruptcy court resulted in a judgment against Scott for $7.24 million dollars, plus pre- and post-judgment interest.

[Compl. ¶ 52]. The district court (Thompson, J) affirmed the judgment over Scott's objection. [Compl. ¶¶ 53-56]; *see also In re Michael S. Goldberg*, 3:15-cv-1682, [Dkt. 28 (Judgment, 09/29/2017)].

## II.   LaBonte family trusts

In May 2010, Mr. Malley informed Scott that an adversarial action was filed against them. [Compl. ¶ 57]. At the time, Scott was aware of the public disclosure of the Ponzi scheme and had discussed it with Mr. Sparveri. [Compl. ¶ 59]. Upon learning of the adversarial proceeding from Mr. Malley, Scott contacted his father, Defendant Roland LaBonte, Mr. Sparveri and, Scott's attorney, Defendant Paul L. Bourdeau, for assistance. [Compl. ¶ 60]. On June 2, 2010, Scott, Roland, Mr. Sparveri, and Attorney Bourdeau met at the offices of Devcon Enterprises, Inc., a closely held LaBonte family real estate management company located in West Hartford, Connecticut. [Compl. ¶¶ 62-63, 242]. Attorney Bourdeau produced his notes from this meeting following Judge Thompson's ruling applying the crime-fraud exception to attorney-client privilege. [Compl. ¶ 64].

Attorney Bourdeau's notes reference a potential "claw back" by a "Hartford Trustee." [*Id.*]. During their depositions, both Mr. Sparveri and Attorney Bourdeau admitted that the purpose of the meeting was to determine a course of action to place Scott's assets beyond the reach of the Trustee. [Compl. ¶¶ 65-67]. Defendant Sally A. LaBonte, Scott's wife, testified that the meeting was for estate planning because they were traveling to Italy with the guardians of their children. [Compl. ¶ 68]. Judge Thompson rejected this explanation during the bankruptcy appeal as pretextual because the documentation was completed after the trip, then backdated to June 2, 2010. [Compl. ¶ 69].

4

Scott then transferred most of his assets, principally real estate interests held individually and in a revocable trust, to the irrevocable Scott A. LaBonte Dynasty Trust using instruments backdated to June 2, 2010. [Compl. ¶ 72](listing the assets). Mr. Sparveri, who was also serving as a trustee for the Scott A. LaBonte Dynasty Trust, [Compl. ¶ 18], obtained approval for the transfers from the other trustees. [Compl. ¶¶ 74-75]. As trustees, Sally, Roland, and Mr. Sparveri each agreed to the assignment and assumption of assets into the Scott A. LaBonte Dynasty Trust. [Compl. ¶¶ 76, 79-80]. The transfers were completed on September 9, 2010. [Compl. ¶ 81].

Mr. Sparveri permitted Scott to value the assets to determine the consideration to be paid by the trusts for the transfer. [Compl. ¶¶ 82-84]. Scott personally valued the assets at approximately $1,000,000, but Scott claimed a year earlier that his total assets were worth $13.1 million in connection with a personal Statement of Financial Condition supplied to a bank by Mr. Sparveri. [Compl. ¶¶ 85-88]. The consideration was provided via a "sham" promissory note that Mr. Sparveri and Attorney Bourdeau opined on; Attorney Bourdeau's notes from the June 2, 2010 meeting reference extending the maturity date on the inter-trust promissory notes. [Compl. ¶¶ 89-97]. Although Scott told the bank the transfers were for estate planning purposes, Attorney Bourdeau testified that the transfers were unrelated to Scott and Sally's estate planning. [Compl. ¶¶ 98-100].

Scott continued to control assets held by the Scott A. LaBonte Dynasty Trust. Monthly distributions generated by properties held by the irrevocable trust continued to be deposited into Scott's personal bank account. [Compl. ¶¶ 102-107]. The other trustees permitted this conduct; Mr. Sparveri permitted it so long as he accounted for

the payments. [Compl. ¶¶ 108-109]. A stipulated pre-judgment remedy entered on Scott on February 10, 2011 in the bankruptcy court, but Scott did not disclose the transferred assets. [Compl. ¶ 111]. A month earlier, funds generated by the assets in the Dynasty Trust began being deposited in the Scott A. LaBonte Dynasty Trust account rather than Scott's personal bank account, along with Scott's monthly draw, thereby appearing to reduce his personal income stream. [Compl. ¶¶ 112-115]. Scott used the diverted income generated by assets in the dynasty trust for personal and business expenses, including to settle obligations incurred for use/ownership of a private jet. [Compl. ¶¶ 117-119].

Scott drew checks on the Scott A. LaBonte Dynasty Trust's account and Sally endorsed them. [Compl. ¶¶ 120-126]. Mr. Sparveri's accounting of the trust payments was haphazard and Mr. Sparveri resigned as a trustee for the Scott. A LaBonte Dynasty Trust the day after he was served with an order related to the pre-judgment remedy order that garnished the promissory notes. [Compl. ¶¶ 126-128]. Upon Mr. Sparveri's resignation, the remaining Scott A. LaBonte Dynasty Trustees, Sally and Roland, ceased accounting for payments made to Scott's benefit. [Compl. ¶¶ 129-130]. In total, after the stipulated pre-judgment remedy was entered, Scott spent $2.9 million from the Scott A. LaBonte Dynasty Trust to pay personal and business expenses with the consent and assistance of its trustees and rendered the dynasty trust insolvent [Compl. ¶¶ 131-134].

### III.   Scott's business dealings with Robert Landino

Scott and Robert A. Landino partnered on commercial real estate development projects through joint ventures from 2006 until 2012. [Compl. ¶¶ 135-137, 140-141]. Scott transferred his interest in their joint ventures to the Scott A. LaBonte Dynasty

Trust as part of the inter-trust transfers discussed above. [Compl. ¶ 138].

Over lunch in the fall of 2011, Scott told Mr. Landino about the adversarial proceeding against him, but stated that he (Scott) had already transferred his assets. Mr. Landino knew that Scott was claiming that he did not have assets and was refusing to provide personal financial information to the joint ventures' lenders. [Compl. ¶¶ 147-153]. In April of 2012, the Landino joint venture entity, Centerplan NB, sued Scott and other LaBonte family entities in a dispute over the distribution of profits from the sale of a commercial real estate project. [Compl. ¶¶ 143-145, 146]. In the verified complaint, Mr. Landino alleged that Scott transferred all of his assets and makes reference to the pendency of the adversarial proceeding and the entry of the pre-judgment remedy against Scott.  [Compl. ¶¶ 145-146, 153].

From May 2012 through October 2013, the LaBonte joint venture entities transferred their interests to the Landino joint venture entities for cash. [Compl. ¶ 156]. As to the sale of SAL North Haven [Compl. ¶¶ 160-170], SAL Smithfield [Compl. ¶¶ 171-176], SAL Cranston [Compl. ¶¶ 177-183], SAL Middletown [Compl. ¶¶ 184-188], and College Square [Compl. ¶¶ 189-194], Plaintiff alleges that the LaBonte joint venture entities were illiquid assets and were thus "transformed" into cash, which was dissipated by Scott and others. There is no allegation, however, that Scott had any direct or indirect reversionary interest in the transactions.

Defendant Attorney Lawrence J. Marks represented Scott and the LaBonte joint ventures in the transactions and knew of the prejudgment remedy and the Trustee's pending claims as evidenced by language in the assignment and e-mail correspondence. *See* [Compl. ¶ 165]. Attorney Marks knew that the funds were going to be used to resolve Scott's obligation for a private jet; Bank of America sued the jet

company and its guarantors, including Scott. Scott wired money to Attorney Marks, who wired it to Bank of America. [Compl. ¶ 168].

Plaintiff alleges that Mr. Landino sold the acquired assets as quickly as possible, although Plaintiff provides no details as to those transactions. [Compl. ¶ 196]. Plaintiff alleges that, in two instances, Mr. Landino engaged in multi-level transactions to "wash" the assets that he acquired from Scott and retained. [Compl. ¶¶ 197-213]. In one transaction involving assets acquired from SAL Middletown, Mr. Landino established new entities such that the acquisition share acquired from SAL Middletown was held by a new entity. [Compl. ¶¶ 197-205]. The second "washing" transaction involved College Square. Mr. Landino's entity, the transferee, paid $5.5 million for SAL NH Investment's interest in the College Square Joint Venture in October 2013, after which Mr. Landino then used a series of transactions to dissolve the transferee. [Compl. ¶¶ 206-13].

### IV.    Devcon Restructuring

Devcon was a LaBonte-family real estate management and development firm, primarily serving the LaBonte family's real estate holdings. [Compl. ¶¶ 214-215]. Scott was the president and chief executive officer, Roland was the chairman, and they were the only board members. [Compl. ¶¶ 214-216]. Pursuant to a 2004 stock purchase agreement, the Scott A. LaBonte Revocable Trust would eventually purchase the outstanding stock from Scott's brothers and a trust settled by Roland. [Compl. ¶ 217]. Through the inter-trust transfers discussed *supra*, Scott transferred his interest in Devcon to the Scott A. LaBonte Dynasty Trust, which eventually acquired all the outstanding Devcon stock by 2015. [Compl. ¶¶ 218-220].

The Trustee filed another action in May of 2014, seeking to recover $1.147M in transfers related to Devcon and the Scott A. LaBonte Dynasty Trust, which remains pending *sub judice* before Judge Thompson. [Compl. ¶¶ 220-224]. During the pendency of that litigation, Scott and Roland rendered Devcon worthless and transferred its assets to DEIPM, a newly created entity. [Compl. ¶ 225]. Sally and Roland approved the transaction and were advised on the transfer and formation of DEIPM by Attorney Marks and Juliano & Marks, with additional advice from Attorney Bourdeau. [Compl. ¶¶ 226-233].

DEIPM's members are the MPL 2015 Revocable Trust, which Marilyn settled and she serves as trustee, and the RGL Trust, which Roland settled and he serves as trustee. [Compl. ¶ 232]. Roland is DEIPM's sole manager. [*Id.*] The MPL 2015 Revocable Trust was formed by Attorney Marks, his firm, Attorney Bourdeau, and Mr. Sparveri in February 2015 to "park" Devcon for Scott until the Trustee litigation ends. [Compl. ¶¶ 233-37]. Attorney Marks dissolved Devcon during the pendency of the adversarial proceeding without setting aside reserves while the Trustee was seeking a pre-judgement remedy. [Compl. ¶ 247]. DEIPM operates as Devcon's alter-ego and successor. [Compl. ¶¶ 239-45]. When Attorney Marks appealed the Connecticut Department of Labor's determination that DEIPM was Devcon's successor for unemployment insurance purposes, he misrepresented the reason for the restructure and omitted information about the transaction (e.g. the relationship between the parties and income distributions). [Compl. ¶¶ 251-56].

Functionally, income earned by DEIPM is accessed by Scott through the MPL 2015 Revocable Trust because the settlor and trustee, Marilyn, gave Scott the checkbook

and signature stamp. [Compl. ¶¶ 257-264]. Scott paid $623,876 in credit card bills with funds from the MPL 2015 Revocable Trust over two and a half years. [Compl. ¶ 264].

Devcon's former management agreement included a provision that the managing firm would be entitled to a 5% transaction fee from the sale price of a property owned by a managed entity. [Compl. ¶ 269]. This provision was amended after the DEIPM-restructure to add a 3-4% refinancing fee. DEIPM received $1.968 million because of this new provision when three of its managed entities refinanced debt. [Compl. ¶¶ 270-82]. The refinancing fees were paid over time to DEIPM. Roland immediately distributed the fee disbursements to the MPL 2015 Revocable Trust, where they would be accessed by Scott. [Compl. ¶¶ 280-281]. Roland testified that if the Trustee tried to attach DEIPM's assets, he and his family would transfer DEIPM's business to a new entity. [Compl. ¶ 267]. Marilyn testified that she parked assets for Scott because "if there was anything [she] can do to help Scott [LaBonte] and his family – which is [her] family, too – … [she] would be willing to do so." [Compl. ¶ 266].

## V.    Underlying Litigation

As set forth in the Complaint, the Trustee has commenced four separate fraudulent conveyance actions: i) the Malley-LaBonte Action, ii) the Scott A. LaBonte Dynasty Trust Action, iii) an adversary proceeding commenced in May 2016, captioned *James Berman, Trustee v. Robert A. Landino, et. al.*, Adv. Pro. No. 16-02042(JAM) and iv) an adversary proceeding commenced in June 2017, captioned *James Berman, Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM). An additional separate action was brought to recover funds that Scott transferred to his sub-investors. [Compl. ¶ 285]. The Trustee alleges that,

notwithstanding significant litigation efforts, he has been unable to collect the judgment against Scott because of the dissipation of assets through the alleged "Enterprise to Obstruct" the Trustee. [Compl. ¶¶ 283-304].

### VI.    Counts alleged

Plaintiff alleges that the conduct of the Defendants constitutes various predicate acts within the meaning of racketeering activity under RICO, 18 U.S.C. § 1961(1), specifically, obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512, concealment and fraudulent transfer of property in violation of 18 U.S.C. § 152, money laundering in violation of 18 U.S.C. § 1956, transaction of money involved in unlawful activity under 18 U.S.C. § 1957, wire fraud in violation of 18 U.S.C. § 1343, and mail fraud in violation of 18 U.S.C. § 1341. [Compl. ¶ 305].

Plaintiff alleges that these acts occurred over an extended period of time, within ten years of each other. [Compl. ¶ 306]. Plaintiff alleges that an association in fact enterprise is "devoted to fraudulently transferring and concealing [Scott's] assets and taking other actions to obstruct and impede the Goldberg Trustee from satisfying the [Scott A. LaBonte] Judgment, while permitting [Scott] to continue to enjoy and benefit from such assets, and was formed for the purpose of carrying out the activities alleged in this Complaint." [Compl. ¶ 307]. Plaintiff alleges that the distributions made to the Goldberg Ponzi scheme victims have been materially smaller because of the Defendants' conduct. [Compl. ¶ 309].

Count one alleges substantive racketeering against Scott, individually and as trustee of the Scott A. LaBonte Revocable Trust, for: a. multiple acts of wire fraud in violation of 18 U.S.C. § 1343; b. multiple acts of concealment and fraudulent transfer

of property in violation of 18 U.S.C. § 152; multiple acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512; and multiple acts of money laundering in violation of 18 U.S.C. § 1956. [Compl. ¶¶ 311-331]

Count two alleges the same substantive racketeering activities against Roland, individually, and as trustee of the Scott A. LaBonte Dynasty Trust and the RGL Revocable Trust. [Compl. ¶¶ 332-347]. Similarly, count three alleges the same violations against Mr. Sparveri, individually, and as trustee of the Scott A. LaBonte Dynasty Trust. [Compl. ¶¶ 348-365]. Count four against Sally, in an individual capacity and as trustee of the Scott A. LaBonte Dynasty Trust, alleges the same racketeering activities, except that the Trustee alleges that Sally engaged in mail fraud in violation of 18 U.S.C. § 1341, instead of wire fraud, and alleges that she engaged in multiple acts of transaction of money involved in unlawful activity under 18 U.S.C. § 1957. [Compl. ¶¶ 366-382].

Count five alleges a racketeering conspiracy. [Compl. ¶¶ 383-393]. Plaintiff alleges that each Defendant knew of the enterprise to obstruct the Trustee and knew that the enterprise extended beyond each Defendant's respective role. Plaintiff alleges that Attorneys Marks and Bourdeau's actions constitute wire fraud (18 U.S.C. § 1343), concealment and fraudulent transfer § 152, and obstruction of justice §§ 1503, 1512. [Compl. ¶ 387]. Plaintiff alleges that Mr. Landino committed, *inter alia*, wire fraud, 18 U.S.C. § 1343, concealment and fraudulent transfer (bankruptcy fraud), § 152, obstruction of justice §§ 1503, 1512, and money laundering, § 1956. [*Id.*].

## Discussion

I.      Defendants' common issues

The Court will first address the Defendants' common arguments and will then address their individual arguments where necessary. [Dkt. 58 (Joint Mem. In Supp.)]. First, as a preliminary matter, the Defendants argue that the Plaintiff does not have standing to bring claims for post-petition conduct, by what they characterize as converting fraudulent conveyance claims into a civil RICO action. [*Id.* at 2, 10-12].

Second, the Defendants commonly argue that Plaintiff's "lost debt" claim is unripe because pendency of parallel litigation means that Plaintiff's recovery, and hence damages, are undeterminable. [*Id.* at 12-18].

Third, the Defendants argue that if Plaintiff's lost debt claim was sufficiently definite, it is time-barred because the Trustee knew about the June 2010 fraudulent conveyances by June 2011, at the latest. [*Id.* at 18-24]. The Defendants argue that most of Plaintiff's collection expenses were incurred beyond the statute of limitations. [*Id.* at 25-26].

Fourth, the Defendants argue that Plaintiff has not alleged a RICO violation. Specifically, the Defendants argue that Plaintiff has not alleged any predicate racketeering acts. The Defendants argue that the conduct alleged does not violate 18 U.S.C. § 152(1) because the assets that were allegedly concealed were not the "property of the estate of the debtor." [*Id.* at 27-28]. Next, Defendants argue that there is no authority for the proposition  that § 18 U.S.C. § 152(7), which criminalizes "knowingly and fraudulently transfer[ing] or conceal[ing] any of his property or the property of such other person or corporation" in contemplation of bankruptcy, applies to a non-debtor, who is not an insider, and not contemplating bankruptcy themselves. [*Id.* at 28-32].

13

Next, the Defendants argue that Plaintiff's allegations do not state the predicate offense of obstruction of justice because the alleged interference was with the collection of the judgment, not the integrity of the proceeding themselves. [*Id.* at 32-35]. The Defendants argue that Plaintiff's allegations of wire and mail fraud also fail because Plaintiff did not have a property interest at the time of the alleged fraud. [*Id.* at 35-41].

Next, the Defendants argue that Plaintiff fails to allege an association in fact enterprise because the of principals variegated interests and relationships, apart from the alleged conspiracy. [*Id.* at 47-51]. The Defendants' final common argument is that the Plaintiff cannot show either open-ended or closed-ended continuity. [*Id.* at 52-54]; [*Id.* at 55-59].

II.    **Legal Standard on Motion to Dismiss for Lack of Subject Matter Jurisdiction, Fed. R. Civ. P. 12(b)(1)**

"Federal courts are courts of limited jurisdiction..." *Gunn v. Minton*, 568 U.S. 251, 256 (2013). Subject matter jurisdiction is not waivable, and a lack of subject matter jurisdiction may be raised at any time, by a party or the court *sua sponte*. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) ("Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy."). In circumstances where a plaintiff lacks Article III standing, a court may not exercise subject matter jurisdiction. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).  If a court lacks subject matter jurisdiction, it must dismiss the action. *See* Fed. R. Civ. P. 12(h)(3).

14

A "district court must take all uncontroverted facts in the complaint [ ] as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings…" *Id*. "In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id*.

The Second Circuit has interpreted the "case and controversy" requirement to coincide "…with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own." S*hearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

a.  <u>Plaintiff's standing to sue</u>

The standing issue concerns the narrow question of whether a bankruptcy trustee may assert a claim for post-petition harm to the estate's property (i.e. the 09/29/2017 Judgement against Scott) where the debtor, Mr. Goldberg, could never have commenced this action himself. [Dkt. 58 (Defs. Joint Mem. in Supp.) 2, 10-12]. Defendants collectively argue that, unlike an action to avoid recoverable transfers and preference payments, Plaintiff is seeking damages on behalf of creditors. [*Id.* at 10]. The Defendants argue that the creditors, not the Trustee on behalf of the debtor's estate, has standing to bring a RICO claim. [*Id.* at 12, n.2] (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988)). The Defendants argue that Plaintiff failed to "alleged any distinct way in which the debtors were injured by the asserted

15

wrongdoing," and instead "alleges that the debtors suffered injuries identical to those of the creditors." [*Id.* at 12](quoting *Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40, 43 (D. Conn. 1994), *aff'd*, 72 F.3d 1085 (2d Cir. 1995)).

In opposition, Plaintiff argues that the Defendants' argument is contradictory because they concede that the Trustee has the authority to commence avoidance actions, but that the Trustee lacks standing to commence a RICO action on the same debt. [Dkt. 70 (Pl. Opp'n to Defs. Joint Mem. in Supp.) at 26]. The Trustee argues that RICO authorizes a creditor to recover treble damages against those who render a debt uncollectable through racketeering activities. [*Id.*](citing *D'Addario v. D'Addario*, 901 F.3d 80, 93-94 (2d Cir. 2018)). The Trustee argues that since the estate owns the judgment at issue, it necessarily owns the RICO claim predicated on that debt. [*Id.* at 27] (citing 11 U.S.C. § 541(a)(3)&(7)). The Plaintiff argues that the Trustee retains exclusive right to sue for injuries to the estate. [Dkt. 70 at 27-28](quoting, *inter alia*, *City Sanitation, LLC v. Burdick (In re Am. Cartage, Inc.),* 438 B.R. 1, 14 (D. Mass., 2010) and *Yelverton v. Marm (In re Yelverton),* Case No. 09-00414, 2014 Bankr. LEXIS 5011, at *17 (Bankr. D.D.C., Dec 11, 2014).

In reply, the Defendants argue that the Trustee's reliance on 11 U.S.C. § 541(a)(7) is misplaced because the alleged post-petition injury is not traceable to any pre-petition property interest. [Dkt. 82 (Def. Joint Repl. Br.) at 3-5]. The Defendants argue that the cases cited by Plaintiff are distinguishable because they arose from either pre-petition conduct or were traceable to the debtor's pre-petition property. [*Id.* at 5].

At the commencement of the bankruptcy case, a bankruptcy estate was created, consisting of all tangible and intangible property of the debtor, Mr. Goldberg. 11 U.S.C. § 541. Mr. Goldberg's bankruptcy estate includes the judgment against Scott.

11 U.S.C. § 541(a)(3)("…Such estate is comprised of all the following property, wherever located and by whomever held: (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.").The judgment against Scott falls squarely within § 541(a)(3) as an avoided transfer and the judgment belongs to the estate. A trustee can only avoid and recover "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990).

Pursuant to 11 U.S.C. § 323(a)-(b) a trustee is the representative of the estate and "has capacity to sue and be sued." However, "it is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors but may only assert claims held by the bankrupt corporation itself." *Wagoner*, 944 F.2d at 118 (2d Cir. 1991).

In *Bankers Trust Co. v. Rhoades*, 859 F.2d at 1100–01, the Second Circuit held that creditors of a bankrupt company had standing to bring an individual RICO action when they had sustained a direct injury. Specifically, the creditors in *Bankers Trust* were forced to defend against frivolous and corrupt lawsuits filed by the defendants, the debtor's officers and attorney, to harass them and to cause them monetary losses over and above that caused by the debtor's corporate bankruptcy. *Id.* at 1101. The plaintiffs in *Bankers Trust* alleged a direct injury, rather than an injury to the corporate debtor or the creditors as a whole.

By comparison, in *Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40, (D. Conn. 1994), *aff'd*, 72 F.3d 1085 (2d Cir. 1995), the bankruptcy trustee asserted claims against law firms and accounting firms that allegedly participated with the debtors in the Colonial

Realty Company Ponzi scheme. There, the district court held that the trustee was asserting claims that the creditors could have asserted against the third parties and the debtor independently. *Id* at 43.

> Recognizing that he cannot assert claims against the defendants on behalf of the creditors, the trustee alleges damage to the debtors, to the extent of the unpaid obligations of the debtors to the creditors. Yet, the trustee has not alleged any distinct way in which the debtors were injured by the asserted wrongdoing of the defendants. Rather, the trustee alleges that the debtors suffered injuries identical to those of the creditors. Under these circumstances, it is the individual creditors, rather than the trustee, who may seek recovery from the defendants. Accordingly, the trustee lacks standing to assert these claims.

*Ibid*. (footnote omitted)

Neither *Bankers Trust* nor *Hirsch* resolve the standing issue. Unlike *Bankers Trust*, the harm at issue here is the estate's losses from the inability to collect a judgment, which is a direct injury to the estate and a derivative injury common to all creditors. In other words, none of the creditors would have standing to assert the claim that Plaintiff raises because it is the estate's loss. Similarly, unlike *Hirsch*, the harm that Plaintiff is alleging is not entangled with the debtor's liability.

The Ninth Circuit's decision in *Estate of Spirtos v. One San Bernardino Cty. Superior Court Case Numbered SPR 02211*, 443 F.3d 1172 (9th Cir. 2006) is instructive. There, a creditor (the debtor's ex-wife) filed a RICO action against "nearly everyone involved in the bankruptcy and probate proceedings of Basil's estate," including the trustee. *Id*. at 1174. Plaintiff alleged that the defendants "have jointly conspired to conceal assets belonging to the bankruptcy and probate estates of Dr. Basil N. Spirtos for the purpose of obstructing the payment of the Decedent's creditors and legal heirs...." *Id*. The district court dismissed the creditor's action because the claims being asserted were on behalf of the estate and the bankruptcy trustee has exclusive

capacity to sue on behalf of the estate pursuant to 11 U.S.C. §§ 323(a)-(b) and 704. *Id*. The Ninth Circuit agreed and rejected the argument that, since the trustee was a defendant to the RICO action, he was conflicted and could not be the only individual with power to also sue the trustee. *Id*. at 1176. Thus, since the creditor's claim for alleged racketeering violations in the administration of the bankruptcy estate belonged to the estate itself, the creditor lacked standing to unilaterally assert the claim. *Id*.

Plaintiffs' claims are more akin to the creditors claims in *In re Spirto* than either *Bankers' Trust* or *Hirsch*. A simple analogy demonstrates the distinction. Suppose that a bankruptcy trustee claws back a preferential transfer of real property to an outsider. While the property is held by the estate but before it can be disposed of for the benefit of creditors, the outsider intentionally destroys the property. The estate is harmed, and the creditors are harmed derivatively, yet the debtor possessed no cause of action against the tortious party prior to the commencement of the estate. The trustee can recover damages against the third parties for the financial loss incurred to the estate. The difference between this case and the hypothetical is that the harm suffered is the costs "incurred in one or more attempts to combat a defendant's RICO violations through the legal system…." *D'Addario*, 901 F.3 at 96.

As with the hypothetical, the harm the estate suffers is directly traceable to the debtor's pre-petition property interest once the claw back action is considered. The cause of action is not new property, but a consequence of efforts to remediate harm allegedly caused to property already within the estate.

Accordingly, the Court holds that the Plaintiff's have standing to assert their RICO claims.

III.    **Legal Standard for Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.

1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

Section 1964(c) of the RICO statute, 18 U.S.C. § 1961 *et seq.*, permits a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." A plaintiff must therefore allege a violation of section 1962 in order to recover damages under RICO.

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962. To establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)(citing *DeFalco v. Bernas*, 244 F.3d 286, 305, 306 (2d. Cir. 2001)).

"Allegations of bankruptcy fraud, like all allegations of fraudulent predicate acts, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004)). The heightened pleading standard also applies to allegations of wire fraud as a predicate act. *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008).

a. <u>Is Plaintiff's "lost debt" claim ripe?</u>

The Court agrees with the Defendants that Plaintiff's "lost debt" claim is unripe under binding Second Circuit precedent because parallel proceedings to collect the amount remain on-going in another forum. *See D'Addario*, 901 F.3d at 93.

In the RICO context, a "lost debt" claim is "…for damages in the form of an owed, but as-yet-uncollected, amount…" *Id.* The Defendants argue that, pursuant to a long line of consistent Second Circuit authority, "lost debt" injuries are unripe when parallel proceedings to collect the amount owed are on-going in another forum. [Dkt. 58 at 24] (citing *D'Addario*, 901 F.3d at 93); *see, e.g., Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003)(clear and definitive amount of damages not established until creditor foreclosed on the loan and value of collateral could be determined); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165-66 (2d Cir. 1993) (finding unripe a RICO claim for injury in amount of two state court judgments entered against defendant where (1) one judgment was satisfied after initiation of RICO suit, and (2) second judgment was "likely to be fully satisfied"); *Bankers Trust Co.*, 859 F.2d at 1105-06 (RICO claim for lost debt injury unripe because fraudulently transferred assets might yet be recovered during bankruptcy proceedings); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (finding unripe RICO claims for injury arising from plaintiff's loans to defendant where, though information from defendants provided as a basis for the loans was alleged to be false, no default had yet occurred).

The Trustee argues that they are "successfully frustrated" in their attempts to collect the debt and therefore the amount of the debt is "reasonably ascertainable." [Dkt. 70 at 28-35]. As plausible as the Trustee's allegations may be, the Second Circuit does not recognize a futility exception to its ripeness rule for lost debt claims.

In *D'Addario*, 901 F.3d at 93-95 the plaintiff-appellant argued that her younger brother looted their father's estate as executor through fraudulent artifices and the probate court never meaningfully oversaw his conduct in the thirty years the estate

remained open. Consequently, its value could increase or decrease, so her final distribution was not yet determinable. Plaintiff, then age 70, argued that the executor intended and would likely succeed in keeping the estate open until plaintiff's death, and that abiding by the RICO ripeness rule in the face of frustration would improperly enable the executor to carry out his plan. *Id.* at 95. The Second Circuit disagreed. "We are not enabled by these pleas to depart from our precedent. Unfortunate as Virginia's situation might be, the RICO statute as construed in our Circuit simply does not provide a remedy before a plaintiff has suffered reasonably ascertainable damages. Nor may a RICO plaintiff, through predictions of a defendant's future plans, artificially ripen a claim that is unripe under our jurisprudence." *Id.* (citing also *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 516 (2d Cir. 2014)). The plaintiff-appellant's petition for certiorari to the U.S. Supreme Court was denied. 139 S.Ct. 1331 (2019).

Jurists may disagree on the wisdom of the Second Circuit's RICO ripeness rule for lost debt injuries. Indeed, the Second Circuit in *D'Addario* recognized that some courts have taken a different approach. 901 F.3d at 93 (citing, e.g. *Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996)). This is of particular concern because RICO is a remedial statute that is broadly construed. *Sedima, S.P.R.L. v. Imrex C*o., 473 U.S. 479, 498 (1985). On the other hand, *D'Addario* recognizes that alternative remedies in the collateral proceeding are also available and the course of collateral litigation is uncertain. 901 F.3d at 95. Proceeding on a lost debt claim prior to conclusion of collateral proceedings poses the practical issue of needlessly duplicating litigation and the additional risk of inconsistent rulings.

Still, there is no reasonable dispute as to the applicability of the rule here. Plaintiff cites the case of *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 409-10 (E.D.N.Y. 2017) for

the proposition that exhaustion of every alternative means of recovery is not required before bringing a RICO action. [Dkt. 70 at 30]. The Court agrees with the Defendants that *Datre* is distinguishable. *Datre* recognized the Second Circuit's rule that "where a plaintiff raises a RICO claim whose injury is dependent on the outcome of an ongoing proceeding or a debt recoverable via foreclosure, the injury is not "clear and definite" enough for the plaintiff to have RICO standing." *Datre*, 245 F. Supp. 3d at 412. But, the district court held that the lost debt rule was inapplicable where the underlying injury was for environmental clean up costs, not to recover on an existing debt. *Id*.

Plaintiff does not cite, and the Court is unaware, of any Second Circuit authority permitting a RICO lost debt claim to proceed during the pendency of the underlying litigation to establish or collect the debt. Plaintiff's actual lost debt damages are speculative for trebling purposes under RICO because the collateral actions to collect the judgment remain pending. Accordingly, the Court GRANTS Defendant's motion to dismiss as to Plaintiff's lost debt claim. The dismissal is without prejudice because the claim is unripe.

### b. Are Plaintiff's collection expenses incurred prior to July 28, 2015 time-barred?

As *D'Addario* makes clear, the Second Circuit has "…long recognized that a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action." 901 F.3d at 96. Unlike a lost debt, collection expenses may increase over time and the previously incurred expenses will not disappear and are therefore neither speculative nor improvable. *Id*. (citing *Bankers Trust Co*., 859 F.2d at 1106).

24

The problem is paradoxical in that the Defendants argue that Plaintiff's claims are both unripe and beyond the statute of limitations.

In the Second Circuit, a civil RICO action begins to accrue when Plaintiff discovers or should have discovered the injury and runs through a four-year statute of limitations. *Bankers Tr. Co*, 859 F.2d at 1102 (citing *Agency Holding Corp. v. Malley-Duff & Assocs.*, Inc., 483 U.S. 143, 156, (1987) for the proposition that civil RICO actions are subject to a four-year statute of limitations). *Bankers Tr. Co.* recognized that civil RICO actions are subject to the rule of separate accrual: "[e]ach time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises." *Bankers Tr. Co.*, 859 F.2d at 1102.

The Defendants argue that the Trustee knew by 2011 that Scott had engaged in a series of fraudulent transactions to render himself judgment proof. [Dkt. 58 at 25-36]. In response, the Plaintiff argues that the four-year statute of limitations begins to run when the bankruptcy court approves the Trustee's attorneys fees, at which time, the Trustee would be obliged to pay them. [Dkt. 70 at 37-38] citing 11 U.S.C. § 330. In reply, the Defendants argue that *Bankers Trust* holds that a plaintiff cannot delay accrual of the claim until the collection expenses are paid. [Dkt. 82 at 19-20].

In *Bankers Trust*, after holding that a four year statute of limitations applied and considering the rule of separate accrual, the Second Circuit affirmed the district court's decision that "…Bankers suffered injury as to each expense when it became obligated to pay that expense, and not at some later date when it actually made the payment." 859 F.2d at 1105. Quoting the district court's decision, the Second Circuit affirmed that Bankers could not postpone the accrual of its claim by delaying

payment of its legal expenses. *Id.* The plaintiff-creditor in Bankers Trust, as a private litigant, was obligated to pay their attorneys for work performed at the time it was performed.

The application of this principle to the instant matter is more quarrelsome. The estate cannot pay legal expenses to the trustee until approved by the bankruptcy court. 11 U.S.C. § 330(a)(1)(A)-(B). The bankruptcy code comprehensively sets forth specific factors for the court to consider when determining compensation and the court may award less than the compensation requested. 11 U.S.C. § 330(2)-(4). This creates a perverse incentive to forestall the bill submission to the bankruptcy court and effectively toll the statute of limitations and then treble the damages.

It is undisputed that Plaintiff has at least some collection expenses that the estate is obligated to pay that were incurred within the four-year statute of limitations. Consequently, the issue is not fully dispositive. The party invoking the statute of limitations, as an affirmative defense, bears the burden of proof on that defense. See *Smith v. United States*, 568 U.S. 106, 112 (2013).  At this early juncture, there is insufficient information for the Court to rule as to when the statute of limitations for Plaintiff's collection expenses begins.

### c. Substantive RICO offenses

A Plaintiff asserting a civil RICO action must establish that the RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well. Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is

"too remote," "purely contingent," or "indirec[t]" is insufficient." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268, 271, 274 (1992)(internal quotation marks and citations omitted)

### i. Bankruptcy fraud in violation of 18 U.S.C. § 152(7)[2]

The first predicate offense alleged is bankruptcy fraud in violation of 18 U.S.C. § 152(7), which subjects to criminal penalty anyone who in "a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation."

The Defendants argue that they are unaware of any authority holding that § 152(7) applies to the transfer of assets by one who is not a debtor, an insider or agent of a debtor, or contemplating filing bankruptcy, to allegedly impede a claw-back action by a trustee. [Dkt. 58 at 28-29]. The Defendants urge the Court to apply the rule of lenity and decline to interpret the statute to apply to the novel circumstances raised. In opposition, Plaintiff cites the statute's legislative history, which shows that Congress expanded the statute to apply its reach beyond debtors, and that the rule of lenity is inapplicable because the statute is unambiguous. [Dkt. 70 at 39-42].

Collier on Bankruptcy opines that § 152(7) is the broadest paragraph contained in the bankruptcy code's criminal fraud section. 1 Collier on Bankruptcy

---

[2] Plaintiff's opposition brief states that "[t]he Complaint alleged violations of 18 U.S.C. §152(1) as a predicate act. The Trustee is not pursuing a claim that any Defendant's conduct violated 18 U.S.C. §152(1)."

P 7.02 (16th 2020).  The statute covers both pre- and post- petition conduct and the term "transfer" takes on a broad construction. *Id.* Typically, but not exclusively, a § 152(7) prosecution involves a "bust-out" scheme, where the defendant buys merchandise on credit and then sells the merchandise at a steeply discounted rate, never intending to pay for it and intending to file bankruptcy instead. *See Burke v. Dowling*, 944 F. Supp. 1036, 1065 (E.D.N.Y. 1995)(explaining a bust-out scheme). The allegations here do not comport with the prototypical § 152(7) prosecution.

The Defendants argue that Plaintiff has not alleged any fraud arising from any existing duty or misrepresentation to the bankruptcy court. "In order to make out a violation of 18 U.S.C. § 152(7), which is the alleged predicate act, plaintiffs must allege specific facts demonstrating that [debtor] made the transfer in *contemplation of bankruptcy or otherwise with an intent to defraud a United States bankruptcy court or defeat the bankruptcy laws*. An intention to engage in a transfer for the purpose of hindering potential creditors does not alone arise to the level of bankruptcy fraud." *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 582 (S.D.N.Y. 2002), *aff'd sub nom. Satinwood, Inc.*, 385 F.3d 159 (italics in original). In a corresponding footnote, *Brickellbush* cites *Burke* as an example of a case where a plaintiff failed to plead bankruptcy fraud with particularity when they alleged that they were "incurring obligations that they knew they could not meet," but failed to allege "that any defendant ever gave any thought to the prospect of filing for bankruptcy in a U.S. court." *Id.* (quoting *Burke*, 944 F. Supp. at 106 (italics in original)).

At issue is the application of the second alternative basis for the intent

requirement, a disjunctive clause, as is what is meant by acting with "intent to defeat the provisions of title 11." Collier explains that this term means:

> At a minimum, this component requires the defendant to act in such a way as to intentionally effect a deviation from the distributions anticipated by title 11 liquidations, including both the priorities and the rule that claimants within a class share pro rata. As formulated by the Tenth Circuit: "[T]he provisions of Title 11 of the Bankruptcy Law are defeated when a person without Court approval acts in a manner that diminishes the estate of the debtor, and thus interferes with the equitable use of [sic] distribution of any material part of the assets of the estate."

1 Collier on Bankruptcy P 7.02 (16th 2020)(quoting jury instruction excerpted in *United States v. Cardall*, 885 F.2d 656, n. 43 (10th Cir. 1989)(from the charge of fraudulent receipt of property belonging to a bankrupt's estate, § 152(5)). The outer bounds of the "intent to defeat the provisions of title 11" appear to relate to transactions which effect priorities and the application of other distributional rules.

In determining whether conduct violated 18 U.S.C. § 152(7) the court looks to the language and the intent of the statute. The allegations here do not comport with a prototypical prosecution of bankruptcy fraud under § 152(7). Neither the Defendants, nor the Plaintiff, nor the Court could identify a criminal case brought under § 152(7) against a bankruptcy creditor. Nevertheless, the facts alleged comport with the text and purpose of this provision, which exists to subject to criminal penalty those persons who engage in bankruptcy planning to retain assets that are properly within the debtor's estate for the benefit of all creditors through fraudulent transfer and concealment.

The rule of lenity is inapplicable because the statute is unambiguous. *See United States v. Sabbeth*, 262 F.3d 207, 215–16 (2d Cir. 2001)("Congress enacted Section 152 and its predecessor statute—11 U.S.C. § 52(b)—to prevent and punish

efforts to defeat the provisions of Title 11, see *United States v. Shapiro,* 101 F.2d 375, 379 (7th Cir.1939) (interpreting the predecessor statute), including the rule that "creditors of equal priority should receive pro rata shares of the debtor's property," *Begier v. IRS*, 496 U.S. 53, 58 (1990). A defendant who fraudulently transfers assets that rightfully belong to a corporation about to file for bankruptcy undermines this pro rata distribution of assets, by making it difficult for creditors to locate and properly distribute these assets.").

Plaintiff satisfied the heighted pleading requirement to allege that members of the enterprise sought to hinder and have in fact hindered the bankruptcy trustee's ability to marshal the bankrupt debtor's assets and distribute them equitably to the creditors. These Defendants deprived the victims of the Goldberg Ponzi scheme of their equitable share of the bankruptcy estate by fraudulently transferring Scott's assets including his net winnings from the Goldberg Ponzi scheme, to an irrevocable trust (Scott A. Labonte Dynasty Trust) with the express intent to remove them from the Trustee's reach while impermissibly allowing Scott unfettered access to the funds for his personal use. The members of the enterprise conceived and executed this fraudulent plan in contemplation of the pending adversarial proceeding in bankruptcy that they anticipated to require the disgorgement of the net winnings. After transferring the assets to avoid their subsequent attachment, Scott concealed the transfer from the Trustee and the bankruptcy court when Scott stipulated to the pre-judgment remedy order in February 2011. [Compl. ¶ 111]. Because of the enterprise's fraudulent conduct Scott received more than his *pro rata* share of the Goldberg bankruptcy estate as the enterprise had intended.

For purposes of Defendants' motion to dismiss, the bankruptcy fraud claim will proceed against the enterprise. Accordingly, the Defendant's motion to dismiss as to this predicate act is DENIED.

### ii. Obstruction of Justice under 18 U.S.C. §§ 1503 and 1512

Next, the Defendants argue that the asset transfers at issue cannot constitute obstruction of justice under 18 U.S.C. §§ 1503 and 1512. The Court agrees. In order to convict for obstruction of justice under the omnibus clause of section 1503, the government must establish "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)(quotations and citations omitted); *see also United States v. Aguilar*, 515 U.S. 593, 599 (1995).

The Defendants argue that the conduct at issue, the enterprise's efforts to fraudulently place assets beyond the reach of the Trustee does not constitute obstruction of justice because it does not interfere with judicial proceedings or procedure. [Dkt. 58 at 32-33]. The Defendants cite dicta in *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1040 (2d Cir. 1984) addressing whether the Government could invoke § 1503 for hindering its efforts to collect contempt fines. The Second Circuit was skeptical of the application of § 1503 to those facts because "[t]he section appears to be directed toward attempts to deflect

jurors, witnesses, or judicial officials from the proper performance of their duties, rather than generally to reach efforts to frustrate the intended effect of an already rendered judgment." *Id* at 1040. The Second Circuit went on to state "[o]ur research has disclosed no case upholding a conviction for violation of § 1503 based on conduct intended to remove an unattached asset from the jurisdiction of the court but not to sway a judicial officer, juror, or witness by threat, promise, or deception." *Id.*

In opposition, Plaintiff argues that the Second Circuit has held that a bankruptcy trustee is a judicial officer within the meaning of § 1503. *United States v. Crispo*, 306 F.3d 71, 78 (2d Cir. 2002). In *Crispo*, a debtor was charged with violating § 1503 for threatening to kidnap the daughter of the bankruptcy attorney hired by a trustee. *Id.* at 75. The Second Circuit reasoned that holding that bankruptcy trustees were court officers would not expand § 1503 to innocent conduct because § 1503 only reaches corrupt endeavors to obstruct justice. *Id.* at 81-82.

Plaintiff argues that the Defendants violated § 1503 by impeding the Trustee in his official duties to "(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). The Plaintiff also argues that Defendants also violated § 1503 by causing a delay in the disposition of the bankruptcy estate. [Dkt 70 at 43-44]. The Court disagrees. Plaintiff does not allege any Defendant filed a false, misleading, or threatening statement intended to compel a judicial officer to act in any schedule, pleading or other sworn statement filed in or communication with the bankruptcy court.

A review of the cases Plaintiff cites for his argument that causing a delay in a judicial proceeding is a prima facie case of obstruction of justice shows that they bear no categorical distinction from other cases where corrupt means are employed in an effort to effect a judicial proceeding. For example, in *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992), the defendant-appellant sent a letter to the clerk of the court falsely claiming to be a juror from the underlying criminal case against the defendant. *Id*. at 632-33. Similarly, *Nye v. United States*, 137 F.2d 73, 76 (4th Cir. 1943), which incorporates the facts of 113 F.2d 1006 (4th Cir. 1940), is a coerced affidavit case. In *United States v. Newton*, 452 F. App'x 288, 291 (4th Cir. 2011), the defendant tipped off the target of a search warrant. The three cases concern the integrity of the judicial process itself, not the effect of the alleged obstruction.

The Court finds the dicta in *In Re Grand Jury Subpoenas* instructive. The Court agrees with the Defendants that the Plaintiff's status as an officer of the court does not convert the Plaintiff's fraudulent conveyance claims into obstruction of justice absent some alleged misconduct that goes to the proceedings themselves, rather than the Trustee's ability to collect an already rendered judgment. The fact that neither the Plaintiff nor the Court have identified a case "upholding a conviction for violation of § 1503 based on conduct intended to remove an unattached asset from the jurisdiction of the court but not to sway a judicial officer, juror, or witness by threat, promise, or deception" *In Re Grand Jury Subpoenas*, 731 F.2d at 1040, is strongly suggestive of the outer bounds of the criminal offense.

Accordingly, the Court dismisses the Complaint as to the alleged predicate acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

### iii. Wire Fraud in violation of 18 U.S.C. § 1343

The next alleged predicate offense at issue is wire and mail fraud. "The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). The Defendants' challenge the sufficiency of Plaintiff's allegations as to the second and third elements. [Dkt. 58 at 35-41]. As to the property element, the Defendants argue that the Trustees do not and cannot argue that they had a property interest before the Trustee secured the judgment against Scott in 2017. [*Id.* at 37-39](citing *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 212 (2d Cir. 2014) ("Nor does the Trustee enjoy a statutory right to those assets. Our case law is clear that assets targeted by a fraudulent conveyance action do not become property of the debtor's estate under the Bankruptcy Code until the Trustee obtains a favorable judgment.")(citing *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992)).

In opposition, the Plaintiff argues that the estate's chose in action is a property right and that the Defendant's fraudulent transfer and concealment of property injures that right. [Dkt. 70 at 47-50](citing *Gutierrez v. Givens*, 989 F. Supp. 1033 (S.D. Cal. 1997)). The Court agrees with the Plaintiff.

In *McNally v. U.S.*, 483 U.S. 350 (1987), the U.S. Supreme Court held that the mail fraud statute limited its scope to the protection of property rights and therefore did not apply to defrauding citizens of their intangible right to good government. (superseded by statute, 18 U.S.C. § 1346). *McNally* did not address when the property interest needed to vest, however.

34

The allegations in the complaint go beyond a pre-judgment fraudulent conveyance. As alleged, the Defendants entered a fraudulent scheme in anticipation of the Plaintiff's asserted intangible property right vesting in the future; first by rendering Scott judgment proof and then disbursing the ill-gotten gains from the Ponzi scheme under false pretenses, knowing that the *source* of those proceeds was subject to a pre-judgment attachment. As a consequence, Plaintiff's chose of action, itself a property interest, was rendered worthless to the estate when it finally vested.

The right to pursue Scott to claw back the Goldberg Ponzi scheme funds belonged *exclusively* to the estate. *Mitchell Excavators, Inc. by Mitchell v. Mitchell*, 734 F.2d 129, 131 (2d Cir.1984). "Property of the estate under § 541[a][1] "includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property...."; *see also In re Keene Corp.*, 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994)("If the trustee has standing to assert the claim for the benefit of the estate, no individual creditor can assert the claim unless it has been abandoned or the creditor obtains relief from the automatic stay."). The Trustee has the right to assign its avoidance powers. *In re Greenberg*, 266 B.R. 45 (Bankr. E.D.N.Y. 2001). As a matter of bankruptcy and property law, the Trustee's rights here were exclusive and alienable.

Courts "…construe the 'property requirement' liberally," although its scope is not "unbounded." *Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004). The exclusivity and transferability of the Plaintiff's right to assert the claw back action distinguishes this case from situations where the property interest asserted is the chance to compete with others for a business opportunity. *See, e.g.* [Dkt. 58 at

38](citing *United States v. Henry*, 29 F.3d 112, 113-14 (3d Cir. 1994)(public official did not meet *McNally* property standard by depriving bank of its interest in a fair bidding opportunity in bid rigging scheme).

*United States v. Adler*, 186 F.3d 574 (4th Cir. 1999) is also distinguishable. There, the defendant contracted with the House of Blues to supply them with custom t-shirts to sell during the 1996 Olympic games. The defendant entered an unsecured contract with a subcontractor (a printer), subject to the defendant's personal guarantee. *Id.* at 575. Following the Olympic bombing, the House of Blues reduced the quantity of their t-shirt order but settled with the defendant on their breach of contract claim. The defendant's company was insolvent at the time it received the settlement payment. *Id.* He used the settlement funds to pay some unsecured vendors and then issued a bonus to himself and the co-owner, after which they left the country and deposited the funds in a foreign account. *Id.* Upon their return, they falsely told the printer that they would be paid and that the company was doing well. *Id.* The defendant provided a false list of payments made with the settlement funds, which omitted the co-owners' bonuses. *Id.* at 576.

The Fourth Circuit affirmed the district court's dismissal of the wire fraud conviction because a "claim on debt is distinct from a claim to particular funds to satisfy that debt and the mere existence of the former does not give rise to the latter." *Id.* at 579. The Fourth Circuit went on, however, to note that "…Printgear [the subcontractor] did nothing to secure payment from particular funds and did nothing at all to ensure payment other than to obtain personal guarantees…" *Id.* at 579.

Here, Plaintiff has set forth sufficient facts to establish that they had a legal

right to the money in question. Unlike *Adler*, Plaintiff alleges that Scott and others engaged in fraud by first transferring assets to the Scott A. LaBonte Dynasty Trust, and then, after the pre-judgment remedy entered against Scott, concealing and then disbursing assets to Scott's benefit that otherwise would have been subject to the pre-judgment remedy inuring to Plaintiff's benefit.

Next, the Defendants argue that Plaintiff has not alleged a "scheme to defraud," meaning conduct that is "designed to defraud by representations as to the past or present, or suggestions and promises as to the future." [Dkt. 58 at 39](citing *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006)). The Defendants argue that "[n]one of the parties to the asset transfers is alleged to have had a duty of disclosure to the Trustee or the bankruptcy court, or to have made any misrepresentation of fact to the Trustee or anyone else." [*Id.*].

In opposition, the Plaintiff argues that, unlike common law fraud, the wire fraud statute does not contain a requirement to plead fraudulent misrepresentation. [Dkt. 70 at 50](citing also to *Reifler*, 446 F.3d at 95]. In reply, the Defendants contend that Plaintiff misstates the rule: the wire communications themselves do not need to be false to satisfy the transmission element so long as the transmission is "incident to an essential part of the scheme," but Plaintiff must still establish a scheme to defraud. [Dkt. 82 at 22-23].

The Defendants are correct as to the applicable legal standard, but Plaintiff has adequately pled a "scheme to defraud." For example, Plaintiff alleges that Sally misrepresented in testimony that the June 2010 transfers were for estate planning purposes, although Judge Thompson found her explanation pretextual under the

circumstances. [Compl. ¶ 68-69]. Scott continued to access money generated by the transferred properties from the dynasty account by drawing checks and having his wife sign them, which created the illusion that the dynasty trust is in fact separate property. [Compl. ¶¶ 112-115]. In another instance, Marilyn provided Scott with her signature stamp so that he could issue checks from the newly formed MPL 2015 Revocable Trust to pay credit card expenses. [Compl. ¶¶ 257-264]. Attorney Bourdeau's notes reference a potential "claw back" by a "Hartford Trustee." [Compl. ¶ 64.]. During their depositions, both Mr. Sparveri and Attorney Bourdeau admitted that the purpose of the meeting was to determine a course of action to place Scott's assets beyond the reach of the Trustee. [Compl. ¶¶ 65-67]. These allegations go beyond efforts to frustrate creditors because Plaintiff plausibly alleges that the vehicles the Defendants used to intentionally permit Scott to continue to access the "property" of the estate were a farce.

The Court concludes that Plaintiff has sufficiently alleged the predicate act of wire fraud in violation of 18 U.S.C. § 1343 because Plaintiff has sufficiently alleged that the estate's property was harmed through a scheme to defraud the estate of its property facilitated by the use of interstate wires.

### iv.    Money Laundering in violation of 18 U.S.C. §§ 1956 and 1957

The final alleged predicate offense is money laundering in violation of § 1956 and in violation of § 1957, as to Sally. To prevail under the money laundering statutes, the government must show that defendant "(1) acquire[d] the proceeds of a specified unlawful activity and then (2) engage[d] in a financial transaction with those proceeds." *United States v. McCarthy*, 271 F.3d 387, 394–95 (2d Cir. 2001).

The Defendants argue that the Plaintiff has not alleged money laundering because Plaintiff has not alleged that the monies at issue were "proceeds of unlawful activity."  [Dkt. 58 at 41-44].

"[F]unds become proceeds [for purposes of Section 1956] when they are derived from an already completed offense, or a completed phase of an ongoing offense." *United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002). The predicate offense must be distinct from those transactions constituting money laundering. Bankruptcy fraud is a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D). "In determining whether the underlying crime, or a discrete phase of that crime, has been completed so as to generate "proceeds," the central inquiry is one of distinctness, not timing." *Id.* at 214.

The First Circuit's decision in *United States v. Ledee*, 772 F.3d 21 (1st Cir. 2014) is instructive. There, the defendant-debtor's initial property transaction constituted bankruptcy fraud in violation of 18 U.S.C. § 152(7), after which eight manager's checks were made payable to four of his relatives, which separately constituted money laundering. *Id.* at 35. Put another way, in *Ledee,* the debtor-defendant's bankruptcy fraud conviction would have stood in the absence of the payments to his relatives.

In this case, for pleading purposes, Plaintiff alleged that the fraudulent transfer of assets to the purportedly irrevocable Scott A. Dynasty Trust constituted bankruptcy fraud in violation of 18 U.S.C. § 152(7). Thus, at the time of the completed transfers, the assets were "proceeds" for purposes of § 1956. Thereafter, like *Ledee*, the enterprise enabled Scott to liquidate the assets in the Scott A. LaBonte Dynasty

Trust for Scott's benefit, which were financial transactions with those proceeds. *See also Sabbeth*, 262 F.3d at 216, n.9 (subsequent transaction of proceeds of bankruptcy fraud sufficient to constitute money laundering).

Accordingly, the Court DENIES the Defendants' Motion to Dismiss the counts of the Complaint alleging money laundering in violation of, 18 U.S.C. §§ 1956 and 1957, as Plaintiff has sufficiently alleged that the Defendants engaged in a "financial transaction [that] with the proceeds of some form of unlawful activity." 18 U.S.C. § 1956.

c. <u>Has Plaintiff alleged the existence of an "enterprise" for purposes of RICO?</u>

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has observed in this regard that "[t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944, 129 (2009). It has further instructed that, in accordance with the law's purposes, the RICO statute is to be "liberally construed," giving a broad and flexible reach to the term "association-in-fact." *Id.*

"In line with this general approach, the Supreme Court has rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO 'enterprises.' RICO associations-in-fact need exhibit only three structural features: (1) a shared purpose; (2) relationships among the associates; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *D'Addario*, 901 F.3d at 100 (2d Cir.

2018)(citing *Boyle*, 556 U.S. at 946). Proof of an enterprise is analytically distinct, but proof of the elements of an enterprise may also coalesce with the racketeering activity. *Boyle*, 556 U.S. at 947(citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

The Court concludes that Plaintiff has plausibly alleged the existence of an enterprise as to the LaBonte family. Apart from the bonds of kinship, the Complaint alleges in detail the decades-long common real estate dealings and familial trusts structures that enabled the family to act in concert to shield Scott from liability for the judgment. The LaBonte family businesses and trusts were the means by which the alleged predicate acts were committed. The face of the complaint alleges an "enterprise" as to the LaBonte family that extends beyond the allegations of racketeering activity. Each of the LaBonte family members are alleged to have made discretionary decisions in furtherance of the enterprise and the predicate offense of wire fraud, knowing the impropriety of its purpose.

The more difficult issue is raised by the non-familial defendants in their individual motions to dismiss as to whether Plaintiff sufficiently alleged that they joined the "enterprise," under 18 U.S.C. § 1962(c) or conspired to violate RICO under 18 U.S.C. § 1962(d). *See United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011)(comparing § 1962(c) with  § 1962(d). Mr. Sparveri is the only defendant that Plaintiff alleges engaged in substantive racketeering offenses in violation of § 1962(c) who is not a member of the LaBonte family. [Compl. ¶¶ 348-365]. Unlike a substantive RICO violation (§ 1962(c)), a conspiracy to violate RICO under § 1962(d) does not require proof that the defendant agreed to operate the enterprise or to commit the predicate

acts. *United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008).

The allegations against Mr. Landino, Attorney Bourdeau, and Attorney Marks are limited to a conspiracy to violate RICO, 18 U.S.C. § 1962(d). A "RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1355 (2019).

i.   <u>Sally LaBonte</u>

18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." The term "conduct" means some degree of direction and the word "participate" refers to the operation or management of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

In *Reves*, the bankruptcy trustee of a farmers' co-op sued its former audit accounting firm alleging that they deliberately inflated assets to deceive noteholders as to the co-op's insolvency and committed securities fraud. *Id.* at 172-76. In holding that "persons" must take *some part* in the participation or management of the enterprise's affairs, the Supreme Court rejected the United States' amicus argument that the test would limit the liability of outsiders. *Id.* at 184-85; ("Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise

42

and participate in the conduct of its affairs—that is, participate in the operation or management of the enterprise itself—but it would be consistent with neither the language nor the legislative history of § 1962(c) to interpret it as broadly as petitioners and the United States urge.") *Id.* at 185.

Sally argues that her alleged participation in the enterprise does not satisfy the *Reves* test because she is not alleged to have participated in the formation of the Scott A. LaBonte Dynasty Trust, nor did she control the assets that were placed in it. [Dkt. 54 at 15]. On the contrary, she argues that the Plaintiff alleges, both in the Complaint and during the adversarial proceeding, that Scott, not Sally exercised control in diverting assets. [*Id.* at 16-17]. As to the transfers involving the former Devcon property, she argues that the Plaintiff alleges that Scott and Roland are responsible for those decisions. [*Id.* at 17-18].

In opposition, the Plaintiff argues that the *Reves* standard requires that the defendant have "*some* part in directing the enterprise's affairs." [Dkt. 71 (Pl Opp'n) at 15)(citing *Reves*, 507 U.S. at 179)(emphasis added). *Reves* makes clear that "…RICO liability is not limited to those with primary responsibility for the enterprise's affairs…" 507 U.S. at 179. Plaintiff argues that they allege five instances where Sally demonstrated "some part in directing the enterprise's affairs," namely: executing twenty assumption agreements and assignments to effectuate Scott's transfers to the dynasty trust, providing false sworn testimony to conceal the purpose of the transfers, permitting Scott to directly receive income from assets in the dynasty trust, endorsing checks to transfer money to her personal bank account for Scott's use, and executing Devcon's transfer to DEIPM. [Dkt. 71 at 16-17].

"In this Circuit, the "operation or management" test typically has proven to be a relatively low hurdle for plaintiffs to clear." *Satinwood, Inc*., 385 F.3d at 176 (citing examples). In that case, the debtor's mother was alleged to have transferred money to her son, received pre-petition assets from him, and made or caused to be made certain misrepresentations to the bankruptcy court. *Id*. at 178. The Second Circuit characterized the allegations as "paint[ing] a picture of a mother helping her son to defraud the bankruptcy court and trustee. We have concluded that where a bankruptcy estate is a RICO enterprise, a debtor who engages in bankruptcy fraud conducts or participates in the conduct of the affairs of the enterprise; thus, it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise." *Id.* at 178.

Sally's argument is belied by factual questions as to the degree to which she exercised decision-making authority. There is no allegation, however, that Scott forged any documents or acted without Sally's consent as trustee. Moreover, even if Sally's actions were at Scott's direction, it would not explain Sally's allegedly false testimony as to why the assets were initially transferred from Scott and his revocable trust to the Scott A. LaBonte Dynasty Trust.

Similarly, the Trustee's claims against Sally pass muster under the less demanding standard for conspiracy allegations under § 1962(d). *See Satinwood*, 385 F.3d at 178 ("conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that [she has adopted] the goal of furthering or facilitating the criminal endeavor.')(internal quotations and citations omitted). In addition to her affirmative

acts facilitating the establishment of the Scott A. LaBonte Dynasty Trust and her deceit as to the timing an purpose of its creation, to secrete assets from the trustee, she facilitated Scott's misappropriation and dissipation of the trust's assets by relinquishing control over the trust's finances to Scott.

The Court DENIES Sally's Motion to Dismiss, [Dkt. 54].

ii.    Mr. Sparveri

Mr. Sparveri argues that under well establish Second Circuit precedent, professionals cannot be liable under the *Reves* test, even when those services proved integral to the enterprise or beyond the ordinary scope, where they knew of the fraudulent activities, and even in instances where an accountant enjoyed substantial persuasive power to influence the RICO enterprise. See [Dkt. 57 (Sparveri Mot. to Dismiss) at 2-11]; [*Id* at 7](citing *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F.Supp. 248, 254-55 (S.D.N.Y. 1997) (collecting cases)).

In opposition [Dkt. 75], Plaintiff argues that Mr. Sparveri's role in relationship to the enterprise is different from the extensive case law the defendant cites because Mr. Sparveri exercised discretionary authority to carry out the enterprise's objective as a trustee to the Scott A. LaBonte Dynasty Trust. [Dkt. 75 at 3-6].

As a pleading matter, the Court agrees with Plaintiff that the Trustee has plausibly alleged that Mr. Sparveri played a role in operating the enterprise. The Complaint begins with background allegations as to how Mr. Sparveri assisted Scott in facilitating the feeder-investments into the Ponzi scheme and that he knew the structure of the investments. [Compl. ¶¶ 35-40]. The Complaint infers that Mr.

Sparveri also knew or should have known at the time that Scott's investments with Goldberg were fraudulent. [Compl. ¶¶ 36-38](Mr. Sparveri is a securities broker, knew that the interest rate charged would be usurious, and then calculated interest on the loans as compounding). Once Scott learned of the adversarial action, he met Mr. Sparveri, Roland, and Attorney Bourdeau for the purpose of moving his assets beyond the reach of the creditor. [Compl. ¶¶ 66]. Mr. Sparveri's role went beyond professional advice and accounting services because he participated in the meeting to plan a strategy to divert and deplete assets and later exercised judgment as a trustee to execute that strategy. [Compl. ¶ 77]. The documents to support the transfers were backdated. [Compl. ¶ 91]. Mr. Sparveri opined on the promissory note that allowed Scott to allegedly dissipate his assets and then accepted it as a trustee. [Compl. ¶¶ 94-95, 97-98]. Mr. Sparveri instructed an employee at Devcon, the LaBonte family owned management company, to make payments directly to Scott for his personal expenses if Mr. Sparveri could account for the payment. [Compl. ¶ 108]. Plaintiff alleges that there were accounting irregularities, an additionally, that Mr. Sparveri did not allocate large expenses, such as personal income tax payments and line-of-credit payments, creating the illusion that the inter-trust promissory notes had value. [Compl. ¶¶ 126-127].

Plaintiff has alleged sufficient facts to state a claim as to § 1961(c) liability as to Mr. Sparveri, not because his relationship with the LaBonte's extended beyond the customary role of an accountant, but because he exercised decision making authority with knowledge of the objective of the alleged conspiracy. *Compare Reves*, 507 U.S. at 186 (failure to inform the board of the co-op as to a valuation did not constitute participation) to *Napoli v. United States*, 45 F.3d 680, 683 (2d Cir.

46

1995)(defendant private-investigator exercised broad discretion in carrying out principals' instructions).

The Court DENIES Mr. Sparveri's Motion to Dismiss. [Dkt. 57].

iii.    **Mr. Landino**

To prove a RICO conspiracy, Plaintiff must show that the co-conspirator "'embraced the objective of the alleged conspiracy,' and agreed to commit ... predicate acts in furtherance thereof.' Assuming that a RICO enterprise exists, the government must prove only 'that the defendant[s] ... know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s]." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989). In applying this analysis, we need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.' *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000)(internal citations omitted)

In his individual motion to dismiss [Dkt. 55 at 12-13], Mr. Landino argues that Plaintiff has not alleged that he was "associated" with the enterprise. The Court agrees that Plaintiff failed to plausibly allege that Mr. Landino conspired with the RICO enterprise.

In opposition, Plaintiff emphasizes Mr. Landino's knowledge of the pending fraudulent conveyance action and the pre-judgment remedy against Scott. [Dkt. 73 (Pl. Opp'n to Landino Mot. to Dismiss) at 8-11]. With knowledge of these liabilities, Mr. Landino entered transactions which essentially bought out Scott's share of their

joint ventures. As a result, Scott received cash payments which were dissipated. In two instances, Mr. Landino "in attempt to artificially insulate *himself* from claims by the Trustee, caused a series of transactions that washed the asset on the same day he received it." *Id.* at 8 (emphasis added).

The Complaint does not set forth any non-conclusory allegations to suggest that Mr. Landino paid less than arm's length consideration for Scott's positions in their joint ventures or received less than arm's length consideration when he sold the assets. Nor does the Trustee allege that Mr. Landino "parked" assets for Scott. Most importantly, the Trustee does not allege that Mr. Landino knew how Scott would dispose of the proceeds from Scott's share of their joint ventures. Instead, Mr. Landino asserted offensively in a verified complaint against Scott that Scott was transferring his assets to his family members. [Compl. ¶ 145(f)]. It does not follow that Mr. Landino's purchase of the assets expresses his agreement to aid a fraudulent scheme while he also sought to enjoin that scheme in a public manner.

Stripped of conclusions and labels, the allegations in the Complaint suggest that Mr. Landino knew that Scott's assets were subject to an attachment, not that Scott intended to dissipate those assets with the assistance of his family members and Mr. Sparveri, which is the objective of the enterprise. Rather, the non-conclusory facts allege suggest that Mr. Landino bought out his former business partner to avoid legal or financial entanglement with the Trustee. Such conduct may subject him to a claw back action, but it does not establish that he knowingly entered a conspiracy to violate RICO, § 1961(d).

Accordingly, Mr. Landino's Motion to Dismiss [Dkt. 55] is GRANTED.

iv.   **Attorney Bourdeau**

Attorney Bourdeau argues that allegations in the Complaint are insufficient to plausibly allege that he conspired with the enterprise. [Dkt 52]. Specifically, Attorney Bourdeau argues that Plaintiff fails to plausibly allege that he knew that racketeering acts were being committed, that the acts were part of a pattern of racketeering activity used to conduct or operate an enterprise, and that he facilitated the commission of those acts in furtherance of the conspiracy. [*Id*. at 5]. Attorney Bourdeau was present at the strategy meeting where the scheme to create the Scott A. LaBonte Dynasty Trust for the purpose of secreting assets from the bankruptcy trustee was hatched.  However, he argues he is not alleged to have had any involvement in Scott's determination of which assets to transfer, the undervaluation of those assets, or that Scott was continuing to receive payments from assets in the Scott A. LaBonte Dynasty Trust post-transfer. [*Id*. at 6]. Attorney Bourdeau further alleges that, following the 2010 intertrust transfers, he is not alleged to have had any involvement with the alleged conspiracy until he prepared a trust document for Marilyn in February 2015. [*Id*. at 6]. He is not alleged to have participated in the decision to transfer Devcon's assets to DEIPM, nor is he alleged to have known about the payments made by the MPL 2015 Revocable Trust to Scott's benefit. [*Id*. at 7].

In opposition, Plaintiff argues that Attorney "Bourdeau also knew that SAL transferred virtually all of his assets to the SALDT to obstruct the Trustee because the RICO Meeting Participants discussed their plans to do so at the RICO Meeting, and in September 2010 he received copies of all of the assignment, assumption, and consent agreements effectuating the Dynasty Trust Transfers." [Dkt. 72 (Pl. Mem. in

Opp'n to Bourdeau Motion to Dismiss) at 6]. As to the trust prepared in 2015, Plaintiff cites paragraphs in the Complaint excerpting an email exchange between Attorney Bourdeau and Roland in 2015 where Roland states that there is an "understanding" that DEIPM will be transferred to "Scott as soon as [h]is current situation allows since he owned 100% of the old DEI corporation [Devcon]." [Compl. ¶ 263]. The allegations plausibly allege that Scott and Roland colluded to "park" DEVCON during the pendency of the Trustee's litigation. The email cited was in reply to an email from Attorney Bourdeau with the trust document.

The fact that Attorney Bourdeau likely knew of the pendency of the Trustee's litigation against Scott does not plausibly allege that Attorney Bourdeau knew that Scott would loot the transferred assets over the course of five years, either with respect to the initial transfers in 2010 or his next engagement five years later. As discussed *supra*., it is the looting of the transferred assets, which alleges predicate acts of wire fraud, and is the objective alleged to have been jointly undertaken by the enterprise. *Compare to Madanes v. Madanes*, 981 F. Supp. 241, 259 (S.D.N.Y. 1997)(denying motion to dismiss brought by attorney on RICO conspiracy allegation where attorney suggested and allegedly created false signature page to falsely show that artwork had been transferred before testator's death).

Accordingly, Attorney Bourdeau's Motion to Dismiss, [Dkt. 52] is GRANTED.

v.      Attorney Marks and Juliano & Marks, LLC

The allegations against Attorney Marks arise from two instances of the provision of legal services to Scott and other LaBonte family entities. Attorney Marks represented Scott and the LaBonte joint venture entities in the Landino transactions

50

which occurred between May 2012 through October 2013. [Compl. ¶ 156]. Then, in late 2014 through early 2015, Attorney Marks completed corporate forms and amended operating agreements to transfer control of Devcon to the new entity, DEIPM. [Compl. ¶¶ 230-232].

The Complaint plausibly alleges that Attorney Marks knew that the Trustee had obtained a pre-judgment remedy order entered against Scott in 2011 because Attorney marks inserted language in one of the assignments that expressly excepted any encumbrances that may exists as a result of the February 2011 prejudgment remedy order. [Compl. ¶ 111]. The Scott A. LaBonte Dynasty Trust was the transferor. [Compl. ¶ 157]. Attorney Marks's representation of the transferor does not suggest that he knew how the Scott A. LaBonte Dynasty Trust planned to dispose of the assets. *See* [Compl. ¶ 168]. The only exception is with respect to a payment to Bank of America to settle an obligation owed by RCZS, LLC to Bank of America for use of a private jet after the bank sued RCZS and its guarantors, including Scott. [Compl. ¶¶ 117, 168]. But these facts taken as true do not show that Attorney Marks knew that an enterprise existed to permit Scott, through pretextual means, to continue to access funds attached by the estate and then agreed to participate in the scheme by facilitating the transfer. Plaintiff does not state the identities of the other guarantors or how Bank of America's dispute with RCZS was resolved. Notably, Plaintiff does not allege that Attorney Marks received any benefit beyond his customary fees. Nor does Plaintiff allege that Attorney Marks prepared any false or fraudulent documents to advance or conceal the transactions.

The allegation that Attorney Marks engaged in a RICO conspiracy as to the

Devcon restructuring is equally dubious. There was no reason for Attorney Marks to believe that Devcon and its assets were subject to an attachment. *See* [Compl. ¶ 224] (PJR application on dynasty trust, which owned Devcon, remains pending *sub judice*). Attorney Marks formed a new corporation which assumed Devcon's assets, drafted new management agreements, advised on termination notices, and appealed a determination by the Connecticut Department of Labor, wherein he allegedly omitted key information about common aspects of the business. [Compl. ¶¶ 230-231, 245-247]. Here too, the information is insufficient to allege an agreement because Plaintiff does not allege that Attorney Marks knew that the new owners of Devcon/DEIPM, Marilyn as trustee and Roland as manager, would allegedly collude to permit Scott to loot LaBonte family assets formerly managed by Devcon.

Accordingly, Attorney Marks and Juliano & Marks, LLC's motion to dismiss, [Dkt. 56] is GRANTED because Plaintiff has not alleged that Attorney Marks knowingly joined a racketeering scheme.

### d. <u>Has Plaintiff alleged continuity for RICO purposes</u>

The final pleading issue raised by the parties in their joint memorandum is whether Plaintiff alleges "…at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 442 (S.D.N.Y. 2019). The "continued criminal activity" requirement can be established through "closed end continuity," meaning evidence of predicate acts extending over a substantial period. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and

variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

"To establish closed-ended continuity, "a plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.'" *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001)(quoting *GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 467 (2d Cir.1995)). The Second Circuit has held that predicate acts spanning two years is sufficient to establish "closed-ended continuity," but that a year and a half was insufficient. *DeFalco*, 244 F.3d at 322.

The Defendants commonly argue that since Plaintiff alleged a single scheme, consisting of discrete and sporadic asset transfers, targeting a single victim, involving a five-member enterprise, it cannot constitute a pattern of criminal conduct. [Dkt. 58 at 55-56]. In opposition, Plaintiff argues that the enterprise achieved its overarching purposes through "sustained and continuous" criminal activity through discrete schemes of a varied nature over six years. [Dkt. 70 at 56-57].

The Court agrees with the Defendants that the number of victims, i.e. the loss to Mr. Goldberg's victims who remain unpaid because of the collection expenses incurred to unravel the alleged looting, is not relevant.  These victims could not have independently asserted a claim against Scott to stop the alleged looting because the assets being looted were traceable to the property of the estate. *Supra*. However, the purpose of considering the multiplicity of victims is to determine whether the

enterprise's predicate offenses are part of a pattern of criminal conduct, i.e. that criminal acts targeting a large number of victims is more suggestive of a pattern of racketeering activity than would be the case if the fraud targeted a single victim.

The Court agrees with the Plaintiff that the allegations in the Complaint sufficiently allege a pattern of racketeering activity. Plaintiff alleges a common objective or scheme that achieved its objective through a continual chain of multiple predicate acts, by multiple participants, over several years. The Complaint is replete with specific and general examples of participants in the enterprise authorizing transfers out of the Scott A. LaBonte Dynasty Trust for Scott's benefit. For example, ¶ 124 alleges that on October 2013, Scott handwrote a $400,000 check payable to Sally that Sally endorsed, the funds from which were used to pay Scott's personal and business expenses. By paying Scott's personal and business expenses from Sally's account, they attempted to avoid alerting the Trustee who was then investigating the Scott A. LaBonte Dynasty Trust. [*Id.*]. Two years later, between March 2015 and October 2017, Scott paid in excess of $600,000 in credit card bills from funds he accessed from a different trust because Marilyn gave him unfettered access to the account. [Compl. ¶¶ 262-264]. Plaintiff has, in sufficient detail, alleged a serious scope of activity reaching beyond "discrete asset transfers" and "sporadic bursts of activity at key points in time." [Dkt. 58 at 58](quoting *Brickellbush, Inc.*, 219 F. Supp. 2d at 587)).

In this case, Plaintiff has sufficiently alleged closed-end continuity based on the duration and the interrelationship between the predicate acts.

54

## Conclusion

For the foregoing reasons, the Court holds that Plaintiff has standing to assert a RICO claim, however, the "lost debt" claim is unripe and is so dismissed. The Court denies the Defendants' partial motion to dismiss as to the applicability of the statute of limitations to collection expenses without prejudice to renew. The Complaint is dismissed as to obstruction of justice as an alleged predicate act. The Court enters the following orders:

- Dkt. 51, Defendant Marilyn LaBonte and Roland LaBonte's Motion to Dismiss is DENIED, except with respect to the ruling in the paragraph above.

- Dkt. 52, Defendant Paul L. Bourdeau's Motion to Dismiss is GRANTED. The Clerk is directed to terminate this party from this proceeding.

- Dkt. 53, Defendant Scott A. LaBonte's Motion to Dismiss is DENIED, except with respect to the ruling in the paragraph above.

- Dkt. 54, Defendant Sally A. LaBonte's Motion to Dismiss is DENIED, except with respect to the ruling in the paragraph above.

- Dkt. 55, Defendant Robert A. Landino's Motion to Dismiss is GRANTED. The Clerk is directed to terminate this party from this proceeding.

- Dkt. 56, Defendant Lawrence J. Marks and Juliano & Marks, LLP's Motion to Dismiss is GRANTED. The Clerk is directed to terminate these parties from these proceedings.

- Dkt. 57, Defendant Joseph W. Sparveri, Jr.'s Motion to Dismiss is DENIED, except with respect to the ruling in the paragraph above.


IT IS SO ORDERED.
_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: September 30, 2020