**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR | : | Case No. 3:19-cv-01533-JCH |
| THE SUBSTANTIVELY CONSOLIDATED | : | |
| ESTATE OF MICHAEL S. GOLDBERG, LLC | : | |
| AND MICHAEL S. GOLDBERG | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SCOTT A. LABONTE; ET AL. | : | |
| | : | |
| Defendants. | : | February 16, 2021 |
| | : | |

**THE GOLDBERG TRUSTEE'S REPLY IN FURTHER SUPPORT OF**
**HIS MOTION TO AMEND AS TO PAUL BOURDEAU**[1]

---

[1] Unless expressly defined otherwise herein, the Trustee incorporates the definitions of capitalized terms set forth in the Proposed Amended Complaint ("Amended Complaint") [Doc. No. 111-2].

I.      Bourdeau Mischaracterizes the Standard Governing Section 1962(d)

Bourdeau incorrectly suggests that the Amended Complaint is futile unless it alleges that he participated in, or knew, every facet of the entire pattern of racketeering through which the Defendants conducted the Enterprise.  Bourdeau Opp. to Trustee's Mot. to Amend Complaint ("Opp."), at 11 n.5.  Bourdeau grossly overstates the Trustee's burden.[2]

The Trustee alleges that Bourdeau conspired to violate RICO in violation of 18 U.S.C. § 1962(d).  A § 1962(d) violation requires proof:

> (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering.

*United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018).[3]

There are two elements of a RICO conspiracy claim: "the pattern element" and "the agreement element." *Id*.  "To prove the pattern element, the [plaintiff] must show that two or more 'predicate acts were, or were intended to be, committed as part of [the] conspiracy.'" *Zemlyansky*, 908 F.3d at 11, *quoting United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). A RICO plaintiff

> need not establish that the [conspirator] 'committed or agreed to commit two predicate acts himself.' *Salinas* [*v. United States*], 522 U.S. [52,] 63 [(1997)]. Rather, the [plaintiff] may prove the pattern element through evidence that 'the co-conspirators, not solely the defendant, agreed to conduct the affairs of the enterprise through a pattern of racketeering.' [*United States* v.] *Yannotti*, 541 F.3d [112,] 129 n.11 [(2d Cir. 2008)].

---

[2] The familiar standard applicable to Fed. R. Civ. P. 12(b)(6) guides the Court's analysis of futility. *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002). Courts are to "construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013) (quotation and citation omitted).

[3] Bourdeau also references 18 U.S.C. §1962(c), which makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Opp. 16, n. 8. The standards that govern 18 U.S.C. §1962(c), including that a person liable thereunder participate in the operation and management of the RICO enterprise, are irrelevant to the Trustee's claim against Bourdeau under § 1962(d). *See generally United States* v. *Pizzonia*, 577 F.3d 455, 462 n.4 (2d Cir. 2009).

*Id.* In this case, Judge Bryant has already concluded that the Trustee properly alleged that other Defendants – members of the LaBonte Family and J. Sparveri, CPA – violated RICO by engaging in a pattern of racketeering through the Enterprise. Memorandum of Decision on Defendants' Motions to Dismiss [Doc. No. 89] (the "Dismissal Ruling"), at 27-40. That alone satisfies the "pattern" element.[4]

Next, to satisfy the "agreement" element, the Trustee must allege that Bourdeau "'knew about and agreed to facilitate' [the] racketeering scheme…." *Related Co.'s, L.P. v. Ruthling*, Docket No. 17cv04175 (DF), 2019 U.S. Dist. LEXIS 234246, at *17 (S.D.N.Y. July 23, 2019), *quoting Zemlyansky*, 908 F.3d at 11. A conspirator need not know of every facet or act that furthers the scheme.  A conspirator need only know of the conspiracy's "general contours." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000); *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) ("a conspirator does not need to know the intricacies and full dimensions of the scheme in order to be liable" but "must be aware of its essential scope and nature").

A conspirator also need not agree to participate in an enterprise, or be aware of it, from its inception. *Domanus*, 847 F.3d at 479. Indeed, in this very case, Judge Bryant denied Marilyn LaBonte's motion to dismiss the RICO conspiracy claim against her even though her first alleged conspiratorial acts began in 2015—years after the RICO Meeting, which she did not attend. Dismissal Ruling, at 55. Moreover, Judge Bryant denied Sally LaBonte's motion to dismiss— holding that the Trustee alleged she was a RICO participant under § 1962(c), which requires "operation and control" of the Enterprise—even though she also was not present at the RICO

---

[4] Bourdeau quotes a portion of *United States v. Pizzonia*, to suggest that a conspirator must him or herself participate in the "pattern of racketeering."  Opp., 11 n. 5 *citing* 577 F.3d at 464. The language that Bourdeau quotes from *Pizzonia* was written in the context of explaining that, for purposes of the statute of limitations, a RICO conspiracy may continue beyond the most recently proven predicate act.  *Id.* at 464-466.  *Pizzonia* has nothing to do with any issue presently before the Court.

Meeting. *Id.*, at 45. If a primary RICO participant, who must operate and control an enterprise, need not participate in the enterprise from its inception or participate in every component of it, then a conspirator necessarily need not do so either. Regardless, Bourdeau was present at, and participated in, the RICO Meeting when the Defendants hatched the Enterprise.  At that meeting, he and other Defendants agreed upon a plan that they quickly began implementing to place SAL's assets beyond the Trustee's reach while allowing SAL to continue to utilize them, *i.e.*, loot the SALDT. *See* Amended Complaint, at ¶¶ 62-69.

In addition, Bourdeau falsely suggests that the Trustee must allege that he *expressly* agreed to participate in the Enterprise. *See* Opp., at 2. However, "it is not necessary for a conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." *Environmental Serv.'s v. Recycle Green Serv.'s*, 7 F. Supp. 3d 260, 275 (E.D.N.Y. 2014) (quotations and citations omitted). A plaintiff may establish a conspirator's "knowing and willing participation in a conspiracy" from circumstantial evidence,

> including the conspirator's "presence at critical stages of the conspiracy that could not be explained by happenstance … or a lack of surprise when discussing the conspiracy with others… [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy [or] possessed items important to the conspiracy.

*United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002); *see also New York Dist. Council of Carpenters Pens. Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013) ("a defendant's agreement to join a conspiracy can 'be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing'"). "[I]t is axiomatic that the proof required to show that a defendant knowingly associated with an existing conspiracy 'need not be

overwhelming.'" *United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994). Indeed, few, if any, criminal enterprises extend their agents formal, written or express offers of employment.

The Amended Complaint alleges that Bourdeau advised SAL to transfer all of his assets to the SALDT to protect them from the Trustee—despite having previously advised SAL to retain his assets to support himself and his family because he was still a young man. Amended Complaint, at ¶ 289.  Within days of the RICO Meeting, but before the Defendants effectuated the Dynasty Trust Transfers, Bourdeau received a balance sheet that prospectively reflected what SAL's net worth would be after they completed the Dynasty Trust Transfers ("SAL's Balance Sheet"). SAL's Balance Sheet clearly shows that the Dynasty Trust Transfers would render SAL insolvent, and Bourdeau expressed no surprise when he received it. *Id.*, at ¶¶ 82, 293, 298. Moreover, the Dynasty Trust Transfers would only impede the Trustee (the admitted purpose for the Dynasty Trust Transfers) if they rendered SAL insolvent or unable to pays his debt to the Trustee.[5] *Id.*, at ¶¶ 65-66.

Bourdeau ***subsequently*** opined on, provided material information for, and approved the 2010 Note that ostensibly served as the consideration for the Dynasty Trust Transfers, knowing that the 2010 Note was worthless to creditors. *Id.*, at ¶ 90. Of course, Bourdeau knew that the 2010

---

[5] Bourdeau claims that he could not have known that the Dynasty Trust Transfers would render SAL insolvent when they planned those transfers at the RICO Meeting, because the transfers occurred in August 2010, two months after the RICO Meeting. Opp., at 18. The fact that the Defendants effectuated the Dynasty Trust Transfers in August is irrelevant to the fact that, as of June, the Defendants knew that the transfers would render SAL insolvent once the Defendants effectuated them. Bourdeau also argues that the Revised 2016 Note "indicates nothing about the assets that would be transferred, or the value of those assets." Opp., at 18 n. 9. While that is true, it too is irrelevant, because it was the 2010 Note – not the Revised 2006 Note – that pertained to the Dynasty Trust Transfers. On June 11, 2010, Bourdeau received SAL's Balance Sheet, which listed the assets (and the deflated valuations of those assets) that SAL later transferred to the SALDT effective June 2, 2010.  SAL's Balance Sheet also confirmed that SAL's "net worth" would be *negative* $1,381,000 after the transfers. Amended Complaint, at ¶ 82. The information contained in SAL's Balance Sheet, as reported to Bourdeau, was the basis for the amount of the 2010 Note.

Note only served to further the Enterprise's goal.[6]

Bourdeau argues that it is implausible to infer from the Trustee's allegations that he knew that SAL would loot the SALDT's assets. Opp., at 2, 12. However, that is the only plausible inference.  As SAL's Balance Sheet showed, SAL had no other source of income and was insolvent, and Bourdeau had advised him to retain his assets to support himself and his family only several years earlier. Amended Complaint, at ¶¶ 289, 293.  In short, the Court may reasonably infer from the Amended Complaint's allegations, which detail Bourdeau's own words and actions, that Bourdeau at least knew of the Enterprise's "general contours" and knowingly facilitated it. Thus, the Amended Complaint satisfies the "agreement" element of 1962(d).[7]

II.   The Proposed Amended Complaint Alleges Bourdeau's Knowledge of and Agreement to Further the Enterprise

The Amended Complaint contains dozens of additional facts that, in combination with the facts alleged in the initial Complaint, allow this Court to draw a reasonable inference that Bourdeau is liable to the Trustee as a RICO conspirator. Bourdeau attempts to minimize the significance of his conduct and portray himself either as a mere scrivener at the RICO Meeting or an attorney mechanically drafting trust documents. These arguments, coming from a veteran trust and estates

---

[6] Bourdeau implicitly concedes at footnote 3 of his Opp. that the notes that SAL received from the SALDT were worthless, noting that "under typical circumstances, the promissory note [issued in exchange for asset sales to a trust] is a valuable asset that a creditor could recover and enforce against the promisor." He does not argue that these were "typical circumstances."

[7] Bourdeau repeatedly asserts that, because he is an experienced attorney who has enjoyed a successful career, the Court should infer that he had no knowledge of, and thus did not join, the Enterprise. Opp., 3, 6. The Trustee does not question Bourdeau's success or skill as an attorney, but they are irrelevant to the Motion for Leave to Amend. The sole issue at this stage is whether the facts alleged in the Amended Complaint, viewed in the light most favorable to the Trustee and drawing all reasonable inferences in his favor, plausibly allege that Bourdeau conspired to violate RICO.

attorney, strain credulity and should be rejected.[8]

    a.   <u>Bourdeau Billed SAL for Services Rendered to the SALDT Because He Knew That SAL Controlled the SALDT</u>

Bourdeau argues that his knowledge that SAL controlled the SALDT in 2013—as evidenced by the fact that he sent SAL (and only SAL) an invoice for services rendered to the SALDT in connection with J. Sparveri, CPA's resignation as Trustee—is not evidence of his knowledge in 2010 (when he counseled SAL to transfer all of his assets to the SALDT).  Opp. 20-21. That is false. While knowledge acquired on one date is not evidence of knowledge on an earlier date, Bourdeau's **conduct** evidences his knowledge.  *See United States v. Campo Flores*, 945 F.3d 687, 715 (2d Cir. 2019); *Peer Intern.'l Corp. v. Luna Records*, 887 F. Sup. 560, 568 (S.D.N.Y. 1995) (a "defendant's knowledge may be inferred from his or her conduct"). The Trustee has not alleged, and no evidence suggests, that Bourdeau learned anything about SAL's control of the SALDT between June 2, 2010 (the date of the RICO meeting) and November, 2013 (when he sent the SALDT's invoice to SAL).  The Court may infer Bourdeau's knowledge from his conduct.

    b.   <u>The MPL 2015 Rev. Trust Does Not Return DEIPM to SAL</u>

Bourdeau states that "[t]he consequence of" creating the MPL 2015 Rev. Trust and placing DEIPM in the MPL 2015 Rev. Trust "would be to *return* assets to [SAL] where they were reachable by the Trustee, not to shelter his assets." Opp. at 24. That is objectively false. The MPL 2015 Rev. Trust owns 99.99% of DEIPM. Upon Marilyn LaBonte's death, the MPL 2015 Rev. Trust distributes DEIPM to *a separate trust* for SAL's and his heirs' benefit. The Trust document

---

[8] Bourdeau repeatedly asks the Court to disregard the allegations against him in the Trustee's original Complaint, arguing that Judge Bryant determined that those allegations were insufficient. *See* Opp., at 9, 10, 31. However, the appropriate focus is *the totality of the allegations in the Proposed Amended Complaint*—not only the Trustee's new allegations or the original allegations in isolation.  *See generally Rothstein*, 708 F.3d at 90 (courts are to "construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor").

does not direct the Trustee to distribute DEIPM to SAL outright.  *See* Marilyn P. LaBonte 2015 Revocable Trust (attached hereto as **Exhibit A**).  Therefore, the MPL 2015 Rev. Trust is a vehicle that Bourdeau created to shield SAL's assets from the Trustee while allowing SAL to control them. Amended Complaint, at ¶ 237.

Moreover, Bourdeau created the MPL 2015 Rev. Trust knowing that sheltering DEIPM was part of the Enterprise, because Roland LaBonte explained to him that there was "an understanding" that DEIPM would be returned to SAL "as soon as [h]is current situation allows." *Id.*, at ¶ 239. In addition, handwritten notes produced by Cummings & Lockwood LLC for the first time on February 9, 2021, show that on January 26, 2015, a month before Bourdeau finalized the MPL 2015 Rev. Trust, Bourdeau participated in a conference with SAL, Roland LaBonte, L. Marks, Esq., and J. Sparveri, CPA. Bourdeau's notes confirm that he and the other participants discussed DEIPM as the successor to Devcon, that DEIPM would be held in trust for SAL's benefit and that Devcon was going out of business.[9]

      c.   <u>Bourdeau's Sworn Testimony Contradicts His Present Characterization of his Invoices</u>

Bourdeau now argues that his invoice accurately describes the RICO Meeting "as a meeting 'to discuss estate planning options.'" Opp., at 27-28. However, Bourdeau previously testified that the purpose of the RICO Meeting was to protect SAL's assets from the Trustee's looming claw-back action. Amended Complaint, at ¶ 65. The Court may infer that Bourdeau falsely described the RICO meeting in his invoice to conceal the meeting's purpose.

---

[9] The Trustee recognizes that the handwritten notes produced on February 9, 2021, are outside of the Amended Complaint, but believes it is most efficient to reference them in connection with the pending Motion to Amend rather than seek leave to further amend based on newly discovered evidence. Moreover, these notes merely evidence facts that the Trustee has alleged, which already allow the Court to infer Bourdeau's knowledge and intent. Because the Trustee is still receiving evidence of the Defendants' knowledge and intent, if the Court believes that the Trustee's Amended Complaint contains a discrete uncured defect, the Trustee respectfully requests the opportunity to cure it.

     d.  <u>The Court May Draw an Adverse Inference Against Bourdeau Because He Unlawfully Deleted Evidence After Receiving a Litigation Hold Letter</u>

Bourdeau argues that his practice of deleting emails, which continued after receiving a litigation hold letter from the Trustee, is inconsequential because the Trustee "has not identified any document or evidence that has been lost." Opp., at 30. Bourdeau goes further, effectively arguing that he should benefit from a favorable inference that he was *not* attempting to conceal evidence from the Trustee, because he preserved and produced certain handwritten notes. (*Id.*).

The rule against spoliation of evidence exists because it is impossible to prove the contents of evidence after it is destroyed. *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("It is often impossible to know what lost documents would have contained"), *abrogated on other grounds Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). That is why courts may order an adverse inference due to spoliation regardless of whether the moving party can establish the lost information's content. *See* Memorandum and Order Granting Motion for Adverse Inference on Account of Spoliation ("SAL Spoliation Order"), Malley-LaBonte Action., D.I. 704, at 5-6 (ordering adverse inference against SAL because it was his burden to establish that the Trustee was not prejudiced when he intentionally deleted his Goldberg related emails after the Trustee had sued him).

"[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). Bourdeau's violation of this well-established principle evidences his state of mind.[10] *See* SAL Spoliation Order, at 5 ("While LaBonte has continued to

---

[10] Bourdeau argues that it is nonsensical to infer that he continued to delete emails to conceal evidence of a RICO conspiracy, but at the same time retained his RICO Notes and produced them to the Trustee.

assert that the e-mails were destroyed as part of his routine practice, it was done so knowingly and intentionally, thus demonstrating a 'culpable state of mind.'")

     e.  It is Unlawful to Perform Otherwise Lawful Acts That Further a Criminal Enterprise

     Bourdeau repeatedly claims that he is not a RICO conspirator because he merely provided legal services to the Enterprise. Opp., at 13, 25. Bourdeau performed services that "were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." *See Reyes v. Zion First Nat'l Bank*, 2012 U.S. Dist. LEXIS 38238, at *21 (E.D. Pa. Mar. 21, 2012). While estate planning is obviously lawful, counseling SAL to transfer his assets to defraud the Trustee and knowingly creating the MPL 2015 Rev. Trust to park Devcon's assets is not—similar to how driving a car is lawful but driving the getaway car from a bank robbery is not. *See United States v. Lang*, 73 F. Supp. 561, 561-562 (E.D.N.Y. Oct. 8, 1947) (it is "a well recognized principle in the law of conspiracy, that an act innocent in itself, which is knowingly performed for the purpose of furthering an unlawful conspiracy, is sufficient to implicate the doer in the conspiracy, and to support his conviction as a conspirator").[11]

     Bourdeau attended the RICO Meeting and advised SAL how to obstruct the Trustee

---

Bourdeau obviously never believed that he would have to produce his RICO Notes. He labeled them privileged and only produced them after Judge Thompson entered the Crime-Fraud Order in October 2018, years after the Trustee had served a subpoena on C&L seeking its SAL related files. Amended Complaint, at ¶ 64; Opp., at 29-30.

[11] *See also e.g.*, *Madanes v. Madanes*, 981 F. Sup. 241, 259-260 (S.D.N.Y. 1997) (attorney's actions "ranging from the restructuring of family assets, to drafting paperwork intended to negate [the plaintiff's] interest in [a]rtwork[], to issuing false denials regarding his status as the Trustee of Baltimore and Westchase -- are of the type that logically would lead him to suspect that he was part of a larger conspiracy" particularly because of "the knowledge [the attorney] possessed… in light of his status as the family attorney" for years); *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997) (attorneys advised their client to create "false promissory note[s]" and "participated in devising a scheme to conceal" income to prevent the plaintiff from collecting a debt, which was sufficient for RICO liability under the more exacting 18 U.S.C. § 1962(c)).

(Amended Complaint, at ¶¶ 63-65), by rendering SAL insolvent (*Id.*, at ¶ 293), knowing that SAL would loot the SALDT's assets and treat them as his own (*Id.*, at ¶¶ 305-10).  Bourdeau also knew that the Trustee had a $5 million PJR against SAL and was pursuing a PJR against Devcon when he created the MPL 2015 Rev. Trust to park Devcon's assets. *Id.*, at ¶¶ 242, 299.   Because Bourdeau performed these services knowing that he was furthering a RICO enterprise, he knowingly conspired to violate RICO. *See Aleskerova*, 300 F.3d at 292-93; *Forde*, 939 F. Supp. 2d at 282.   Moreover, the fact that Bourdeau claimed that he received his customary fees for services does not absolve him from liability for furthering a RICO enterprise. Opp., at 12-15. The Trustee has alleged that SAL was a very valuable referral source for Bourdeau. Amended Complaint, at ¶ 22. The Court can reasonably infer that Bourdeau assisted SAL and the Enterprise so that he would continue receiving fees and referrals to wealthy clients from the LaBonte Family.

III.    <u>Conclusion</u>

For all of the foregoing reasons, as well as those set forth in the Motion for Leave to Amend, the Trustee respectfully requests that the Court grant the Motion for Leave to Amend and grant the Trustee leave to file the Proposed Amended Complaint, or, alternatively, if the Court determines that a discrete uncured defect remains, permit the Trustee to seek leave to correct it.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE SUBSTANTIVELY CONSOLIDATED
ESTATE OF MICHAEL S. GOLDBERG, LLC AND
MICHAEL S. GOLDBERG

By: */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)
James M. Moriarty (ct21876)
Christopher H. Blau (ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Tele: (203) 368-4234
Fax: (203) 367-9678
Email: aromney@zeislaw.com
jmoriarty@zeislaw.com
cblau@zeislaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


By: */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)

12