# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED ESTATE OF MICHAEL S. GOLDBERG, LLC AND MICHAEL S. GOLDBERG<br><br>Plaintiff,<br><br>v.<br><br>SCOTT A. LABONTE; ET AL.<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 3:19-cv-01533-JCH<br><br><br><br><br><br><br><br><br><br><br><br><br>February 16, 2021 |

## THE GOLDBERG TRUSTEE'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO AMEND AS TO LAWRENCE J. MARKS AND JULIANO & MARKS, LLC[1]

---

[1] Unless expressly defined otherwise herein, the Trustee incorporates the definitions of capitalized terms set forth in the Proposed Amended Complaint ("Amended Complaint") [Doc. No. 111-2].

I.  Marks Ignores That His Conduct Was Inextricably Connected to a Pattern of Racketeering that the Trustee Has Already Adequately Alleged

Ostensibly to argue that the Trustee has failed to allege that he agreed to join a RICO Enterprise, Marks relies upon cases in which the Court held that the plaintiff failed to allege that a RICO enterprise existed—as distinguished from whether a defendant whose conduct indisputably furthered the enterprise did so knowingly. Mem. Law of Def's Lawrence J. Marks and Juliano & Marks, LLC in Opp. to Trustee's Mot. for Leave to Amend ("Opp."), at 21-23, *citing Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *In re Trilegiant Corp. Inc.*, 11 F. Supp. 3d 82, 108 (D. Conn. 2014). In doing so, Marks attempts to blur the distinction between the elements of a RICO enterprise, on the one hand, and the elements required to allege that an additional defendant conspired with an existing enterprise, on the other hand. *See e.g.*, *In re Trilegiant Corp. Inc.*, 11 F. Supp. 3d at 108 ("In this circuit, analysis of any RICO conspiracy claim begins with the premise that it necessarily fails where the underlying substantive claim is insufficiently pled.").

A claim for conspiracy to violate RICO under 18 U.S.C. § 1962(d) requires proof:

> (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering.

*United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). Thus, there are two necessary components of a RICO conspiracy claim: "the pattern element" and "the agreement element." *Id*.

"To prove the pattern element, the [plaintiff] must show that two or more 'predicate acts were, or were intended to be, committed as part of [the] conspiracy.'" *Zemlyansky*, 908 F.3d at 11, *quoting United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). A RICO plaintiff

> need not establish that the [conspirator] 'committed or agreed to

1

> commit two predicate acts himself.' *Salinas* [*v. United States*], 522 U.S. [52,] 63 [(1997)]. Rather, the [plaintiff] may prove the pattern element through evidence that 'the co-conspirators, not solely the defendant, agreed to conduct the affairs of the enterprise through a pattern of racketeering.' [*United States* v.] *Yannotti*, 541 F.3d [112,] 129 n.11 [(2d Cir. 2008)].

*Id*. In this case, Judge Bryant has already concluded that the Trustee properly alleged that other Defendants – members of the LaBonte Family and J. Sparveri, CPA – violated RICO by engaging in a pattern of racketeering activity through the Enterprise. Mem. Dec. on Defs.' Mot. Dism. [Doc. No. 89] (the "Dismissal Ruling"), at 27-40. That alone satisfies the pattern element.

To satisfy the "agreement" element, the Trustee must allege that Marks "'knew about and agreed to facilitate' a racketeering scheme…." *Related Companies, L.P. v. Ruthling*, Docket No. 17cv04175 (DF), 2019 U.S. Dist. LEXIS 234246, at *17 (S.D.N.Y. July 23, 2019), *quoting Zemlyansky*, 908 F.3d at 11. A conspirator need not know every facet or act in furtherance of the scheme. A conspirator need only know of the conspiracy's "general contours." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000); *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) ("a conspirator does not need to know the intricacies and full dimensions of the scheme in order to be liable" but "must be aware of its essential scope and nature").

Marks places great weight on the fact that he was not present at the RICO Meeting where some of the Defendants hatched the Enterprise to Obstruct the Trustee. Opp., at 8-9. He ignores that a conspirator need not agree to participate in an enterprise, or be aware of it, from its inception. *See Domanus*, 847 F.3d at 479. Indeed, in this very case, Judge Bryant denied Marilyn LaBonte's motion to dismiss the RICO conspiracy claim against her even though her first alleged conspiratorial acts began in 2015—years after the RICO Meeting, which she did not attend. Dismissal Ruling, at 55. Moreover, Judge Bryant denied Sally LaBonte's motion to dismiss— holding that the Trustee alleged she was a RICO participant under § 1962(c), which requires

"operation and control" of the Enterprise—even though she also was not present at the RICO Meeting. Dismissal Ruling, at 44. If a RICO participant, who must operate and control an enterprise, need not participate in the enterprise from its inception or in every component of it, then a conspirator necessarily need not do so either.

In addition, Marks falsely claims that the Trustee must allege an express agreement to participate in the Enterprise. Opp., at 19. However, "it is not necessary for a conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." *Envtl. Serv.'s v. Recycle Green Serv.'s*, 7 F. Supp. 3d 260, 275 (E.D.N.Y. 2014) (quotations and citations omitted). A plaintiff may establish a conspirator's "knowing and willing participation in a conspiracy" from circumstantial evidence, including the conspirator's

> presence at critical stages of the conspiracy that could not be explained by happenstance … or a lack of surprise when discussing the conspiracy with others… [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy [or] possessed items important to the conspiracy.

*United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002); *see also New York Dist. Council of Carpenters Pens. Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013) ("a defendant's agreement to join a conspiracy can 'be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing'"). "[I]t is axiomatic that the proof required to show that a defendant knowingly associated with an existing conspiracy 'need not be overwhelming.'" *United States v. Viola*, 35 F.3d 37, 44 (2d Cir. 1994). Indeed, it is the rare criminal Enterprise that extends conspirators written participation offers.

II. <u>Marks Knowingly Furthered the Enterprise</u>

Marks generally argues that the Trustee "has not alleged a single dishonest act" and is

instead "alleging that [he] performed otherwise legitimate legal work and attaching boilerplate conclusions of 'RICO conspiracy' to this work."[2] Opp., at 5-6. In fact, the Trustee *has* alleged that Marks engaged in *multiple* dishonest acts, and is not simply labelling his legal services with boilerplate conclusions. *See Fabrique Innovations, Inc.* v. *Federal Ins. Co.*, 354 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) ("'dishonest' act is commonly defined as one characterized by a 'lack of truth, honesty, probity or trustworthiness' or 'an inclination to mislead, lie, cheat, or defraud'") (citation omitted). An otherwise innocent action performed with knowledge of other facts and attendant circumstances sufficient to alert the actor that the action is in furtherance of an unlawful objective is not innocent. *See United States v. Lang*, 73 F. Supp. 561, 561-562 (E.D.N.Y. Oct. 8, 1947) (it is "a well recognized principle in the law of conspiracy, that an act innocent in itself, which is knowingly performed for the purpose of furthering an unlawful conspiracy, is sufficient to implicate the doer in the conspiracy, and to support his conviction as a conspirator"). Here, Marks knowingly facilitated the Enterprise, which was an organized criminal effort to mislead, cheat, and defraud the Trustee and the Goldberg Victims.

There can be little doubt, and Marks seemingly does not dispute, that Marks' conduct alleged in the Amended Complaint, in fact, furthered the Enterprise. Without limitation, Marks unquestionably (i) allowed SAL to use his IOLTA account to pay his personal debts from the proceeds of assets that he had previously transferred to the SALDT (Amended Complaint, at ¶¶

---

[2] Marks references two cases from outside of the Second Circuit in support of this argument. Opp., at 6. In *ADA* v. *Cigna Corp.*, 605 F.3d 1283, 11th Cir. 2010, the Eleventh Circuit rejected a RICO conspiracy argument predicated on the defendants' "independent action in a competitive environment" as insufficient to support an inference of an agreement. *Id*., at 1295. By contrast, this case involves a closely-knit family and their long-serving professionals, as distinguished from the independent actors and "competitive environment" in *Cigna Corp.* In *Rao v. BP Products N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009), the Seventh Circuit made reference to 18 U.S.C. § 1962(d) a *single time* and rejected the plaintiff's conspiracy claim because the complaint "only recited generically that the defendants had 'conspired to violate 18 USCA 1962(a), 18 USCA 1962(b) and/or 18 USCA 1962(c).'" *Id*., at 400. The Amended Complaint contains far more detailed allegations concerning Marks' knowledge and intent.

325-28; (ii) formed DEIPM, the entity through which SAL laundered Devcon's (and various LaBonte Family real-estate entities') assets back to himself (*Id.*, at ¶¶ 336-42); and (iii) allowed the MPL 2015 Rev. Trust to use J&M's address as its own to open a bank account that SAL used to pay his personal expenses with money that he laundered through DEIPM. *Id.*, at ¶ 351. Moreover, at no point did Marks take any action that was *inconsistent with* or *contrary to* the Enterprise's goals of obstructing the Trustee and looting the SALDT. Thus, the sole question is whether the Trustee has alleged that Marks knew of the general contours of the conspiracy when his conduct furthered it.

As a threshold matter, Marks knew by no later than May 2012 that the Trustee had obtained a $5 million prejudgment remedy against SAL, because SAL had received fraudulent transfers from the Goldberg scheme.[3] *Id., at* ¶¶ 146, 166-68, 228. Marks also knew by no later than November 6, 2014, that the Trustee sought a prejudgment remedy against the SALDT, because SAL transferred his property, including Devcon, to the SALDT. *Id.*, at ¶¶ 118, 229, 250-52, 333-36. Further, at minimum, Marks knew by no later than February 2015, that SAL, Roland LaBonte and Marilyn LaBonte were engaged in a coordinated effort to park Devcon's assets in DEIPM, an entity that Marks had created to protect Devcon's assets from the Trustee. Marks unquestionably knew that because Roland LaBonte explained it to him in an email.[4] *Id.* at ¶¶ 239.

---

[3] During this entire time Marks represented SAL in numerous matters, including matters related to the Goldberg Scheme, and received payment from the SALDT – not SAL – for his efforts. *Id.*, at ¶ 354.

[4] On February 9, 2021, the Trustee received from Cummings & Lockwood, LLC, additional handwritten notes which confirm that Marks, Bourdeau, SAL, Roland LaBonte and Joe Sparveri, CPA participated in a conference on January 26, 2015, in which they discussed DEIPM as the successor to Devcon, that DEIPM would be held in trust for SAL's benefit and that Devcon was going out of business. The Trustee recognizes that the handwritten notes produced on February 9, 2021, are outside of the Amended Complaint, but believes it is most efficient to reference them in connection with the pending Motion to Amend rather than seek leave to further amend based on newly discovered evidence. Moreover, these notes merely evidence facts that the Trustee has already alleged, which allow the Court to infer Marks' knowledge and intent. However, because the Trustee is still receiving evidence of the Defendants' knowledge and intent, if the Court believes that the Trustee's Amended Complaint contains a discrete uncured defect, the Trustee respectfully requests the opportunity to cure it.

The Court can also infer from Marks' conduct that he knew much more about the Enterprise. *Peer Intl. Corp. v. Luna Records*, 887 F. Sup. 560, 568 (S.D.N.Y. 1995) ("[a] defendant's knowledge may be inferred from his or her conduct"); *see also United States v. Campo Flores*, 945 F.3d 687, 715 (2d Cir. 2019). For example, as more fully set forth in the Amended Complaint, in May 2012 Marks utilized his former law firm's IOLTA account to assist SAL to pay a personal obligation to BoA on account of his guaranty of a debt owed by RCZS (an entity that the SALDT did not own) using proceeds that belonged to at least one entity that SAL had transferred to the SALDT (SAL North Haven, LLC); and Marks also knew at the time that the Trustee had obtained a separate PJR against SAL North Haven. Amended Complaint, at ¶¶ 118, 167-68, 325-326. Marks argues—for the first time—that he paid the BoA debt to remove a lien from Sally LaBonte's home—who was a beneficiary of the SALDT. Opp., at 20.

However, BoA did not have a lien on Sally LaBonte's home or even a claim against Sally LaBonte. BoA had a PJR against SAL—who owned no interest in the home. A lien against "SAL's interest" in a home he did not own is exactly what it sounds like—nothing, which probably explains why Marks first offered this explanation for his conduct in February 2021, nearly a decade after the transaction. Putting aside that the Trustee never alleged anything about a lien on Sally LaBonte's home (so it is irrelevant at this juncture), the pretextual excuse that Marks now offers underscores his consciousness of guilt.[5] *See Fisher v. Vassar College*, 114 F.3d 1332, 1372 (2d Cir. 1997).

Thereafter, beginning in late 2014 and continuing into 2015, Marks advised SAL and

---

[5] Attached hereto as **Exhibit A** is a copy of a June 6, 2000 Warranty Deed from SAL to Sally LaBonte transferring all of SAL's interest in 6 Lowell Road, Farmington, Connecticut to Sally LaBonte. Attached hereto as **Exhibit B** is a May 11, 2012, Certificate of Attachment of Real Estate attaching SAL's non-existent interest in 6 Lowell Road, Farmington. The Trustee recognizes that these documents are outside of the pleadings and submits them solely to counter Marks' pretextual explanation for the payment to BoA.

helped him transfer Devcon's assets to DEIPM while he knew that the hearing on the Trustee's PJR application against the SALDT was imminent. Marks also knew that SAL had previously transferred his 100% interest in Devcon to the SALDT. Amended Complaint, at ¶¶ 333-42. On November 6, 2014, Marks told SAL and Roland LaBonte that "[i]t would be a great time to move [Devcon/DEIPM] to a new address if you understand my meaning." Amended Complaint, at ¶ 338. That instruction *only* makes sense if Marks understood that the catalyst for transferring Devcon's assets to DEIPM was to protect the value of SAL's interest in Devcon from the Trustee.[6]

Marks claims that advising SAL and Roland LaBonte to move DEIPM's offices was not only innocent; it would be "legal malpractice" not to provide that advice. Opp., at 16. That is absurd. No standard of care permits, much less requires, an attorney to advise a client—that the attorney knows is a successor to another entity with massive debts—to move its address in order to avoid detection as a successor.[7]

Moreover, in June 2015, after Roland LaBonte had expressly told Marks that DEIPM was Devcon's successor (Amended Complaint, at ¶ 239), Marks escalated his participation by knowingly misrepresenting to the CT Department of Labor that DEIPM was not a mere continuation of Devcon. *Id.*, at ¶¶ 257-62. Given that Marks knew that DEIPM was Devcon's

---

[6] Marks falsely claims that the Trustee "failed to pursue the PJR it sought against Devcon." Opp., at 14. The Trustee pursued the Dynasty Trust PJR Application vigorously, including completing a 3-day long PJR hearing, submitting post-hearing briefs, and, after Judge Dabrowski (the presiding judge) retired while the motion was *sub judice*, filing a motion pursuant to Fed. R. Civ. P. 63 asking the Honorable Alan S. Trust, (USBCJ) to certify familiarity with the application and issue a decision. *See* SALDT Action, Doc. No. 149. Judge Trust sat by designation in the District of Connecticut after the Hon. Alan H. W. Shiff retired (Judge Shiff presided over the Goldberg bankruptcy cases for a short period of time after Judge Dabrowski retired). Judge Thompson withdrew the reference of the SALDT Action before Judge Trust ruled on the Rule 63 motion. Judge Thompson never ruled on the Rule 63 Motion or the Trustee's PJR application. Under these circumstances, it is unclear what Marks contends the Trustee could have done to further pursue his PJR application.

[7] Marks also asserts, boldly, "that the formation of DEIPM actually put assets in Scott LaBonte's hands." Opp. at 16. That is inconceivable. SAL owned no legal interest in DEIPM, the MPL 2015 Rev. Trust's property or the property of the trust that is to receive DEIPM upon Marilyn LaBonte's death. *See* Marilyn P. LaBonte 2015 Revocable Trust (attached hereto as **Exhibit C**).

7

successor and that he had personally advised SAL and Roland LaBonte to move its address from Devcon's address, it is unclear how Marks can plausibly ask the Court to infer anything but his intent to further the Enterprise by this time—particularly under the Fed. R. Civ. P. 15(a) futility/ Fed. R. Civ. P. 12(b)(6) standard. *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002); *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013) (drawing all reasonable inferences in plaintiffs' favor).

Thereafter, beginning in June 2015 and continuing to January 2016, Marks drafted (and later amended further) DEIPM's management agreements to add (and later increase) refinance fee provisions that served no purpose other than to allow SAL to siphon *even more* money from certain commercial real estate projects to the MPL 2015 Rev. Trust's bank account through DEIPM. Amended Complaint, at ¶¶ 274-88. Marks knew that SAL received almost all of this money (nearly $2 million in total), because he established the MPL 2015 Rev. Trust's bank account, allowed it to use J&M's office address as its own, received all of the MPL 2015 Rev. Trust's bank statements as a result, and knew that SAL controlled the MPL 2015 Rev. Trust from New England while the MPL 2015 Rev. Trust's Trustee (Marilyn LaBonte) lived in Florida. *Id.*, at ¶¶ 355-59.

Marks is liable as a conspirator because his actions were central and necessary to the Enterprise's unlawful purpose and he acted with knowledge of and intent to further it. *See Glen Flora Dental Center, Ltd. v. First Eagle Bank*, Docket No. 17-cv-9161, 2019 U.S. Dist. LEXIS 161470, at *18 (N.D. Ill. Sep. 23, 2019) (banker liable as a RICO conspirator because "the very nature of the alleged conspiracy confirms that [other actors] could not have carried out the alleged scheme alone . . . [and] they needed [the banker] to facilitate the scheme"); *see also Envtl. Serv.*, 7 F. Supp. 3d at 275 (inferring agreement from words and actions).

Marks repeatedly falls back on the mantra that he merely performed legal services for a standard fee and argues that he "did not derive any financial benefit from" the Enterprise. Opp., at

14. All other things aside, as Marks celebrates repeatedly, he "is an attorney in a two-lawyer firm" that "has no support staff." *Id*., at 3. The LaBonte Family, and the numerous real estate entities they controlled—were significant clients of Marks that at times generated tens of thousands of dollars in fees per year. Amended Complaint, at ¶¶ 19, 357.

Between July 2, 2015, and December, 2020, J&M and Marks received over $46,000 in payment from the MPL 2015 Rev. Trust's bank account, alone, as payment for services rendered to SAL—who had no remaining assets in his own name from which to pay J&M and Marks. Devcon's assets, which Marks helped transfer to DEIPM while the Trustee actively sought to attach them, funded these payments. *Id*., at ¶¶ 355-60.[8] Marks knew that Devcon's/DEIPM's assets funded the payments that he received from the MPL 2015 Rev Trust, because, *inter alia*, he setup the MPL 2015 Rev. Trust's bank account, listed J&M's office as the address on the account and received all of the MPL 2015 Rev. Trust's bank statements. Therefore, Marks knew that SAL could not have paid him and J&M but for the Enterprise that they facilitated. *Contra* Opp., at 25 citing *RSM Production Corp. v. Freshfields Bruckhaus Deringer US LLP*, 401 U.S. App. D.C. 238, 244-2467, 682 F.3d 1043 (2012) (no allegation "that the funds used to pay [law firm] for its legal services were ill-gotten gains" or that firm "committed any of the predicate acts").

III.     Granting the Trustee Leave to Amend Will Not Unfairly Prejudice Marks or J&M

J&M and Marks argue that they will suffer prejudice if the Motion for Leave to Amend is granted and they remain Defendants in this action. More specifically, they argue that the Trustee's claims "have taken a significant toll on [Marks'] and his law partner." Opp., at 27-28. However, the fact that Marks and his law partner would prefer that Marks and his firm not be parties to this

---

[8] The $46,000 Marks received from the MPL 2015 Rev. Trust bank related only to SAL. Marks also provided services to Roland LaBonte, Marilyn LaBonte, DEIPM and other LaBonte family real estate entities and trusts. Amended Complaint, at ¶ 19.

lawsuit does not constitute prejudice in any legally recognized sense.[9] *See e.g.*, *Giuliano v. Everything Yogurt*, 152 F.R.D. 449, 453 (E.D.N.Y. 1994) ("[a]ctual prejudice refers not to the stigma of being a defendant in a civil action…."); *Lickteig v. Cerberus Capital Management, L.P.*, Docket No. 1:19-cv-5263-GHW, 2020 U.S. Dist. LEXIS 240647, at *14 (S.D.N.Y. Dec. 21, 2020) ("additional motion practice and trial preparation is not sufficient to constitute undue prejudice"); *see also United States ex rel Maritime Admin. v. Continental Illinois Nat'l. Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989) ("burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading").

Indeed, as Judge Thompson stated in his February 16, 2021, decision, Dismissing the SALDT Action *without prejudice,* a party's fraudulent and criminal conduct is to be given greater weight than a claim of prejudice. SALDT Action Doc. No. 130, at 4 ("The defendants emphasize that they have spent over $450,000 to defend themselves in this case and the economic and emotional toll on their lives has been equally costly, but the court places greater weight on its conclusions related to the applicability of the crime fraud exception."). Therefore, J&M and Marks have failed to establish prejudice from their continued involvement in this lawsuit.

IV. <u>Conclusion</u>

For foregoing reasons, the Trustee respectfully requests that the Court grant the Motion for Leave to Amend, or, alternatively, if the Court determines that a discreet uncured defect remains, that the Court permit the Trustee to seek leave to correct it.

---

[9] J&M and Marks latch onto an out of context statement made by one of the Trustee's attorneys to the bankruptcy court in January 2019, to suggest that the Trustee brought this action to use "reputational harm" as a "leverage point to force a settlement." Opp., at 1 n.1. While the Trustee's motives are not relevant to the question of whether his Amended Complaint states viable claims against J&M and Marks, the quoted language was made to explain why, back in January 2019, the Trustee believed it made sense to pursue a pre-litigation settlement before expending additional resources on litigation.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE SUBSTANTIVELY CONSOLIDATED
ESTATE OF MICHAEL S. GOLDBERG, LLC AND
MICHAEL S. GOLDBERG

By: */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)
James M. Moriarty (ct21876)
Christopher H. Blau (ct30120)
ZEISLER & ZEISLER, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Tele: (203) 368-4234
Fax: (203) 367-9678
Email: aromney@zeislaw.com
jmoriarty@zeislaw.com
cblau@zeislaw.com

CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: */s/ Aaron A. Romney*
Aaron A. Romney (ct28144)