## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES BERMAN, Chapter 7 Trustee | : | CIVIL CASE NO. |
| for the Substantively Consolidated | : | 3:19-CV-1533 (JCH) |
| Estate of Michael S. Goldberg, LCC | : | |
| and Michael S. Goldberg | : | |
|     Plaintiff, | : | |
| | : | |
|   v. | : | JUNE 4, 2021 |
| | : | |
| SCOTT A. LABONTE, et al., | : | |
|     Defendants. | | |

### RULING ON MOTION FOR LEAVE TO AMEND (DOC. NO. 111)

## I.    INTRODUCTION

Plaintiff, James Berman ("Berman"), acting as trustee for the substantively

consolidated estate of Michael S. Goldberg, LLC and Michael S. Goldberg, brings this

action against defendants, Scott A. LaBonte and various of his family members and

associates, pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO")

Act.  See Compl.  After the defendants moved to dismiss the initial Complaint, the court

permitted certain aspects of Berman's claims to proceed against a subset of the

defendants.  See Order ("Prior Ruling") (Doc. No. 89) at 55.

The court's Prior Ruling, as amended by the court's Order granting Berman's

Motion for Reconsideration, dismissed defendants Paul L Bourdeau ("Bourdeau"),

Robert A. Landino ("Landino"), and Lawrence J. Marks and Juliano & Marks ("Marks

and J & M") from the case without prejudice.  See id.; Min. Entry (Doc. No. 108)

(granting Motion for Reconsideration).  Currently before the court is Berman's Motion for

Leave to Amend the Complaint, in which Berman seeks to amend his allegations

against Bourdeau, Landino, and Marks and J & M.  See Tr.'s Mot. for Leave to Amend Compl. ("Pl.'s Mot.") (Doc. No. 111).

Defendants Bourdeau and Marks and J & M oppose this Motion.  See Bourdeau's Mem. of Law in Opp'n to Tr.'s Mot. for Leave to Amend Compl. ("Bourdeau's Opp'n") (Doc. No. 113); Mem. of Law of Defs. Marks and Juliano & Marks, LLC in Opp'n to Tr.'s Mot. for Leave to Amend Compl. ("Marks and J & M's Opp'n") (Doc. No. 114).  Berman has withdrawn his Motion as to Landino, and the court has already terminated the Motion to Amend as to Landino.  See Notice of Withdrawal of Tr.'s Mot. for Leave to Amend Compl. as to Landino Only (Doc. No. 115); Order (Doc. No. 118) (terminating Motion for Leave to Amend as to Landino).  The court heard oral argument on May 19, 2021.  See Min. Entry (Doc. No. 128).

For the reasons stated below, the court denies in part and grants in part the Motion for Leave to Amend the Complaint.  Berman's Motion is denied as to Bourdeau and granted as to Marks and J & M.

## II.   BACKGROUND

### A.   Initial Complaint and Prior Ruling

Familiarity with the court's Prior Ruling, which recounts the allegations contained in the initial Complaint in detail, is presumed.[1]  See Prior Ruling at 1-11.

Michael S. Goldberg, who is not a party in this case, pleaded guilty to operating a Ponzi scheme that defrauded investors of approximately $30 million.  Prior Ruling at 1.

---

[1] Further, the court notes that, although the entirety of the allegations in the initial Complaint and Proposed Amended Complaint inform the court's analysis, the court does not undertake to recount every allegation in the 129-page Proposed Amended Complaint.

Berman, the plaintiff in the current case, was appointed as bankruptcy trustee and filed adversary actions against the "net-winners" of the Ponzi scheme.  Id. at 3.  Both Scott A. LaBonte ("Scott") and his cousin Edward S. Malley ("Malley") acted as "feeders" who received finder's fees or loan fees by recruiting new investors into the Ponzi scheme. Id.

In May 2010, Malley informed Scott that Berman had filed an adversarial action against them.  Id. at 4.  On June 2, 2010, Scott convened a meeting, discussed in more detail below, at which he developed a plan to shield his assets from Berman.  See id. at 4.  Subsequently, Scott transferred most of his assets, which consisted primarily of interests in real estate held individually and in a revocable trust, to the irrevocable Scott A. LaBonte Dynasty Trust ("SALDT").  Id. at 5.  These transfers, which were backdated to June 2, 2010, were completed on September 9, 2010.  Id. at 5.

Meanwhile, on November 12, 2010, Berman filed an Amended Complaint in the adversarial action against Malley and LaBonte and simultaneously filed Applications for Prejudgment Remedies which sought to attach over $7 million of Scott's assets.  See Compl. ¶ 110.  On February 7, 2011, the Bankruptcy Court entered a stipulated pre-judgment remedy against Scott in the amount of $5 million.  Prior Ruling at 6.  Scott did not disclose the assets he had transferred to the SALDT.  Id.  Further, he used funds from the SALDT for personal and business expenses.  Id.  In total, Scott spent approximately $2.9 million from the SALDT after the entry of the stipulated pre-judgment remedy and thereby rendered the SALDT insolvent.  Id.

As a result of Scott's actions, Berman has been unable to collect on the final judgment the Bankruptcy Court entered against Scott in 2017, despite Berman's

prosecution of four separate fraudulent conveyance actions against Scott and associated individuals and entities, as well as a fifth action to recover funds that Scott transferred to sub-investors.  Id. at 10-11.  On September 27, 2019, Berman initiated the instant action by filing his initial Complaint against Scott and various of his family members, associates, and associated entities.  See Compl.  As relevant here, the initial Complaint sought to raise claims for substantive racketeering, in violation of section 1962(c) of title 18 of the U.S. Code, against Scott, Roland LaBonte ("Roland") (Scott's father), J. Sparveri ("Sparveri") (Scott's accountant), and Sally LaBonte ("Sally") (Scott's wife), and claims for conspiracy to commit racketeering, in violation of section 1962(d), against all defendants--a group that includes Bourdeau, Landino, and Marks and J & M. See Compl. ¶¶ 311-99.

The court's Prior Ruling concluded that the Complaint plausibly alleged a racketeering enterprise involving Scott, Roland, Sally, and Sparveri.  Prior Ruling at 41, 45-47.  The Prior Ruling also determined that the Complaint plausibly alleged the following predicate offenses: bankruptcy fraud, in violation of section 152(7) of title 18 of the U.S. Code; wire fraud, in violation of section 1343; and money laundering, in violation of sections 1956 and 1957.[2]  Id. at 27-31; 34-40.  The Prior Ruling also concluded that the Complaint plausibly alleged RICO conspiracy claims against Scott, Sally, Roland, and Marilyn.  Id. at 41, 44-45, 55.

---

[2] The Prior Ruling determined that the initial Complaint did not plausibly allege obstruction of justice as a predicate offense.  Id. at 31-33.

However, the Prior Ruling concluded that the Complaint did not plausibly allege conspiracy to commit racketeering on the part of Landino, Bourdeau, or Marks and J & M.  Id. at 47-52.  With respect to Bourdeau, the Prior Ruling reasoned that "[t]he fact that Attorney Bourdeau likely knew of the pendency of [Berman]'s litigation against Scott does not plausibly allege that Attorney Bourdeau knew that Scott would loot the transferred assets over the course of five years."  Id. at 50.  Therefore, because "it is the looting of the transferred assets" that constituted "the objective alleged to have been jointly undertaken by the enterprise", the Prior Ruling concluded that the allegations against Bourdeau did not state a claim for conspiracy to commit racketeering.  Id.

Likewise, with respect to Marks and J & M, the Prior Ruling concluded that Marks's actions in providing legal services to Scott and associated entities did "not show that Attorney Marks knew that an enterprise existed to permit Scott, through pretextual means, to continue to access funds attached by the [bankruptcy] estate and then agreed to participate in the scheme by facilitating the transfer."  Id. at 51.  In addition, the Prior Ruling concluded that allegations pertaining to Marks's role in the restructuring of Devcon, an entity operated by members of the LaBonte family, were "insufficient to allege an agreement because [Berman] does not allege that Attorney Marks knew that the new owners of Devcon/DEIPM . . . would allegedly collude to permit Scott to loot LaBonte family assets formally managed by Devcon."  Id. at 52.  The Prior Ruling also noted that the Complaint did "not allege that Attorney Marks received any benefit

5

beyond his customary fees."[3]  Id. at 51.

          1.      Allegations Against Bourdeau in the Initial Complaint

        The allegations in the initial Complaint pertaining to Bourdeau focused on his role in providing legal services in connection with Scott's transfer of assets from his revocable trust to the SALDT in 2010 and in connection with the creation of a document pertaining to a revocable trust associated with Scott's mother, Marilyn LaBonte ("Marilyn").  See Prior Ruling at 49-50.

        In May 2010, Malley informed Scott that Berman had filed an adversary action against them.  Compl. ¶ 57.  After receiving this information, Scott convened a meeting between himself, Roland, Sparveri, and Bourdeau on June 2, 2010.  Id. ¶¶ 62-63.  Notes created by Bourdeau at the meeting "reference a potential 'claw back' by a 'Hartford Trustee[.]'"  Id. ¶ 64.  The Goldberg bankruptcy matters were commenced in the Hartford division of the Bankruptcy Court.  Id.  Bourdeau's notes were produced after Judge Thompson concluded that there was "probable cause to believe that a fraud was committed [by Scott] and that the communications at issue were in furtherance of that fraud."  Id.  Additionally, Bourdeau testified at an October 2018 deposition that, during the June 2010 meeting, Scott was presented with "options he could consider given the situation he was in . . . [w]here he was concerned about a potential claw-back from the Goldberg deal."  Id. ¶ 65.

---

[3] Given that Berman no longer seeks to replead as to Landino, the current Ruling does not discuss the allegations pertaining to Landino, except as necessary to explain the allegations against Bourdeau and Marks and J & M.

Following the June 2010 meeting, Scott transferred his interests in various businesses to the SALDT.  See id. ¶¶ 71-2.  The transfer of Scott's assets was accompanied by the issuance of a promissory note from the SALDT to Scott's revocable trust ("the 2010 Note") and the replacement of a promissory note that had previously been issued from the SALDT to Scott's revocable trust in 2006 with a new note featuring a later maturity date.  Id. ¶¶ 90-94.

On the same date as the June 2010 meeting, Bourdeau emailed Sparveri regarding interest rates to be used in the re-issued promissory note.  Id. ¶ 95.  Sparveri was responsible for drafting the replacement promissory note.  Id.  Bourdeau reviewed Sparveri's draft and stated in an email on June 10, 2020, that the note was "in excellent shape."  Id. ¶ 95.  On September 9, 2010, Attorney Jomarie T. Andrews ("Andrews"), who coordinated obtaining the signatures necessary for the transfers of assets to the SALDT together with Sparveri, emailed Bourdeau and Sparveri fully executed copies of the transfer agreements.  Id. ¶¶ 75, 81.

The second episode described in the initial Complaint as involving Bourdeau relates to the creation of DEIPM, a successor entity to Devcon, a LaBonte family real estate management company.  In July 2014, Berman applied for a Prejudgment Remedy seeking attachment of over $1 million of Devcon's property.  Id. ¶ 223.  As of the filing of the initial Complaint in this case, that application remained pending.  Id. ¶ 224.  In late 2014 and early 2015, Devcon was dissolved and its assets were transferred to DEIPM.  See ¶¶ 225-50.  Berman alleges that DEIPM "served no purposes other than to 'park' Devcon's business for SAL until he could settle with [Berman] for pennies on the dollar based on his purported insolvency."  Id. ¶ 234.

7

In February 2015, Bourdeau helped establish the Marilyn P. LaBonte 2015 Revocable Trust ("the 2015 MPL Trust"), which was made a 99.9% member of DEIPM. See id.  On February 20, 2015, Bourdeau emailed Roland regarding an amendment to the MPL 2015 Trust.  Id. ¶ 235.  Bourdeau mentioned in his email that he "prepared the amendment to Marilyn's existing revocable trust to provide that, if Scott is deceased at the time when you and Marilyn are both deceased, the interest in the new DEI entity [DEIPM] would pass to all of your descendants in the same proportions as your other assets."  Id.  Bourdeau continued: "Scott has requested that if he is then deceased that this [DEIPM] interest pass exclusively to Sally."  Id.  Roland wrote in response to Bourdeau that Roland and Scott shared "an understanding between us to transfer the new company [DEIPM] membership interests to Scott as soon as [h]is current situation allows since he owned 100% of the old DEI corporation [Devcon]", and that, "[t]herefore, the new company should pass to Sally or his heirs in the event of a catastrophe."[4]  Id. ¶ 236.  Bourdeau drafted the MPL 2015 Trust instruments accordingly.  Id. ¶ 238.

2.      Allegations Against Marks and J & M in the Initial Complaint[5]

The allegations in the initial Complaint pertaining to Marks focused on his role in representing Scott in transactions with Scott's business partner Landino and in creating DEIPM.  See Prior Ruling at 50-51.

---

[4] Scott previously held "10 shares of Devcon's Class A Common Stock and 100 shares of Devcon's Class B Common Stock" in his revocable trust, but he transferred these shares to the SALDT as part of the 2010 transfers.  See Compl. ¶ 218.

[5] J & M is a law firm of which Marks is a member.  See Compl. ¶ 19.  The Complaint alleges actions taken by Marks and pleads a claim for vicarious liability against J & M.  See id. ¶¶ 394-99.

Between 2006 and 2012, Scott and Landino developed commercial properties together through joint venture entities.  Compl. ¶¶ 135-36.  Scott's interests in these joint ventures were the subject of the transfers to the SALDT in 2010.  Id. ¶ 138. Subsequently, in a series of transactions beginning in May 2012 and continuing through October 2013, Landino's joint venture entities paid cash for what had been Scott's interests in the joint ventures.  See id. ¶ 156.  Marks represented Scott in connection with these transactions.  Id. ¶¶ 165, 174, 181, 187, 192.

Marks was aware at that time that Berman had secured a prejudgment remedy relating to interests in the joint venture entities, as evidenced by Marks's insertion of language into an agreement between Scott and Landino referencing such an order.  Id. ¶ 166.  Further, Marks was also aware that proceeds from the transactions were being used to satisfy an obligation owed by Scott relating to use of a private jet, because Marks wired money to Bank of America on behalf of Scott in satisfaction of that obligation.[6]  Id. ¶ 168.

With respect to the dissolution of Devcon and formation of DEIPM, Marks was responsible for drafting documents pertaining to the creation of DEIPM.  Id. ¶ 229.  He also registered DEIPM as a Connecticut limited liability company and drafted DEIPM's operating agreement.  Id. ¶¶ 230-31.  Further, Marks appealed the Connecticut Department of Labor's determination that DEIPM was a successor of Devcon and, in

---

[6] Technically, Scott owed this obligation to RCZS, LLC, an entity that owned a private jet.  See Compl. ¶ 117.  Scott was a member of RCZS and used the private jet owned by RCZS.  Id.  The SALDT did not own interests in RCZS.  Id.  Bank of America sued RCZS and its members, and, as a result of that lawsuit, Scott owed an obligation to RCZS, which, in turn, owed an obligation to Bank of America.  See id. ¶ 168.

the course of this appeal, represented that Devcon was dissolved because it lost management contracts and failed to disclose that Roland, the manager of DEIPM, was the father of Scott, Devcon's president.  Id. ¶¶ 252-54.

Marks also was involved in the creation of the 2015 MPL Trust and was copied on Roland's email to Bourdeau mentioning Roland and Scott's "understanding" that interests in DEIPM would be transferred to Scott "as soon as [Scott's] current situation allows."  Id. ¶¶ 234, 236.

      B.     The Proposed Amended Complaint

          1.     New Allegations Against Bourdeau

The Proposed Amended Complaint introduces new allegations pertaining to the general background of Bourdeau's relationship with Scott and knowledge of Scott's affairs, as well as new details concerning the events alleged in the initial Complaint. The Proposed Amended Complaint alleges that Bourdeau warned Scott in 2006 "not to transfer all of his assets to the SALDT because [Scott] . . . was still a young man, and could not lawfully access any assets that he transferred for the SALDT to pay his personal expenses."  Proposed Am. Compl. (Doc. No. 111-1) ¶ 289.  Further, by 2010, Bourdeau was aware that Scott "had many outstanding obligations, including . . . a $3 million note and mortgage to Bank of America secured by a luxury Rhode Island vacation home."  Id. ¶ 292.  Bourdeau's notes from the June 2010 Meeting refer to this $3 million note.  Id.  Bourdeau also knew that Sally was not employed.  Id. ¶ 292.  In addition, Bourdeau "had a longstanding history with Devcon and was familiar with its business" as a result of his work providing estate planning services to Scott.  Id. ¶ 315.

With respect to the events surrounding the June 2010 Meeting, the Proposed Amended Complaint alleges that, on June 11, 2010, Sparveri emailed Scott, Bourdeau, and Andrews with a copy of Scott's balance sheet.  Id. ¶ 82.  This balance sheet indicated that the transfers to the SALDT left Scott with a net worth of "negative $1,381,000--even after crediting the entire face value of the 2006 Note and the 2010 Note."  Id.  In other words, the balance sheet showed that Scott had "transfer[red] more than his entire net-worth to the SALDT, including his entire interest in Devcon."  Id.

Following the June 2010 Meeting, Bourdeau created a time entry stating that the purpose of the meeting was to "discuss estate planning options."  Id. ¶ 295.  However, Bourdeau would later testify at a deposition that the meeting did not concern estate planning.  Id.  Bourdeau later generated an invoice describing the legal services he rendered in connection with the meeting as involving "general advice and representation in connection with the conservation and management of your assets and property interests held for the production of income."  Id. ¶ 294.

In addition, Bourdeau marked his notes from the June 2010 Meeting as "privilege[d]."  Id. ¶ 300.  The only other documents Bourdeau marked as privileged were notes from an April 2011 call with Scott's trial counsel, Attorney Ross Fingold ("Fingold").  Id. ¶ 302.  During the April 2011 call, Fingold informed Bourdeau that Berman was seeking to obtain approximately $8 million from Scott.  Id. ¶ 299.  Bourdeau's notes from this call mention "transfer in June 2010 for notes."  Id. ¶ 300.

With respect to the creation of the 2015 MPL Trust, the Proposed Amended Complaint alleges that Bourdeau helped Marks insert a new signature page in DEIPM's operating agreement in a manner that concealed the fact that a different trust

associated with Marilyn, for which all of Marilyn and Roland's children were designated as beneficiaries, had previously been identified as the 99.9% member of DEIPM. See id. ¶ 233-34. By contrast, Bourdeau structured the 2015 MPL Trust so that interests in DEIPM would pass only to Sally in the event that both Marilyn and Roland died. Id. ¶ 238. Moreover, Bourdeau "responded 'Will do!'" after receiving Roland's email about Roland and Scott's "understanding" that interests in DEIPM should transfer to Scott "as soon as [h]is current situation allows." Id. ¶¶ 239-40, 318-19. Further, Bourdeau had by this time already received a litigation hold from Berman in early 2015 identifying Devcon as a fraudulently transferred interest. Id. ¶ 316.

The Proposed Amended Complaint also describes a dispute between Bourdeau and Scott over a bill ostensibly charged to the SALDT. In October 2013, after Berman served Sparveri with an order related to the pre-judgment remedy, Sparveri resigned as trustee of the SALDT. Id. ¶ 129. Bourdeau sent Scott a bill, charged to the SALDT, for legal services related to Sparveri's resignation. Id. ¶¶ 129, 305-06. In an accompanying cover letter, Bourdeau stated: "Dear Scott . . . Joe [Sparveri] is entitled to reimbursement for reasonable legal expenses from the trust . . . . Therefore, these expenses should be paid from the [SALDT]." Id. ¶ 307. Scott complained to Bourdeau in an email that "[i]t's not fair to do work at Joe's request and for his benefit and then send me a bill without ever checking with me." Id. ¶ 308. Bourdeau did not send this bill to Sally or Roland, who remained as the only trustees of the SALDT after Sparveri's resignation. Id. ¶ 310. Further, Bourdeau later described this episode in his deposition as "when I billed Scott LaBonte for that work." Id. ¶ 311.

Finally, the Proposed Amended Complaint alleges that, in June 2014, Berman

sent Bourdeau a litigation hold letter pertaining to the SALDT transfers.  Id. ¶ 312.  The

litigation hold letter directed Bourdeau, inter alia, to "suspend any routine document

destruction policy and place a 'litigation hold' on all electronically stored information.'"

Id. ¶ 313.  After receiving this letter, and through at least October 2018, Bourdeau

continued to delete emails pertaining to Scott and the LaBonte family.  Id. ¶ 314.

2.    New Allegations against Marks

The Proposed Amended Complaint introduces new details regarding Marks's role

in the transactions between Scott and Landino and the creation of DEIPM.  With regard

to the transactions between Scott and Landino pertaining to interests in joint venture

entities, the Proposed Amended Complaint alleges new facts concerning Marks's

knowledge that Scott was using proceeds from these transactions, which belonged to

the SALDT, to satisfy Scott's obligation to RCZS relating to the use of a private jet.

The lawsuit filed by Bank of America against RCZS and its members, including

Scott, was filed in May 2012.  Proposed Am. Compl. ¶¶ 321-22.  Marks negotiated a

resolution of this litigation on behalf of Scott and therefore was aware that Scott was

required to make payments to Bank of America.  See id. ¶ 322.  Marks arranged for the

resolution of the Bank of America litigation to coincide with the transactions between

Scott and Landino pertaining to the joint venture entities, so that proceeds from these

transactions could be used to satisfy the obligation owed by Scott to RCZS, which, in

turn, owed an obligation to Bank of America.  Id. ¶ 323.  Indeed, Berman alleges that

Marks specifically "told Landino's counsel that the resolution of the [Bank of America]

Action had to coincide with SAL's transfer of . . . [the joint venture entities]."  Id. ¶ 323.

13

Marks's law firm received the share of the proceeds of each transaction that was owed to SALDT, and Marks therefore knew that these proceeds did not belong to Scott.  See id. ¶ 325.

Marks accomplished this result by transferring proceeds from these transactions directly from Marks's IOLTA account to Bank of America.  Id. ¶ 326.  Marks did so, even though Scott had already transferred his interests in the joint venture entities to the SALDT in 2010.  See id. ¶¶ 324-25.  As alleged in the initial Complaint and re-alleged in the Proposed Amended Complaint, Marks knew at that time that Berman had secured a prejudgment remedy relating to interests in the joint venture entities, as evidenced by Marks's insertion of language into an agreement between Scott and Landino referencing such an order.  Compl. ¶ 166

With respect to the replacement of Devcon with DEIPM, Marks emailed Roland on November 6, 2014, stating that "[i]t would be a great time to move to a new address if you understand my meaning."  Proposed Am. Compl. ¶ 338.  Around the same time, Marks negotiated a lease for DEIPM to use office space located in the same building previously occupied by Devcon, but one floor lower.  Id.  Berman alleges that Marks specifically advised Scott and Roland to move the DEIPM office "in order to decrease the likelihood that [Berman] would detect, and be able to prove, that DEIPM was Devcon's successor."  Id. ¶ 247.  Subsequently, Marks drafted letters to Devcon customers and the Connecticut Department of Labor representing that DEIPM was a materially different organization than Devcon.  Id. ¶¶ 343, 345.  Nevertheless, he simultaneously coordinated actions that achieved no purpose other than moving assets from Devcon to DEIPM.  See id. ¶¶ 349-52.

14

Further, during this time, Marks was paid for his services by checks issued by the MPL 2015 Trust that had been signed using stamps of Marilyn LaBonte's signature and which had been mailed from Connecticut and Rhode Island addresses, where Scott lived.  See id. ¶¶ 14, 356-58.  However, Marilyn primarily lived in Florida during this time, and Roland (her husband) commented on the "warm weather down south" in emails to Marks during this same general time period.  See id. ¶¶ 358-59.  The bank account associated with the MPL 2015 Trust used J & M's address.  Id. ¶ 351.

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend a complaint should "freely" be given "when justice so requires."  Fed. R. Civ. P. 15(a).  The Supreme Court has instructed that leave to amend should be granted "[i]n the absence of . . . undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies previously allowed, undue prejudice . . . [or] futility of amendment."  See Foman v. Davis, 371 U.S. 178, 182 (1962).   A proposed amendment to a pleading is futile if the relevant aspect of the amended pleading would be subject to dismissal under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  See Pettaway v. Nat'l Recovery Sols., 955 F.3d 299, 304 (2d Cir. 2020) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)).

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the non-movant's favor.[7]  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

## IV.    DISCUSSION

As explained above, the court's Prior Ruling concluded that the initial Complaint did not plausibly allege conspiracy to commit racketeering against Bourdeau, on the ground that "[t]he fact that Attorney Bourdeau likely knew of the pendency of [Berman]'s litigation against Scott does not plausibly allege that Attorney Bourdeau knew that Scott would loot the transferred assets over the course of five years."  Prior Ruling at 50. Similarly, the Prior Ruling dismissed the RICO conspiracy claim against Marks and J & M, because the allegations in the initial Complaint did "not show that Attorney Marks knew that an enterprise existed to permit Scott, through pretextual means, to continue to access funds attached by the estate and then agreed to participate in the scheme by facilitating" the Landino transactions."  Id. at 51.  The Prior Ruling also concluded that "the information is insufficient to allege an agreement because [Berman] does not allege that Attorney Marks knew that the new owners of Devcon/DEIPM, Marilyn as trustee

---

[7] Although Berman filed the instant Motion to Amend, he effectively is the non-movant for the purposes of Rule 12(b)(6).

and Roland as manager, would allegedly collude to permit Scott to loot LaBonte family

assets." Id. at 52.

The elements of a RICO conspiracy claim are as follows:

(a) [ ] an agreement to join a racketeering scheme, (b) [ ] the defendant's
knowing engagement in the scheme with the intent that its overall goals be
effectuated, and (c) that the scheme involved, or by agreement between any
members of the conspiracy was intended to involve, two or more predicate acts
of racketeering.

See United States v. Zemlyansky, 908 F.3d 1, 11 (2d Cir. 2018).  The Second Circuit

has observed that, "[u]nlike 'basic' conspiracy, RICO conspiracy does not require proof

that a defendant knowingly agreed to facilitate a specific crime (e.g., mail fraud)." Id.

Rather, "it suffices to show that [a defendant] intended that the broad goals of the

racketeering scheme be realized, along with evidence that some (or any) members of

the conspiracy intended that specific criminal acts be accomplished." Id.

Thus, the essence of the court's Prior Ruling was that, in order to allege that

Bourdeau and Marks intended for the broad goals of the enterprise to be realized,

Berman needed to allege facts supporting a reasonable inference that they plausibly

intended both that Scott's assets would be transferred in a manner that would frustrate

Berman's claw-back efforts and that Scott would undertake to deplete these assets.

The Prior Ruling construed Berman's conspiracy claims in this manner because, with

respect to each of the predicate offenses that the Prior Ruling permitted to proceed, the

Prior Ruling determined that allegations pertaining to both transferring Scott's assets

and depleting these assets were required to state a claim.  Prior Ruling at 30

(bankruptcy fraud); id. at 35, 38 (wire fraud); id. at 39-40 (money laundering).

Consistent with the approach taken by the Prior Ruling, the Second Circuit has

17

observed, albeit in a summary order, that "a fraudulent conveyance does not constitute an act of racketeering." Apollon Waterproofing & Restoration, Inc. v. Bergassi, 87 F. App'x 757, 760 (2d Cir. 2004) (summary order) (citing 18 U.S.C. § 1961(1)(A)).

The court notes that precedents involving the conduct of attorneys in relation to alleged RICO conspiracies appear to focus primarily on examples of allegations at the extremes. It is clear, on the one hand, that a plaintiff fails to state a claim for RICO conspiracy under section 1962(d) if "the complaint alleges no conduct by [counsel] beyond the provision of normal legal services." See RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP, 682 F.3d 1043, 1051 (D.C. Cir. 2012). On the other hand, a claim should be allowed to proceed beyond a motion to dismiss if it alleges facts supporting a reasonable inference that an attorney "perform[ed], under the guise of [ ] legal services, illegal acts, such as devising a fraudulent scheme to manipulate the bankruptcy process." Id. (citing Handeen v. Lemaire, 112 F.3d 1339, 1350-51 (8th Cir. 1997)). Further, a plaintiff may "provide a detailed claim of wrongdoing by [ ] attorney defendants" that is grievable, or even actionable under a different theory of liability, but that does not give rise to a "path to relief based on . . . RICO." See Domanus v. Locke Lord LLP, 847 F.3d 469, 483 (7th Cir. 2017).

Between these general guideposts, there is a relative dearth of case law concerning close cases, that is, cases addressing allegations that fall just short of pleading a RICO conspiracy claim against an attorney, or allegations that are just barely sufficient to plead such a claim. The court views the instant dispute as a close case, i.e., not as a case at either of the extremes that are the primary focus of precedents involving RICO claims filed against attorneys.

18

A.    <u>Bourdeau</u>

With respect to the June 2010 meeting and the subsequent transfers to the SALDT, Bourdeau's receipt of Scott's balance sheet indicating that the SALDT transfers left Scott with a negative net worth alerted Bourdeau to the fact that Scott was rendering himself insolvent.  <u>See</u> Proposed Am. Compl. ¶ 293.  Bourdeau should have realized that, given the situation and Scott's outstanding obligations, Scott would likely seek to access the transferred funds in the future.  <u>See</u> <u>id.</u>  Similarly, the allegation that Bourdeau had previously advised Scott, in 2006, not to transfer a great share of his assets to the SALDT provides some additional support for the notion that Bourdeau should have expected that Scott would seek to access assets held by the SALDT.  <u>See</u> <u>id.</u> ¶ 289.

Further, although the Proposed Amended Complaint alleges that Bourdeau did not receive the balance sheet until shortly after the June 2010 meeting, this allegation casts the allegations concerning the June 2010 meeting itself, re-alleged from the initial Complaint, in a different light.  As alleged in the initial Complaint and re-alleged in the Proposed Amended Complaint, Bourdeau attended the June 2010 meeting, created notes referencing a potential "claw back" by a "Hartford Trustee", and opined on a promissory note relating to the transfers to the SALDT.  Compl. ¶¶ 62-64, 95. Bourdeau's receipt of the balance sheet "immediately thereafter", reflecting Scott's insolvency, provides support for an inference that, beginning when Bourdeau participated in the June 2010 meeting and opined on promissory notes relating to the SALDT transfers, Bourdeau could have known that Scott might attempt to loot the transferred assets.  <u>See</u> Proposed Am. Compl. ¶ 293.  Bourdeau's email, sent on the

19

same date as the meeting, stating that the re-issued promissory note was "in excellent shape", suggests some degree of active participation in implementing the plan formed at the meeting. See Compl. ¶ 95.

These allegations are also cast in a different light by the new allegations concerning the billing dispute and the creation of the 2015 MPL Trust. With respect to the October 2013 billing dispute stemming from Sparveri's resignation, the fact that Bourdeau sent the SALDT bill to Scott--and not to Sally or Roland, who were at that time the only trustees of the SALDT--suggests that the events in 2010 left Bourdeau with the understanding that Scott would retain control over decisions concerning management of the SALDT. See Proposed Am. Compl. ¶¶ 129, 305-11.

As for events pertaining to the structuring of the 2015 MPL Trust, Bourdeau's emphatic response ("Will do!") to Roland's email concerning Roland and Scott's "understanding" that interests in DEIPM should eventually pass to Scott should have alerted Bourdeau to the fact that Scott still desired to access assets that Scott had transferred out of Berman's reach.[8] See id. ¶¶ 239-40. Bourdeau's response to Roland's email is particularly troubling, given that Roland's email expressed a clear intent both to frustrate Berman's claw-back efforts and to give Scott the benefit of the transferred assets. See id. ¶ 239. Notably, Roland's email mentioned that Scott "owned 100% of the old DEI corporation", i.e., Devcon, which was part of the purportedly irrevocable 2010 transfers to the SALDT that Bourdeau helped facilitate.

---

[8] The court notes that, although the 2015 MPL Trust is a revocable trust, Scott's interests in Devcon, the predecessor entity to DEIPM, were included in the transfer to the SALDT, an irrevocable trust. See Compl. ¶ 218.

See id. ¶¶ 82, 239.  Further, Bourdeau helped Marks obscure the fact that the revocable 2015 MPL Trust, unlike Marilyn's previous revocable trust, would pass DEIPM interests to Sally, rather than to all of Marilyn and Roland's children, in the event that Marilyn and Roland died.  Id. ¶¶ 233-34.

Nevertheless, although the new allegations in the Proposed Amended Complaint, when read together with the facts re-alleged from the initial Complaint, and when accepted as true and viewed together with all reasonable inferences that could be drawn in Berman's favor, suggest that Bourdeau engaged in conduct that is less than admirable, they do not support a reasonable inference that Bourdeau knew that a RICO conspiracy existed to permit Scott to loot assets that had been transferred out of Berman's reach, nor that Bourdeau agreed to join such a conspiracy.  With respect to the June 2010 meeting, Berman's allegations support an inference only that Bourdeau should have known that Scott might seek to access the transferred funds at some point in the future.  The allegations pertaining to the billing dispute suggest that Bourdeau might have known that Scott retained some degree of informal control over how the SALDT's assets were managed, thus providing an opportunity for looting.  However, the subject of the billing dispute was not a bill that pertained to Scott's personal interests but rather to Sparveri's legal expenses incurred in connection with Sparveri's resignation as a trustee of the SALDT.  See id. ¶¶ 306-10.  Berman does not suggest that it was improper for the SALDT to pay for these expenses and, in fact, he quotes from an email written by Bourdeau, in which Bourdeau correctly explains why the expenses should be paid by the SALDT.  See id. ¶ 307.

Bourdeau's emphatic response to Roland's email regarding DEIPM is the most troubling allegation against Bourdeau, given that Roland spelled out for Bourdeau the connection between Scott's former interests in Devcon (which Bourdeau knew had been transferred to the SALDT) and the interests in DEIPM held by the 2015 MPL Trust.  See id. ¶¶ 239-40.  However, this two-sentence response, sent years after the 2010 transfers to the SALDT, is simply not enough to transform the remainder of the allegations against Bourdeau into a plausible RICO conspiracy claim.  Further, the gravamen of Roland's email was not that Scott was looting transferred assets but rather that Scott still desired to access a subset of the transferred assets at some undetermined point in the future.  The court also notes that, although Bourdeau was involved in the 2010 transfers to the SALDT, which involved Devcon, the allegations in the Proposed Amended Complaint do not suggest that Bourdeau's familiarity with Devcon went beyond a basic understanding that it was a real estate management company that Scott formerly owned.  Therefore, the court denies the Motion to Amend, as to Bourdeau.[9]

B.    Marks and J & M

The new allegations pertaining to Marks's involvement in the May 2012-October 2013 Landino transactions support an inference that Marks knew Scott was using

---

[9] Berman's Reply in support of his Motion for Leave to Amend, with respect to Bourdeau, references "handwritten notes produced on February 9, 2021", which show that "Bourdeau participated in a [January 2015] conference" regarding the replacement of Devcon with DEIPM.  See Goldberg Tr.'s Reply in Further Supp. of Mot. to Amend as to Bourdeau (Doc. No. 116) at 7 n.9.  As Berman acknowledges, these notes "are outside the Amended Complaint."  Id.  The court does not consider these allegations for the purposes of this Ruling: counsel cannot amend the Proposed Amended Complaint through a Reply.

proceeds from the transactions to satisfy Scott's obligation in connection with Bank of America's lawsuit against RCZS and its members, which included Scott.  See Proposed Am. Compl. ¶¶ 321-32.  Marks facilitated Scott's use of these funds for this purpose, over the course of multiple transactions, despite the fact that Scott had already transferred his interests in the Landino joint venture entities to the SALDT.  Id. ¶¶ 324-25.

The court's Prior Ruling acknowledged that Marks facilitated "a payment to Bank of America to settle an obligation . . . for use of a private jet", despite the fact that Marks "knew that [Berman] had obtained a pre-judgment remedy order entered against Scott."  See Prior Ruling at 51.  However, the new allegations in the Proposed Amended Complaint demonstrate a depth of knowledge and involvement on Marks's part, with respect to Scott's use of assets that belonged to the SALDT, that provides a different view of the entirety of the allegations against Marks.  Accepting the allegations in the Proposed Amended Complaint as true, Marks represented Scott in the negotiations that resulted in Scott's obligation to RZCS relating to use of a private jet and therefore understood the personal nature of this obligation.  See Proposed Am. Compl. ¶¶ 321-22.  Further, it is now alleged that Marks routed the proceeds of the Landino transactions through his firm's IOLTA account and told Landino's counsel that the transaction needed to be timed to coincide with Scott's payment of his obligation to RCZS.  Id. ¶¶ 323, 326.

The Prior Ruling characterized Marks's role in funneling proceeds from these transactions to Bank of America as "[t]he only exception" to the general proposition that Marks did not know "how the [SALDT] planned to dispose of the assets."  Prior Ruling at

23

51.  However, the new allegations in the Proposed Amended Complaint, when read together with the allegations re-alleged from the initial Complaint, reflect a deliberate, considered effort to facilitate Scott's looting of assets that belonged to the SALDT, over the course of multiple transactions, and to do so in a manner that would evade detection.  See Proposed Am. Compl. ¶¶ 323-26.

Further, the allegations of Marks's intimate involvement in the dissolution of Devcon and DEIPM, including actively misrepresenting the nature of Devcon's dissolution to the Connecticut Department of Labor, reflects a willingness to reengage in the scheme to hide Scott's assets from Berman in a manner that would facilitate looting. The allegations against Marks pertaining to Devcon and DEIPM, on their own, would suggest only that Marks knowingly agreed to join a scheme to transfer funds out of Berman's reach.  See id. ¶¶ 334-51.  However, Marks took these actions having previously facilitated looting of transferred assets in connection with the Landino joint venture transactions.  Further, accepting the allegations as true and drawing all reasonable inferences in Berman's favor, the allegations concerning the nature of Marks's involvement in the creation of DEIPM, such as his November 6, 2014 tongue-in-cheek message to Roland, stating that "[i]t would be a great time to move to a new address if you understand my meaning", id. ¶ 338, as well as Marks's misrepresentations to the Connecticut Department of Labor, id. ¶¶ 257-61, are indicative of a willingness to undertake deceptive conduct for Scott's benefit.

The court also considers these allegations in connection with the new allegations pertaining to checks that were issued by the MPL 2015 Trust.  See id. ¶¶ 356-60. Stripped of conclusory assertions, the relevant allegations on this issue are that: (i) the

checks issued by the MPL 2015 Trust to J & M were signed using a stamp of Marilyn's signature; (ii) the checks were mailed from addresses in Connecticut and Rhode Island; (iii) Roland (Marilyn's husband) commented on "the warm weather down south" in an email to Marks; and (iv) Marks permitted a bank account associated with the 2015 MPL Trust to use J & M's address.  See id. ¶¶ 351, 356-60.  Construing these allegations as sufficient to support an inference of knowledge with respect to looting requires the court to infer that Marks assumed from passing comments in emails about local weather and the return addresses on envelopes that Scott was surreptitiously using a stamp of Marilyn's signature.  The allegations specific to the checks cannot bear the weight of this inference on their own, but the depth of Marks's involvement in the Landino transactions, as well as the structuring of DEIPM, casts these allegations in a different light.

The court concludes that, viewed in combination, the allegations concerning all of the above episodes support a reasonable inference that Marks agreed to join a scheme to facilitate Scott's looting of assets transferred beyond Berman's reach, and that Marks did so with knowledge of the scheme's purpose.[10]  Marks's role in funneling assets

---

[10] Marks emphasizes language from In re Trilegiant Corp., Inc., 11 F. Supp. 3d 82 (D. Conn. 2014), stating that the plaintiffs in that case failed to plead the agreement element of their RICO conspiracy claims, because they did not allege "how or when all of the Defendants formed such an agreement."  See Marks and J & M's Opp'n at 22 (quoting In re Trilegiant Corp., Inc., 11 F. Supp. 3d at 108-09).  In that case, however, the court determined that the plaintiffs failed to allege a RICO enterprise. In re Trilegiant Corp., Inc., 11 F. Supp. 3d at 108-09.  By contrast, the Prior Ruling in the current case found that Berman "plausibly alleged the existence of an enterprise as to the LaBonte family."  Prior Ruling at 41.  Thus, the issue before the court, with respect to the agreement element, is whether Marks agreed to join the scheme operated by that enterprise.  See id. at 41-42.  The court is unaware of any binding authority requiring that a plaintiff allege that all of the members of a RICO conspiracy came together at the same moment to form an agreement.  Indeed, the Prior Ruling permitted conspiracy claims to proceed against Marilyn and Sally, who, like Marks, were not present at the June 2010 meeting. See id. at 4, 41-42, 44, 55.

belonging to the SALDT to satisfy Scott's obligation to RCZS, over the course of multiple transactions, implies an agreement to join the scheme as early as May 2012. See Proposed Am. Compl. ¶¶ 321-32.  Marks's conduct in connection with the dissolution of Devcon and creation of DEIPM indicates that Marks's engagement in the scheme continued beyond the Landino transactions and involved several acts of deception that, viewed together with the entirety of the allegations against Marks, support a reasonable inference that Marks willfully helped Scott loot assets that were hidden from Berman.  See id. ¶¶ 333-49.  Therefore, the court concludes that the allegations in the Proposed Amended Complaint reasonably support inferences of agreement and knowledge on Marks's part sufficient to state a plausible claim for RICO conspiracy.  The court grants Berman's Motion to Amend, as to Marks and J & M.[11]

## V.     CONCLUSION

For the reasons discussed above, the court denies in part and grants in part Berman's Motion for Leave to Amend the Complaint (Doc. No. 111).  Berman's Motion is denied as to Bourdeau, and granted as to Marks and J & M.

**SO ORDERED.**

Dated this 4th day of June, 2021, at New Haven, Connecticut.

 /s/ Janet C. Hall
Janet C. Hall
U.S. District Judge

---

[11] Berman's Reply in support of his Motion for Leave to Amend, with respect to J & M, references the same "handwritten notes produced on February 9, 2021" discussed above, supra 17 n.4, in connection with Bourdeau.  See Goldberg Tr.'s Reply in Further Supp. of Mot. to Amend as to Marks and J & M (Doc. No. 117) at 5 n.5.  The court does not consider these allegations for the purposes of this Ruling.